# UNITED STATES DISTRICT COURT FOR THE
## DISTRICT OF COLUMBIA

|  |  |
|---|---|
| ALLIANCE TO SAVE THE MATTAPONI,<br>387 Shilo Road, King & Queen, VA  23085<br><br>THE CHESAPEAKE BAY FOUNDATION, INC.,<br>1108 East Main Street, Suite 1600,<br>Richmond, VA  23219-3539<br><br>and SIERRA CLUB, VIRGINIA CHAPTER,<br>422 E. Franklin Street, Suite 302,<br>Richmond, VA  23219<br><br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES ARMY CORPS OF ENGINEERS,<br>Headquarters, 441 G Street, NW, Washington, DC<br>20314<br><br>FRANCIS J. HARVEY, in his official capacity as<br>Secretary Of The Army, 101 Army Pentagon,<br>Washington, D.C. 20310<br><br>CARL STROCK, in his official capacity as<br>Chief of Engineers and Commanding General of the<br>U.S. Army Corps of Engineers, Headquarters,<br>441 G Street, NW, Washington, D.C.  20314<br><br>and WILLIAM T. GRISOLI, in his official capacity as<br>Brigadier General, Commander and Division Engineer<br>of the U.S. Army Corps of Engineers, North Atlantic<br>Division, 302 General Lee Avenue, Fort Hamilton<br>Military Community, Brooklyn, NY 11252-6700<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)      Civil Action No.<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## COMPLAINT

## NATURE OF ACTION

1.      This action challenges the issuance of a permit under Section 404 of the

Clean Water Act, 33 U.S.C. § 1344, by the United States Army Corps of Engineers (the

"Corps") to the City of Newport News ( "Newport News") to construct a 1,526-acre

reservoir in King William County, Virginia ("King William Reservoir" or "Reservoir").

The Corps issued Department of the Army Permit No. 93-0902-12 to Newport News on

15 November 2005. The fill and discharge that this permit allows will result in the single

largest authorized destruction of wetlands in Virginia and in the entire mid-Atlantic

region in the history of the Clean Water Act. The Corps' action overturns the 2001

recommended decision of the Norfolk (Virginia) District of the Corps ("Norfolk

District") and violates substantive and procedural provisions of the Clean Water Act, 33

U.S.C. §§ 1251 et seq. ("Clean Water Act"), the National Environmental Policy Act, 42

U.S.C. §§ 4321 et seq. ("NEPA"), and the Chesapeake 2000 Agreement, and is arbitrary

and capricious, an abuse of discretion, and otherwise not in accordance with the law in

violation of the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-706.

2.      The Reservoir will be constructed on Cohoke Creek, a tributary to the

Pamunkey River, and will inundate much of the Cohoke Creek watershed. Up to 75

million gallons per day ("mgd") of water will be withdrawn from the Mattaponi River to

supply water to the Reservoir. The Mattaponi and Pamunkey Rivers join to form the

York River downstream of the project and are tributaries to the Chesapeake Bay. Water

withdrawn from the Reservoir will be transferred by pipeline to Newport News' existing

storage and treatment facilities. The Reservoir is the primary component of a water supply proposal intended to meet the long-term water needs of the Lower Peninsula region of Virginia through the year 2040.

3.      The Corps' issuance of the Section 404 permit will result in the significant degradation of a large and valuable wetland complex and other unique aquatic resources in violation of the Clean Water Act. The project involves the excavation, fill, and flooding of over 400 acres of freshwater wetlands and the elimination of 21 miles of free-flowing perennial and intermittent streams to build the 1700-foot long dam and Reservoir. The impoundment of Cohoke Creek will impact an additional 105 acres of wetlands downstream of the project because of reduced flows. The project will also destroy important riparian and forested habitat, flood a great blue heron rookery, and adversely impact certain rare species, as well as infringe upon sites that are vital to the culture and history of Native American tribes in the area.

4.      Water withdrawals from the Mattaponi River will affect the flows and salinity patterns in the River, and will impair critical spawning grounds of the American shad, an anadromous fish species that has been in steady decline in the Commonwealth of Virginia for the past several decades. According to the Virginia Marine Resources Commission, the intake structure will be located in "the most productive region, of one of the most productive sub-estuaries of the Chesapeake Bay with respect to American shad." Letter from Tony Watkinson to Brian Ramaley (16 May 2003). The Mattaponi River is considered "one of the most significant natural habitats in the eastern United States." Letter from EPA Region III to Norfolk District Engineer (13 Nov. 1996).

5.    These substantial impacts to wetlands and other important natural resources are completely avoidable. The Corps' own studies and conclusions show that Newport News' future water needs are less than half of projections shown and relied upon in the Corps' 1997 Final Environmental Impact Statement ("1997 Final EIS") to justify the Reservoir. The Norfolk District Commander of the Corps found in his 2001 final decision recommending denial of the permit that the Reservoir therefore was not justified. Further, the Norfolk District Commander found that there were alternatives available to satisfy the lower demand. The Corps' issuance of the Section 404 permit where the Reservoir is unnecessary and there are practicable and less damaging alternatives available violates the Clean Water Act.

6.    The wetland mitigation measures that Newport News has proposed cannot offset the unprecedented and permanent destruction of the diverse and complex wetland and aquatic ecosystem. The wetlands that will be destroyed are aquatic resources of national importance as a result of their diverse type, quantity, and functional values. Wetlands in the Chesapeake Bay watershed are also recognized as nationally significant, and their importance is recognized worldwide under the Ramsar Convention Treaty as wetlands of international significance. The Corps' action in issuing the Section 404 permit where the project will cause significant adverse environmental impacts that cannot be eliminated or minimized by mitigation violates the Clean Water Act. Further, the Corps' action in issuing the Section 404 permit violates the objectives of the Chesapeake 2000 Agreement to achieve a no-net loss of wetland acreage and functions in the Chesapeake Bay states.

7.    NEPA requires the Corps to fully analyze the environmental impacts and alternatives to a proposal in an EIS and to prepare a Supplemental EIS when there are significant changes in the project or significant new circumstances or information relevant to environmental concerns. The Corps' failure to prepare a Supplemental EIS and its failure thoroughly and accurately to consider the impacts of the Reservoir and a full range of alternatives in its 1997 Final EIS, including alternatives that would reflect the significantly reduced water needs projections for the region, violate NEPA.

8.    Plaintiffs ask the Court to: (1) declare that the Corps violated its statutory and regulatory duties under the Clean Water Act, NEPA, the Chesapeake 2000 Agreement, and the APA; (2) issue an injunction requiring the Corps to rescind the Section 404 permit for the King William Reservoir; (3) issue an injunction requiring the Corps to prepare a revised EIS or a Supplemental EIS; and (4) award to the Plaintiffs their costs and expenses of this action, including reasonable attorneys' fees and expert witness fees.

## JURISDICTION AND VENUE

9.    This action arises under the Clean Water Act, 33 U.S.C. §§ 1251 et seq., NEPA, 42 US.C. §§ 4321 et seq., and the APA, 5 U.S.C. §§ 701-706. This Court has jurisdiction of this action pursuant to 28 U.S.C. § 1331 (federal question), 28 U.S.C. § 1361 (mandamus), and 28 U.S.C. §§ 2201 and 2202 (declaratory and further relief).

10.    Venue is proper in this Court under 28 U.S.C. § 1391(e) and 5 U.S.C. § 703 because defendant United States Army Corps of Engineers resides at 441 G Street, N.W., Washington, D.C., 20314, where its headquarters are located.

## PARTIES AND STANDING

11.    Plaintiffs are the Alliance to Save the Mattaponi ("Alliance"), The Chesapeake Bay Foundation, Inc. ("CBF"), and the Virginia Chapter of the Sierra Club ("Sierra Club") (collectively referred to as "Plaintiffs"). As alleged below, Plaintiffs have participated extensively in the public processes relating to the Clean Water Act Section 404 permit and in the public processes relating to the state permits needed for the project. Plaintiffs brought an action in Virginia state court challenging the Virginia State Water Control Board's ("SWCB") issuance of a Virginia Water Protection Permit ("VWP Permit") authorizing the withdrawal of up to 75 mgd of water from the Mattaponi River, and they participated in the public hearings before the Virginia Marine Resources Commission ("VMRC") on the issuance of a permit for the water intake structure and pipelines for the Reservoir. Plaintiffs have maintained throughout the federal and state permitting proceedings that the Reservoir project will irrevocably harm their interests by disturbing the ecology of the Mattaponi and Pamunkey Rivers and Cohoke Creek. Plaintiffs have exhausted their administrative remedies.

12.    Plaintiff Alliance is an unincorporated local grassroots coalition located in King William and King and Queen Counties, Virginia, dedicated to protecting the Mattaponi River and the Cohoke Creek watershed. The Alliance has participated fully in the public proceedings relating to the Reservoir, submitting, *inter alia*, comments on the Draft and 1997 Final EISs and presenting additional information to the North Atlantic Division of the Corps warranting a supplemental EIS. The Alliance currently has over 1,100 supporters, including 1) property owners on the Mattaponi and Pamunkey Rivers and on Cohoke Creek, 2) members who derive their livelihoods from these resources, and 3) members who use these resources for a wide variety of purposes, including agriculture,

water supply, boating, fishing and recreation. The Alliance members' interests would be harmed by construction and operation of the Reservoir because it would disturb the ecology of the Mattaponi and Pamunkey Rivers and Cohoke Creek and reduce flows in the Mattaponi River. Alteration of salinity patterns in the Mattaponi River would also adversely impact the interests of Alliance members who have used and continue to use the River to irrigate their farmlands. In addition, the effects of the project on the River's ecology and the noise of the Reservoir's raw water intake and pumping station on the Mattaponi River will negatively impact certain Alliance members who live in close proximity to these operations. These members' use of the River for swimming, boating, and fishing will be adversely affected, diminishing the enjoyment and value of their property. Defendants' actions and violations of law directly and irreparably harm the particularized interests of members of the Alliance. The relief requested of this Court would redress these injuries because construction of the Reservoir cannot go forward without the Section 404 permit.

