

EXHIBIT

1

GEORGETOWN UNIVERSITY LAW CENTER
INSTITUTE FOR PUBLIC REPRESENTATION

Hope M. Babcock
Angela J. Campbell
David C. Vladeck
  Directors
Marvin Ammori
Jillian M. Cutler
Emma E. Garrison
Jennifer L. Prime*
Kristi M. Smith
  Staff Attorneys

600 New Jersey Avenue, NW, Suite 312
Washington, DC 20001-2075
Telephone: 202-662-9535
TDD: 202-662-9538
Fax: 202-662-9634

April 20, 2006

The Honorable Francis J. Harvey
Secretary
Department of the Army
1500 Army Pentagon
Washington, D.C. 20310

Lieutenant General Carl A. Strock
Commander and Chief of Engineers
U.S. Army Corps of Engineers
Headquarters
441 G. Street, NW
Washington, DC 20314

Stephen L. Johnson
Administrator
U.S. Environmental Protection Agency
1200 Pennsylvania Avenue N.W.
Washington, D.C. 20460

Re: NOTICE OF INTENT TO FILE CITIZEN SUIT UNDER THE CLEAN WATER ACT

Dear Recipients:

Pursuant to section 505(a)(2) of the Federal Water Pollution Control Act ("Clean Water Act" or "CWA"), 33 U.S.C. § 1365(a)(2), and 40 C.F.R. §§ 135.1-135.5, the Institute for Public Representation ("IPR"), on behalf of its client, the Mattaponi Indian Tribe ("Tribe"), hereby notifies you of the Tribe's intent to file suit under section 505(a)(2), 33 U.S.C. § 1365(a)(2), against Francis J. Harvey in his capacity as Secretary of the Army, Lieutenant General Carl A. Strock in his capacity as Chief of the Army Corps of Engineers, and Stephen L. Johnson in his capacity as Administrator of the Environmental Protection Agency for failing to perform non-discretionary duties under section 404 of the Clean Water Act, 33 U.S.C. § 1344, and the Act's implementing regulations, including 40 C.F.R. § 230.10 and 33 C.F.R. § 320.4, regarding the

*Admitted to the Indiana Bar only. Practice Supervised by Members of the D.C. Bar

Notice of Intent to File Citizen Suit Under Clean Water Act
April 20, 2006
Page 2 of 12

issuance of Permit 93-0902-12 authorizing the King William Reservoir ("KWR"). The KWR is a proposed large-scale reservoir that will be located near the modern Mattaponi Reservation and will withdraw water from the Mattaponi River as well as flood the Tribe's ancestral lands. Although not required by law, the Tribe also gives notice of its intent to sue the same parties under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-706, for their violations of the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4332.

The Tribe has participated fully in the public processes and has exhausted its administrative remedies. The Tribe filed numerous comment letters on the proposed permit, including the Environmental Impact Statement and the archaeological reports issued pursuant to the National Historic Preservation Act. The Tribe also participated fully in related permit proceedings before the State Water Control Board ("SWCB"), involving the CWA section 401 state certification of the federal permit, and before the Virginia Marine Resources Commission ("VMRC") on the issuance of a subaquaeous bed permit for the project's intake structure. The Tribe maintained throughout the federal and state permit proceedings that the KWR will irrevocably harm the Tribe by disturbing the ecology of the Mattaponi River and destroying archaeological sites of cultural importance to the Tribe, and that the project may not be feasible or serve its intended purpose.

The Tribe intends to bring this action on its own behalf and as *parens patriae* on behalf of its individual members. The Tribal Council has authorized Chief Carl T. Lone Eagle Custalow to file this notice on behalf of the Tribe in its opposition to the KWR project.

IPR is a public interest law firm and clinical education program established at Georgetown University Law Center in 1971. Attorneys at IPR function as counsel for groups and individuals who are unable to obtain effective legal representation. IPR has represented the Mattaponi for ten years.

## A. Background

The Mattaponi Indian Tribe has resided on the banks of the Mattaponi River in east-central Virginia since the beginning of recorded history, and its members were among the first American Indians that met the English settlers at Jamestown in 1607. In 1677, several Indian tribes, including the Mattaponi, and the colonial representatives of King Charles II of England entered into an agreement known as the Treaty at Middle Plantation ("Treaty").[1] The Treaty created the Mattaponi Reservation, ensured that the Tribe's Indian town and "three miles around" would be protected from unwanted encroachment, and guaranteed the Tribe's right to "have and enjoy their wonted conveniences" of fishing and gathering on its traditional lands.[2]

The modern Mattaponi Reservation consists of about 150 acres located on the banks of the Mattaponi River. The Tribe's continued cultural and economic survival is dependent on the

---

[1] The Treaty at Middle Plantation with Tributary Indians After Bacon's Rebellion, May 29, 1677, reprinted in Early American Indian Documents, 1607-1789, Virginia Treaties, 1607-1722, at 82-87 (Alden T. Vaughan & W. Stitt Robinson eds., 1983)
[2] Id. at Arts. IV, VII.

