# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____

ALLIANCE TO SAVE THE MATTAPONI,                )
387 Shilo Road, King & Queen, VA  23085,       )
                                               )
THE CHESAPEAKE BAY FOUNDATION, INC.,           )
1108 East Main Street, Suite 1600,             )
Richmond, VA  23219-3539,                      )
                                               )
and SIERRA CLUB, VIRGINIA CHAPTER,             )        Civil Action No.
422 E. Franklin Street, Suite 302,             )      1:06-cv-01268-HHK
Richmond, VA  23219,                           )
                                               )
            Plaintiffs,                         )
                                               )
MATTAPONI INDIAN TRIBE                         )
and CARL T. LONE EAGLE CUSTALOW, CHIEF         )
1467 Mattaponi Reservation Circle              )
West Point, VA  23181,                          )
                                               )
            Plaintiff-Intervenors,              )
                                               )
                                               )
                                               )
v.                                             )
                                               )
UNITED STATES ARMY CORPS OF ENGINEERS,         )
Headquarters, 441 G Street, NW, Washington, DC 20314, )
                                               )
FRANCIS J. HARVEY, in his official capacity as )
Secretary Of The Army, 101 Army Pentagon,      )
Washington, DC  20310,                         )
                                               )
CARL A. STROCK, in his official capacity as    )
Chief of Engineers and Commanding General of the )
U.S. Army Corps of Engineers, Headquarters,    )
441 G Street, NW, Washington, DC  20314,        )
                                               )
WILLIAM T. GRISOLI, in his official capacity as )
Brigadier General, Commander and Division Engineer )
of the U.S. Army Corps of Engineers, North Atlantic )
Division, 302 General Lee Avenue, Fort Hamilton )
Military Community, Brooklyn, NY  11252-6700,   )

UNITED STATES ENVIRONMENTAL PROTECTION )
AGENCY, Headquarters, 1200 Pennsylvania Ave, NW )
Washington, DC  20460, )
　 )
and STEPHEN L. JOHNSON, in his official capacity as )
Administrator of the U.S. Environmental Protection )
Agency, 1200 Pennsylvania Avenue, NW, )
Washington, DC 20460, )
　 )
     Defendants )
　 )
CITY OF NEWPORT NEWS, VIRGINIA, )
2400 Washington Street )
Newport News, VA  23607, )
　 )
     Defendant-Intervenor. )
_____)

**COMPLAINT**

**NATURE OF ACTION**

1.      This action challenges the Army Corps of Engineers' ("Corps") issuance of Permit 93-0902-12, authorizing the King William Reservoir ("KWR") on the grounds that it violates Section 404 of the Clean Water Act ("CWA"), 33 U.S.C. § 1344, the CWA implementing regulations, including 40 C.F.R. § 230.10, 40 C.F.R. § 230.12, and 33 C.F.R. § 320.4, and the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4332.

2.      The Army Corps of Engineers issued a Clean Water Act Section 404 permit authorizing the City of Newport News ("the City") to construct the proposed King William Reservoir in King William County, Virginia.  The KWR will withdraw water from the Mattaponi River, which borders the Mattaponi Indian Tribe's reservation, and will irreparably diminish the river's American shad population, which is central to the Tribe's history and culture.  The KWR project will also flood hundreds of acres of lands in the surrounding areas that are culturally significant to the Tribe.

3.      The construction and operation of this reservoir project will make the Tribe's cultural heritage, spiritual ceremonies, and day-to-day practices, such as operating the shad hatchery and fishing and eating shad, nearly impossible to maintain and will irreparably intrude into sites of cultural and spiritual significance that the Tribe wishes to remain undisturbed.

**JURISDICTION AND VENUE**

4.      Jurisdiction is proper in this Court under 28 U.S.C. § 1331 because this action arises under the laws of the United States, including, *inter alia*, the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202; the Clean Water Act, 33 U.S.C. § 1365(a)(2); the National Environmental Policy Act, 42 U.S.C. §§ 4332; and the Administrative Procedure Act ("APA"), 5

1

U.S.C. §§ 701-706.  As required for all suits brought under 33 U.S.C. § 1365(a)(2), the Tribe

notified defendants of its intent to file this suit against them in a 60-day notice letter dated April

20, 2006.

