## UNITED STATES DISTRICT COURT FOR THE
## DISTRICT OF COLUMBIA

_____
                                                    )
                                                    )
ALLIANCE TO SAVE THE MATTAPONI, *et al.*,           )
                                                    )
                        Plaintiffs,                 )
                                                    )
                                                    )
            v.                                      )
                                                    )        Docket No.
UNITED STATES ARMY CORPS                            )
OF ENGINEERS, *et al.*,                             )        1:06-cv-01268-HHK
                        Defendants.                 )
                                                    )
                                                    )
                                                    )
_____)


## RESPONSE OF THE ALLIANCE *ET AL.* TO THE UNITED STATES' PARTIAL
## MOTION TO DISMISS AND IN OPPOSITION TO PLAINTIFFS' MOTION TO
## AMEND COMPLAINT

### INTRODUCTION

This action challenges the United States Army Corps of Engineers' (the "Corps")

issuance of a permit to the City of Newport News ("Newport News") under section 404 of the

Clean Water Act, 33 U.S.C. §1344, to construct a 1,526-acre reservoir in King William County,

Virginia.  Amended Compl. ¶ 1.[1]  The Reservoir would be constructed on Cohoke Creek, a

tributary to the Pamunkey River.  Up to 75 million gallons per day ("mgd") of water would be

withdrawn from the Mattaponi River and piped to the Reservoir.  The Mattaponi and Pamunkey

Rivers join to form the York River downstream of the project and are tributaries to the

Chesapeake Bay.  Amended Compl. ¶ 2.

_____

[1] For ease of reference, all cites are to the proposed Amended Complaint.

The Corps' action overturned the 2001 recommended decision of the Norfolk (Virginia) District of the Corps ("Norfolk District") to deny the permit. Amended Compl. ¶ 2. Plaintiffs the Alliance to Save the Mattaponi, the Chesapeake Bay Foundation, Inc., and the Virginia Chapter of the Sierra Club (collectively the "Alliance") filed their complaint on 17 July 2006. The complaint alleges that the Corps' issuance of the permit violates the Clean Water Act, 33 U.S.C. §§1251 *et seq.* ("Clean Water Act"), the National Environmental Policy Act, 42 U.S.C. §§4321 *et seq.* ("NEPA"), and the Chesapeake 2000 Agreement, and is arbitrary and capricious, an abuse of discretion, and otherwise not in accordance with the law in violation of the Administrative Procedure Act ("APA"), 5 U.S.C. §§701-706. Amended Compl. ¶ 1.

On 16 November 2006 this Court granted the motion of the Mattaponi Indian Tribe, *et al*. (the "Tribe") to intervene in this case as plaintiff-intervenors. The Tribe's complaint adds the Environmental Protection Agency ("EPA") as a defendant and specifically asserts claims against the Corps and EPA under section 505(a)(2) of the Clean Water Act, 33 U.S.C. §1365(a)(2), the Act's citizen suit provision. In light of the Tribe's allegations, the Alliance, by letter dated 16 November 2006, notified EPA and the Corps of their intent to assert claims against them under section 505(a)(2) for their failure to perform nondiscretionary duties under the Act with respect to the issuance of the permit. Amended Compl. ¶ 10. The Alliance's letter also indicated the intent to assert, in the alternative, the same claims against EPA under the APA for violations of the Clean Water Act, NEPA, and the Chesapeake 2000 Agreement as set forth against the Corps in the original complaint. Amended Compl. ¶ 10. Following the expiration of the 60-day notice period for suits under section 505(a)(2), the Alliance filed the Motion for Leave to File First Amended Complaint and supporting memorandum on 31 January 2007.

On 23 February 2007, pursuant to the briefing schedule entered by this Court on 5 February, EPA and the Corps (the "federal defendants"), moved to dismiss all of the Tribe's claims against EPA and to dismiss the Tribe's claims asserted against the Corps under the citizen suit provision. [2] The federal defendants likewise oppose the Alliance's motion to amend the complaint to add any claims against EPA and to add claims against the Corps under section 505(a)(2). Combined Mem. In Support of the United States' Partial Motion to Dismiss and in Opposition to Plaintiffs' Motion to Amend Complaint at 2 [hereinafter "Fed. Def. Br."].

## NATURE AND STATEMENT OF THE CASE

The fill and discharge allowed by the permit would result in the single largest authorized destruction of wetlands in the entire mid-Atlantic region in the history of the Clean Water Act. Amended Compl. ¶ 1. The proposed project requires the excavation, fill, destruction, and flooding of over 400 acres of freshwater wetlands and the elimination of 21 miles of free-flowing perennial and intermittent streams. The impoundment of Cohoke Creek would impact an additional 105 acres of wetlands downstream of the project because of reduced water flow. Amended Compl. ¶¶ 3, 34. The wetland mitigation measures set forth in the Final Wetlands Mitigation Plan for the project cannot offset the unprecedented and permanent destruction of the diverse and complex wetland and aquatic ecosystem. The wetlands that would be destroyed are aquatic resources of national importance as a result of their diverse type, quantity, and functional values. They are also critical to the increasingly imperiled health of the Chesapeake Bay as

---

[2] Newport News supports the federal defendants' motion to dismiss all claims asserted against EPA. Response of the Intervening Defendant City of Newport News, Virginia to the United States' Partial Motion to Dismiss at 1. Newport News filed its pleading on 5 March 2007. The briefing schedule entered by this Court, however, only expressly contemplates briefing by the federal defendants, the Tribe, and the Alliance. The Alliance does not object to the filing of Newport News' "response," but would strenuously object to the filing of a "reply" by the Intervening Defendant to this response.

recognized by Congress in the Clean Water Act and by the federal defendants in the Chesapeake 2000 Agreement.  Amended Compl. ¶ 6.

In addition to the wetlands impacts, water withdrawals from the Mattaponi River would affect the flows and salinity patterns in the river and would impair critical spawning grounds of the American shad, an anadromous fish species that has been in steady decline in the Commonwealth of Virginia for the past several decades.  Amended Compl. ¶¶ 4, 34.  The water intake structure and pumping facility in the Mattaponi River would be located in "the most productive region, of one of the most productive sub-estuaries of the Chesapeake Bay with respect to American shad."  Letter from Tony Watkinson, Virginia Marine Resources Comm'n, to Brian Ramaley, Newport News (16 May 2003), Amended Compl. ¶ 4.  These and other substantial impacts are completely avoidable because the proposed project is not needed to meet the region's water needs.  The Corps' own studies and conclusions show that Newport News' projections of its future water needs were greatly exaggerated and that construction of the Reservoir is unnecessary.  Amended Compl. ¶¶ 5, 65-68.

The Norfolk District issued its Final Recommended Record of Decision ("Final RROD") on 2 July 2001, recommending that the section 404 permit be denied on the grounds that the issuance of a permit would be contrary to the binding regulations that govern the Corps' consideration of a permit application.  Amended Compl. ¶¶ 70, 71.  Specifically, the Norfolk District found that the Reservoir was not justified; that there were alternatives available to satisfy Newport News' water needs; and that the discharges associated with the project would cause or contribute to significant degradation of waters of the United States, including wetlands, that could not be mitigated. The Norfolk District further found that issuing a section 404 permit for the Reservoir would be contrary to the public interest.  Final RROD at 327-29, 339-40, available

at http://www.nad.usace.army/mil/kwr.  Amended Compl. ¶ 71.  The Norfolk District concluded that "[t]he risk to the environment, the risk to an entire watershed and the risk to the continued way of life of Native Americans in the Pamunkey Neck area, especially the Mattaponi Tribe, are too great when weighed against the unjustified need…."  Final RROD at 337, Amended Compl. ¶ 70.