13.    Plaintiff CBF is a Maryland nonprofit corporation registered to do business in the Commonwealth of Virginia with offices in, among other places, Richmond and Norfolk, Virginia. CBF is the largest conservation organization dedicated to protecting the Chesapeake Bay watershed and its tributaries, including the Mattaponi and Pamunkey Rivers. CBF has approximately 117,000 total members, and about 40,000 of these members reside in Virginia. CBF has participated fully in the public proceedings relating to the Section 404 permit application, submitting, *inter alia*, comments on the Draft and 1997 Final EISs and Newport News' conceptual wetlands mitigation plan. Among other issues, these comments focused upon the magnitude and significance of the

wetland and aquatic losses that the Reservoir will cause in the Chesapeake Bay watershed and the inability to mitigate for these losses. The Reservoir will injure CBF members who regularly use and enjoy the Mattaponi and Pamunkey Rivers and adjacent watersheds, for swimming, bird watching, boating, kayaking, canoeing, fishing, hunting, hiking, and other recreational, aesthetic, and educational pursuits. A number of CBF members own property along the Mattaponi River, including members who live in the vicinity of the proposed raw water intake and pumping station for the Reservoir. These members use the river for fishing, swimming, boating and environmental education purposes. The interests of these members will be harmed by the ecological damage that the raw water intake and pumping station for the Reservoir will have on the Mattaponi River and its aquatic species, including American shad, through increased salinity levels and decreased flow rates. Additionally, the noise of the pumping station will adversely affect these CBF members' use of the river for aesthetic purposes as well as for swimming and boating.

14.     The Reservoir will also injure CBF's corporate efforts to protect and enhance the Chesapeake Bay and its resources. CBF operates several educational programs in and around the Mattaponi, Pamunkey, and York Rivers that will be impacted by the creation of the proposed Reservoir and pipeline. For example, CBF's Education Department has conducted numerous student field investigations in the area with elementary, middle, and high schools from around the state. CBF has also conducted teacher training programs with state university graduate schools (CBF's Chesapeake Classrooms program). This program is designed to instruct teachers or those studying to become teachers about the ecology of the river and riparian ecosystems and their relation

to the Chesapeake Bay. CBF has also led canoe and kayak trips designed to educate

adults about the natural resources of the area and the relationship of the rivers to the Bay.

These instructional programs occur on the Mattaponi River near Walkerton, Virginia,

which is near the proposed Reservoir site. These educational programs will be harmed

by the creation of the Reservoir either because of the destruction of natural resources in

and along the Mattaponi River or through impairment of the aesthetic values of the River

as an educational resource.

15.      Further, CBF's Education Department has sponsored several submerged

aquatic vegetation planting projects of *Valisneria americana* (wild celery) in this area

with two different local schools, Aylett Country Day School and King William High

School. Both the school planting site and CBF's own restoration site of *Valisneria*

*americana* will likely suffer injury from increased salinity in the Mattaponi River as a

result of the Reservoir construction and operation.

16.      CBF has funded and continues to fund and operate environmental

restoration programs specifically designed to improve the water quality of the Bay and its

tributaries including the Mattaponi, Pamunkey, and York River basins. CBF has spent

and will spend significant funds and volunteer time creating and preserving wetland and

riparian buffer zones in these river basins, which may be adversely affected by the

construction and operation of the Reservoir. For example, CBF, along with other

partners such as the United States Fish and Wildlife Service, has completed the following

projects: Gwathmey (King & Queen County), 60 acres of wetland restoration on the

Mattaponi River; Martin (Louisa County), 91 acres of forested riparian buffer on Beaver

Run, a tributary to the South Anna River, which in turn is a tributary to the York River;

and Shaw (Louisa County), 18 acres of forested riparian buffer, on the South Anna River, a tributary to the York River. The following CBF projects are either in progress or are pending for 2007: Pamunkey Farm (Hanover County), 500 acres of wetland and forested riparian buffer on the Pamunkey River; Holly Hills (King & Queen County), eight acres of forested riparian buffer on the Mattaponi River; and Sarah Creek (Gloucester County), a tributary to the York River. For the latter, CBF is projected to work with 150 homeowners (septic pumping) and two farms (riparian buffers) through a Virginia Water Quality Improvement Fund grant awarded May 2006; the watershed surrounds CBF's Virginia Oyster Farm where oysters used in CBF restoration efforts in Virginia waters of the Chesapeake Bay are grown. The project partners include Gloucester County, the Virginia Department of Environmental Quality, and the Virginia Department of Conservation and Recreation.

17.    Further, CBF has stocked historic oyster reefs in the York River with oysters grown at its Oyster Farm and by citizen and student oyster gardeners. CBF has entered into an agreement with the Virginia Institute of Marine Science ("VIMS") to conduct a large scale oyster restoration project at the VIMS Gloucester Point Campus on the York River. Increased salinity in the river due to the construction and operation of the reservoir can harm oyster survival by permitting the introduction of disease. Defendants' actions and violations of law directly and irreparably injure the particularized interests of CBF and its members. The relief requested would redress the injuries identified above because construction of the Reservoir cannot go forward without the Section 404 permit.

18.    Plaintiff Sierra Club is a national nonprofit corporation organized under the laws of the State of California and dedicated to protecting and restoring the quality of the natural and human environment. Sierra Club's Virginia Chapter is headquartered in Richmond, Virginia, and has over 17,000 voting members. Sierra Club has participated fully in the public proceedings relating to the Section 404 permit application, by, for example, submitting comments on the Draft and 1997 Final EISs, as well as actively communicating its concerns in the state permitting proceedings. Among the concerns it has continually raised are the lack of need for a reservoir, the significant wetland and habitat loss that would accompany the construction of the Reservoir, and the inability to mitigate for the wetlands that would be destroyed. The July 1997 report authored by Michael Siegel and Dr. Thomas Muller and submitted on behalf of Plaintiffs Sierra Club and the Alliance, which analyzed Newport News' demand and supply forecast for the Lower Peninsula region's future water needs, played a key role in convincing the Norfolk District to undertake its own independent assessment of Newport News' projections. Sierra Club members use and enjoy the Mattaponi and Pamunkey Rivers, as well as Cohoke Creek, for fishing, swimming, canoeing, and other aesthetic and recreational purposes. These uses will be significantly undermined by the construction and operation of the Reservoir. Certain Sierra Club members own property along the Mattaponi River, and some live in the vicinity of the proposed location for the Reservoir's raw water intake and pumping station. The interests of these members will be harmed by the ecological damage that the Reservoir project will have on the Mattaponi River and its aquatic species through altered salinity patterns and decreased flow rates. In addition, the noise of the pumping station will adversely affect these members' use of the river for

swimming and boating and will diminish the enjoyment and value of their property. Defendants' actions and violations of law directly and irreparably injure the particularized interests of Sierra Club members. The relief requested of this Court would redress these injuries because construction of the Reservoir cannot go forward without the Section 404 permit.

19.    Defendant United States Army Corps of Engineers is the federal agency charged with evaluating applications for permits under Section 404 of the Clean Water Act for the discharge of dredged or fill material into waters of the United States. In evaluating such permit applications, the Corps must ensure that the requirements of Section 404 and the Section 404(b)(1) Guidelines and the requirements of NEPA are fulfilled. The Corps is headquartered in Washington, D.C., and has a District Office in Norfolk, Virginia, and a Division Office, the North Atlantic Division, in Brooklyn, New York. The North Atlantic Division of the Corps ("North Atlantic Division") overturned the Norfolk District's recommended decision to deny the Section 404 permit for the King William Reservoir.

20.    Defendant Secretary Francis J. Harvey is the Secretary of the Army and is sued in his official capacity. The Secretary of the Army, acting through the Corps of Engineers, has ultimate responsibility for the issuance of Section 404 permits by the Corps. 33 U.S.C. § 1344(a),(d). The Department of the Army's headquarters is located in Washington, D.C.

21.    Defendant Lieutenant General Carl A. Strock is the Chief of Engineers and Commanding General of the Corps. The Office of the Chief of Engineers is located in the Corps headquarters in Washington, D.C. Defendant Strock is charged with the

supervision and management of all Corps decisions and actions, and is sued in his official capacity.

22.    Defendant Brigadier General William T. Grisoli, Commander and Division Engineer of the U.S. Army Corps of Engineers, North Atlantic Division, is located in Brooklyn, New York. Brigadier General Grisoli is sued in his official capacity. He supervises and manages all decisions and actions of the North Atlantic Division, and he signed the Section 404 permit that is the subject of this lawsuit. Brigadier General Grisoli is the official successor to Brigadier General Merdith W. B. Temple, who held this position at the time of the decision to approve the permit on 29 July 2005.

23.    The North Atlantic Division became involved in the permitting process for the Reservoir after the then-Governor of the Commonwealth of Virginia, James S. Gilmore III, objected to the preliminary position of the Norfolk District that the issuance of a permit for the Reservoir would be contrary to the public interest. The Norfolk District's subsequent decision to deny the permit was elevated to the North Atlantic Division, as a result of the former Governor's objection, pursuant to 33 C.F.R. § 325.8(b)(2).

### The King William Reservoir

24.    The King William Reservoir ("Reservoir") is the primary component of a regional water supply proposal intended to serve Lower Peninsula counties and municipalities in southeastern Virginia through the year 2040. In addition to the Reservoir, the water supply proposal consists of three other components: 1) fresh groundwater development; 2) brackish groundwater desalination; and 3) conservation measures and use restrictions.

25.    The Reservoir component consists of the Reservoir itself, a water intake structure and pumping station in the Mattaponi River, and a network of water conveyance and distribution pipelines (collectively referred to herein as the "Reservoir Project"). Construction of the 1,526-acre Reservoir entails the construction of a 1,700-foot long and 78-foot high earthen dam across Cohoke Creek in King William County, Virginia. The Reservoir would have a storage volume of 12.2 billion gallons of water at normal pool elevation.

26.    The raw water intake and pumping station would be constructed in the Mattaponi River at Scotland Landing, Virginia.    Up to 75 mgd of water would be withdrawn from the Mattaponi River to supply the Reservoir. A 1.5-mile underground pipeline would be constructed to transport the water from the River to the Reservoir. The Reservoir Project was designed as a "high-flow" "skimming" operation, in which more water would be withdrawn during the higher flow months of the year. The permit to construct the intake structure that the Virginia Marine Resources Commission issued in August 2004 significantly alters this design, by imposing a pumping hiatus from 1 March through 31 July. See paragraphs 79-85 infra.