Notice of Intent to File Citizen Suit Under Clean Water Act
April 20, 2006
Page 3 of 12

river's continued health. In particular, the Tribe relies on the American shad for food, jobs, and income, as well as its cultural identity. The river's shad population, however, is in severe decline.[3] The Tribe operates a shad hatchery to replenish the declining stocks, which also provides the Tribe with a major source of jobs and income, and fosters the Tribe's long-standing cultural connection to the Mattaponi River and its shad. The Tribe also gathers plants and medicinal herbs along the river's banks, and the river itself plays an essential part in many of the Tribe's religious and spiritual practices. Archaeological sites of cultural significance to the Tribe are found in neighboring Cohoke Creek Valley.[4] The Tribe also hunts and gathers in and around Cohoke Creek and its associated wetlands.

The Regional Raw Water Study Group ("RRWSG"), a consortium of cities and counties on the Virginia peninsula, has proposed the development of a dam and reservoir along Cohoke Mill Creek near the modern Mattaponi Reservation. The proposal for the King William Reservoir ("KWR") identifies the Mattaponi River as its primary source of water and will withdraw as much as seventy-five million gallons a day (one-third of the river's daily flow) during periods of high to moderate flow.[5] The reservoir would also flood 1,526 acres of unoccupied land, including 437 acres of forested wetlands.[6] This inundation will result in the largest destruction of wetlands on the east coast since the passage of the Clean Water Act.[7] Moreover, the King William Reservoir will encroach upon over 500 acres of the Tribe's Treaty-protected lands. Taking into account the wetlands mitigation plan, which the Corps released for comment in 2004, the KWR project's scope has increased from 1,526 acres to 7,629 acres.[8] Archaeological surveys in the proposed impoundment and mitigation areas revealed over two-hundred-and-fifty sites[9] that contain Indian artifacts, including seventy-two culturally significant sites that are eligible for the National Register of Historic Places.[10]

### B. Procedural History

On July 6, 1993, the City of Newport News ("the City"), on behalf of RRWSG, submitted a permit application to the Corps of Engineers Norfolk District for the King William

---

[3] Letter from Dr. Edward F. Cheslak, Ph.D., to William A. Pruitt, VMRC Commissioner at 3 (April 18, 2003) ("Cheslak 2003").

[4] MAAR Associates, Inc., Phase I Cultural Resource Survey for the Proposed King William Reservoir King William County, Virginia and a Background Review, Architectural Survey and Archaeological Reconnaissance for the Proposed Black Creek Reservoir New Kent County, Virginia IV-4 to IV-5 (revised January 2004) ("MAAR Report").

[5] Army Corps of Engineers, Record of Decision Memorandum for Permit Application Number 93-0902-12 (Norfolk District) by the City of Newport News, Virginia for the King William Reservoir Project at 1-2 (July 29, 2005) ("ROD").

[6] Id. at 1-2. Army Corps of Engineers, Final Recommended Record of Decision of the District Commander On Permit Application Number 93-0902-12 Submitted by the City of Newport News at 2 (July 2, 2001) ("RROD").

[7] RROD at 253.

[8] ROD at 24.

[9] The Phase I Cultural Resource Survey initially documented over one-hundred Native American sites in the proposed impact area. MAAR Report at i; ROD at 187. An additional 150 sites will be affected by the mitigation plan. See Letter from Hope Babcock to Brigadier General Merdith W.B. Temple at 5 (Jan. 31, 2005) ("Comments to Mitigation Plan").

[10] RROD at 187.

Notice of Intent to File Citizen Suit Under Clean Water Act
April 20, 2006
Page 4 of 12

Reservoir pursuant to section 404 of the Clean Water Act, 33 U.S.C. § 1344. As required by the Clean Water Act and Virginia state law, the City also sought approval for a Virginia Water Protection Permit ("VWP") from the State Water Control Board ("SWCB") and a subaqueous beds permit from the Virginia Marine Resources Commission ("VMRC"). Because permitting the reservoir constitutes a major federal action, the Corps prepared an Environmental Impact Statement ("EIS"), as required by NEPA, and issued the final version on January 24, 1997. The state agencies, however, issued permits subsequent to the issuance of the EIS that significantly modified the project. More specifically, the SWCB included permit conditions regarding minimum instream flow restrictions ("MIF"),[11] and the VMRC imposed pumping restrictions as conditions on its subaqueous beds permit. The MIF requirement specifies a minimum instream flowby for each month and prohibits the City from withdrawing water when water flow is less than that minimum.[12] The VMRC restrictions prohibit water withdrawals from the Mattaponi River between March 1 and July 31 of any year until the City can prove that a shorter pumping hiatus would be equally protective of American shad.[13]