5.      Venue is proper in this Court under 28 U.S.C. § 1391(e) and 5 U.S.C. § 703

because at least one Defendant, United States Army Corps of Engineers, resides in Washington,

D.C., where its headquarters are located.

## PARTIES AND STANDING

6.      The Plaintiff-Intervenors in this action are the Mattaponi Indian Tribe and Chief

Carl T. Lone Eagle Custalow (collectively, "Tribe").  The Tribe has participated extensively in

the public proceedings relating to the Clean Water Act Section 404 permit and relating to the

state permits needed for the KWR.  The Tribe has maintained throughout the federal and state

permitting proceedings that the reservoir project will harm its interests by irreparably harming

the Mattaponi River and the river's American shad population, on which the Tribe depends, and

by damaging archeological sites of cultural and spiritual significance to the Tribe.

7.      Plaintiff-Intervenor Mattaponi Indian Tribe is an Indian Tribe formally

recognized by the Commonwealth of Virginia.  The Tribe's reservation consists of

approximately 150 acres and is located on the banks of the Mattaponi River in King William

County, Virginia.

8.      Plaintiff-Intervenor Chief Carl T. Lone Eagle Custalow is the Tribe's chief and

has been authorized by the Tribal Council to bring this action on behalf of the Tribe.  The

Mattaponi Tribal Council, as the governing body of the Mattaponi Indian Tribe, approved the

filing of this Complaint on its own behalf and as *parens patriae* on behalf of all individual tribal

members.

9.    The KWR will irreparably harm the Tribe's cultural and economic resources by inundating archeological sites of cultural and spiritual significance and by diminishing the Mattaponi River's American shad population, which will adversely affect the Tribe's hatchery, on which the Tribe relies for jobs and income.

10.    The Corps' issuance of Permit 93-0902-12 is the cause of this irreparable harm to the Tribe because it authorizes the construction and operation of the reservoir.

11.    Revocation of the permit will redress the Tribe's injury as this damage will not occur if the permit is revoked and not re-issued because the KWR cannot be constructed without the permit.

12.    Plaintiffs are the Alliance to Save the Mattaponi, the Chesapeake Bay Foundation, and the Sierra Club, Virginia Chapter, (collectively, "environmental plaintiffs").

13.    Defendants are the United States Army Corps of Engineers, Secretary of the Army Francis J. Harvey, Chief of Engineers and Commanding General of the U.S. Army Corps of Engineers Carl A. Strock, Brigadier General William T. Grisoli, the United States Environmental Protection Agency, United States Environmental Protection Agency Administrator Stephen L. Johnson, and the City of Newport News, Virginia.

14.    Defendant United States Army Corps of Engineers is the federal agency charged with evaluating applications for permits under CWA Section 404 for the discharge of dredged or filled materials into the waters of the United States.  In evaluating such permit applications, the Corps must abide by its own regulations and ensure that the requirements of CWA Section 404 and EPA's 404(b)(1) guidelines, as well as the requirements of NEPA, are fulfilled.

15.    The Corps' headquarters are in Washington, D.C.  The Corps operates a District Office in Norfolk, Virginia, and a North Atlantic Division Office in Brooklyn, New York.  The

Corps' North Atlantic Division overturned the Norfolk District's recommended decision to deny the Section 404 permit for the KWR on September 30, 2002.

16.    Defendant Secretary Francis J. Harvey is the Secretary of the Army and is sued in his official capacity.  The Secretary of the Army, acting through the Corps of Engineers, has ultimate responsibility for the issuance of all Section 404 permits by the Corps.  33 U.S.C. § 1344(a), (d).  The Department of the Army's headquarters are in Washington, D.C.

17.    Defendant Lieutenant General Carl A. Strock is the Chief of Engineers and Commanding Officer of the Corps and is sued in his official capacity.  Lieutenant General Strock is charged with the supervision and management of all Corps' decisions and actions.  The Office of the Chief of Engineers is in the Corps' headquarters in Washington, D.C.

18.    Defendant Brigadier General William T. Grisoli is the Commander and Division Engineer of the U.S. Army Corps of Engineers, North Atlantic Division, and is sued in his official capacity.  Brigadier General Grisoli supervises and manages all decisions and actions of the North Atlantic Division and signed Permit 93-0902-12, which is the subject of this lawsuit. Brigadier General Grisoli is the official successor to Brigadier General Meredith W.B. Temple, who held this position at the time of the decision to approve provisionally Permit 93-0902-12 on July 29, 2005.