The North Atlantic Division of the Corps (the "NAD") became involved in the permitting process for the proposed reservoir after the then-Governor of Virginia objected to the Norfolk District's stated intent to deny the permit.  As a result, pursuant to 33 C.F.R. §325.8(b)(2), the Norfolk District's Final RROD was elevated to the NAD, Amended Compl. ¶ 72, and on 30 September 2002, the NAD issued an interim "Decision Memorandum" overturning the Norfolk District's Final RROD, Amended Compl. ¶ 73.  On 29 July 2005, the NAD issued its final Record of Decision, resulting in the issuance of the permit on 16 November 2005.  Amended Compl. ¶¶ 79, 82.

## FEDERAL STATUTORY AND REGULATORY BACKGROUND

In 1972, Congress passed the Clean Water Act, 33 U.S.C. §§1251 *et seq*. "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." Clean Water Act §101(a), 33 U.S.C. §1251(a).  To achieve this objective, section 301(a) of the Clean Water Act, 33 U.S.C. §1311(a), prohibits the discharge of any "pollutant" into waters of the United States, which include wetlands, except in accordance with permits issued under other sections of the Clean Water Act.  *See* 40 C.F.R. §232.2.  Amended Compl. ¶¶ 36, 37.

Section 404 of the Clean Water Act, 33 U.S.C. §1344, authorizes the Secretary of the Army to issue permits for the discharge of dredged or fill material into waters of the United States when certain conditions are met.  Amended Compl. ¶ 38.  In reviewing an application for

a section 404 permit, the Corps must follow the guidelines developed by the EPA Administrator, which are known as the "404(b)(1) Guidelines" and are codified in the Code of Federal Regulations at 40 C.F.R. Part 230.  *See* 33 U.S.C. §1344(b).  Amended Compl. ¶ 40.  The Corps is prohibited from issuing a section 404 permit unless there is "sufficient information to make a reasonable judgment as to whether the proposed discharge will comply with [the] Guidelines." 40 C.F.R. §230.12(a)(3)(iv).   "[A]ll requirements in §230.10 must be met" before a permit may issue.  40 C.F.R. §230.10.  Amended Compl. ¶ 40.

The 404(b)(1) Guidelines prohibit the issuance of a section 404 permit under certain conditions relevant to this lawsuit.  First, no permit shall issue if there is a practicable alternative that would have less adverse impact on the aquatic ecosystem.  40 C.F.R. §230.10(a).  Amended Compl. ¶ 41.  Second, no permit shall issue if the discharge will "cause or contribute to significant degradation of the waters of the United States," including wetlands.  40 C.F.R. §230.10(c).  *See*  40 C.F.R. Subpart E, §230.41.  Amended Compl. ¶ 42.  Third, no permit shall issue if "appropriate and practicable steps" remain available to "minimize potential adverse impacts of the discharge on the aquatic ecosystem."  40 C.F.R. §230.10(d).  Amended Compl. ¶ 43.  In addition, pursuant to a 1990 Memorandum of Agreement, the Corps and EPA have also implemented a policy of no overall net loss of wetland values and functions in carrying out their responsibilities under section 404 of the Clean Water Act.  Amended Compl. ¶ 43.

The Corps' "public interest" requirements, codified at 33 C.F.R. §320.4(a), prohibit the issuance of a section 404 permit if "the district engineer determines that it would be contrary to the public interest."  This "public interest review" requires the Corps to weigh the benefits of the project against its reasonably foreseeable detriments, considering all relevant factors and their cumulative impacts.  *Id*.; *see also* 33 C.F.R. §320.4(b)(4).  Amended Compl. ¶ 44-45.

Under section 404(c) of the Act, EPA has the authority to veto the issuance of a section 404 permit. 33 U.S.C. §1344(c). Amended Compl. ¶ 38. More specifically, permits for the discharge of dredged or fill material into waters of the United States may only be granted for a specified disposal site. 33 U.S.C. §1344(a). EPA can prohibit or withdraw the specification of a disposal site when the discharge of such materials will have an "unacceptable adverse effect on," among other things, "shellfish beds and fishery areas (including spawning and breeding areas), [and] wildlife." 33 U.S.C. §1344(c). Amended Compl. ¶ 46.

As set forth more fully below, the Alliance's proposed Amended Complaint asserts that the Corps has a mandatory duty to comply with the 404(b)(1) Guidelines and the public interest regulations in determining whether to issue a permit under section 404 of the Clean Water Act. Amended Compl. Count I, ¶ 105; Count II, ¶ 113; Count III, ¶ 122; Count IV, ¶ 130. The Alliance alleges that the Corps' issuance of the permit for the Reservoir violates the Corps' mandatory duties under the 404(b)(1) Guidelines to deny a permit that will result in the significant degradation of waters of the United States, Amended Compl. Count I, to deny a permit where the project is unnecessary or where there are less damaging practicable alternatives available, Amended Compl. Count II, and to deny a permit where appropriate steps have not been taken to minimize the adverse impacts, Amended Compl. Count III. The Alliance alleges that these failures also precluded the Corps from carrying out its mandatory duty to conduct an objective public interest review before issuing a permit. Amended Compl. Count IV, ¶¶ 127, 128.

With respect to EPA, the Alliance alleges that, throughout the section 404 process, EPA has taken the consistent position that other less damaging, practicable alternatives are available, Amended Compl. ¶ 69, that the project would result in the significant degradation of waters of

the United States, including wetlands, Amended Compl. ¶¶ 69, 104, and that the proposed

mitigation cannot offset the unprecedented destruction of wetlands and impacts upon the aquatic

resources, Amended Compl. ¶¶ 76, 77.  Based on these facts, the amended complaint alleges that

EPA violated its mandatory duties under section 404(c) by not requiring the Corps to comply

with the binding requirements outlined above and deny the permit, and by not thereafter vetoing

the permit.  Amended Compl. Count I, ¶ 105, Count II, ¶ 113, Count III, ¶ 122, Count IV, ¶ 130.

Further, the amended complaint alleges that the Corps and EPA failed to consider their

respective obligations under the Chesapeake 2000 Agreement when the Corps granted the permit

to Newport News and EPA failed to exercise its oversight authority under section 404(c).

Amended Compl. Count VII.  The United States, through EPA, entered into the 2000 Agreement

with the District of Columbia, the states of Maryland and Pennsylvania, and the Commonwealth

of Virginia in an attempt to address the continued degradation of the Chesapeake Bay and its

tributaries, which include the Mattaponi, Pamunkey, and York Rivers.  The Agreement requires

the federal defendants to preserve and restore wetland resources, not allow them to be destroyed.

## STANDARD OF REVIEW

At the motion to dismiss stage, the court must accept all of the plaintiffs' factual

allegations as true.  *See Conley v. Gibson*, 355 U.S. 41, 45-46 (1957); *Karst Envtl. Educ. &*

*Prot., Inc. v. EPA*, 2007 U.S. App. 1943 (D.C. Cir. 2007). In considering a motion to dismiss,

complaints are to be "construed liberally in favor of the plaintiff[.]"  *Wilderness Soc'y v. Griles*,

824 F.2d 4, 16 (D.C. Cir. 1987).  Dismissal is only warranted "if no plausible inferences can be

drawn from the facts alleged that, if proven, would provide grounds for relief."  *Price v. Socialist*

*People's Libyan Arab Jamahiriya*, 294 F.3d 82, 93 (D.C. Cir. 2002) (involving legal sufficiency

of plaintiff's jurisdictional claims in the context of sovereign immunity).

## SUMMARY OF ARGUMENT

The federal defendants do not dispute that this Court has jurisdiction over the Alliance's and the Tribe's challenges to the Corps' issuance of the permit for the proposed project. Fed. Def. Br. at 2-3. Rather, they argue that section 505(a)(2) authorizes claims only against EPA, and not against the Corps, and only where EPA has failed to perform a mandatory duty, which they contend neither the Alliance nor the Tribe has identified. The Alliance asserts that the amended complaint states valid claims for relief under section 505(a)(2) against both the Corps and EPA and, in the alternative, against EPA under the APA. *See* Amended Compl. Count I, ¶¶ 105-106, Count II, ¶¶ 113-115, Count III, ¶¶ 122-123, Count IV, ¶¶ 126-131.