27.    A second pumping station and an 11.7-mile pipeline would be constructed to pump and transfer water from the Reservoir to an outfall on Beaverdam Creek, a tributary to Newport News' existing Diascund Creek Reservoir in New Kent County, Virginia. The water would be transported an additional 0.8 miles downstream to the Diascund Creek Reservoir and Newport News' network of transmission and treatment facilities.

28.     Construction of the Reservoir would flood 1,526 acres of land, destroying 437 acres of wetlands and waters in the Cohoke Creek watershed, and 21 miles of perennial and intermittent streams, which provide valuable and diverse habitat for fish and wildlife.  The Reservoir Project would inundate an additional 875 acres of upland wildlife habitat.  Additionally, the Reservoir Project will adversely impact another 105 acres of wetlands downstream of the Reservoir dam and permanently alter the existing flow regime.  The freshwater withdrawals from the Mattaponi River will threaten vital spawning grounds for the American shad and could alter salinity patterns in the River that may affect other aquatic species, including rare plant species such as the sensitive joint vetch (*Aeschynomene virginica*), which is listed as a threatened species under the Endangered Species Act.

29.     In addition, an agreement between Newport News and King William County, the host county for the Reservoir site, reserves to Newport News lands directly below the Reservoir site for possible future enlargement of the Reservoir.  King William Reservoir Project Development Agreement between Newport News and King William County, Addendum 3 (March 1997).  Expansion of the Reservoir, if permitted, would destroy an additional 137 to 216 acres of highly valuable freshwater wetlands and their associated fish and aquatic resources.

### Federal Statutory and Regulatory Background

30.     In 1972, Congress passed the Clean Water Act, 33 U.S.C. §§ 1251 et seq. "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters."  Clean Water Act § 101(a), 33 U.S.C. § 1251(a).  To achieve this objective, Section 301 of the Clean Water Act, 33 U.S.C. § 1311(a), prohibits the discharge of any

"pollutant" into "waters of the United States" except in accordance with promulgated water quality standards and permits issued under other sections of the Clean Water Act.

31.     "Pollutants" include dredged spoil, rock, and sand, among other materials. Clean Water Act § 502(6), 33 U.S.C. § 1362(6). The term "waters of the United States" includes wetlands. 40 C.F.R. § 232.2.

32.     Section 404 of the Clean Water Act, 33 U.S.C. § 1344, authorizes the Secretary of the Army to issue permits for the discharge of dredged or fill material into waters of the United States when certain conditions are met. The Section 404 permitting program is administered by the Corps. Under Section 404, the Environmental Protection Agency ("EPA") has the authority to veto the issuance of a Section 404 permit. Unless exempted by section 404(f)(1), all discharges of dredged or fill material into waters of the United States, including wetlands, must be authorized by the Corps through the issuance of a Section 404 permit.

33.     In addition to obtaining a Section 404 permit to discharge and fill wetlands, Section 401 of the Clean Water Act, 33 U.S.C. § 1341, requires that applicants for permits to discharge pollutants into waters of the United States obtain a certification from the State in which the proposed discharge would originate that the discharge will not violate specified water quality standards. A Virginia Water Protection Permit issued by the Virginia State Water Control Board serves as the required Section 401 certification from the Commonwealth of Virginia.

34.     In reviewing an application for a Section 404 permit, the Corps must follow guidelines developed by the EPA Administrator in conjunction with the Chief of Engineers of the Corps. 33 U.S.C. § 1344(b)(1). These guidelines are known as the

"404(b)(1) Guidelines" and are codified in the Code of Federal Regulations at 40 C.F.R. Part 230. The Corps is prohibited from issuing a Section 404 permit unless there is "sufficient information to make a reasonable judgment as to whether the proposed discharge will comply with [the] Guidelines." 40 C.F.R. § 230.12(a)(3)(iv). "[A]ll requirements in § 230.10 must be met" before a permit may issue. 40 C.F.R. § 230.10. Pursuant to a 1990 Memorandum of Agreement, the Corps and EPA have also implemented a policy of no overall net loss of wetland values and function in carrying out their responsibilities under Section 404 of the Clean Water Act.

35.    The 404(b)(1) Guidelines prohibit the issuance of a Section 404 permit under certain conditions relevant to this lawsuit: First, no permit shall issue if there is a practicable alternative that would have less adverse impact on the aquatic ecosystem. 40 C.F.R. § 230.10(a). An alternative is "practicable" if "it is available and capable of being done after taking into consideration cost, existing technology, and logistics in light of overall project purposes." 40 C.F.R. § 230.10(a)(2).

36.    Second, the 404(b)(1) Guidelines prohibit the issuance of a Section 404 permit if the discharge will "cause or contribute to significant degradation of the waters of the United States." 40 C.F.R. § 230.10(c). "Significant degradation" includes, but is not limited to, "significantly adverse effects" on "fish, shellfish, wildlife, and special aquatic sites," 40 C.F.R. § 230.10(c)(1), the last of which includes wetlands. 40 C.F.R. Subpart E, § 230.41. "Significant degradation" also includes "significantly adverse effects . . . on life stages of aquatic life and other wildlife dependent on aquatic ecosystems," as well as on "aquatic ecosystem diversity, productivity, and stability." 40 C.F.R. § 230.10(c)(2),(3). Other factors that must be considered in determining whether

or not a project will result in "significant degradation" of waters of the United States include, but are not limited to: 1. alterations of salinity gradients, 40 C.F.R. § 230.25; 2. impacts to threatened and endangered species, 40 C.F.R. § 230.30; and 3. impacts to recreational and commercial fisheries, 40 C.F.R. § 230.51.

37.     Third, the 404(b)(1) Guidelines prohibit the issuance of a Section 404 permit if "appropriate and practicable steps" remain available to "minimize potential adverse impacts of the discharge on the aquatic ecosystem." 40 C.F.R. § 230.10(d). The Corps' mitigation policy is embodied in a 1990 Memorandum of Agreement with EPA that mandates appropriate and practicable compensatory mitigation as the last of a sequential three-step process. Under the sequencing process, first, wetland losses must be avoided; second, unavoidable impacts must be minimized to the maximum extent practicable; and third, unavoidable wetland losses must be mitigated. If there is no demonstrated need for the loss, the loss is avoidable, and no amount of wetland mitigation is permissible.

38.     In addition, the Corps' "public interest" regulation, codified at 33 C.F.R. § 320.4(a), prohibits the issuance of a Section 404 permit if "the district engineer determines that it would be contrary to the public interest." This "public interest review" requires the Corps to weigh the benefits of the project against its reasonably foreseeable detriments, considering all relevant factors and their cumulative impacts. 33 C.F.R. § 320.4(a); see also 33 C.F.R. § 320.4(b)(4). Among the relevant factors listed are general environmental concerns, wetlands, fish and wildlife values, water supply and conservation, water quality, and the general needs and welfare of the people. 33 C.F.R. § 320.4(a).

39.    The "public interest review" also establishes general criteria that must be considered in the evaluation of every application for a Section 404 permit, including, among others:    1. the "relative extent of the public and private need" for the project;  2. the "practicability of using reasonable alternative locations and methods to accomplish the objective" of the project; and   3. the "extent and permanence of the beneficial and/or detrimental effects which the proposed structure or work is likely to have on the public and private uses to which the area is suited." 30 C.F.R. § 320.4(a)(2)(i)-(iii).

40.    NEPA, 42 U.S.C. §§ 4321, et seq., requires, among other things, that federal agencies prepare a detailed Environmental Impact Statement on every proposal for a major federal action that may "significantly affect the quality of the human environment." NEPA § 102(2)(C), 42 U.S.C. § 4332(2)(C).

41.    The EIS requirement serves NEPA's "action-forcing" purpose in two important respects.  First, it ensures that the agency has available and will carefully consider detailed information regarding the environmental effects of a proposed project before making a decision.  Second, the EIS guarantees that relevant information about a proposed project is made available to the public so that the public may play a role in the decision-making process.

42.    The Council on Environmental Quality ("CEQ") has promulgated regulations to implement NEPA, codified at 40 C.F.R. §§ 1500-1508, that are applicable to all federal agencies ("CEQ NEPA regulations").  In addition, the Corps has promulgated regulations and adopted procedures for complying with NEPA in the processing of Section 404 permits.  These regulations supplement the CEQ NEPA regulations and are codified at 33 C.F.R. § 325 Appendix B.

43.    Under NEPA and its implementing regulations, the effects that must be discussed in the EIS include the direct, indirect, and cumulative environmental impacts of the proposed action. 40 C.F.R. § 1508.25(c).

44.    NEPA also requires an agency to include in an EIS a "detailed statement" on "alternatives to the proposed action." 42 U.S.C. § 4332(2)(C)(iii). The agency is required to rigorously explore and objectively evaluate all reasonable alternatives. 40 C.F.R. § 1502.14(a). The alternatives analysis "is the heart of the environmental impact statement." 40 C.F.R. § 1502.14. Further, the Corps' NEPA regulations specifically mandate that the EIS for a Section 404 permit application "should discuss geographic alternatives, e.g., changes in location and other site specific variables, and functional alternatives, e.g., project substitutes and design modifications." 33 C.F.R. § 325 App. B, 9(b)(5)(c).

45.    Permitting agencies have an obligation under NEPA to independently evaluate and verify factual information supplied by the project applicant. See 40 C.F.R. § 1506.5.

46.    An agency must prepare a supplement to the EIS if: 1) the agency makes substantial changes in the proposed action relevant to environmental concerns, or 2) there are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts. 40 C.F.R. § 1502.9(c)(1).

**Proceedings Relating to Section 404 Permit and NEPA Review for the Project**

47.    In June 1989, Newport News, acting on behalf of the Regional Raw Water Study Group ("RRWSG"), expressed to the Norfolk District of the Corps an interest in constructing a new regional water supply reservoir. The RRWSG is a consortium of

local governments in and around the Lower Peninsula of southeastern Virginia,

consisting of the Cities of Newport News, Williamsburg, Hampton, and Poquoson, and

the Counties of York and James City. The Reservoir is the primary component of a water

supply proposal intended to meet the long-term water needs of the Lower Peninsula

region of Virginia through the year 2040. Fresh groundwater development, brackish

groundwater desalination and conservation measures are the other three components of

Newport News' water supply plan.

48.     On 30 July 1990, the Norfolk District of the Corps issued a notice of intent

in the Federal Register to prepare a Draft Environmental Impact Statement ("Draft EIS")

on Newport News' regional raw water supply proposal.