In light of the new state permit conditions, the Tribe requested on November 29, 2004 that the Corps prepare a supplemental EIS ("SEIS").[14] The Tribe's SEIS request also noted the increased harm to archaeological resources when taking into account the City's Wetlands Mitigation Plan, which was issued in 2004 and would increase the scope of the project nearly five-fold.[15] As the Tribe noted in its comments on the mitigation plan, over one-hundred and fifty additional archeological sites have been identified on the wetlands mitigation sites, making the project's increased scope even more harmful to cultural resources.[16] The Corps rejected the Tribe's request for a supplemental EIS and issued a proposed permit and record of decision ("ROD") on July 29, 2005. In addition to the project changes the Tribe identified in its SEIS request and comment letters, the ROD reflected that region's projected water demand had dropped dramatically since the EIS was issued in 1997—from 39.8 million gallon a day to 15.9 million gallon a day.[17]

### C. Violations of the Clean Water Act

The Corps has the authority to issue CWA section 404 permits[18] and has a mandatory duty to "ascertain the relevant facts, correctly construe the applicable statutes and regulations, and

---

[11] Virginia Department of Environmental Quality, Virginia Water Protection Permit No. 93-0902 (Dec. 22, 1997) ("VWP Permit"); RROD at 4.
[12] VWP Permit Part 1 at 3.
[13] Virginia Department of Environmental Quality, Listing of Permit / Approval Conditions Associated with the Enforceable Policies of the Virginia Coastal Resource Management Program for the King William Reservoir Project (Aug. 2004).
[14] Letter from Hope Babcock to Brigadier General Merdith W.B. Temple (Nov. 29, 2004) ("SEIS letter.")
[15] Id. at 3. The SEIS letter indicates that the addition of the mitigation sites would the scope of the project from 1500 acres to 4500 acres. The final estimation of the project scope as presented in the ROD, however, indicates that the mitigation sites will total approximately 6,103 acres in addition to the 1,526 acres for the project itself. ROD at 14, 24.
[16] See Comments to Mitigation Plan.
[17] Army Corps of Engineers, Final Environmental Impact Statement for the King William Reservoir Project at 3-3 (January 24, 1997) ("EIS"); ROD at 5.
[18] 33 U.S.C. § 1344(a).

Notice of Intent to File Citizen Suit Under Clean Water Act
April 20, 2006
Page 5 of 12

properly apply the law to the facts."[19]  Here, however, the Corps violated the regulations implementing the CWA, which require the Corps to: (1) evaluate less harmful, practicable alternatives;[20] (2) investigate factors relevant to the "public interest review";[21] (3) refrain from issuing a permit that will cause or contribute to significant degradation of United States waters;[22] and (4) properly balance the project's potential costs against its benefits.[23]  The EPA is responsible for promulgating the controlling environmental regulations[24] and has a duty to oversee that permits issued comply with these guidelines.[25]  Both the EPA and the Corps are liable for the following violations of the Clean Water Act.

### 1. Failure to evaluate less harmful, practicable alternatives

The EPA regulations implementing CWA prohibit the issuance of a permit under section 404, "if there is a practicable alternative . . . which would have less adverse impact on the aquatic ecosystem."[26]  The Corps must carefully evaluate such alternatives, and the regulations specify that when the Corps relies on NEPA documents that "may not have considered the alternatives in sufficient detail to respond to the requirements of these Guidelines . . . it may be necessary to supplement these NEPA documents."[27]  The Corps violated this duty because it relied on the alternatives analysis of an outdated EIS and thus failed to adequately assess the feasibility of various less harmful alternatives.

When conducting the alternatives analysis required by the CWA, the Corps relied on its prior analysis of alternatives prepared for the EIS in 1997. The alternatives analysis in the EIS depended on the RRWSG's projected demand for water, which has fallen by 60 percent since the EIS's issuance in1997, from 39.8 million gallons a day to 15.9 million gallons a day.[28]  The Corps, however, did not supplement its findings[29] nor reevaluate potential alternatives that may now be practicable in light of RRWSG's reduced water demand,[30] although this information was brought to the Corps' attention during the permitting process.[31]  For instance, building groundwater desalinization facilities, taking additional drawdowns from existing reservoirs,

---

[19] National Wildlife Federation v. Hanson, 859 F.2d 313, 316 (4th Cir. 1988).