19.    The North Atlantic Division of the Corps became involved in the reservoir project's permitting process when then-Governor of the Commonwealth of Virginia, James S. Gilmore III, objected to the preliminary position of the Corps' Norfolk District that the issuance of a permit for the reservoir would be contrary to the public interest.  The former Governor's objection elevated the Norfolk District's subsequent decision to deny the permit to the North Atlantic Division, pursuant to 33 C.F.R. § 325.8(b)(2).

20.    Defendant Environmental Protection Agency ("EPA" is the United States agency with ultimate and final supervisory authority over the Corps' administration of, and compliance with, Section 404 of the CWA, specifically including EPA's regulations implementing Section 404(b)(1) of the CWA.  EPA's headquarters are in Washington, D.C.

21.    Defendant Stephen L. Johnson is the Administrator of the U.S. Environmental Protection Agency and is sued in his official capacity.  Administrator Johnson is charged with overseeing the Corps' administration of, and compliance with, the CWA, specifically including EPA's regulations implementing Section 404(b)(1) of the CWA.  EPA's headquarters are in Washington, D.C.

22.    Intervenor-Defendant is the City of Newport News, Virginia.  The City is a part of the Regional Raw Water Study Group ("RRWSG") that proposed the development of the King William Reservoir.  On November 16, 2005, the Corps issued Permit 93-0902-12 to the City for construction and operation of the KWR.

## PROCEDURAL POSTURE

23.    The environmental plaintiffs filed this action on July 17, 2006, alleging violations of CWA and NEPA against the Army Corps of Engineers, Secretary of the Army Francis J. Harvey, Chief of Engineers and Commanding General of the U.S. Army Corps of Engineers Carl A. Strock, and Brigadier General William T. Grisoli.  The City of Newport News filed a Motion to Intervene on August 23, 2006, which was granted on September 1, 2006.  On October 6, 2006, the City filed a Motion to Join the Mattaponi Indian Tribe as a Defendant.  On October 12, 2006, the City notified the Court of its withdrawal of that motion, based on the Tribe's stated intent to voluntarily intervene.

24.     This Complaint accompanies the Tribe's Motion to Intervene as Plaintiff-Intervenor pursuant to Fed. R. Civ. P. 24 in an action brought against Defendants by Environmental Plaintiffs.

## RELATED STATE PROCEEDING

25.     The Tribe is currently involved in a lawsuit against Intervenor-Defendant City of Newport News in Virginia state trial court, which challenges the construction and operation of the KWR on state law grounds.

## FACTUAL BACKGROUND

26.     The Mattaponi Indian Tribe is one of eight American Indian tribes living in Virginia.  These tribes once formed a prosperous network ruled by the Great Chief Powhatan, father of Pocahontas, and once controlled most of Virginia's shoreline.

27.     Today, approximately 65 members of the Tribe live on its 150 acre reservation. The Tribe has more than 400 members, many of whom wish to return to the reservation when space becomes available.

28.     The Tribe's reservation lies on the banks of the Mattaponi River 3 miles below the proposed intake structure for the KWR.

29.     The Commonwealth of Virginia formally recognizes the Mattaponi Indian Tribe as an Indian Tribe.

30.     The Tribe maintains a tribal government ruled by traditional tribal laws, and the Tribe is not taxed under Virginia state or local law.

31.     The Mattaponi Indian Tribe depends on the Mattaponi River and the river's American shad population for food, jobs, spiritual ceremonies, and cultural continuity.

32.    The American shad is a member of the herring family and is a species of anadromous fish sensitive to changes in water salinity.

33.    The American shad population is fragile, and the stocks of shad in the York River system are severely declining.

34.    The Mattaponi River is a critically important spawning and nursing area for American shad in the York River system.  Small, steady losses or even one large loss of shad in the Mattaponi River could have a disastrous effect on the system's declining shad population.

35.    In response to the declining shad population, the Tribe operates a shad hatchery, licensed by the Commonwealth of Virginia and funded by a grant from the Virginia Marine Resources Commission.  The shad hatchery is the Tribe's primary source of income, jobs, and job training, and also provides the Tribe with food and cultural continuity.

36.    The Tribe catches most of its fish during the spring shad and herring runs, preserving the catch for year-round consumption.