First, the statutory framework and relevant precedent in the Fourth Circuit establish that section 505(a)(2) operates to waive the Corps' sovereign immunity. Because this issue is a matter of the Court's subject matter jurisdiction, this Court owes no deference to the Corps' contrary view. Second, based on the cases in the Fourth Circuit, the Alliance properly alleges that the Corps' issuance of the permit violates the Corps' mandatory duty to comply with binding regulations in making a permit decision. Third, as a result of EPA's oversight authority under section 404(c) of the Act, EPA has a mandatory duty to ensure compliance with the binding regulations governing section 404 permit decisions. The Alliance alleges that EPA violated its duty under section 404(c) by not requiring the Corps to comply with the specific prohibitions on the issuance of a permit and by not vetoing the permit thereafter. In the alternative, the binding nature of EPA's duties under section 404 renders its inaction with respect to the permit reviewable under the APA.

In addition, as EPA has acknowledged, "[w]etland protection is integral to the goals of the Chesapeake 2000 Agreement which not only focus on wetland restoration but clearly seek to

reduce wetland loss through the regulatory program." Amended Compl. ¶ 76. EPA has stated

that the proposed reservoir "would deal a serious blow to efforts to restore and enhance the

existing wetland base within the Commonwealth of Virginia and the Chesapeake Bay

Watershed. . . . " Amended Compl. ¶ 76. As asserted in Count VII of the Amended Complaint,

the federal defendants failed to consider their obligations pursuant to the Chesapeake 2000

Agreement in reviewing the permit application. Thus, the Corps' decision to grant the permit

that will result in the destruction of over 400 acres of wetlands, and EPA's failure to exercise its

veto authority, were arbitrary and capricious, an abuse of discretion, and not in accordance with

the law under the APA. Amended Compl. ¶ 147. *See* infra Part IV.

## ARGUMENT

### I.      The Corps, In Addition To The EPA Administrator, Is Subject To Suit Under Section 505(a)(2), The Citizen Suit Provision Of The Clean Water Act.

The federal defendants argue that section 505(a)(2) does not confer jurisdiction and

waive sovereign immunity as to the Corps. As stated above, this court owes no deference to an

agency's interpretation of a statute that defines the court's subject matter jurisdiction. *Sierra*

*Club v. Leavitt*, 355 F. Supp. 2d 544, 548 (D.D.C. 2005)(citation omitted). The Alliance alleges

that Congress has waived the Corps' sovereign immunity through the operation of section

505(a)(2) of the Clean Water Act, Amended Compl. ¶ 10, which provides that "any citizen may

commence a civil action on his own behalf . . . against the Administrator where there is alleged a

failure of the Administrator to perform any act or duty under this chapter which is not

discretionary with the Administrator." 33 U.S.C. §1365(a)(2). Although this provision only

explicitly mentions the EPA Administrator, under section 404 of the Act the Corps and EPA

exercise joint authority regarding the granting of permits, the enforcement of section 404's

requirements, and the interpretation of this provision. *See National Wildlife Federation v.*

*Hanson*, 859 F.2d 313, 315 (4th Cir. 1988)[hereinafter "*Hanson*"]; *Environmental Def. Fund v. Tidwell*, 837 F. Supp. 1344, 1354 (E.D.N.C. 1992). Because the Corps performs functions parallel to that of the Administrator, section 505(a)(2) should be interpreted to waive sovereign immunity on behalf of the Corps when it fails to perform a mandatory duty under section 404.

The federal defendants assert that section 505(a)(2) "has consistently been held to extend only to EPA and exclude suits against the Corps." The defendants fail to point out, however, that courts in the Fourth Circuit, beginning with *Hanson*, have expressly held that section 505(a)(2) does allow suits against the Corps in cases in which the Corps has failed to perform mandatory duties under section 404 of the Act.

In *Hanson*, plaintiffs sued both the Corps and EPA pursuant to section 505(a)(2), challenging the Corps' determination under section 404 that a certain tract was not a wetlands. The district court held that both EPA and the Corps failed to perform their statutory duties under section 404. On appeal, the government argued that plaintiffs' suit did not qualify as a citizen suit because the plaintiffs' suit in effect challenged the Corps' exercise of its discretion in making the wetlands determination and not EPA's failure to perform a mandatory duty. *Hanson*, 859 F.2d at 315. The Fourth Circuit disagreed.

In undertaking its inquiry, the Fourth Circuit first determined that sections 404 and 505(a)(2) of the Clean Water Act "must be read together." *Id*. The court closely examined section 404 and found that "both the Corps and the EPA are responsible for the issuance of permits under [the section] and enforcement of their terms." *Id*. Specifically, the court noted that while section 404 authorizes the Secretary of the Army, acting through the Corps, to regulate the discharge of dredged or fill material into United States waters, including wetlands, this power is constrained by EPA's authority. EPA has power over section 404 permitting both because the

Corps' permit decisions must comply with the 404(b)(1) Guidelines established by EPA and because section 404(c) authorizes the EPA Administrator "to block or override a Corps' permit decision." *Id*. The court concluded that, as a result of this shared responsibility, section 505(a)(2) must be interpreted to encompass the Corps in addition to the Administrator to avoid anomalous results in the enforcement of section 404. *Id*. at 316. The court stated: "Congress cannot have intended to allow citizens to challenge erroneous wetlands determinations when the EPA Administrator makes them but to prohibit such challenges when the Corps makes the determination and the EPA fails to exert its authority over the Corps' determination." *Id*.

The Fourth Circuit held that the Corps' duty to regulate dredged or fill material under section 404 is nondiscretionary. *Id*. To fulfill its duty, the court stated that the Corps must make "reasoned" wetlands determinations. *Id*. at 315. Further, the court concluded that to make this kind of reasoned determination, the Corps has "a mandatory duty to ascertain the relevant facts, correctly construe the applicable statutes and regulations, and properly apply the law to the facts." *Id*. at 315-16. With respect to EPA, the court stated that EPA's "ultimate[] responsib[ility]" for the protection of wetlands under the Act and its authority under section 404(c) "to block or override a Corps' permit decision" imposed mandatory duties on EPA. *Id*. at 315. The court held that, because of the agencies' joint responsibilities in section 404 permitting, section 505(a)(2) allows citizens to sue the Administrator and join the Corps "when the Corps abdicates its responsibility to make reasoned wetlands determinations and the Administrator fails to exercise the duty of oversight imposed by section [404(c)]." [3] *Id*. at 316.

---

[3] The court added that section 505(a)(2) should also be read in conjunction with the joinder rule set forth in Rule 20 of the Federal Rules of Civil Procedure to allow citizens to sue the Administrator and join the Corps when these federal agencies have failed to perform mandatory duties under section 404. This same rationale applies here because the Alliance alleges a joint failure to perform nondiscretionary duties regarding the issuance of the permit for the Reservoir based upon common questions of law and facts.

The U.S. District Court for the Eastern District of North Carolina has applied *Hanson* in two subsequent cases involving the Corps' regulatory duties under section 404. *See Environmental Def. Fund v. Tidwell*, 837 F. Supp. 1344 (E.D.N.C. 1992); *Pamlico-Tar River Found. v. U.S. Army Corps of Eng'r*, No. 4:02-CV-53-(4), Mem. Order (E.D.N.C. 13 Aug. 2003) (attached as Exhibit A). In *Environmental Defense Fund v. Tidwell*, the court held that section 505(a)(2) allowed a suit against both the Corps and EPA in a challenge to the Corps' determination that a section 404 permit was not required on the grounds that the discharge at issue was exempt as a normal silvicultural activity under section 404(f)(1) of the Act. 837 F. Supp. at 1354. The Corps argued that, because a Memorandum of Agreement between the Corps and EPA gave EPA the "final authority" for interpreting the exemption, the Corps itself had no responsibility under 404(f) to "abdicate" and that *Hanson* therefore was distinguishable. *Id*. While acknowledging EPA's authority regarding section 404(f), the district court found that the Corps was nevertheless subject to suit under section 505(a)(2) because the Corps remained "ultimately responsible" for making permit decisions under section 404. *Id*. The court held, based on *Hanson*, that both EPA's and the Corps' actions constituted nondiscretionary duties for purposes of section 505(a)(2). *Id*. at 1355.