49.     On 13 November 1990, Newport News executed an agreement with the

Board of Supervisors of King William County, Virginia, entitled "King William

Reservoir Project Development Agreement," regarding construction of the King William

Reservoir and Mattaponi River pumpover.

50.     On 1 July 1993, Newport News submitted to the Corps and to the Virginia

Department of Environmental Quality, on behalf of the RRWSG, its joint application for

the Section 404 and Section 401 permits and certification for the construction of the

Reservoir Project. The proposed location and size of the King William Reservoir was

subsequently changed twice from that proposed in the 1993 permit application. The final

revision containing the current proposed location was submitted on 30 December 1996.

51.     The Corps issued a Draft EIS for the Virginia Lower Peninsula regional

raw water supply plan in February 1994, the stated purpose of which was to satisfy

Newport News' claimed year 2040 water deficit of 30.2 million gallons per day (mgd) for

the region. The Draft EIS listed 31 alternatives but carried forward for further review three reservoir alternatives, including Newport News' preferred alternative of the King William Reservoir.

52.    The other federal agencies involved in the project review, the United States Fish and Wildlife Service ("FWS") and EPA, submitted comments on the Draft EIS, dated 17 May 1994 and 1 June 1994, respectively, stating that the Draft EIS was inadequate and requesting that the Norfolk District prepare a Supplement to the DEIS.

53.    On 8 June 1994, the Norfolk District of the Corps announced its intent to prepare a Supplement to the Draft EIS, and on 29 December 1995, the District issued a Supplement to the Draft EIS ("Supplement").

54.    In comments to the Corps on the Supplement, dated 28 March 1996, the FWS recommended denial of the Section 404 permit because of the substantial and unacceptable impacts to "aquatic resources of national importance." Under a 1992 Memorandum of Agreement with the Department of the Army and EPA and the Department of Interior, entered into pursuant to Clean Water Act section 404 (q)("1992 Memorandum of Agreement"), classification of a resource as an "Aquatic Resource of National Importance" allows EPA and the Department of Interior to request that proposed individual permit decisions impacting such resource be "elevated" for review by a higher level of authority within the Corps of Engineers.

55.    In comments dated 13 November 1996, EPA rated both the Draft EIS and Supplement as "EU-2," indicating that the magnitude of the impacts from the Reservoir were "Environmentally Unsatisfactory" and that the documents contained "Insufficient

Information" to fully assess the environmental impacts that should be avoided to protect the environment.

56.     The Corps published the 1997 Final EIS on 24 January 1997 and accepted public comments through 25 July 1997.

57.     In its comments dated 25 July 1997 on the 1997 Final EIS, EPA stated that the King William Reservoir could result in unacceptable impacts to "Aquatic Resources of National Importance." The FWS, in its comments dated 25 July 1997, reasserted its recommendation that the permit be denied, stating that the impacts of the Reservoir Project "are extremely detrimental to the fish and wildlife resources of Southeast Virginia" and "will result in substantial and unacceptable impacts to aquatic resources of national importance."

58.     The 1997 Final EIS indicated an increase in Newport News' projected Year 2040 water deficit for the Lower Peninsula region from 30.2 mgd, reflected in the Draft EIS, to 39.8 mgd. During the comment period on the 1997 Final EIS, the Norfolk District received three expert reports indicating that Newport News' projected water needs in both the Draft and Final EISs were greatly inflated, including a report authored by Michael Siegel and Dr. Thomas Muller, entitled "Analysis of the Lower Virginia Peninsula, Regional Raw Water Supply Plan" (14 July 1997).

59.     Because of the serious questions raised regarding Newport News' projected water needs, the Norfolk District requested that the Corps' Institute for Water Resources ("IWR") provide an independent technical review of Newport News' water needs forecast and the three expert reports critiquing it. IWR contracted with Planning and Management Consultants, Ltd. ("PMCL"), and in May 1998, PMCL issued a report

concluding that the 39.8 mgd deficit set forth in the 1997 Final EIS representing the region's projected Year 2040 water shortfall was significantly overstated. The PMCL report concluded that the Year 2040 needs would more likely range between 16 to 19 mgd – less than half the amount projected by Newport News. Newport News submitted a rebuttal on 31 July 1998.

60.    At the Norfolk District's request, IWR assembled a panel of water resource experts to evaluate the PMCL report and Newport News' rebuttal. The IWR panel presented the findings of the panel to the Norfolk District in May 1999 ("IWR 1999 Panel Report"). The 1999 Panel Report verified that Newport News had significantly overestimated future demand and that Newport News' projected water supply shortfall by the Year 2040 was closer to 17 mgd. The 1997 Final EIS, setting forth Newport News' projected shortfall of 39.8 mgd, had acknowledged that practicable non-reservoir alternatives could supply a combined treated water safe yield of 21.2 mgd. (1997 Final EIS at 3-84.) The IWR finalized its report in August 2001 ("IWR Final Report"), confirming that the region's Year 2040 water deficit was less than half the amount the 1997 Final EIS had assumed.

61.    On 4 June 1999, the Norfolk District informed Newport News of its preliminary conclusion that the issuance of a permit for the Reservoir Project would be contrary to the public interest, based on the lack of a demonstrated need for a reservoir and the combined adverse environmental impacts. Governor Gilmore disagreed with this position in a letter dated 8 June 1999. On 20 March 2001, the Norfolk District published a draft of its decision to deny a permit for the Reservoir in a comprehensive, 341-page Draft Recommended Record of Decision ("Draft RROD").

62.    Both the FWS and EPA supported the Norfolk District's Draft RROD to deny the permit. EPA, in its letter dated 1 May 2001, stated that "the substantial impacts to wetlands and other important natural resources are avoidable because there are options available to the RRWSG members to reduce water demand and optimize existing sources of water." EPA reiterated that if the project were approved it would be "the largest single destruction of wetlands and their associated habitat" in the mid-Atlantic in the history of the Clean Water Act. In its 1 May 2001 letter, the FWS stated that it "strongly support[ed]" the Norfolk District's recommended decision to deny the permit. Further FWS stated that it "share[d] [the Norfolk District's] belief that the proposed project would cause or contribute to significant degradation of waters of the United States, including wetlands," and that it "concur[red] that these damaging environmental impacts are avoidable by selecting other water supply options available to the applicant."

63.    The Norfolk District issued its Final Recommended Record of Decision ("Final RROD") on 2 July 2001, affirming its conclusion set forth in the Draft RROD that the Section 404 permit should be denied. The Final RROD found that "[t]he project would result in adverse effects to fish, wildlife and special aquatic sites, has the potential for significant effects on life stages of aquatic life and other wildlife dependent on the aquatic ecosystem, would have significant effects on the diversity, productivity and stability of the ecosystem, would represent a significant loss of fish and wildlife habitat and has the potential to significantly affect the economy of the Mattaponi Indian Tribe." (RROD at 329.) The Norfolk District concluded that "[t]he risk to the environment, the risk to an entire watershed and the risk to the continued way of life of Native Americans

in the Pamunkey Neck area, especially the Mattaponi Tribe, are too great when weighed against the unjustified need...."  (Final RROD at 337.)

64.     In terms of the specific criteria of the Section 404(b)(1) Guidelines and the public interest review, the Final RROD determined that: 1. practicable alternatives were available to Newport News that would have less adverse impact on the aquatic ecosystem; 2. discharges associated with the project would cause or contribute to significant degradation to waters of the United States and to the aquatic ecosystem; 3. Newport News had not taken appropriate and practicable steps to minimize potential adverse impacts to the aquatic ecosystem; and 4. issuing the Section 404 permit for the Reservoir would be contrary to the public interest.  RROD at 327-29, 339-40.

65.     Pursuant to 33 C.F.R. § 325.8(b)(2), the application was elevated to the North Atlantic Division for its review because the Norfolk District's position to deny the permit was contrary to the written position of the then-Governor of Virginia, James S. Gilmore, III.

66.     On 30 September 2002, the North Atlantic Division, through Brigadier General Rhoades, issued a 38-page interim "Decision Memorandum for the King William Reservoir Project" ("Interim Decision Memorandum" ), overturning the Norfolk District's Final RROD.  The Interim Decision Memorandum incorporated the calculations set forth in the IWR Final Report finding that the Year 2040 regional water deficit was estimated to be less than half the demand deficit set forth in the 1997 Final EIS.  Nonetheless, Brigadier General Rhoades erroneously concluded that the Reservoir was necessary and was the least environmentally damaging practicable alternative. (Interim Decision Memorandum at 23.)  The Interim Decision Memorandum did not

result in the issuance at that time of the Section 404 permit, but rather indicated that processing of the permit application should resume to address issues outstanding regarding impacts to Native Americans and wetlands mitigation.

67.    Regarding wetlands mitigation, the RRWSG developed a conceptual mitigation plan in August 1996, which was appended to the 1997 Final EIS. Because of EPA's and the FWS's continuing objections to the mitigation plan, it was revised several times, culminating in the release of a draft conceptual mitigation plan in December 2003 for public comment and a Final Streams and Wetlands Mitigation Plan in June 2004 ("Final Mitigation Plan").

68.    The Final Mitigation Plan purports to provide a 2:1 compensation ratio for the wetlands that would be destroyed by the Reservoir Project through the creation or restoration of approximately 806 acres of freshwater wetlands on 11 separate and geographically scattered sites. Plaintiff CBF pointed out in its comments dated 1 February 2005 on the Final Mitigation Plan that the largest mitigation site, comprising 195 acres (nearly 25%) of the total wetland restoration acreage, is located outside the York River basin in a different watershed from the proposed location for the Reservoir. Many of the mitigation sites are not of "like kind" of the mixture of palustrine forested, scrub-shrub and emergent wetlands that the Project will harm. Instead, they are primarily composed of existing pastureland that will need to be converted to wetlands.

69.    In its earlier comments on the Draft RROD dated May 2001, EPA stated that the project, if permitted, "would deal a serious blow to efforts to restore and enhance the existing wetland base within the Commonwealth of Virginia and the Chesapeake Bay Watershed. In light of commitments made by the Federal government and the Governors

of Virginia, Maryland and Pennsylvania in the Chesapeake 2000 Agreement to restore
and maintain the wetland resources of the Chesapeake Bay, losses of this magnitude
should not be authorized unless they clearly are unavoidable. Wetland protection is
integral to the goals of the Chesapeake 2000 Agreement which not only focus on wetland
restoration but clearly seek to reduce wetland loss through the regulatory program." EPA
further stated that the proposed wetlands mitigation "cannot replicate the size, location,
interspersion, and landscape context functions inherent in an intact watershed."