[20] 40 C.F.R. § 230.10(a).

[21] 33 C.F.R. § 320.4(a)(1).

[22] 40 C.F.R. §§ 230.12(a)(3).

[23] 33 C.F.R. § 320.4(a)(1).

[24] 33 U.S.C. § 1361(a).

[25] 33 U.S.C. § 1344(c); Bersani v. EPA, 850 F.2d 36, 40 (2d Cir. 1988) (noting EPA's authority to veto projects that will have an "unacceptable adverse effect" on aquatic wildlife); Hanson, 859 F.2d at 315-16 (noting that the "EPA is ultimately responsible for the protection of wetlands").

[26] 33 U.S.C. § 1344(b); 40 C.F.R. § 230.10(a); see Utahns for Better Transportation v. U.S. Dept. of Transportation, 305 F.3d 1152, 1189 (10th Cir. 2002) (holding that the issuance of a permit was arbitrary and capricious because the Army Corps of Engineers failed to rationally assess the practicable alternatives).

[27] 40 C.F.R. § 230.10(a)(4).

[28] ROD at 5.

[29] ROD at 35 ("I find that the analysis of alternatives in the Final Environmental Impact Statement provides sufficient information regarding alternatives to be evaluated under these guidelines.").

[30] Comments on ROD of July 29, 2005 from Michael Siegel, Public and Environmental Finance Associates at 9 (Sept. 2, 2005) ("Siegel").

[31] Siegel at 4-6.

Notice of Intent to File Citizen Suit Under Clean Water Act
April 20, 2006
Page 6 of 12

increasing withdrawals from the Chickahominy River, together with keeping the Big Bethel reservoir open (an alternative not mentioned in the EIS), could produce 16.2 million gallons a day.[32] This number already exceeds the projected water demand of 15.9 million gallons a day, and does not include the potential benefits of other water supply alternatives, like increasing water conservation and expanding the Beaver Creek reservoir.[33] These alternatives to the King William Reservoir are not only feasible,[34] but are also far less damaging to aquatic life and the environment.[35] Furthermore, the Corps has presented no evidence that the KWR will be able to produce 15.9 million gallons a day in light of the newly imposed instream flow and pumping restrictions.

The Corps' failure to reevaluate the feasibility of less harmful alternatives in light of the region's decreased water demand is a violation of its mandatory duty to examine practicable alternatives and to deny a permit when a less harmful alternative exists.[36]

2. Failure to investigate and balance factors relevant to the public interest review

The Corps failed to fully investigate and carefully consider factors highly relevant to this project, such as water conservation and the impact on cultural resources,[37] and failed to give appropriate weight to comments,[38] all in violation of its own regulations governing the evaluation of permit applications.

Permitting agencies have an obligation to verify factual information supplied by the applicant, if interested parties challenge the accuracy of that information.[39] Here, however, the Corps did not verify factual information relevant to the public interest review required by its regulations. For instance, the public interest review requires the consideration of water supply and conservation,[40] but the Corps did not consider comments that revealed significant new information regarding the region's water supply and demand.[41] As a result, nothing in the ROD shows whether the reservoir will be able to produce an adequate water supply considering the

---

[32] Id.
[33] Id.
[34] Id. at 6, 9.
[35] In addition to destroying over 400 acres of forested wetlands, the KWR threatens to cause damage to aquatic life. See discussion at 8-10.
[36] 40 C.F.R. §§ 230.10(a), 10(a)(4).
[37] 33 C.F.R. § 320.4(a)(1). The factors the Corps must balance are "conservation, economics, aesthetics, general environmental concerns, wetlands, historic properties, fish and wildlife values, flood hazards, floodplain values, land use, navigation, shore erosion and accretion, recreation, water supply and conservation, water quality, energy needs, safety, food and fiber production, mineral needs, considerations of property ownership and, in general, the needs and welfare of the people." Id.
[38] 33 C.F.R. § 320.4(3).
[39] Utahns for Better Transp. v. U.S. Dept. of Transp., 305 F.3d 1152, 1165 (10th Cir. 2002); Van Abbema v. Fornell, 807 F.2d 633 (7th Cir. 1986); North Carolina v. Hudson, 665 F. Supp. 428, 442 (E.D.N.C. 1987); see also Sierra Club v. Marsh, 701 F. Supp. 886, 912 (D. Maine 1988) ("The Corps may not reflexively rubber stamp the information and conclusions of an applicant and its consultants.").
[40] 33 C.F.R. § 320.4(a)(1).
[41] See, e.g., Siegel at 5-7.