37.    The Tribe's most important fishing grounds are located where the KWR water intake structure on the Mattaponi River will be constructed.

38.    The KWR will encroach upon more than 500 acres of the Mattaponi Indian Tribe's ancestral lands, damaging or destroying culturally significant archeological sites.

39.    Archeological surveys in the KWR project's proposed impoundment and mitigation areas revealed more than 250 sites containing Native American artifacts, including 72 locations eligible for the National Register of Historic Places.  Some of these historically significant sites date back to 7,540-6,200 B.C.

40.    The Tribe gathers plants and medicinal herbs along the Mattaponi River's banks.

41.    The Mattaponi River plays an essential role in many of the Tribe's religious and

spiritual practices. The Tribe's heritage and culture cannot be understood or sustained without the Mattaponi River and the American shad.

42. If the KWR is constructed, the Tribe will find it difficult, if not impossible, to maintain its economy and cultural identity.

43. The reservoir will have a capacity of approximately 12.2 billion gallons and will cover more than 1,526 acres.

44. A raw water intake structure and pumping station will be constructed at Scotland Landing, three miles upstream from the Mattaponi Indian Reservation.

45. The KWR project will withdraw up to 75 million gallons of water per day from the Mattaponi River to supply the reservoir.

46. The raw river water will be transported 1.5 miles between Scotland Landing and the KWR in a 54-inch-diameter pipeline. A pumping station with a capacity to pump 50 million gallons of water each day will be constructed at the KWR. This pumping station will transfer water from the reservoir to Beaverdam Creek at New Kent, Virginia, via an 11.7-mile, 48-inch-diameter pipeline. The water will leave the pipeline through a water discharge outfall structure into Beaverdam Creek, and from there it will flow into the existing City of Newport News Waterworks' Diascund Creek Reservoir in New Kent County, Virginia. The water from the Diascund Creek Reservoir will be diverted to the City of Newport News and used to supply water to residents of the Virginia Peninsula.

47. This diversion of water from the Mattaponi River will jeopardize the plants, fish, and other resources on which the Tribe depends.

48. This diversion of water from the Mattaponi River will upset the ecological balance of the river and permanently harm the Tribe's traditional lifestyle, practices, culture, and

ability to continue as a Tribe.

49.    The KWR project will adversely affect American shad and other river species.

50.    The KWR project's freshwater withdrawals from the Mattaponi River will increase noise and sedimentation levels in the river.

51.    The KWR project's withdrawal of freshwater from the Mattaponi River will change salinity levels within the river, adversely affecting the river ecosystem, shad spawning, and shad food sources.

52.    The KWR project's withdrawal of water from the Mattaponi River will remove nutrients that are vital to young-of-the-year shad and may, therefore, significantly impair shad survival and long-term shad population sustainability in the river.

53.    Comments submitted by the Tribe during the permitting process for the federal permit informed the Corps that the KWR will irreparably damage the river's aquatic ecosystem, numerous sites containing archeological resources, and the Tribe's economy and culture.

54.    On July 2, 2001, the Norfolk District published its Final Recommended Record of Decision to deny a permit for the reservoir.

55.    Then-Governor James S. Gilmore III, objected to the preliminary position of the Norfolk District, and the application was elevated to the North Atlantic Division for its review pursuant to 33 C.F.R. § 325.8(b)(2).

56.    On September 30, 2002, the North Atlantic Division, through Brigadier General Rhoades, issued an interim decision, overturning the Norfolk District's decision.

57.    On July 29, 2005, Brigadier General Merdith W. B. Temple, Division Engineer of the North Atlantic Division of the Corps, issued a Final Record of Decision

("ROD") granting a permit for the King William Reservoir.  On November 16, 2005, Brigadier

General Grisoli of the North Atlantic Division signed and issued Permit 93-0902-12.

58.    All permits necessary to construct and operate the KWR project have been issued,

including a Virginia Water Protection ("VWP") permit issued by the State Water Control Board

and a subaqueous beds permit issued by the Virginia Marine Resources Commission ("VMRC"),

in addition to the Clean Water Act Section 404 permit issued by the Army Corps of Engineers at

issue here.

59.    On December 1, 2004, the Corps requested comments on the Wetland Mitigation

Plan submitted by RRWSG.  The Tribe filed comments with the Corps, asserting that more than

one-hundred archaeological sites were located within the proposed mitigation areas.