*Pamlico-Tar River Foundation v. U.S. Army Corps of Engineers* is particularly apt here. That case involved a suit under section 505(a)(2) against both EPA and the Corps challenging the Corps' issuance of a section 404 permit. Plaintiffs alleged that the Corps failed to analyze a full range of practicable alternatives and that this failure constituted an incorrect construction of the 404(b)(1) Guidelines that prohibit the issuance of a permit if a practicable and less damaging alternative exists. Mem. Order, No. 4:02-CV-53-(4) at 12-13. They claimed that such failures prevented the Corps from making a "reasoned" determination whether to issue a permit. *Id*. at

14.  Plaintiffs also alleged that EPA failed to carry out its duty of oversight under section 404(c) by not requiring the Corps to comply with the 404(b)(1) Guidelines and by not vetoing a permit that was issued on a faulty legal foundation.  *Id.* at 13.  The court rejected the Corps' argument that the citizen suit provision did not extend to the Corps and found that the plaintiffs' allegations regarding the Corps' and EPA's failure to perform mandatory duties under section 404 stated a claim for which relief could be granted.[4]  *Id.* at 17.

The cases that the defendants cite in which courts have found that the citizen suit provision does not authorize suits against the Corps focus narrowly on section 505(a)(2) and not the broader statutory context of the Clean Water Act.  *See Preserve Endangered Areas of Cobb's History (P.E.A.C.H.) v. U. S. Army Corps of Eng'r*, 87 F.3d 1242, 1249-50 (11th Cir. 1996).  As the federal defendants acknowledge, the Clean Water Act is a "comprehensive statute," *see* Fed. Def. Br. at 3, designed to "restore and maintain the … integrity of the Nation's waters," including wetlands.  33 U.S.C. §1251(a).  The decisions in *Hanson* and its progeny reflect the structure and purpose of section 505, as well as the shared responsibilities of EPA and the Corps under section 404, and the broader objectives of the Act.  While a waiver of sovereign immunity is generally to be narrowly construed, granting the Corps' claim of immunity in this case would be inconsistent with the broader statutory context.  The Alliance therefore urges this Court to follow the Fourth Circuit's reasoning and find that section 505(a)(2) allows citizen suits against the Corps for failure to perform a nondiscretionary duty.

II.    **Section 404 Of The Clean Water Act And Implementing Regulations Impose Nondiscretionary Duties Upon The Corps And EPA, Which The Federal Defendants Have Failed To Perform.**

---

[4] The court ultimately held in favor of the defendants on the merits, however.  *See* 329 F. Supp.2d 600 (E.D.N.C. 2004).

The Alliance asserts that both the Corps and EPA have violated mandatory duties regarding the Corps' issuance of the section 404 permit for the proposed King William Reservoir. Amended Compl. Counts I-IV. The federal defendants do not dispute, nor can they, that the 404(b)(1) Guidelines impose mandatory duties that the Corps must follow in considering a section 404 permit application, as the court held in *Hanson*.[5] *See, e.g.*, 40 C.F.R. §230.10 ("all requirements in [the Guidelines] must be met"). *See also National Wildlife Federation v. Norton*, 332 F. Supp. 2d 170, 186 (D.D.C. 2004) (Corps "has a duty" under 40 C.F.R. §230.10(a) to evaluate practicable alternatives to issuing section 404 permit that will result in filling a wetland).

This Court's decision in *Sierra Club v. Leavitt*, 355 F. Supp. 2d 544 (D.D.C. 2005), is also relevant by analogy. The Court held, in the context of the Clean Air Act, that the regulation at issue imposed a binding duty on the agency, the violation of which could be challenged through the Act's citizen suit provision, even if the regulation imposed a more stringent obligation than the statute itself. *Id*. at 553, 556. The Clean Air Act's citizen suit provision, 42 U.S.C. §7604(a), is identical to that of the Clean Water Act in section 505(a)(2). The regulation in question required the EPA Administrator, by a date certain, to propose "any requirements" to control hazardous air pollutants from motor vehicles and fuels that the Administrator determines "are appropriate" pursuant to a specific provision of the Clean Air Act. The Court further found that "even though the agency has discretion to promulgate 'any' regulation it deems

---

[5] With respect to the Corps, the federal defendants claim only that section 505(a)(2) does not extend to the Corps; they make no assertion regarding the Corps' duties arising under section 404. Likewise the cases that the defendants cite turn solely on the issue whether section 505(a)(2) allows a claim against the Corps. Because of the disposition of the sovereign immunity issue, the cited cases, with one exception, do not address whether the Corps' duties under section 404 are nondiscretionary. In *Cascade Conservation League v. M.A. Segale, Inc.*, 921 F. Supp. 692, 698 n.8 (W.D. Wash. 1996), cited by the federal defendants, Fed. Def. Br. at 14, the court noted in a footnote that even if section 505 applied, the Corps did not have a mandatory duty. The court's statement was dictum, however, and the court offered no analysis to support its statement. Plaintiffs are not aware of any case, and defendants have pointed to none, in which a court has held that the 404(b)(1) Guidelines and the Corps' own section 404 regulations do not impose mandatory duties on the Corps.

appropriate," the regulation still created a mandatory duty to act. *Id*. at 550. Quoting *Bennett v. Spear*, 520 U.S.154, 172 (1997), this Court stated that "'it is rudimentary administrative law that discretion as to the substance of the ultimate decision does not confer discretion to ignore the required procedures of decisionmaking.'" 355 F. Supp.2d at 550.

The Court's reasoning is equally applicable here. In determining whether to issue a permit under section 404, the Corps' discretion is constrained by its obligations to follow the mandatory requirements set forth in the 404(b)(1) Guidelines and the Corps' own regulations. As was alleged in *Pamlico-Tar River Foundation*, the Alliance asserts that the Corps' failure to follow the binding regulations set forth in the 404(b)(1) Guidelines and the Corps' related regulations prevented the Corps from making a "reasoned" determination whether to issue a permit.

With respect to EPA, the federal defendants assert that "multiple courts have held" that the "non-mandatory language of section 404(c) renders EPA's exercise of discretion under that section [as] outside the ambit of the citizen suit provision." Fed. Def. Br. at 11. The only cases cited are *City of Olmsted Falls v. EPA*, 266 F. Supp.2d 718 (N.D. Ohio 2003), *aff'd*, 435 F.3d 632 (6th Cir. 2006), and the *P.E.A.C.H.* decision. The Fourth Circuit in *Hanson*, however, expressly held that section 404 gives rise to mandatory duties on the part of both the Corps and EPA. The Alliance contends that the Fourth Circuit's reasoning better comports with the statutory framework than the *P.E.A.C.H* decision. Moreover, *City of Olmsted Falls* is inapposite because the claims were brought under the APA and not the citizen suit provision. *City of Olmsted Falls*, 266 F. Supp.2d at 722. While the court in that case stated that EPA's veto authority under section 404(c) was discretionary, the court did not have occasion to consider the interrelationship between sections 404(c) and 505(a)(2).

A.  **The Corps Has Failed to Fulfill the Mandatory Duties Imposed By Section 404, the 404(b)(1) Guidelines, and the Corps' "Public Interest" Regulations.**

The proposed Amended Complaint alleges that the Corps' issuance of the permit violates the prohibition in 40 C.F.R. §230.10(a) that "*no* discharge of dredged or fill material *shall* be permitted if there is a practicable alternative to the proposed discharge which would have less adverse impact on the aquatic ecosystem . . . ."  (emphasis added).  The Alliance alleges that the Corps violated this mandatory duty by issuing a permit for a project that is not needed to satisfy Newport News' water needs and where less damaging practicable alternatives are available. Amended Compl. Count II.