70.     Both EPA and the FWS voiced their continued objections to the draft
Final Mitigation Plan released for public comment in December 2003. In its comments
dated 22 March 2004, EPA stated that the impacts of the Project would represent a
"dramatic alteration of a functioning stream valley ecosystem in the Chesapeake Bay
watershed."

71.     FWS's comments on the Plan, submitted on 29 March 2004 and 1
February 2005, affirmed its strong opposition to the issuance of a permit for the
Reservoir Project and expressed concerns about the net loss of wetlands and significant
degradation of the aquatic ecosystem from the project.  In the February 2005 letter, the
FWS questioned the availability of some of the proposed mitigation sites and concluded
that, even if all contingency sites were to remain available and undergo successful
restoration, the project would result in a net loss of wetlands and aquatic habitats in the
York River basin.

72.     On 29 July 2005, Brigadier General Merdith W. B. Temple, Division
Engineer of the North Atlantic Division of the Corps, issued his Record of Decision
Memorandum ("2005 ROD") for the King William Reservoir.   The 2005 ROD affirmed

the major findings of the 2002 Interim Decision Memorandum and superseded it.
(Defendant Brigadier General Grisoli is the official successor to Brigadier General
Temple.)

73.    The 2005 ROD acknowledged that the project would have significant and
long-term adverse impacts upon wetlands and the aquatic ecosystem but concluded that
the Final Mitigation Plan would not cause or contribute to significant degradation of
waters of the United States on the grounds that the conceptual mitigation plan would
result in no net loss of wetland functions and values.  Further, the 2005 ROD relied on
the projected Year 2040 water demand figure set forth in the IWR's Final Report,
anticipating a Year 2040 water deficit of approximately 15.9 mgd, less than half of what
Newport News had asserted was necessary.  Nonetheless, the 2005 decision found that
the project was justified.  Final ROD at 40-41.

74.    On 11 August 2005, pursuant to the 1992 Memorandum of Agreement, the
FWS's Regional Director for Region 5 advised the North Atlantic Division that it was
recommending to the Department of Interior's Assistant Secretary for Fish and Wildlife
and Parks that the decision to issue the Section 404 permit be elevated for review to the
Assistant Secretary of the Army for Civil Works.  On 1 September 2005, the Department
of the Interior ("DOI") advised the Assistant.Secretary of the Army for Civil Works that,
as a result of additional coordination between the FWS and the Corps, the DOI would not
request further review of the North Atlantic Division's decision.  The additional
coordination included agreements between the FWS and the Corps that the wetland
mitigation be constructed to the maximum extent practicable within the York River

Watershed. It has been revealed that, since then, certain key mitigation sites identified in the Final Mitigation Plan are no longer available.

75.    Brigadier General Grisoli of the North Atlantic Division signed and issued the Section 404 permit for the King William Reservoir on 15 November 2005.

### Related State Proceedings

76.    Regarding the Clean Water Act § 401 certification, on 22 December 1997, the Virginia State Water Control Board ("SWCB") issued the Virginia Water Protection permit ("VWP" permit) authorizing the water withdrawals from the Mattaponi River for the King William Reservoir. Among other conditions, the VWP permit imposes minimum instream flow restrictions on the amount of water that can be withdrawn in a particular month.

77.    In separate actions brought in state court, plaintiffs and the Mattaponi Indian Tribe appealed the SWCB's issuance of the VWP permit. The matter came twice before the Virginia Supreme Court, with the Court ultimately upholding the VWP permit in November 2005.

78.    On 13 December 2005, Newport News sent a letter to the Virginia Department of Environmental Quality requesting an extension of time for completing and complying with various conditions of the VWP permit, as well as a five-year extension of the term of the permit. A public hearing is scheduled for July 2006.

79.    The other state permit required for the Reservoir Project is from the Virginia Marine Resources Commission ("VMRC") dealing with state-owned submerged lands. In 1993, Newport News applied to the VMRC for a permit to authorize

construction of the 75 mgd raw water intake structure in the Mattaponi River, the water conveyance and distribution pipelines, and the discharge structure on Beaverdam Creek.

80.     On 14 May 2003, the VMRC voted to deny Newport News' application on the grounds that the Reservoir Project: "would not be in the best interest of the marine resources of the Commonwealth of Virginia. The proposed intake would adversely impact the early life history stages of American shad that utilize the Mattaponi River as spawning and nursery grounds. The proposed intake would be placed in the most productive region, of one of the most productive sub-estuaries of the Chesapeake Bay with respect to American shad and the project would affect other fishery resources the Commission is entrusted to protect." 16 May 2003 letter from Tony Watkinson, Acting Chief, Habitat Management, VMRC, to Brian Ramaley, Director, Newport News Waterworks.

81.     Newport News filed an action challenging the VMRC's decision to deny the permit. The parties entered into a settlement agreement in March 2004 that allowed Newport News to obtain a new hearing limited to the potential impacts of the intake structure on juvenile and larval stages of shad and other fisheries.

82.     On 17 August 2004, the VMRC issued a permit for the Reservoir Project, contrary to the recommendations of the VMRC's own staff and the Virginia Institute of Marine Science (VIMS). The permit includes as a condition a "springtime pumping hiatus" that prohibits any pumping during the period from 1 March through 31 July. This pumping hiatus is intended to approximate the American shad spawning season in the Mattaponi River, pending completion of a monitoring program to obtain concrete data about the spawning season. In its comments dated 25 June 2004 on the draft permit,

VIMS stated that the proposed intake location poses some of the highest potential risk to juvenile anadromous fish populations. In the absence of site specific data about the spawning season in the Mattaponi River, VIMS recommended completion of a monitoring program prior to any final decision on the VMRC permit. VIMS also warned that effective implementation of the pumping hiatus proposal "may prevent [Newport News] from realizing a satisfactory safe yield of water" from the Reservoir.

83.     As a result of the VMRC permit, withdrawals are now prohibited for some of the same months in which the largest withdrawal amounts are indicated under the project design and the VWP permit.

84.     The Commonwealth of Virginia, acting through the Virginia Department of Environmental Quality, issued its concurrence with Newport News' certification of consistency with the Virginia Coastal Resources Management Program on 27 December 2004, without evaluating the ecological impacts of the new pumping scenario resulting from the VMRC permit condition.

85.     The Corps has never considered the environmental impacts, or the potential changes to the safe yield of the Reservoir, that will result from the significant changes to the Project imposed by conditions of the VMRC permit including the "springtime pumping hiatus."

**CLAIMS FOR RELIEF**

**<u>Count I</u>**

**(Clean Water Act – Violation of 404(b)(1) Guidelines –
Significant degradation of the waters of the United States)**

86.     Paragraphs 1 through 85 are incorporated herein by reference.

87.    The Corps' issuance of the Section 404 permit violates the requirement of 40 C.F.R. § 230.10(c) that it not issue a permit for any discharge of fill material that will "cause or contribute to significant degradation of the waters of the United States," which includes wetlands.

88.    The King William Reservoir Project will involve the excavation, filling and flooding of 437 acres of waters of the United States, consisting of 403 acres of highly diverse and valuable freshwater wetlands in the Cohoke Creek watershed and 34 acres of shallow open water, and the inundation of 21 miles of free-flowing perennial and intermittent streams. These aquatic resources and habitat will be permanently lost. The issuance of the Section 404 permit for the Reservoir Project would result in the single largest authorized destruction of wetlands in Virginia and in the entire mid-Atlantic region in the history of the Clean Water Act. The impoundment of Cohoke Creek will impact an additional 105 acres of wetlands downstream of the project because of reduced flows in Cohoke Creek. Other wetland impacts would occur as a result of construction of the pipelines, outfall and intake structure for the Reservoir Project.

89.    The 2005 ROD acknowledges that "the proposal is expected to have a major, long-term impact upon wetlands," as well as "the current functions of the aquatic ecosystem." ROD at 37, 40. The 2005 ROD also acknowledges that the Reservoir "would directly result in a major, long-term alteration of downstream flows and in the normal water fluctuation in Cohoke Creek." ROD at 39.

90.    The Reservoir Project will have significantly adverse impacts on, among other things, aquatic ecosystem diversity, productivity, and stability of the filled and inundated wetlands and waters. Such impacts include, but are not limited to, the loss of

33

fish and wildlife habitat and the loss of capacity of the affected wetland complex to assimilate nutrients and purify water. 40 C.F.R. § 230.10(c)(3). The impacts from the Reservoir Project on the ecosystems, habitat, and wildlife of these waters would be irreversible.

91.     Construction and operation of the Reservoir will also have significantly adverse impacts on, among other things, aquatic ecosystem diversity, productivity, and stability of 105 acres of wetlands located downstream of the Reservoir. Such impacts include, but are not limited to, the loss of fish and wildlife habitat and the loss of capacity of the affected wetland complex to assimilate nutrients and purify water. 40 C.F.R. § 230.10(c)(3). The impacts from the Reservoir Project on the ecosystems, habitat, and wildlife of these wetlands would be irreversible.

92.     Water withdrawals from the Mattaponi River for the Reservoir and construction and operation of the raw water intake structure will result in the significant degradation of the Mattaponi River and its aquatic ecosystems. Such impacts include, but are not limited to, changes in salinity patterns that may adversely impact important fish, wildlife, and plant populations and their habitat, including American shad and the sensitive joint vetch, a federally threatened species under the Endangered Species Act. According to the Virginia Marine Resources Commission, the intake structure will be located in "the most productive region, of one of the most productive sub-estuaries of the Chesapeake Bay with respect to American shad."

93.     A large population of a federally threatened aquatic plant, the sensitive joint vetch, is found in the immediate vicinity of the proposed intake structure, and other populations are located elsewhere on the Mattaponi River, all of which could be impacted

through changes in salinity caused by the Reservoir. The Virginia Institute of Marine Sciences ("VIMS") completed a study that concluded that alterations in salinity of the river has affected, and will affect, the river's vegetation. See 12 March 2003 letter from Dr. Roger L. Mann, VIMS, to William A. Pruitt, VMRC Commissioner. Pivotal changes to salinity regimes will occur in the wetland regions during the sensitive springtime seed set, summer seed maturation, and fall dispersal of seed, impacting the sensitive joint vetch and other wetland flora.