Notice of Intent to File Citizen Suit Under Clean Water Act
April 20, 2006
Page 7 of 12

newly imposed state permit conditions, or even if the project is still needed given the region's water demand and the availability of alternative sources of water supply.[42]

Similarly, the Corps did not carefully examine the extent of damage to Mattaponi religious and cultural sites. The City's Wetlands Mitigation Plan ignores over one-hundred archaeological sites that will be affected by the mitigation efforts.[43] Although the Tribe filed comments on the mitigation plan with the Corps, the Corps did not consider the potential harmful effects of wetlands mitigation activities on these sites of great cultural significance.[44]

Throughout the permitting process, the Tribe and other groups have challenged the City's conclusions on these issues; yet, the Corps failed to verify the accuracy of the applicant's information. Because the Corps did not investigate these points of information, it could not balance all relevant factors, including the reservoir's ability to meet the region's water supply needs and the project's potential impact on cultural resources. Thus, the Corps violated its nondiscretionary duty to consider and balance all relevant factors, as required by the CWA public interest review.

### 3. Issuance of a permit that will degrade the aquatic ecosystem

By authorizing the KWR project, the Corps violated its nondiscretionary duty to ensure that authorized projects will not "result in significant degradation of the aquatic ecosystem."[45] The Corps has authorized a project that, based on available information, will harm fish and aquatic life.[46]

Although the state permit conditions were designed to prevent adverse effects to aquatic life, specifically the American shad,[47] there is evidence in the record that undermines this conclusion. The MIF requirements combined with the VMRC pumping hiatus are not sufficiently protective because the permits allow pumping to resume at any time during the summer-month hiatus period, if "a water supply emergency has been declared."[48] The City seeks to use the Mattaponi River as the reservoir's sole source of water, yet it cannot withdraw water from the river for five of the six months with the highest water demand. Furthermore, in a typical year, the MIF restrictions will result in an additional three months of decreased or no pumping.[49] The combined effects will create circumstances that make it likely that such a "water supply emergency" would arise. There is evidence that allowing emergency withdrawals during these

---

[42] Siegel at 1-2.
[43] Comments on Mitigation Plan at 5.
[44] ROD at 27 (cursorily noting that the Memorandum of Agreement pursuant to section 106 of the National Historic Preservation Act is adequately protective of cultural resources).
[45] 40 C.F.R. §§ 230.12(a)(3)(ii).
[46] Letter from Dr. Edward F. Cheslak, Ph.D., to William A. Pruitt, VMRC Commissioner at 1 (May 12, 2004) ("Cheslak 2004").
[47] VWP Permit Part I at 3-6; Letter from Robert Grabb, Chief Habitat Management Marine Resources Commission to Brian Ramaley, Newport News Waterworks at 2 (August 17, 2004) ("VMRC Permit Conditions").
[48] VWP Permit Part I at 3-6.
[49] See Attached Chart (demonstrating the combined effects of pumping hiatus and MIF restrictions).

Notice of Intent to File Citizen Suit Under Clean Water Act
April 20, 2006
Page 8 of 12

restricted summer months, particularly during a dry summer, would devastate young shad.[50] And, "[i]f several 'emergencies' occurred in succession . . . the entire fishery could be lost."[51] The Corps violated the guidelines by issuing this permit despite the indications that the state permit conditions will degrade the aquatic environment. Moreover, the Corps violated the guidelines because it issued the permit without further investigation of the potential combined effects of the MIF restrictions and VMRC permit condition.[52]

Additionally, the proposed KWR has the potential to harm young shad notwithstanding the VMRC pumping hiatus, because the hiatus may not always correlate with shad spawning season, which varies from year to year.[53] The long-term plan to use temperature to determine when to resume pumping is not sufficiently protective because, although shad spawning is correlated to the temperature, other factors exert influence on spawning as well.[54] For example, if the pumping station operates when the shad are spawning, the intake pipes' suction will likely trap young shad larvae as they are poor swimmers and will be unable to escape.[55] Furthermore, it is likely that fragile shad eggs will collide with the screens over the intake pipes and be destroyed.[56] Finally, the increased salinization of the Mattaponi River caused by the water withdrawals will be particularly harmful to young shad, which cannot live in salt water because they do not have gills and cannot yet control the salt levels in their bodies.[57]

The withdrawals from the river are likely to have adverse effects on both adult and juvenile shad by increasing salinity and decreasing water levels in the river, regardless of when during the year the withdrawals occur.[58] Additionally, the heavy water withdrawals during the four non-hiatus months could harm the shad population by depriving the shad of a major food source.[59] The screens covering the intake pipes will not prevent the removal of needed nutrients, like small planktonic organisms, from the water.[60] The withdrawals could harm young-of-the-year shad because they rely primarily on in-river production for food, and thus significantly impair long-term population sustainability.[61]