60.    The Corps published in the Federal Register a notice of issuance of the Final

Environmental Impact Statement ("EIS") on January 24, 1997.  The January EIS summarized the

environmental impacts of, and practicable alternatives to, the KWR.

61.    The Corps has not supplemented the Final EIS since its issuance on January, 24,

1997.

62.    The Tribe and Environmental Plaintiffs asserted that the EIS did not reflect

significant changes to the project that occurred subsequent to its issuance in 1997, and requested

that the Corps prepare a Supplemental Environmental Impact Statement (SEIS).

63.    The alternatives analysis in the EIS depended on the RRWSG's projected water

demand for the Virginia peninsula.

64.    The RRWSG's original projections of water demand has fallen sixty percent since

the EIS was issued in January 1997 (from 39.8 million gallons per day to 15.9 million gallons

per day).

65.     The KWR may be unnecessary in light of the decreased regional water demand and the availability of practicable alternatives.

66.     The record does not establish that the reservoir can reasonably be expected to provide the region with 15.9 million gallons of water per day.

67.     Because the projected water demand has dropped to 15.9 million gallons a day, alternatives that were dismissed or overlooked in the 1997 EIS may be viable today.

68.     Practicable alternatives to the KWR include building groundwater desalinization facilities, taking additional water from existing reservoirs, and increasing withdrawals from the Chickahominy River.  These alternatives, together with keeping the Big Bethel Reservoir open, could produce 16.2 million gallons of water a day.  This figure exceeds the City's projected water demand of 15.9 million gallons of water a day and does not include potential benefits from other alternatives, like increasing water conservation and expanding the Beaver Creek Reservoir.

69.     When conducting the alternatives analysis required by the Clean Water Act, the Corps relied on its alternatives analysis prepared for the 1997 EIS.

70.     In May 1998, subsequent to the issuance of the EIS, the Corps' consultants completed a report entitled, "Review of Water Supply Needs Assessment for the Regional Raw Water Study Group, Newport News, Virginia," which refuted the City's analysis of its need for the KWR project and concluded that RRWSG tended to overestimate future water demand and underestimate future supply.

71.     In April 2004, subsequent to the issuance of the 1997 EIS, the Virginia Institute of Marine Sciences completed a study that concluded that the salinity of the river has affected, and will affect, the river's vegetation.

72.     In October 1998, subsequent to the issuance of the 1997 EIS, the Bragdon Moretti-Langholtz Traditional Cultural Properties Study concluded that the KWR will significantly and irreversibly impact the Tribe because it will change the Mattaponi River and its wildlife, alter the rural character of the community, lead to further isolation of the Mattaponi and Pamunkey reservations, harm prehistoric archeological sites, impact the Tribe's future plans to expand its land base, and negatively affect the Tribe's morale.

73.     The VWP permit specifies minimum in-stream flow ("MIF") restrictions for each month.  The permit prohibits water withdrawals when water flow in the Mattaponi River is at or below the MIF.

74.     The VWP allows the MIF restrictions to be lifted if "the permitee has instituted mandatory emergency drought conservation measures."

75.     The VWP permit's MIF requirement was added on December 22, 1997, when the VWP permit was issued.  The adoption of this condition was subsequent to the issuance of the 1997 EIS.

76.     The VMRC permit prohibits all water withdrawals from the Mattaponi River between March 1 and July 31 of any year until the City can prove that a shorter pumping hiatus would be equally protective of the American shad.

77.     The VMRC permit allows pumping to resume at any time during the summer-month hiatus period if "a water supply emergency has been declared."

78.     The VMRC permit along with its conditions, including the pumping hiatus, was granted in August 2004, subsequent to the issuance of the 1997 EIS.

79.     There is no evidence in the record that the VWP permit's MIF restrictions and the VMRC permit's pumping hiatus will prevent harm to aquatic life, especially the American shad.

80.    The City seeks to use the Mattaponi River as the reservoir's sole water source.

81.    Due to the pumping hiatus, the City cannot withdraw water from the river for five of the six months of the year with the highest water demand unless there is a water supply emergency.

82.    In addition to the VMRC permit's five-month pumping hiatus, in a typical year, the MIF restrictions will result in an additional three months of decreased or ceased pumping.

83.    The KWR can pump water out of the river for four months each year, which occur during the City's lowest water demand period.