The selection of the Reservoir alternative in the 1997 Final Environmental Impact Statement ("EIS") was based on Newport News' projected water deficit by the year 2040 of 39.8 mgd.  Amended Compl. ¶¶ 65, 109.  After considering a number of expert reports, including the independent reports of the Corps' Institute of Water Resources, the Norfolk District concluded that Newport News' water needs were less than half of Newport News' projections and that Newport News had failed to demonstrate a need for the Reservoir.  Amended Compl. ¶¶ 67-68, 70, 110.  Moreover, in the NAD's 2005 Record of Decision to issue the permit, it found that the year 2040 deficit was only 15.9 mgd.  Amended Compl.¶¶ 80, 111.   The 1997 Final EIS itself indicated that practicable non-reservoir alternatives could supply a combined treated safe water yield of 21.2 mgd.  Amended Compl.  ¶¶ 67, 110.

The Alliance alleges that in the face of these clear findings by the Corps that the Reservoir is not needed, the Corps' issuance of the permit for the Reservoir violated the mandatory requirement that no permit shall issue if there are practicable, less damaging alternatives available.  In addition, the Alliance alleges that the Corps abdicated its

responsibilities to perform the alternatives analysis required under 40 C.F.R. §230.10(a) because the NAD's review focused solely on the EIS alternatives that were designed to meet the discredited water needs analysis. Amended Compl. ¶ 110-112.

The Alliance further alleges that the Corps' issuance of the permit to Newport News violates the prohibitions in 40 C.F.R. §§230.10(c) and 230.10(d), respectively, that "*no* discharge of dredged or fill material *shall* be permitted which will cause or contribute to significant degradation of the waters of the United States," and "unless appropriate and practicable steps have been taken which will minimize potential adverse impacts of the discharge on the aquatic ecosystem." (emphasis added). Amended Compl. Counts I, III. The Alliance alleges that the permitted activity will cause significant degradation to waters of the United States as a result of the permanent and irretrievable loss of over 400 acres of highly diverse and valuable wetlands and the inundation of 21 miles of streams as well as other significant impacts, as the Norfolk District found in its 2001 Final RROD. Amended Compl. ¶¶ 3-4, 69, 95-100, 102-104.

Further, under the 1990 Memorandum of Agreement with EPA, mitigation of wetlands losses is the last legal option available to the Corps, after avoidance of losses and minimization of unavoidable losses. If there is no demonstrated need for the loss, the loss is avoidable and a permit must be denied. Amended Compl. ¶ 117. The Alliance alleges that there is no demonstrated need for the wetland losses because the Reservoir is not needed to supply Newport News' water needs. *See* Amended Compl. Count II, ¶¶ 69-70. The wetlands that would be destroyed are highly diverse, ecologically significant and contiguous, and function as an integrated system. Amended Compl. ¶ 118. The Alliance asserts that it is not possible to replicate this integrated ecosystem and that the creation or restoration of wetlands in scattered mitigation sites set forth in the Final Mitigation Plan will not compensate for the loss of wetlands

functions and values.  Amended Compl. ¶¶ 75-78, 118-121.  The Alliance's allegations, taken to

be true, state a claim that the Corps has violated the mandatory duties prescribed by 40 C.F.R.

§§230.10(c) and 230.10(d) in issuing the permit.

The Corps is also required by 33 C.F.R. §320.4 to deny a section 404 permit if the district

engineer determines that it would be contrary to the public interest.  Amended Compl. Count IV.

In its 2001 Final RROD, the Norfolk District found that issuing a section 404 permit for the

Reservoir would be contrary to the public interest because the risks to the Tribe, to the

environment, and to the entire watershed were too great when weighed against the unjustified

need for the project, Amended Compl. ¶¶ 70,126, but the NAD found to the contrary in the 2005

ROD.  The Alliance alleges, among other things, that the Corps' failure to follow the mandatory

requirements of the 404(b)(1) Guidelines, as set forth above, in turn precluded the Corps from

carrying out its duty to conduct an adequate and objective public interest review before issuing a

section 404 permit.  Amended Compl. ¶¶ 126-129.

### B.  Section 404 Imposes Mandatory Duties On EPA That EPA Has Failed To Perform.

The federal defendants incorrectly argue that the Alliance has failed to identify any

mandatory duty that EPA has failed to perform.  To the contrary, the *Hanson* line of cases

establish, and the Alliance has alleged, that EPA has a duty to ensure compliance with the

404(b)(1) Guidelines when the Corps issues a section 404 permit.  Under the holding in *Hanson*,

section 505(a)(2) allows citizens to sue EPA when "the Administrator fails to exercise the duty

of oversight imposed by section [404](c)."  859 F.2d at 316.

The Amended Complaint alleges that EPA violated its statutory duty under section 404(c)

to ensure compliance with the 404(b)(1) Guidelines by failing to require the Corps to deny the

permit, and by failing to exercise its veto authority when the Corps issued a permit (1) that will

cause significant degradation of the waters of the United States, Amended Compl. Count I; (2) where the reservoir is not needed and there are practicable, less damaging alternatives available to satisfy Newport News' water needs, Amended Compl. Count II; and (3) where appropriate and practicable steps to avoid and minimize the adverse effects on the adequate ecosystem have not been taken, Amended Compl. Count III, in violation of the Guidelines. The amended complaint further alleges that EPA violated its mandatory oversight duties under section 404(c) by failing to require an adequate and objective "public interest review," 33 C.F.R. §320.4, and by failing to veto the Corps' decision to issue a permit without such review. Amended Compl. Count IV.

These allegations of mandatory duties on the part of EPA must be considered in the context of the Alliance's other allegations that EPA, throughout the 404 process in this case, has taken the position that other less damaging, practicable alternatives are available, that the project would result in the significant degradation of waters of the United States, including wetlands, and that the proposed mitigation cannot offset the unprecedented destruction of wetlands and impacts upon the aquatic resources. [6] For example, EPA asserted in 1997 that the proposed reservoir could result in unacceptable impacts to "Aquatic Resources of National Importance." Amended Compl. ¶ 64. In its May 2001 comments on the Norfolk District's Draft RROD to deny the permit, EPA stated that the project would result in "the largest destruction of wetlands

---

[6] EPA's views on the project were fully supported by the U.S. Fish and Wildlife Service (the "FWS"), the other federal agency involved in reviewing the project. The FWS repeatedly recommended that the permit be denied on the grounds that the impacts of the project "are extremely detrimental to the fish and wildlife resources of Southeast Virginia," and "will result in substantial and unacceptable impacts to aquatic resources of national importance." Amended Compl. ¶ 64. *See* Amended Compl. ¶¶ 61, 69. The FWS, like EPA, agreed with the Norfolk District's 2001 RROD, stating that it shared the Norfolk District's belief "that the proposed project would cause or contribute to significant degradation of waters of the United States, including wetlands," and that it concurred that "these damaging environmental impacts are avoidable by selecting other water supply options available to the applicant." Amended Compl. ¶ 70. After the NAD's initial 2002 decision overturning the Norfolk District's Final RROD, the FWS continued to affirm its strong opposition to the issuance of a permit for the Reservoir. Amended Compl. ¶¶ 77,78. With respect to the Final Mitigation Plan, the FWS concluded that even in the unlikely event that the plan were implemented successfully, the project would still result in a net loss of wetlands and aquatic habitats in the York River basin. Amended Compl. ¶ 78.

and their associated habitat" in the mid-Atlantic in the history of the Clean Water Act.  Amended

Compl. ¶ 69.  EPA also found that "the impacts [from the project] would cause or contribute to

significant degradation of waters of the United States, including wetlands, specifically in Cohoke

Mill Creek and the Mattaponi River as described under the 404(b)(1)Guidelines." Amended

Compl. ¶ 104.

EPA also voiced its objections to the wetlands mitigation plan.  In its comments dated 22

March 2004 on the draft Final Plan, EPA stated that the impacts of the project would represent a

"dramatic alteration of a functioning stream valley ecosystem in the Chesapeake Bay

watershed." Amended Compl. ¶ 77.  Further, according to EPA, the proposed wetlands

mitigation "cannot replicate the size, location, interspersion, and landscape context functions

inherent in an intact watershed." Amended Compl. ¶ 76.