94.    The minimum instream flow requirements, imposed by the state VWP permit, and the spring pumping hiatus, imposed as a condition of the VMRC permit, will not sufficiently protect aquatic life because the permits allow pumping to occur despite these conditions if "a water supply emergency has been declared." Allowing emergency water withdrawals during the restricted spring and summer months will devastate young shad and could threaten the entire shad fishery. See 12 May 2004 letter from Edward F. Cheslak, Ph.D., to William A. Pruitt, VMRC Commissioner.

95.    The Project will also significantly degrade the main channel of Beaverdam Creek, at which the concrete water outfall structure will be located, by increasing the sustained average stream flow conditions above existing flow conditions. Such increased flow conditions could adversely and permanently change the stream dynamics and stream morphology; increase erosion rates, turbidity, and deposition of silt and organic materials; and impact downstream aquatic resources, including vegetated wetlands, fisheries and benthic populations.

96.    In its 2001 Final RROD, the Norfolk District concluded that the discharges associated with the project would cause or contribute to significant

degradation of waters of the United States and to the aquatic ecosystem, RROD at 328-
34, stating that the project "would result in the irreversible and irretrievable loss of 403
acres of vegetated wetlands, 34 acres of shallow open water, 21 miles of free-flowing
streams," which "have been identified as Aquatic Resources of National Importance . . .
by the U.S. Fish and Wildlife Service and EPA." RROD at 329-30. In rejecting the
Norfolk District's recommended decision, the North Atlantic Division erroneously
concluded that implementation of Newport News' Final Mitigation Plan will mean that
the net effect of the proposed discharges of fill material for the construction of the
Reservoir Project will not cause or contribute to significant degradation of waters of the
United States.

97.     The Corps violated Section 404 of the Clean Water Act and the 404(b)(1)
Guidelines by issuing and approving the Section 404 permit to Newport News for a
discharge that will clearly cause and contribute to significant degradation of the waters of
the United States. The Corps' approval and issuance of the 2005 Final ROD and the
Section 404 permit is therefore arbitrary and capricious, an abuse of discretion, and not in
accordance with law.

### Count II

### (Clean Water Act – Violation of 404(b)(1) Guidelines – Least damaging practicable alternative)

98.     Paragraphs 1 through 97 are incorporated herein by reference.

99.     The Corps' issuance of the Section 404 permit violates the requirement of
40 C.F.R. § 230.10(a) that no permit shall issue if there remains available a "practicable
alternative to the proposed discharge which would have less adverse impact on the
aquatic ecosystem."

100.    The Corps' consideration and evaluation of alternatives to the Reservoir

Project in the 2005 ROD are based on Newport News' stated water demand projections

reflected in the 1997 Final EIS. The Draft EIS incorporated Newport News' calculation

of the region's projected Year 2040 water deficit of 30.2 mgd, and, in the 1997 Final EIS,

the Corps incorporated Newport News' revised calculation of the projected deficit of 39.8

mgd. The selection and analysis of alternatives in the Draft and Final EISs were based on

the ability of the various potential alternatives to satisfy these projected deficits.

101.    After taking into consideration a number of expert reports that indicated

that the RRWSG's projected Year 2040 water needs were greatly exaggerated, including

the independent reports of the Corps' Institute of Water Resources, the Norfolk District

found that Newport News had failed to demonstrate a need for the Reservoir and that

there were other non-reservoir alternatives or combination of alternatives available to

Newport News. The 1997 Final EIS stated that practicable non-reservoir alternatives

could supply a combined treated water safe yield of 21.2 mgd. 1997 Final EIS at 3-84.

102.    In the North Atlantic Division's 2005 Final ROD, the Corps incorporated

a Year 2040 water deficit of 15.9 mgd, an amount 23.9 mgd lower than the Year 2040

water deficit figure used in the 1997 Final EIS. The Corps failed to evaluate alternatives

that would meet this lower demand deficit. Because the Corps relied on the alternatives

in the 1997 Final EIS that were based on an exaggerated projected water deficit, the

Corps' consideration of alternatives was erroneously skewed toward projects of much

greater magnitude than necessary. The Corps' failure to evaluate alternatives based on

Newport News' actual needs violates the requirements that no permit shall issue if there

are practicable alternatives available that would have less adverse impact on the aquatic

ecosystem, and the issuance of the Section 404 permit for the Reservoir was therefore arbitrary and capricious, an abuse of discretion, and not in accordance with law.

103.    There remain less damaging, practicable alternatives.  Among the potential water supply components that could meet the lower projected need are additional groundwater desalination facilities, additional drawdowns from existing reservoirs and increased withdrawals from the Chickahominy River,  advancing gray-water reuse technology, more restrictive conservation measures and demand side management techniques, and use of a reservoir known as the Big Bethel Reservoir at Fort Monroe in Hampton, Virginia, that the military has discontinued using.   The Corps' failure to consider less damaging, practicable alternatives violates the requirements that no permit shall issue if there are practicable alternatives available that would have less adverse impact on the aquatic ecosystem, and the issuance of the Section 404 permit for the Reservoir was therefore arbitrary and capricious, an abuse of discretion, and not in accordance with law.

104.    In the alternative, the Corps has failed to evaluate the ability of the Reservoir to meet the demand deficit of 15.9 mgd set forth in the 2005 ROD if Newport News adheres to the springtime pumping restrictions imposed by the VMRC permit.  The Corps' failure to evaluate whether the Reservoir Project is practicable violates Section 404 of the Clean Water Act and the Section 404(b)(1) Guidelines.  The Corps' approval and issuance of the 2005 Final ROD and the Section 404 permit is therefore arbitrary and capricious, an abuse of discretion, and not in accordance with law.

## Count III

### (Clean Water Act – Violation of 404(b)(1) Guidelines –
### Minimization of potential adverse impacts on aquatic ecosystem)

105.    Paragraphs 1 through 104 are incorporated herein by reference.

106.    The Corps' issuance of the Section 404 permit violates the requirement of 40 C.F.R. § 230.10(d) that it not issue a permit for any discharge of fill material "unless appropriate and practicable steps have been taken which will minimize potential adverse impacts of the discharge on the aquatic ecosystem." The Corps' mitigation policy is embodied in the 1990 Memorandum of Agreement with EPA that mandates appropriate and practicable mitigation as the last of a sequential three-step process. Under the sequencing process, wetland losses must first be avoided, then unavoidable losses must be minimized, and only then is mitigation considered. Pursuant to the 1990 Memorandum of Agreement, mitigation is intended to result in no overall net loss of wetlands functions and values. If there is no demonstrated need for the loss, the loss is avoidable, and no amount of wetland mitigation is permissible.

107.    The Reservoir Project would require the excavation, fill, and flooding of 403 acres of freshwater wetlands and 34 acres of shallow open water and the elimination of 21 miles of free-flowing streams, and would indirectly impact an additional 105 acres of downstream wetlands from reduced flows. The wetlands that would be destroyed are highly diverse, ecologically significant and contiguous, and function as an integrated system. The 2005 ROD acknowledges that the "inundation of wetlands would have a major, long-term adverse impact upon the current functions of the aquatic ecosystem." ROD at 40.    The 2005 ROD erroneously concluded, however, that the Final Mitigation Plan would result in no net loss of wetlands functions and values. ROD at 41. These two conclusions are mutually exclusive, and the Corps' approval and issuance of the 2005

Final ROD and the Section 404 permit is arbitrary and capricious as a matter of law. Reliance upon the Final Mitigation Plan does not cure this defect.

108.    The Final Mitigation Plan proposes a 2:1 compensation ratio for the 403 acres of wetlands that would be permanently lost through the creation or restoration of approximately 806 acres of freshwater wetlands on 11 separate and geographically scattered sites. Additionally the Plan proposes to create, restore, or preserve 36.4 miles of streams for the elimination of the 21 miles of stream. The functions and values of the complex mosaic of habitats that would be lost cannot be replaced by the offsite compensation set forth in the Final Mitigation Plan.

109.    Among the inherent deficiencies and significant flaws that make the mitigation plan wholly inadequate are the following: 1. The large, well-integrated stream corridor- wetland complex of the Cohoke Creek watershed cannot be replaced – as the Final Mitigation Plan proposes – by many small, unconnected, out-of-kind mitigation sites. It is not possible to replicate the ecology and diversity of an entire integrated system of wetlands and streams in scattered mitigation sites that are primarily farmland, and in several small watersheds. 2. Functional replacement of the diverse mix of scrub-shrub and palustrine forested wetlands found in the Cohoke Creek wetland complex cannot be attained through fragmented and segregated mitigation sites, even at a 2 to 1 acreage ratio. 3. The largest wetland mitigation site included in the Final Mitigation Plan, accounting for 25% of the entire wetland restoration goal, is located out-of-basin in the Rappahannock River basin.  The proposed mitigation would result in a net loss of wetlands and aquatic habitats in the York River basin. 4. The upland agricultural sites included in the Final Mitigation Plan cannot achieve functional replacement of the

diverse mix of wetlands, including forested wetlands that would be destroyed.  5. Certain sites included in the Final Mitigation Plan are now no longer available to Newport News, including the Meadow Farm and Burlington site, which account for 87 acres of proposed wetland restoration or creation and 212 total acres of wetland mitigation.   The Final Mitigation Plan will not compensate for the losses in wetland functions, values, and specific habitat.

110.    The Reservoir Project will result in a net loss of wetlands functions and values, and the inherent deficiencies and flaws in Newport News' Final Mitigation Plan demonstrate that appropriate and practicable steps to minimize potential adverse impacts to the aquatic ecosystem have not been taken. The Corps' issuance of the Section 404 permit where appropriate and practicable steps to minimize adverse impacts of the Reservoir Project have not been taken violates Section 404 of the Clean Water Act and the Section 404(b)(1) Guidelines.  The Corps' approval and issuance of the 2005 Final ROD and the Section 404 permit is therefore arbitrary and capricious, an abuse of discretion, and not in accordance with law.