Comments submitted during the permitting process have informed the Corps that the KWR may be harmful to the aquatic ecosystem. By issuing the permit notwithstanding this information, the Corps violated its duty to ensure that all permits issued comply with the CWA guidelines. Alternatively, the Corps violated this duty because, by failing to investigate the

---

[50] Cheslak 2004.
[51] Id.
[52] 40 C.F.R. §§ 230.12(a)(3) (iv).
[53] Cheslak 2004 at 1.
[54] See Peter Henderson, Pisces Conservation Ltd, Comments on the KWR Mattaponi Fish Impact Assessment and Mitigation Report at 10-11 (May 11, 2004) ("Henderson").
[55] Cheslak 2003 at 3-4.
[56] Id.
[57] Henderson at 11.
[58] Cheslak 2003 at 3; Henderson at 11.
[59] Henderson at 9; Cheslak 2004 at 2.
[60] Henderson at 9, Cheslak 2003 at 2.
[61] Cheslak 2004 at 2.

Notice of Intent to File Citizen Suit Under Clean Water Act
April 20, 2006
Page 9 of 12

effects of the state permit conditions, it lacked "sufficient information to make a reasonable judgment" as to whether the KWR will comply with the CWA guidelines.[62]

### 4. Issuance of a permit that is contrary to the public interest

Before issuing a permit, the Corps must conduct a public interest review, wherein the Corps must evaluate the project's probable impacts and carefully balance the project's potential benefits against the reasonably foreseeable costs.[63] The Corps may not grant a permit if, after conclusion of that process, the Corps determines that the project is not in the public interest.[64] Here, the record demonstrates that the KWR will adversely impact hundreds of acres of forested wetlands, the river's aquatic ecosystem, and numerous sites containing archaeological resources, and will also irreparably damage the Tribe's economy and culture.

The record, however, does not establish that the project can reasonably be expected to provide its intended benefit of serving the region with 15.9 million gallons of water a day. Moreover, as noted above, the record demonstrates that it is reasonably foreseeable that the KWR will be unnecessary in light of the decreased regional demand for water and availability of practicable alternatives. Given this evidence in the record, the Corps violated its own regulations by finding that the KWR project's benefits outweigh its costs and concluding that the project is in the public interest.

## B. Violation of the National Environmental Policy Act

The Corps' failure to supplement the EIS prepared in 1997 constitutes a violation of NEPA.

As required by NEPA, the Corps prepared an EIS summarizing the environmental impacts of, and practicable alternatives to, the King William Reservoir.[65] Whenever the nature of a proposed action changes subsequent to the issuance of an EIS, the Corps must take a "hard look" at those changes and determine whether a supplemental EIS is necessary.[66] If the Corps determines that the changes are substantial or raise environmental concerns, the Corps must supplement the EIS.[67] The Corps, however, has not supplemented the EIS to reflect the significant changes to the proposed KWR project since the issuance of the EIS in 1997, nor has it taken a "hard look" to determine whether these changes necessitate a supplemental EIS

---

[62] 40 C.F.R. §§ 230.12(a)(3) (iv); accord Monongahela Power Company v. Marsh, 809 F2d 41, 51 (D.C. Cir. 2006).
[63] 33 C.F.R. § 320.4 (a)(1).
[64] Id.
[65] See 42 USC § 4332.
[66] Marsh v. Oregon Natural Resources Council, 490 U.S. 360, 378 (1989); Hughes River Watershed Conservancy, 165 F.3d 283. Hughes River Watershed Conservancy v. Glickman, 81 F.3d 437, 445 (4th Cir. 1996).
[67] 40 C.F.R. § 1502.9(c).

Notice of Intent to File Citizen Suit Under Clean Water Act
April 20, 2006
Page 10 of 12

("SEIS").[68] The EPA and the Corps acted contrary to NEPA by issuing a permit for the KWR without an EIS that accurately summarized the current nature of the proposed project.[69]

First, the Corps should have supplemented the EIS because the balance between the environmental costs and economic benefits has shifted significantly since the EIS was issued in 1997. As the proposal now stands, the KWR is more likely to harm the environment and cultural resources, and less likely to provide for the region's water supply needs. The VMRC and SWCB permit conditions in particular have changed the project's relative costs and benefits. In a typical year, the combined effect of the VMRC pumping hiatus and the SWCB's MIF restrictions will restrict pumping for seven months, and allow only minimal pumping during the month following the hiatus.[70] Because the Corps did not supplement the EIS, the Corps has not addressed whether the restrictions will allow the City to withdraw the envisioned 15.9 million gallons a day to meet the region's water supply demands. In order to compensate for the hiatus, the City might withdraw more water than previously planned in other months. The Corps has not evaluated whether such an increase in pumping would harm the shad or otherwise increase the environmental harm of the project. A supplemental EIS is necessary because the record does not contemplate the serious harms that may result from the newly imposed pumping restrictions, nor does it reevaluate whether the project will produce the desired amount of water under the permit conditions.