84.    To compensate for the five-month hiatus, the City may withdraw more water than previously planned in other months.  The state permitting conditions do not prohibit the City from pumping an extra volume of water during the hiatus period under certain conditions.

85.    The Corps has not evaluated whether such increased pumping would harm the American shad or otherwise increase the reservoir project's environmental impact.

86.    The combined effects of the VWP and VMRC permits will create circumstances that make a "water supply emergency" likely to arise.

87.    Allowing emergency withdrawals during these restricted summer months, especially during a dry season, will devastate young-of-the-year shad.

88.    If several "emergencies" occur in succession, the shad population could be destroyed and the Tribe's shad hatchery could be rendered futile.

89.    The shad spawning season varies from year to year.

90.    The proposed KWR has the potential to harm young-of-the-year shad notwithstanding the VMRC pumping hiatus because the hiatus may not always correlate with shad spawning season.

91.    The long-term plan to use temperature measurements to determine when to resume pumping is not sufficiently protective because, although shad spawning is related to water temperature, it is also influenced by other factors.

92.    Shad larvae swim more slowly than juvenile and adult shad.

93.    Shad larvae will likely be unable to escape the KWR's intake pipes' suction.

94.    If the pumping station operates when the shad are spawning, the intake pipes' suction will likely trap shad larvae.

95.    Fragile shad eggs will likely be destroyed when they touch the screens covering the intake pipes.

96.    Young-of-the-year shad cannot live in salt water because they do not have gills and cannot control the salt levels in their bodies.

97.    The increased salinization of the Mattaponi River caused by freshwater withdrawals to supply the reservoir will be particularly harmful to young-of-the-year shad.

98.    Withdrawals from the river are likely to have adverse effects on both juvenile and adult shad by increasing salinity and decreasing water levels in the river, regardless of when during the year the withdrawals occur.

99.    Screens covering the intake pipes will not prevent the shad's major food sources that provide needed nutrients, like small planktonic organisms, from being removed from the water.

100.    Heavy water withdrawals during the non-hiatus months could harm the shad population by depriving shad of its major food sources.

101.    The withdrawals could particularly harm young-of-the-year shad which rely primarily on microscopic organisms for nourishment.

14

102.    Malnourished young-of-the-year shad could significantly impair the fish's long-term population viability and sustainability in the Mattaponi River and the York River systems.

103.    EPA did not exercise its supervisory authority and did not require the Corps to prepare an SEIS.

104.    EPA allowed the approval of Permit 93-0902-12 despite the various concerns raised in the record, especially with respect to the KWR's impact on shad.

## CLAIMS FOR RELIEF

105.    The Corps has delegated authority under the CWA to issue Section 404 permits, 33 U.S.C. § 1344(a), and has a mandatory duty to review the relevant facts and abide by the CWA implementing regulations when it issues such permits.

106.    The EPA is responsible for promulgating regulations implementing the CWA, 33 U.S.C. § 1344(b)(1).

## <u>Count I</u>

### The Corps Failed to Evaluate Less Harmful, Practicable Alternatives to the Proposed King William Reservoir

107.    Paragraphs 1 through 106 are incorporated herein by reference.

108.    The Corps violated its mandatory duty under 40 C.F.R. § 230.10(a) to evaluate less harmful, practicable alternatives to the KWR project when it relied on an analysis of alternatives prepared for the 1997 EIS, which included RRWSG's outdated water demand figures.

109.    The Corps violated its mandatory duty under 40 C.F.R. § 230.10(a) to evaluate less harmful, practicable alternatives to the KWR project when it failed to reevaluate the feasibility of less harmful alternatives in light of the region's decreased water demand.

110.    The Corps' issuance of Permit 93-0902-12 violated 40 C.F.R. § 230.10(a) when the Corps failed to reevaluate less harmful practicable alternatives as required by, was arbitrary and capricious, and otherwise not in accordance with law.

111.    By allowing the issuance of Permit 93-0902-12 despite the Corps failure to reevaluate less harmful practicable alternatives as required by 40 C.F.R. § 230.10(a), EPA acted arbitrarily and capriciously, and otherwise not in accordance with law.

## Count II

### The Corps Failed to Investigate and Balance Factors Relevant to the Public Interest Review

112.    Paragraphs 1 through 111 are incorporated herein by reference.

113.    The Corps violated its mandatory duty under 33 C.F.R. § 320.4(a) when it failed to investigate fully and consider carefully factors relevant to the KWR, including the need to conserve water and protect cultural resources.