In addition, EPA stated that the project "would deal a serious blow to efforts to restore

and enhance the existing wetland base within the Commonwealth of Virginia and the

Chesapeake Bay Watershed.  In light of commitments made by the Federal government and the

Governors of Virginia, Maryland and Pennsylvania in the Chesapeake 2000 Agreement to

restore and maintain the wetland resources of the Chesapeake Bay, losses of this magnitude

should not be authorized unless they clearly are unavoidable.  Wetland protection is integral to

the goals of the Chesapeake 2000 Agreement which not only focus on wetland restoration but

clearly seek to reduce wetland loss through the regulatory program." Amended Compl. ¶ 76.

EPA also found that "the substantial impacts to wetlands and other important natural

resources are avoidable because there are options available . . . to reduce water demand and

optimize existing sources of water." Amended Compl. ¶ 69.  These facts all show that EPA knew

that the Corps' issuance of the permit would violate the mandatory prohibitions set forth in the

404(b)(1) Guidelines.  On these facts, the Alliance has identified mandatory duties under 404(c)

that EPA has failed to perform by not requiring the Corps to deny the permit or by not vetoing

the permit.  Thus, this Court should find that the Alliance has alleged sufficient facts to state a

claim for which relief can be granted.

> **III.     In The Alternative, EPA's Violation Of Section 404(c) States A Claim
> For Relief Under The APA.**

The Alliance alleges, in the alternative, that EPA's violation of section 404(c) states a

claim for relief under the APA.  Amended Compl. ¶¶ 106, 114-115, 123, 131.  The federal

defendants' assertion that the Alliance has not identified any duty under the Clean Water Act that

is properly challenged through APA §706, Fed. Def. Br. at 11, is incorrect.  As the court in

*Hanson* determined, EPA's "duty of oversight imposed by section [404](c)" is mandatory.

*Hanson*, 859 F.2d at 316.  It therefore is not "committed to agency discretion by law," 5 U.S.C.

§701(a)(2), and does not fall within the narrow exception to reviewability provided for in APA

§701.  *See Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 410 (1971)("The

legislative history of the Administrative Procedure Act indicates that [the 701(a)(2) exception] is

applicable in those rare instances where 'statutes are drawn in such broad terms that in a given

case there is no law to apply.'").  Those rare exceptions in which there is "no law to apply" occur

when "the court would have no meaningful standard against which to judge the agency's

exercise of discretion."  *Heckler v. Chaney*, 470 U.S. 821, 830 (1985).  As the D.C. Circuit

recognized in *Center for Auto Safety v. Dole*, 846 F.2d 1532, 1534 (D.C. Cir. 1988), "[j]ust as

Congress can provide the basis for judicial review of nonenforcement decisions by spelling out

statutory factors to be measured by the courts, so an agency can provide such factors by

regulation."  Thus an agency's regulations that prescribe mandatory action are "self-imposed

constraints" that overcome the "presumption against the review of agency inaction."  *Id*.

To fulfill its duty under section 404(c), EPA must ensure compliance with the mandatory 404(b)(1) Guidelines, by either requiring the Corps to comply with the Guidelines or by vetoing a permit that violates those regulations.  EPA's consistent findings in this case show that the 404(b)(1) Guidelines would be violated by the issuance of the permit.  Under the standards set forth above, the "laws to apply" are section 404(c) and the 404(b)(1) Guidelines and the EPA's obligations are clear.  Therefore, EPA's failure to comply with these laws is agency inaction reviewable under the APA.

**IV.    The Alliance's Claims Asserted Under The Chesapeake 2000 Agreement State A Valid Claim For Relief.**

**A.    The APA Waives Sovereign Immunity for the Alliance's Claims under the Chesapeake 2000 Agreement.**

The federal defendants assert that the Alliance's claims alleged in County VII of their Amended Complaint are blocked by sovereign immunity.  Fed. Def. Br at 12-14.  The federal defendants misunderstand the nature of the Alliance's claims.

Count VII asserts that because the federal defendants failed to consider their obligations pursuant to the Chesapeake 2000 Agreement, the Corps' decision to grant a permit under section 404 of the Clean Water Act to Newport News to destroy over 400 acres of wetlands, and EPA's failure to exercise its veto authority, were arbitrary and capricious, an abuse of discretion, and not in accordance with the law.  Amended Compl. ¶ 147.  The complaint challenges the Corps' issuance of the section 404 permit and alleges a variety of reasons why the issuance of that permit, and EPA's failure to veto it, violated the standards applicable to such decisions.  Count VII merely alleges that ignoring and violating the Chesapeake 2000 Agreement is one of the ways in which EPA and the Corps violated those standards and abused their discretion.  The

APA straightforwardly waives sovereign immunity for these claims, and the Court should allow this count to proceed on the merits.

The D.C. Circuit has long recognized that APA §702 waives the United States' sovereign immunity from claims challenging agency action that do not seek monetary damages, regardless of whether such claims are brought under the APA or not. *See Trudeau v. Federal Trade Comm'n*, 456 F.3d 178, 186 (D.C. Cir. 2006); *Chamber of Commerce v. Reich*, 74 F.3d 1322, 1328 (D.C. Cir. 1996) ("The APA's waiver of sovereign immunity applies to any suit whether under the APA or not."); *Clark v. Library of Congress*, 750 F.2d 89, 102 (D.C. Cir. 1984) ("[T]he 1976 amendments to §702 of the Administrative Procedure Act, 5 U.S.C. §702, eliminated the sovereign immunity defense in virtually all actions for non-monetary relief against a United States agency or officer acting in an official capacity"). Therefore, notwithstanding the federal defendants' violations of the provisions of the APA averred in Count VII, section 702 of the APA operates as a waiver of sovereign immunity in this case. *See Trudeau*, 456 F.3d at 187.

Further, the court in *Preferred Risk Mutual Insurance Co. v. United States*, 86 F.3d 789, 792 (8th Cir. 1996), cited by the federal defendants in support of their claim of sovereign immunity, also recognized that the APA, not the substantive provision of law violated by the agency, waives sovereign immunity:

> [A]lthough the plaintiff need not demonstrate that the substantive statute independently waives federal sovereign immunity, which is the function of section 702, the plaintiff must identify a substantive statute or regulation that the agency action had transgressed and establish that the statute or regulation applies to the United States.

Accordingly, the cases cited by the federal defendants in footnote 5 of their Partial Motion to Dismiss are inapposite because the Alliance does not contend that the Chesapeake 2000 Agreement contains a direct waiver of sovereignty itself; rather the waiver of sovereignty is effected by APA §702. Furthermore, Count VII satisfies the basic test for a right to sue under

24

the APA identified in *Preferred Risk*. The Alliance alleges that, in issuing the permit, the defendants violated section 404 of the Clean Water Act by ignoring their obligations under the Chesapeake 2000 Agreement, which, among other things, represents part of an ongoing effort to implement the Clean Water Act more effectively with respect to pollution problems in the Chesapeake Bay.