### Count IV

### (Clean Water Act – Violation of the
### Public Interest Review Requirements - 33 C.F.R. § 320.4)

111.    Paragraphs 1 through 110 are incorporated herein by reference.

112.    33 C.F.R. § 320.4(a) prohibits the Corps from issuing a Section 404 permit if "the district engineer determines that it would be contrary to the public interest." This "public interest review" requires the Corps to weigh the benefits of the project against its reasonably foreseeable detriments, considering all relevant factors and their cumulative impacts. 33 C.F.R. § 320.4(a); see also 33 C.F.R. § 320.4(b)(4).  Included among these

factors are general environmental concerns, wetlands, fish and wildlife values, water supply and conservation, water quality, and the general needs and welfare of the people. 33 C.F.R. § 320.4(a).

113.   In its 2001 Recommended Record of Decision, the Norfolk District found that issuing a section 404 permit for the Reservoir Project would be contrary to the public interest, concluding that "[t]he risk to the environment, the risk to an entire watershed and the risk to the continued way of life of Native Americans in the Pamunkey Neck area, especially the Mattaponi Tribe, are too great when weighed against the unjustified need." RROD at 337.   The Corps concluded in the 2005 ROD that the Reservoir Project is not contrary to the public interest, based on, among other items, the erroneous views that a reservoir is necessary to provide a dependable, long-term water supply for the Lower Peninsula in Virginia, that the Reservoir Project is the least environmentally damaging, practicable alternative to meet the need, that the expected benefits outweigh the loss of aquatic resources, and that the Final Mitigation Plan will compensate for those losses. For the reasons set forth above, the Corps' conclusions and issuance of the Section 404 permit violates the requirements pertaining to the Corps' "public interest review" in 33 C.F.R. § 320.4 and are arbitrary and capricious, an abuse of discretion, and not in accordance with law.

114.   More specifically, the Corps' assessment of Newport News' water needs and its failure to consider alternatives that would meet the greatly reduced demand from that set forth in the 1997 Final EIS precluded an adequate and objective assessment of the "public and private need for the project" and reasonable alternative locations and methods to accomplish Newport News' objective.  33 C.F.R. §§ 320(a)(2)(i), (a)(2)(ii).

In addition, it undermined the Corps' balancing of the relevant public interest factors enumerated in 33 C.F.R. § 320.4(a), including, among others, conservation, wetlands, and fish and wildlife values.

115. Further, the Corps' erroneous conclusions that the Reservoir Project is the least environmentally damaging, practicable alternative and that the Final Mitigation Plan will compensate for the losses of aquatic resources undermined the Corps' balancing of the relevant public interest factors enumerated in 33 C.F.R. § 320.4(a), including, among others, conservation, wetlands, and fish and wildlife values. In addition, the Corps' failure to consider the impacts on aquatic resources of the Mattaponi River, including plant species, from the springtime pumping hiatus imposed by the VMRC permit precluded an adequate and objective consideration of the relevant public interest factors enumerated in 33 C.F.R. § 320.4(a) above.

116. The Corps' issuance of the Section 404 permit without having undertaken an adequate and objective "public interest review" violates 33 C.F.R. § 320.4. The Corps' approval and issuance of the 2005 Final ROD and the Section 404 permit is therefore arbitrary and capricious, an abuse of discretion, and not in accordance with law.

### Count V

### (National Environmental Policy Act – Failure to Adequately Evaluate Environmental Impacts and Alternatives in 1997 Final EIS)

117. Paragraphs 1 through 116 are incorporated herein by reference.

118. NEPA requires that every EIS must be prepared with objective good faith and must fully and fairly discuss, among other things, the adverse environmental effects of the proposed action and the alternatives to the proposed action which may avoid or minimize these adverse effects. 42 U.S.C. § 4332(2)(C),(E). An EIS must analyze the

direct, indirect, and cumulative environmental impacts of the proposed action. 40 C.F.R.

§ 1508.25(c). The NEPA regulations define "direct effects" as effects "which are caused

by the action and occur at the same time and place." 40 C.F.R. § 1508.8(a). "Indirect

effects" are those effects "which are caused by the action and are later in time or farther

removed in distance, but are still reasonably foreseeable." 40 C.F.R. § 1508.8(b). The

NEPA regulations define "cumulative impact" as the "impact on the environment which

results from the incremental impact of the action when added to other past, present, and

reasonably foreseeable future actions regardless of what agency (Federal or non-Federal)

or person undertakes such other actions. Cumulative impacts can result from individually

minor but collectively significant actions taking place over a period of time." 40 C.F.R. §

1508.7.

119.    NEPA also requires an agency to include in an EIS a "detailed statement"

on "alternatives to the proposed action." 42 U.S.C. § 4332(2)(C)(iii). The agency is

required to "[r]igorously explore and objectively evaluate all reasonable alternatives." 40

C.F.R. § 1502.14(a). The alternatives analysis "is the heart of the environmental impact

statement." 40 C.F.R. § 1502.14.

120.    The 1997 Final EIS is inadequate under NEPA in at least the following

respects:

        a.    <u>Discussion of Alternatives:</u>

            (i)    The Corps' consideration of alternatives in the 1997 Final

                    EIS was premised upon and limited to those alternatives

                    that would satisfy Newport News' projected Year 2040

                    water deficit of 39.8 mgd, adopted in the 1997 Final EIS.

                    Newport News' projections significantly overestimated

                    future demand, by more than twice the amount that the

Corps later found to be justified.    As a result, the Corps'
consideration and evaluation of alternatives was skewed
toward a project of much greater magnitude than necessary,
preventing the Corps from adequately considering less
damaging alternatives that could satisfy the Lower
Peninsula's water needs without necessitating the
construction of the Reservoir.

(ii)    Among the alternatives that the Corps failed to evaluate or
adequately consider that could in various combinations
satisfy the region's water needs are additional groundwater
desalination facilities, additional drawdowns from existing
reservoirs and increased withdrawals from the
Chickahominy River, advancing gray-water reuse
technology, more restrictive conservation measures and
demand side management techniques, and reopening of the
Big Bethel Reservoir at Fort Monroe in Hampton, Virginia,
that the military has discontinued using – an alternative that
the 1997 Final EIS does not mention.

(iii)    The Corps' consideration of alternatives in the 1997 Final
EIS is not legally adequate under NEPA and its
implementing regulations, and the Corps' action is issuing
the Section 404 permit for the Reservoir Project where the

Final EIS is inadequate is arbitrary and capricious, an abuse of discretion, and not in accordance with law.

b.  Discussion of Environmental Impacts:

(i)  The Reservoir Project entails freshwater withdrawals of up to 75 mgd from the Mattaponi River to fill and maintain the Reservoir.  The withdrawals from this tidal river will alter salinity patterns and other properties of the River, impacting its plants and fish and wildlife resources.   The Corps' conclusion in the 2005 ROD that potential impacts from salinity changes in the Mattaponi River would be "minor" is based on an inadequate consideration in the 1997 Final EIS of the direct, indirect and cumulative impacts of the water withdrawals.

(ii)  Among the impacts on the Mattaponi River that the 1997 Final EIS failed adequately to address are evidence and information that some organisms may be susceptible to long-term exposure to even slight salinity changes, or may have certain life stages that could be harmed by acute salinity impacts, and that  salinity changes directly caused by the Reservoir Project will exacerbate any natural salinity increases during times of drought or during periods when the wind pushes the tidal water farther upstream.  The 1997 Final EIS failed adequately to consider the indirect impacts

on fish and wildlife resources, including endangered and

threatened plant or animal species, in the Mattaponi River

from salinity intrusion.  In addition, the 1997 Final EIS

failed adequately to consider the long-term additive

impacts on plant and animal resources in the Mattaponi

River.  No matter how slight the alterations in salinity or

other chemical properties of the River, the changes would

be permanent and could irreversibly alter the natural habitat

of the freshwater plants and animals.

(iii)    The 1997 Final EIS failed to consider the potential for

methyl mercury formation in the Reservoir.  Newly

flooded reservoirs and constructed wetlands have been

shown to increase mobilization of mercury, potentially

harming aquatic species.

(iv)    The 1997 Final EIS failed to consider the cumulative

impacts from the reservoir withdrawals from the Mattaponi

River with other reasonably foreseeable withdrawals from

the River.  Other counties in the region, including King and

Queen County and Caroline County, Virginia, will likely

need to obtain their future water supplies from the river,

and farmers along the Mattaponi River also withdraw water

to irrigate their lands.  In addition to affecting salinity

levels, the cumulative effect of the withdrawals could alter

47

water chemistry and alter nutrient dynamics and change the
composition of organisms above and below the withdrawal
point for the Reservoir, adversely affecting aquatic animals
and plants such as the American shad and sensitive joint
vetch. The cumulative impacts of these current and
reasonably foreseeable future withdrawals and the reservoir
withdrawals have not been considered.

(v)    The 1997 Final EIS completely failed to consider the
cumulative impacts that would result through a future
expansion of the Reservoir footprint. An agreement
between Newport News and King William County, the host
county for the Reservoir site, reserves to Newport News the
lands immediately below the Reservoir site for possible
future enlargement of the Reservoir. 2005 ROD at 24;
King William Reservoir Project Development Agreement
between Newport News and King William County,
Addendum No. 3 (Mar. 1997). Expansion of the Reservoir,
if permitted, would destroy an additional 137 to 216 acres
of highly valuable freshwater wetlands and their associated
fish and aquatic resources. RROD at 320. The 1997 Final
EIS failed completely to consider the cumulative impacts of
the reasonably foreseeable Reservoir expansion.

(vi)   The 1997 Final EIS failed to consider the cumulative

impacts that would result from a second pumpover from the Pamunkey River to supply the Reservoir. The agreement between Newport News and King William County allows Newport News to build a Pamunkey River pump station to provide a second pumpover to augment the Mattaponi River withdrawals. (King William Reservoir Project Development Agreement between Newport News and King William County, Addendum No. 2 (Aug.1995).) The Pamunkey River pumpover would supply an additional 45 to 120 mgd of water to the Reservoir. RROD at 317. The freshwater withdrawals from the Pamunkey River would affect salinity in the Pamunkey and in the Mattaponi Rivers because these rivers are hydrologically connected and would result in further ecological effects on the resources in the York River system, consisting of the Mattaponi, Pamunkey, and York Rivers, and in the Chesapeake Bay. RROD at 246-47, 317. Reduction in freshwater flows in the Pamunkey, combined with existing and potential consumptive withdrawals from the Pamunkey River by King William, New Kent and Hanover Counties, could also result in adverse cumulative impacts on the natural resources in the York River system. The 1997 Final EIS failed completely to evaluate the cumulative impacts of the

reasonably foreseeable second pumpover for the Reservoir

and from other freshwater withdrawals from the Pamunkey

River.