The Corps also should have supplemented the EIS to assess the available alternatives more accurately and address the dramatic reduction in the region's projected water demand. NEPA demands that agencies "[r]igorously explore and objectively evaluate all reasonable alternatives."[71] When preparing the EIS in 1997, the Corps dismissed many alternatives as not practicable because they did not provide for the then-projected need of 39.8 million gallons a day. As noted above, now that the projected water demand has dropped to 15.9 million gallons a day, alternatives that were dismissed or overlooked in 1997 may indeed be viable.[72] The Corps has not supplemented the EIS to reflect how the decreased projected water demand affects the practicability of alternatives, and thus has failed to evaluate alternatives to the project rigorously as required by NEPA.

Finally, the Corps should have supplemented the EIS to reflect the current understanding of the project's impacts. The Corps must issue an SEIS if "new information provides a *seriously different* picture of the environmental landscape."[73] Since 1997, a number of studies have been issued addressing the quality of the wetlands mitigation plan, the City's water needs, and the effects of salinity on river life. For example, the Bragdon Moretti-Langholtz Traditional Cultural

---

[68] Marsh, 490 U.S. at 378.
[69] See Hickory Neighborhood Defense League v. Skinner, 893 F.2d 58, 63 (4th Cir.1990) (necessitating an SEIS when changed circumstances "present a seriously different picture of the environmental impact of the proposed project from what was previously envisioned").
[70] See Cheslak 2004; Attached Chart.
[71] 40 C.F.R. § 1502.14.
[72] Id. at 6.
[73] Wisconsin v. Weinberger, 745 F.2d 412, 418 (7th Cir.1984) (emphasis in original); Hickory Neighborhood Defense League, 893 F.2d 58, 63 (4th Cir. 1990); West Branch Valley Flood Protection Ass'n v. Stone, 820 F.Supp. 1, 6 (D.D.C. 1993).

Notice of Intent to File Citizen Suit Under Clean Water Act
April 20, 2006
Page 11 of 12

Properties Study concluded that the Project will significantly and irreversibly impact the Tribe
because it will change the River and its wildlife, alter the rural character of the community, lead
to further isolation of the Mattaponi and Pamunkey reservations, harm prehistoric archeological
sites, impact the Tribe's future plans to expand its need for its land base, and negatively effect the morale of
the Tribe.[74] Additionally, in May 1998 the Corps' consultants completed a report entitled,
"Review of Water Supply Needs Assessment for the Regional Raw Water Study Group, Newport
News, Virginia," which refuted the City's analysis of its need for the KWR Project and
concluded that RRWSG tended to overestimate future water demand, and underestimate future
supply.[75] The Virginia Institute of Marine Sciences also completed a study that concluded that
the salinity of the river has affected, and will affect, the river's vegetation.[76] These studies
present a substantially different picture of the environmental impacts that will occur if the project
goes forward, and necessitate further scrutiny of the KWR project in the form of an SEIS.

Not only did the Corps not issue an SEIS, but it did not even give the new information
and project changes the required "hard look" to determine whether an SEIS was necessary.[77]
"[T]he hallmarks of a 'hard look' are thorough investigation into environmental impacts and
forthright acknowledgment of potential environmental harms."[78] Here, however, because the
Corps has neither addressed how the pumping hiatus will affect the project's harms and benefits,
nor reevaluated the existence of practicable alternatives in light of the dramatic decrease in water
need, the Corps has not taken a "hard look."[79]

The Corps' balancing of economic benefits against environmental harms in the 1997 EIS
is no longer current, its exploration of alternatives is no longer adequate given the decreased
water demand, and the Corps has not addressed new information regarding the project's cultural
and environmental impacts. Despite this, the Corps has not supplemented the EIS, nor carefully
examined whether an SEIS is necessary. On this basis, the permit violates NEPA, § 102(2)(c),
42 U.S.C. § 4332(2)(c), and cannot stand.