114.    The Corps violated its mandatory duty under 33 C.F.R. § 320.4(a) when it failed to give appropriate weight to public comments and to verify relevant factual information after that information was challenged by the Tribe and other plaintiffs in this case.

115.    The Corps violated its mandatory duty under 33 C.F.R. § 320.4(a) when it issued a permit when the ROD did not show that the reservoir will be able to produce an adequate water supply or even if the project is still needed.

116.    The Corps violated its mandatory duty under 33 C.F.R. § 320.4(a) when it did not carefully examine the extent to which the KWR will damage archeological sites of cultural and spiritual significance to the Tribe.

117.    The Corps violated its mandatory duty under 33 C.F.R. § 320.4(a) when it approved the City's Wetland Mitigation Plan after the Tribe filed comments with the Corps that

asserted that the Wetland Mitigation Plan ignores more than one hundred archeological sites that will be affected by the project's mitigation efforts.

118.    The Corps violated its mandatory duty under 33 C.F.R. § 320.4(a) when it failed to consider the potential harmful effects of wetlands mitigation activities on culturally significant sites.

119.    The Corps violated its mandatory duty under 33 C.F.R. § 320.4(a) to balance all relevant factors when it did not investigate challenges made by the Tribe to the City's conclusions throughout the permitting process.

120.    The Corps' issuance of Permit 93-0902-12 was arbitrary and capricious and otherwise not in accordance with law when the Corps ignored, or failed to fully investigate, pertinent information, and, therefore, could not have balanced all relevant factors, including the reservoir's ability to meet the region's water demand and the project's potential impact on cultural resources, as required by 33 C.F.R. § 320.4(a).

## Count III

### The Corps Issued a Permit that Will Significantly Degrade the Aquatic Ecosystem

121.    Paragraphs 1 through 120 are incorporated herein by reference.

122.    The Corps violated its mandatory duty to ensure that authorized projects will not "result in significant degradation of the aquatic ecosystem," 40 C.F.R. § 230.12(a)(3)(ii), when it issued a permit for a project that, based on available information, will significantly harm fish and aquatic life.

123.    The Corps violated its mandatory duty to ensure that permitted projects will not "result in significant degradation of the aquatic ecosystem," 40 C.F.R. § 230.12(a)(3)(ii), when it

issued Permit 93-0902-12 despite evidence placed in the record by the Tribe that the state permit conditions will not protect against degradation of the aquatic environment.

124.    The Corps violated its mandatory duty to ensure there was "sufficient information to make a reasonable judgment as to whether the proposed discharge will comply with these Guidelines," 40 C.F.R. § 230.12(a)(3)(iv), when it issued Permit 93-0902-12 without further investigating the potential combined effects of the MIF restrictions and VMRC permit conditions despite evidence in the record that the state permit conditions will not protect against degradation of the aquatic environment.

125.    The Corps violated its mandatory duty to ensure that authorized projects will not "result in significant degradation of the aquatic ecosystem," 40 C.F.R. § 230.12(a)(3)(ii), when it issued Permit 93-0902-12 despite evidence in the record to show that the proposed KWR project has the potential to harm the river's shad by altering water salinity, removing nutrients from the river, and damaging shad eggs and larvae.

126.    The Corps violated its mandatory duty to ensure that authorized projects will not "result in significant degradation of the aquatic ecosystem," 40 C.F.R. § 230.12(a)(3)(ii), when it issued Permit 93-0902-12 despite evidence in the record to show that the long-term plan to use temperature measurements to determine when to resume pumping after a hiatus will not sufficiently protect the shad.

127.    The Corps violated its mandatory duty to ensure that authorized projects will not "result in significant degradation of the aquatic ecosystem," 40 C.F.R. § 230.12(a)(3)(ii), when the Corps issued Permit 93-0902-12, despite information in the record and comments submitted during the permitting process informing the Corps that the KWR may harm the aquatic ecosystem.

128.    The Corps' issuance of Permit 93-0902-12 despite evidence in the record that the project will "result in significant degradation of the aquatic ecosystem" in violation of 40 C.F.R. § 230.12(a)(3)(ii) was arbitrary and capricious, and otherwise not in accordance with law.