      **B.**        **The Chesapeake 2000 Agreement Includes Substantive Commitments That Are Relevant To The Permitting Decision At Issue.**

      The Chesapeake 2000 Agreement was signed by the United States, the Chesapeake Bay Commission, Virginia, Maryland, Pennsylvania, and the District of Columbia, as part of ongoing efforts to restore the health of the Chesapeake Bay. The Agreement includes a variety of commitments, many of which are highly relevant to various aspects of the Clean Water Act. The "Water Quality Protection and Restoration" section of the Agreement specifically references that the Bay is failing to achieve water quality standards under the Clean Water Act. The signatories have committed to the goal of remedying these violations by 2010 and set out a suite of actions and programs, many under the Clean Water Act, to remedy these violations. Most relevant to the section 404 permitting decision in this case, the Agreement commits the signatories to "[a]chieve a no-net loss of existing wetlands acreage and function in the signatories' regulatory programs." Chesapeake 2000 Agreement, at http://www.chesapeakebay.net/agreement.htm (Vital Habitat Protection and Restoration – Goal – "Preserve, protect and restore those habitats and natural areas that are vital to the survival and diversity of the living resources of the Bay and its rivers." – Wetlands). This section of the Agreement also provides that the signatories will "[b]y 2010, achieve a net resource gain by restoring 25,000 acres of tidal and non-tidal wetlands. To do this, we commit to achieve and maintain an average restoration rate of 2,500 acres per year basin wide by 2005 and beyond." *Id.* The Agreement also commits the signatories to "restore passage

for migratory fish and work to ensure that suitable water quality conditions exist in the upstream spawning habitats upon which they depend." *Id.* (Living Resource Protection and Restoration – Goal - "Restore, enhance and protect the finfish, shellfish and other living resources, their habitats and ecological relationships to sustain all fisheries and provide for a balanced ecosystem." – Fish Passage and Migratory and Resident Fish).  The permit for the Reservoir in fact violates both of these commitments, and the Corps and EPA failed to consider these commitments in issuing the permit.

>        **C.        Congress Recognized And Ratified The Chesapeake 2000 Agreement In The Clean Water Act.**

Congress recognized and ratified the Chesapeake 2000 Agreement in an amendment to the Clean Water Act.  Chesapeake Bay Restoration Act of 2000, Pub. L. 106-457, Title II, §202, 114 Stat. 1967 (7 Nov. 2000)(codified at 33 U.S.C. §1267).  Congress recognized in the Act that "the Chesapeake Bay is a national treasure and a resource of worldwide significance."  *Id.* Congress provided that the United States (acting through EPA) as well as the District of Columbia and the states of Virginia, Maryland, and Pennsylvania "have committed to a comprehensive cooperative program to achieve improved water quality and improvements in the productivity of living resources of the [Chesapeake] Bay."  *Id.*  Thus, Congress enacted Section 117 of the Clean Water Act in order "to achieve the goals established in the Chesapeake Bay Agreement."  *Id.*

Section 117 specifically requires the Administrator of the EPA to maintain a Chesapeake Bay Program office to, *inter alia*, coordinate the actions of EPA with the actions of other federal agencies in developing strategies to improve the water quality and living resources in the Chesapeake Bay ecosystem and achieve the objectives of the Chesapeake Bay Agreement.  33 U.S.C. §1267(b)(2).  Moreover, the Administrator "shall ensure that management plans are

developed and implementation is begun by signatories to the Chesapeake Bay Agreement to achieve and maintain – (D) habitat restoration, protection, creation and enhancement goals established by the Chesapeake Bay Agreement signatories for wetlands, riparian forests, and other types of habitat associated with the Chesapeake Bay ecosystem." *Id*. §1267(g)(1)(D). Thus, section 117 of the Clean Water Act reflects a clear affirmation by Congress of the federal role in carrying out the Chesapeake Bay Agreement and makes the Chesapeake 2000 Agreement a relevant factor for federal agencies to consider when making permitting decisions that will impact the Chesapeake Bay ecosystem.

### D.    The Defendants' Permitting Actions Were Constrained by the Chesapeake 2000 Agreement.

As discussed above, this court does not have to find that the Chesapeake 2000 Agreement waives sovereign immunity.  Rather, it simply must find "a substantive statute or regulation that the agency action had transgressed and establish that the statute or regulation applies to the United States." *Preferred Risk Mut. Ins.,* 86 F.3d at 792.  Here, the Alliance alleges that the Corps and EPA transgressed the Clean Water Act and the Chesapeake 2000 Agreement by granting the permit and failing to exercise oversight authority.[7]  Thus, both elements of the *Preferred Risk* test are met, and the APA functions as a waiver of the United States' sovereign immunity with respect to the Alliance's allegations in Count VII of the Amended Complaint. Moreover, there is a strong presumption in favor of judicial review of agency action under the APA.  *Steenholdt v. F.A.A.*, 314 F.3d 633, 638 (D.C. Cir. 2003); *Menkes v. U.S. Dept. of Homeland Sec.*, 402 F. Supp.2d 204, 207 (D.D.C. 2005).  Therefore, "[e]ven though the APA

---

[7] By enacting section 117 of the Clean Water Act, Congress has expressly affirmed the federal government's commitments under the Chesapeake Bay Agreement.  *See* 33 U.S.C. §1267.  Because the permitting decision violates numerous provisions of the Chesapeake 2000 Agreement, which expressly applies to the United States, arguably the Chesapeake 2000 Agreement itself satisfies the standard in *Preferred Risk Mut. Ins.* and could function as an independent waiver of sovereign immunity notwithstanding section 404 of the Clean Water Act.

itself technically grants no jurisdiction, power to review *any* agency action exists under 28 U.S.C. §1331." *El Rio Santa Cruz Neighborhood Health Ctr. Inc. v. Dep't of Health and Human Serv.*, 300 F. Supp.2d 32, 36 (D.D.C. 2004) (internal quotations omitted) (emphasis in original). As the federal defendants concede, "there is no dispute that the Alliance and the Tribe can pursue an APA claim challenging the Corps's issuance of the Permit as arbitrary or capricious." [8] Fed. Def. Br. at 9.

As discussed above, the Chesapeake 2000 Agreement both implements specific programs and goals of the Clean Water Act, and was integrated into the Clean Water Act through he passage of 33 U.S.C. §1267. By signing the Agreement, the United States committed itself to specific goals and implementation measures, including preservation and restoration of wetlands and fish passage. The Corps failed to base its decision to approve the permit for the Reservoir on any consideration of the Chesapeake 2000 Agreement. *See* NAD 2005 Record of Decision at 6. EPA was aware that the Corps' issuance of the permit would violate the federal government's obligations under the Chesapeake 2000 Agreement and failed to ensure that proper consideration of those obligations was included in the Corps' final permit decision. *See* Amended Compl. ¶ 76. These facts, taken as true, state a claim that the actions of the Corps and EPA were arbitrary and capricious under APA §706(2)(A). *See State Farm*, 463 U.S. at 43; *James*, 229 F.3d at 284.

Courts reviewing agency decisions under section 706(2)(A) of the APA will find a decision to be arbitrary and capricious if the agency has "entirely failed to consider an important

---

[8] The federal defendants' somewhat cryptic footnote that the Alliance's original complaint "improperly characterizes its claim as one for 'violation' of the Clean Water Act or its implementing regulations," Fed. Def. Br. at 14 n.6, incorrectly construes the legal basis for the Alliance's claim. As the federal defendants state, "[t]here is no right to sue for a violation of the APA in the absence of a 'relevant statute' whose violation 'forms the basis for [the] complaint.'" *Id.* at 13 (quoting *Preferred Risk*, 86 F.3d at 792). The Alliance properly alleges, with respect to the APA claim, that the Corps violated the Clean Water Act in issuing the permit.

aspect of the problem." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983); *see also Advocates For Highway & Auto Safety v. Fed. Motor Carrier Safety Admin.*, 429 F.3d 1136 (D.C. Cir. 2005) (applying the *State Farm* test in finding that agency action ignoring extensive sources of evidence and relevant materials published by another agency was arbitrary and capricious).  Therefore, a plaintiff states a claim that an agency's action is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law," 5 U.S.C. §706(2)(A), by alleging that the agency "failed to consider factors made relevant by Congress." *James v. Hurson Assoc., Inc.*, 229 F.3d 277, 284 (D.C. Cir. 2000).  Not only has Congress explicitly made the Chesapeake Bay Agreement relevant to permitting decisions by the Corps and EPA that may adversely affect the Bay ecosystem, but the Chesapeake 2000 Agreement itself is inherently "an important aspect" of such considerations.  *See State Farm*, 463 U.S. at 43.