121.    The 1997 Final EIS is not legally adequate under NEPA and the

implementing regulations, and the Corps' issuance of the Section 404 permit for the

Reservoir where the EIS is inadequate violates NEPA. The Corps' approval and issuance

of the 2005 Final ROD and the Section 404 permit is therefore arbitrary and capricious,

an abuse of discretion, and not in accordance with law.

## Count VI

### (National Environmental Policy Act – Failure to Conduct a Supplemental EIS)

122.    Paragraphs 1 through 121 are incorporated herein by reference.

123.    NEPA requires agencies to prepare a Supplemental EIS when: (1) there

are substantial changes in the proposed action relevant to environmental concerns; or (2)

there are significant new circumstances or information relevant to environmental

concerns and bearing on the proposed action or its impacts.   40 C.F.R. § 1502.9(c)(1).

124.    Substantial changes in the Reservoir Project and significant new

circumstances or information since the preparation of the 1997 Final EIS require the

preparation of a new or supplemental EIS. These substantial changes and significant new

circumstances or information, which the Corps has failed to analyze, include at least the

following:

>           a.    The Reservoir Project has substantially changed as a result of the
>
>                 conditions imposed in the state permit issued by the VMRC in
>
>                 2004 prohibiting Newport News from withdrawing water from the

50

Mattaponi River between 1 March and 31 July of each year unless a water emergency is declared. The Reservoir Project as evaluated in the 1997 Final EIS is premised upon a "high flow" "skimming" operation that relies on significantly higher water withdrawals during periods of high flows to meet the alleged demand. However, the "springtime pumping hiatus" imposed by the VMRC permit corresponds to some of the highest flow months of the year, the very months upon which the project relies to achieve its safe yield. As a result of the VMRC permit, Newport News will now have to increase its pumping during drier months of the year in order to make up for not being able to pump water during some of the wettest months.

b. The Corps has never analyzed the impacts that this significant alteration in project design and pumping regime would have on aquatic resources in the Mattaponi River. For example, larger withdrawals will now occur during sensitive periods of plant germination, flowering, and seed dispersal for the sensitive joint vetch and other wetland flora. The Corps has also failed to analyze how this significant change in the pumping regime may affect the salinity modeling results. The modeling results formed the basis for numerous determinations by the Corps regarding potential environmental impacts, and thus a supplemental EIS is warranted. Further, the Corps has not evaluated the impacts of the changed

51

pumping scenario on American shad. The VMRC issued the state permit in the face of recommendations from its staff and VIMS that the permit should be denied based on a lack of concrete information regarding the impacts on American shad. The Corps has failed to conduct its own analysis of the revised pumping hiatus and the impacts on American shad

c.    Neither the VMRC nor the Corps has ever analyzed whether Newport News can achieve the amount of water that it claims it needs from the Reservoir, while adhering to the new "springtime pumping hiatus" imposed by the VMRC, together with the minimum instream flow requirements imposed by the VWPP permit. As a result, the Corps has not analyzed whether the Reservoir will supply the expected safe yield and fulfill the project "purpose and need" as a result of the state permit restrictions. Evidence before the VMRC indicated that, to achieve the expected safe yield, the pumping hiatus would need to be lifted more frequently and more water withdrawn from the River during the shad spawning season than Newport News represented, thus posing a severe risk to American shad and other aquatic resources. The Corps has not evaluated the likelihood of the project to supply the amount of water claimed to be needed as a result of the withdrawal restrictions or the impacts on shad and other species

from circumvention of such restrictions, thus warranting a new or supplemental EIS.

d.    On 23 June 2005, the FWS submitted a letter to the Corps stating that the Reservoir Project had changed significantly since the Corps' issuance of the 1997 Final EIS, specifically referencing the conditions imposed by the VMRC permit. The FWS requested that the Corps consider the effects of the "springtime pumping hiatus" on the environment and the safe yield of water that the Reservoir would be able to provide. The FWS stated: "One new piece of information is how [Newport News'] cessation of water intake during a springtime pumping hiatus period would affect the pumping patterns during other seasons of the year over the hydrologic record, especially during the drier summer period. [Newport News] has not provided evidence of this analysis, or how the hiatus affects their safe yield of water. Furthermore, this issue was not considered during the VMRC permit evaluation process."

e.    The Corps failed to consider significant new information regarding regional water demand and the availability of other feasible sources of regional water supply. Letter from Michael Siegel, Public and Environmental Finance Associates to North Atlantic Division (2 Sept. 2005). The information submitted to the Corps demonstrated that regional water demand is falling short of even the IWR forecasts incorporated into the 2005 ROD. As a result, a

supplemental EIS is warranted to analyze whether the Reservoir will be able to produce an adequate water supply considering the newly imposed state permit conditions and the need for the Reservoir given the updated information about the region's water demand and the availability of alternative sources of water supply.

f.  The 2004 VMRC permit also allows for the installation of a chemical feed system within the water intake pipe for the purpose of controlling bio-fouling organisms.  The addition of the pipes for the intake chemical feed system and the use of chemicals could have significant adverse impacts on other unintended animal and plant species, including the sensitive joint vetch, listed as federally threatened under the Endangered Species Act.  The Corps has failed to analyze the potential impacts from the installation of a chemical feed system.

g.  On information and belief, certain key mitigation sites identified in the Final Mitigation Plan are no longer available.  The Corps has failed to analyze the potential impacts from this significant change on the adequacy of the Plan and the feasibility of mitigation.

h.  The Corps has also failed to address the potential for methyl mercury formation in the Reservoir.  According to a U.S. Geological Survey publication, newly flooded reservoirs and constructed wetlands have been shown to increase mobilization of mercury, potentially impacting aquatic species.  The FWS raised

54

this concern by letter dated 23 June 2005 to the North Atlantic Division. The Corps has failed to conduct its own analysis of this issue.

125.    Plaintiffs requested the Corps to prepare a supplemental EIS based on the above significant changes and new information. The Corps determined in the 2005 ROD that the changes to the Project resulting from the conditions imposed by the VMRC permit did not constitute substantial changes or significant new circumstances or information that would require the preparation of a supplemental EIS.

126.    The Corps' failure to prepare a Supplemental EIS to evaluate the substantial changes to the Reservoir Project and the significant new information violates NEPA. The Corps' approval and issuance of the 2005 Final ROD and the Section 404 permit is therefore arbitrary and capricious, an abuse of discretion, and not in accordance with law.

## Count VII

### (Failure to Comply with Chesapeake 2000 Agreement)

127.    Paragraphs 1 through 126 are incorporated herein by reference.

128.    The Chesapeake Bay Commission, the State of Maryland, the Commonwealths of Pennsylvania and Virginia, the District of Columbia, and the United States entered into the Chesapeake 2000 Agreement, reaffirming their commitment to the restoration and protection of the ecological integrity, productivity and beneficial uses of the Chesapeake Bay system, and their commitments to previously-adopted Chesapeake Bay agreements and supporting policies.

129.    One of the goals of the Chesapeake 2000 Agreement is to: "Preserve, protect and restore those habitats and natural areas that are vital to the survival and diversity of the living resources of the Bay and its rivers." Further, with respect to wetlands, the Chesapeake 2000 Agreement sets forth the following goals, among others: 1) "Achieve a no-net loss of existing wetlands acreage and function in the signatories regulatory programs"; and 2) "By 2010, achieve a net resource gain by restoring 25,000 acres of tidal and non-tidal wetlands . . . ."

130.    The Agreement is binding on the Corps.

131.    The Reservoir Project will result in a net loss of wetlands functions, values, and acreage in Virginia.

132.    As a result, the Corps' issuance of the Section 404 permit violates the Chesapeake 2000 Agreement. The Corps' approval and issuance of the 2005 Final ROD and the Section 404 permit is therefore arbitrary and capricious, an abuse of discretion, and not in accordance with law.

## PRAYER FOR RELIEF

Wherefore, Plaintiffs respectfully request that the Court grant the following relief:

133.    Enter a declaratory judgment stating that Department of the Army Discharge Permit number 93-0902-12, issued on 15 November 2005 by the North Atlantic Division of the Corps of Engineers to Newport News, was unlawfully issued in violation of NEPA, the Clean Water Act, the Chesapeake 2000 Agreement, and the APA.

134.    Issue a permanent injunction requiring the Corps to withdraw specification of the disposal site identified by the permit as in violation of the Clean Water Act and the Section 404(b)(1) Guidelines and the public interest review requirements, and thereby

revoke the permit and remand the same to the Corps for further action consistent with the Court's rulings.

135.    In the alternative, issue an injunction requiring the Corps to withdraw the permit and to prepare a revised EIS or supplemental EIS before issuing any new permit for the discharge of dredged or fill material in conjunction with a project to construct a reservoir.

136.    In the alternative, issue an injunction requiring the Corps to withdraw the permit and to comply with the Chesapeake 2000 Agreement before issuing any new permit for the discharge of dredged or fill material in conjunction with a project to construct a reservoir.

137.    Award plaintiffs all costs and expenses of this action, including reasonable attorneys' fees pursuant to the Equal Access to Justice Act, 5 U.S.C. § 504, and other applicable laws.

138.    Award such additional relief as to the Court appears proper.

Respectfully submitted this __17th__ day of July 2006.

_Austin D Gerken, Jr._
Austin D. Gerken, Jr. (DC Bar No. 474947)
Southern Environmental Law Center
29 N. Market Street, Suite 700
Asheville, NC  28801-2934
(828) 258-2023 Telephone
(828) 258-2024 Fax

Deborah M. Murray  (DC Bar No. 362563)
Senior Attorney
Southern Environmental Law Center
201 West Main Street, Suite 14
Charlottesville, VA  22902
(434) 977-4090 Telephone
(434) 977-1483 Fax

Counsel for Plaintiffs
Alliance to Save the Mattaponi
The Chesapeake Bay Foundation, Inc.
Sierra Club, Virginia Chapter


Jon A. Mueller
Director of Litigation
The Chesapeake Bay Foundation, Inc.
6 Herndon Ave.
Annapolis, MD 21403
(410) 268-8816 Telephone
(410) 268-6687 Fax

Co-Counsel for Plaintiff
The Chesapeake Bay Foundation, Inc.