The Corps' issuance of the permit authorizing the King William Reservoir violated both
the Clean Water Act and NEPA. The permit violates the Clean Water Act because it authorizes a
project that will not be in the public interest and is likely to adversely affect the aquatic
environment, without investigating factors relevant to the public interest review and without
properly analyzing the availability and feasibility of alternatives. Furthermore, because the

---

[74] TCP Study at 103-04; RROD at 193.

[75] RROD at 21-22.

[76] Letter from Dr. Roger L. Mann, Virginia Institute of Marine Sciences, to William A. Pruitt, VMRC Commissioner (Mar. 12, 2003) at 13.

[77] Marsh v. Oregon Natural Resources Council, 490 U.S. at 374; see also Norton v. Southern Utah Wilderness Alliance, 542 U.S. 55, 72-73 (2004) ("In Marsh, we interpreted § 4332 in light of this regulation to require an agency to take a 'hard look' at the new information to assess whether supplementation might be necessary.")

[78] National Audubon Society v. Department of Navy, 422 F.3d 174, 187 (4th Cir. 2005).

[79] See Glickman, 81 F.3d at 445 (holding that the district biologist's two telephone calls to individuals in the Corps' water quality section in response to evidence of the project's "devastating" environmental consequences did not constitute a hard look); Natural Resources Defense Council v. Lujan, 768 F. Supp. 870, 889 (D.D.C.1991) (concluding that there was no hard look when "[d]efendants did not respond to [information regarding environmental impacts], much less explain why they disregarded the proffered data").

Notice of Intent to File Citizen Suit Under Clean Water Act
April 20, 2006
Page 12 of 12

Corps did not supplement the EIS to address various project changes, the permit is also in violation of NEPA. The Tribe asks that the EPA and the Corps withdraw the permit and redress the violations of law.

　　　This letter is intended to put the recipients of this letter on notice that unless the violations described in this letter are corrected, the Mattaponi Indian Tribe will file suit against them under section 505(a)(2) of the CWA, 33 U.S.C. § 1365(a)(2), and under the APA, 5 U.S.C. §§ 701-706, for their violations of the NEPA, 42 U.S.C. § 4332. In any suit filed, the Mattaponi will seek declaratory and injunctive relief, as well as attorneys' fees and costs to the extent allowed by law.

The name, address, and telephone number of person giving notice of intent to sue is:

Carl Custalow, Chief
Mattaponi Indian Tribe
1467 Mattaponi Reservation Circle
West Point, VA 23181
804-769-4508

Counsel for the parties giving notice are:

Hope M. Babcock, Senior Attorney/ Director
Emma Garrison, Staff Attorney
Institute for Public Representation
600 New Jersey Avenue, NW
Washington, D.C. 20001
(202) 662-9535
(202) 662-9634 (Facsimile)

Sincerely,

Hope Babcock
Senior Attorney/Director
Emma E. Garrison
Staff Attorney/ Graduate Fellow

Attorneys for the Mattaponi Indian Tribe

cc: Donald S. Welsh, Regional Administrator, U.S. Environmental Protection Agency;
　　Brigadier General William T. Grisoli, Division Commander, U.S. Army Corps of Engineers;
　　Alberto Gonzales, Attorney General, U.S. Department of Justice;
　　David K. Paylor, Director, Virginia Department of Environmental Quality

# ATTACHMENT A

## COMBINED EFFECTS OF PUMPING HIATUS AND MIF RESTRICTIONS ON PROJECT'S WATER WITHDRAWALS

|  | Median Daily Stream Flow (mgd)[14] | Daily MIF Restrictions (mgd)[15] | Daily Median Water Available for Withdrawal (mgd)[16] | Maximum Daily Water Withdrawal (mgd)[17] |
|---|---|---|---|---|
| **January** | 534 | 329 | 205 | 75 |
| **February** | 618 | 423 | 195 | 75 |
| March | 731 | 454 | 277 | |
| April | 624 | 347 | 277 | |
| May | 395 | 206 | 191 | |
| June | 264 | 155 | 109 | |
| July | | | 115 | |
| **August** | 112 | 114 | 0 | 0 |
| **September** | 109 | 114 | 0 | 0 |
| **October** | 127 | 114 | 13 | 13 |
| **November** | 258 | 125 | 133 | 75 |
| **December** | 393 | 231 | 162 | 75 |

  Months of no pumping due to the pumping hiatus

  Months of decreased or no pumping due to the MIF restrictions

---

[14] Median Daily Stream Flow of the Mattaponi River at Scotland Landing. FEIS at Table 3-B.
[15] Conditions of the VWP permit issued by the State Water Control Board on December 22, 1997.
[16] Difference Between Median Daily Stream Flow and Daily MIF Restrictions
[17] Lesser of maximum permitted withdrawal or Daily Median Water Available for Withdrawal