129.    By allowing the issuance of Permit 93-0902-12 despite evidence in the record that the project will "result in significant degradation of the aquatic ecosystem," 40 C.F.R. § 230.12(a)(3)(ii), EPA acted arbitrarily and capriciously, and otherwise not in accordance with law.

<u>**Count IV**</u>

**The Corps Issued a Permit Contrary to the Public Interest**

130.    Paragraphs 1 through 129 are incorporated herein by reference.

131.    The Corps violated its mandatory duty under 33 C.F.R. § 320.4(a)(1) to balance a project's reasonably foreseeable costs and benefits and deny a permit if not in the public interest when it issued Permit 93-0902-12 despite evidence in the record that the KWR will damage the river's aquatic ecosystem, numerous archeological sites containing cultural resources, and the Tribe's economy and culture.

132.    The Corps violated its mandatory duty under 33 C.F.R. § 320.4(a)(1) to balance a project's reasonably foreseeable costs and benefits and deny a permit if not in the public interest when it issued Permit 93-0902-12 despite evidence in the record that the KWR may be unnecessary because of decreased regional water demand and the availability of practicable alternatives.

133.    The Corps violated its mandatory duty under 33 C.F.R. § 320.4(a)(1) to balance a project's reasonably foreseeable costs and benefits and deny a permit if not in the public interest when it issued Permit 93-0902-12 despite a lack of evidence in the record to establish that the

reservoir project can reasonably be expected to provide the region with 15.9 million gallons of water per day.

134.    The Corps' issuance of the Permit 93-0902-12 was arbitrary and capricious, and otherwise not in accordance with law when the Corps found that the KWR project's benefits outweigh its costs and concluded that the project is in the public interest.

<u>**Count V**</u>

**The Corps Violated the National Environmental Policy Act
By Not Supplementing the EIS**

135.    Paragraphs 1 through 135 are incorporated herein by reference.

136.    The Corps violated NEPA, 42 U.S.C. § 4332(2)(C), and 40 C.F.R. § 1502.9(c) when it did not supplement the EIS, nor take a "hard look" to determine whether a supplemental EIS was necessary, despite evidence in the record to show that the balance between environmental costs and economic benefits has shifted since the creation of the 1997 EIS.

137.    The Corps violated NEPA, 42 U.S.C. § 4332(2)(C), and 40 C.F.R. § 1502.9(c) when it did not supplement the EIS, nor take a "hard look" to determine whether an SEIS was necessary, despite evidence in the record that the KWR is more likely to harm the environment and the community's cultural resources and is less likely to provide for the region's water needs than was thought when the EIS was issued in 1997.

138.    The Corps' issuance of Permit 93-0902-12 violated NEPA, 42 U.S.C. § 4332(2)(C), and 40 C.F.R. § 1502.9(c), and was arbitrary and capricious.

**PRAYER FOR RELIEF**

Wherefore, Plaintiff-Intervenors respectfully pray for the following relief:

1.      A declaration that Permit 93-0902-12 violated of the Clean Water Act, the

National Environmental Policy Act, and the Administrative Procedure Act.

2.      An injunction requiring the Corps to withdraw the permit and not re-issue a CWA

Section 404 permit until the aforementioned violations are remedied.

3.      An injunction requiring the Corps to prepare a Supplemental Environmental

Impact Statement before issuing a new permit for the discharge of dredged or fill material

related to the construction of the KWR.

4.      An award to Plaintiff-Intervenors of all costs and expenses related to this action,

including reasonable attorneys' fees, pursuant to Clean Water Act Section 505, 33 U.S.C.

§ 1365(d), or, in the alternative, the Equal Access to Justice Act, 5 U.S.C. § 504.

4.      Any Additional relief as the Court should deem proper.


November 8, 2006

                        Respectfully Submitted,



                        /s/ Hope M. Babcock_____
                        Hope M. Babcock, Senior Attorney / Director
                        (Fed/DC 14639)
                        Emma Garrison, Staff Attorney / Graduate Fellow
                        (Admitted in CA, DC)
                        Margaret Engoren, Law Student Intern
                        Institute for Public Representation
                        600 New Jersey Avenue, NW
                        Washington, D.C.  20001
                        (202) 662-9535
                        (202) 662-9634 (Facsimile)
                        *Counsel for the Mattaponi Indian Tribe and*
                        *Chief Carl T. Lone Eagle Custalow*