The permit issued by the Corps contemplates the largest destruction of wetlands acreage (all located within the Chesapeake Bay Ecosystem) in the mid-Atlantic region in the history of the Clean Water Act.  Amended Compl. ¶ 36.  Moreover, the permitted activities, if allowed to proceed, will significantly degrade water quality and quantity regimes of the Mattaponi River, one of the most productive estuarine river tributaries of the Chesapeake Bay for American shad.[9] *See* Amended Compl. ¶¶ 36-38.  Because wetlands protection and restoration and preservation of aquatic habits are especially critical in the Chesapeake Bay ecosystem, the failure by the Corps to consider the federal government's obligations under the Chesapeake 2000 Agreement in issuing the permit and EPA's failure to ensure such consideration were arbitrary and capricious.

---

[9] Indeed, the Norfolk District's 2001 Final RROD specifically found that any alteration of river systems in the area covered by the permit that blocked the passage of anadromous fish stocks would be in conflict with current restoration efforts under the Chesapeake Bay Agreement.  *See* 2001 Final RROD at 179.

Additional agreements and commitments by the Corps and EPA reinforce the relevance of the Agreement to the permitting decision at issue in this case.  The Department of Defense ("DOD") and EPA have a well-established policy of compliance with a prior Chesapeake Bay Agreement.  In 1990, DOD and EPA agreed to cooperatively implement the goals and objectives of the Chesapeake Bay Agreement.  *See* Cooperative Agreement Between Department of Defense and Environmental Protection Agency Concerning Chesapeake Bay Activities (20 April 1990).  This agreement included a specific commitment by DOD to "[c]ontinue to actively participate in the Chesapeake Bay Program (CBP) through central coordination of all related activities."  *Id.*  In 1998, the EPA and the Department of the Army (and thus the Corps), among other federal agencies, established a unified plan to meet the goals of the Chesapeake Bay Agreement.  *See* Federal Agencies' Chesapeake Ecosystem Unified Plan (5 Nov. 1998), available at http://www.chesapeakebay.net/pubs/FACEUP_Agreement.pdf.  This unified plan includes a specific commitment to "support the Chesapeake Bay Program's Wetlands Directive by assisting states in implementation of their strategies for net gain of wetlands . . . ."  *Id.*

In addition, the Corps' general policies under section 404 for evaluating permit applications required consistency with the Chesapeake 2000 Agreement in this case.  Specifically, the Corps must undertake a "public interest review" in which the Corps must evaluate the probable impacts of issuing a permit by carefully weighing "all those factors which become relevant in each particular case."[10]  33 C.F.R. §320.4(a)(1).  The Corps' regulation places a thumb on the scale against wetlands destruction in light of their vital role in ecosystem health and those concerns are particularly heightened in this case owing to the protections afforded to the Chesapeake Bay ecosystem under the Chesapeake 2000 Agreement.  *See* 33

---

[10] The public interest review provision of the Corps' regulations further provides: "All factors which may be relevant to the proposal must be considered including the cumulative effects thereof: among those are conservation . . . aesthetics, general environmental concerns, wetlands . . . fish and wildlife values . . . ."  33 C.F.R. §320.4(a)(1).

C.F.R. §320.4(b)(1).  The Corps' regulations make clear that "state regulatory laws or programs

for classification and protection of wetlands will be considered."  33 C.F.R. §320.4(b)(5).  The

Chesapeake 2000 Agreement and Virginia's efforts to implement the Agreement certainly

qualify as such a program.

  Both the Corps and EPA are aware that they are required to explicitly take the Agreement

into consideration and that granting the Permit would undermine their obligations under the

Chesapeake Bay Agreement.  The Corps is obligated under the 1998 Unified Plan to ensure that

its numerous properties located within the Chesapeake Bay ecosystem are fully compliant with

the terms of the Chesapeake 2000 Agreement.  *See* Unified Plan.  Not only did the Corps have

experience implementing the Chesapeake 2000 Agreement through its Unified Plan obligations,

but it also received comments from EPA in this case that granting the permit would violate the

Chesapeake 2000 Agreement.  Specifically, EPA informed the Corps that "[w]etlands protection

is integral to the goals of the Chesapeake 2000 Agreement which not only focus on wetland

restoration, but clearly seek to reduce wetland loss through the regulatory program."  Amended

Compl. ¶ 76.

  EPA further recommended that "[i]n light of commitments made by the Federal

government . . . in the Chesapeake 2000 Agreement to restore and maintain the wetland

resources of the Chesapeake Bay, losses of this magnitude [437 acres as allowed by the permit]

should not be authorized unless they clearly are unavoidable."  *Id.*  The abject failure of the

Corps to consider these potential violations of the Chesapeake 2000 Agreement in its final

decision to issue the permit cannot be rationally upheld.  Further, given the EPA's understanding

that the issuance of the permit would constitute a violation of the Chesapeake 2000 Agreement,

its failure to ensure that the permitting decision properly weighed those obligations violates APA

§706(2)(A).  In sum, the Corps and EPA were required to consider and to act consistently with the Chesapeake Bay Agreement.  The federal defendants' failure to do so was arbitrary and capricious under APA §706(2)(A).  Thus, the Alliance's claims under Count VII should be permitted to stand and the federal defendants' motion denied.

## CONCLUSION

For the reasons stated above, the Alliance requests that this Court reject the federal defendants' Partial Motion to Dismiss and In Opposition to the Alliance's Motion to Amend the Complaint with respect to the Alliance, and grant the Alliance's request to file the Amended Complaint set forth in Exhibit A of the Alliance's Motion to Amend.  Alternatively, the Alliance requests that the Court postpone any decision until the briefing on summary judgment is completed.  While the Alliance contends that the facts alleged supports its position, the Alliance can of course only point to agency statements of which plaintiffs are aware.  Postponement of the decision would allow the Alliance to review the administrative record, which has not yet been produced, and alert the Court to any additional information in the record that would support its position.

Pursuant to LCvR 7(f), the Alliance requests oral argument on this matter.

Respectfully submitted this 16th day of March 2007.

*/s/ Deborah M. Murr*ay
Deborah M. Murray (D.C. Bar No. 362563)
Senior Attorney
Southern Environmental Law Center
201 West Main Street, Suite 14
Charlottesville, VA   22902
(434) 977-4090 Telephone
(434) 977-1483 Fax

Counsel for Plaintiffs
Alliance to Save the Mattaponi

32

The Chesapeake Bay Foundation, Inc.
Sierra Club, Virginia Chapter


Jon A. Mueller
Director of Litigation
The Chesapeake Bay Foundation, Inc.
6 Herndon Ave.
Annapolis, MD 21403
(410) 268-8816 Telephone
(410) 268-6687 Fax

Co-Counsel for Plaintiff
The Chesapeake Bay Foundation, Inc.

**CERTIFICATE OF SERVICE**

I hereby certify that on 16 March 2007, I electronically filed the Response Of The Alliance Et Al. To The United States' Partial Motion To Dismiss And In Opposition To Plaintiffs' Motion To Amend Complaint with the Clerk of Court using the CM/ECF system.

I also hereby certify that on 16 March 2007, true and correct copies of the Response Of The Alliance Et Al. To The United States' Partial Motion To Dismiss And In Opposition To Plaintiffs' Motion To Amend Complaint were served by first class mail, postage prepaid, properly addressed to the following counsel who do not receive electronic notification of filings:

M. Scott Hart
Troutman Sanders LLP
222 Central Park Avenue
Suite 2000
Virginia Beach, VA 23462

James E. Ryan, Jr.
George A. Somerville
Lynne F. Rhode
Troutman Sanders LLP
PO Box 1122
Richmond, VA 23218-1122

Stuart E. Katz, City Attorney
Allen L. Jackson, Chief Deputy City Attorney
City of Newport News
2400 Washington Street
Newport News, VA   23607

Pat M. Falcigno
Office of Counsel
North Atlantic Division
U.S. Army Corps of Engineers
Fort Hamilton
302 General Lee Avenue
Brookly, NY   11252-6700

*/s/ Deborah M. Murray*