UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF COLUMBIA

ALLIANCE TO SAVE THE MATTAPONI, *et al.*,

                Plaintiffs,

v.

UNITED STATES ARMY CORPS
OF ENGINEERS, *et al.*,
                Defendants.

Docket No.

1:06-cv-01268-HHK

**OPPOSITION OF THE PLAINTIFFS THE ALLIANCE *ET AL.* TO THE UNITED STATES' ENVIRONMENTAL PROTECTION AGENCY'S MOTION FOR PARTIAL RECONSIDERATION AND MEMORANDUM IN SUPPORT**

Plaintiffs the Alliance to Save the Mattaponi *et al.* ("the Alliance") oppose the Motion for Partial Reconsideration of the United States Environmental Protection Agency ("EPA"), requesting the Court to reconsider its Order allowing plaintiffs to amend their complaint to allege claims against EPA under the Administrative Procedure Act ("APA"), 5 U.S.C. § 706. Contrary to EPA's assertions, the federal defendants had ample opportunity to, and did, argue that EPA's failure to veto the permit for the proposed King William Reservoir was not reviewable under the APA. This Court fully considered and resolved those arguments against the defendant. EPA can point to no new circumstance or factor that would justify reconsideration, but instead improperly seeks to re-litigate the issue. EPA's Motion thus should be denied.

# ARGUMENT

## I. EPA's Motion Does Not Satisfy the Standard for Reconsideration.

EPA asserts in its motion that "the United States failed to fully explicate the nature of section 404(c) and its implementing regulations and failed to draw the Court's attention to [relevant] precedent" because "the question of whether section 404(c) creates a mandatory duty was treated in the briefs as being, in essence, dispositive of the APA claims against EPA." EPA Motion for Partial Reconsideration and Memorandum in Support, at 3 (13 June 2007), Document No. 39 [hereinafter "EPA Motion"]. EPA's assertion is completely disingenuous.

The federal defendants in their opening brief on this matter made the same arguments that EPA makes now – namely that EPA's "inaction" was "committed to agency discretion by law" and unreviewable under the APA. *See* United States' Partial Motion to Dismiss and in Opposition to Plaintiffs' Motion to Amend Complaint at 11–12 (23 Feb. 2007), Document No. 24. The Alliance clearly addressed this issue in its brief in response, arguing that, quite apart from its §505(a)(2) claim, EPA's failure to veto the permit was reviewable under the APA and did not fall within the narrow exception to judicial review provided for in §701(a)(2). *See* Response of the Alliance *et al.* to the United States' Partial Motion to Dismiss and in Opposition to Plaintiffs' Motion to Amend Complaint at 22–23 (16 Mar. 2007), Document No. 29 [hereinafter "Alliance Response to Motion to Dismiss"]. Following full briefing and oral argument on the matter, this Court resolved the issue against EPA.

EPA has nothing new of substance to add to its earlier arguments. EPA's desire now to reargue or elaborate on the issue is not permitted under Rule 54(b) of the Federal Rules of Civil Procedure. As the court stated in *Singh v. George Wash. Univ.*, 383 F. Supp. 2d 99, 101 (D.D.C. 2005), "where litigants have once battled for the court's decision, they should neither be required,

2

nor without good reason permitted, to battle for it again." *Id.* at 102 (declaring that movant's attempt to "re-litigate" legal issue "will not be countenanced").

None of the circumstances or factors for reconsideration set forth in *Judicial Watch v. Dept. of the Army*, 466 F.Supp.2d 112, 123 (D.D.C. 2006), applies in this case. EPA's suggestion that the Court made a decision outside the issues presented to the Court, EPA Motion at 3, is belied by the briefing and the Court's own decision which includes multiple references to cases cited by the parties in their earlier briefs. *See* Memorandum Opinion and Order at 8-14 (30 May 2007), Document No. 36 [hereinafter "Mem. Op."]. Regardless, even without such briefing, this Court has the authority to address the matter *sua sponte* because it involves the Court's own subject matter jurisdiction. *See Athens Cmty. Hosp. v. Schweiker*, 686 F.2d 989, 992 (D.C. Cir. 1982) ("It is axiomatic . . . that courts may raise the issue [of jurisdiction] sua sponte"). Nor does EPA's suggestion that the Court made "an error not of reasoning, but of apprehension," EPA Motion at 3, fare any better. EPA has not presented any new facts or evidence that the Court failed to apprehend, but rather seeks to rehash its same arguments. EPA's motion for reconsideration is therefore improper and should be denied. *See Above the Belt, Inc. v. Mel Bohannan Roofing, Inc.*, 99 F.R.D. 99, 101 (E.D. Va. 1983) ("Perhaps its new brief was better than its former brief but that is not significant. Plaintiff improperly used the motion to reconsider to ask the Court to rethink what the Court had already thought through— rightly or wrongly."); *Singh v. George Wash. Univ.*, 383 F. Supp. 2d 99, 101–02 (D.D.C. 2005)(denying motion for reconsideration where litigant sought to re-litigate legal issue); *Cobell v. Norton*, 224 F.R.D. 266, 275-76 (D.D.C. 2004)(denying motion for reconsideration in the absence of new evidence).

3

## II. EPA's Motion for Partial Reconsideration Should Be Denied Because The Court's Decision That The Claims Against EPA Are Reviewable Under The APA Is Correct.

EPA asserts that its failure to veto the permit for the proposed King William Reservoir is "committed to agency discretion by law" and unreviewable under APA §701(a)(2), and that such inaction does not constitute "final agency action." Neither of these arguments is persuasive.

### A. The Clean Water Act Provides A Meaningful Standard Against Which To Review EPA's Failure To Veto The Permit.

As this Court held in its Memorandum Opinion and Order, the standard to apply in reviewing EPA's failure to veto the permit in this case is provided in section 404(c) itself.[1] Mem. Op. at 10. Section 404(c) provides that EPA may veto a §404 permit "whenever [EPA] determines . . . that the [permitted] discharge . . . will have an unacceptable adverse effect on municipal water supplies, shellfish beds and fishery areas (including spawning and breeding areas), wildlife, or recreational areas." 33 U.S.C. §1344(c). EPA regulations implementing section 404(c) define an "unacceptable adverse effect" to mean an

> impact on an aquatic or wetland ecosystem which is likely to result in significant degradation of municipal water supplies (including surface or ground water) or significant loss of or damage to fisheries, shellfishing, or wildlife habitat or recreation areas. *In evaluating the unacceptability of such impacts, consideration should be given to the relevant portions of the section 404(b)(1) guidelines (40 CFR Part 230).*

40 C.F.R. §231.2(e) (emphasis added).[2]

As highlighted above, the regulations also specifically provide that EPA should consider the 404(b)(1) Guidelines in assessing whether the impacts constitute an "unacceptable adverse

---

[1] More specifically, section 404(c) authorizes EPA "to prohibit the specification (including the withdrawal of specification) of a disposal site." 33 U.S.C. §1344(c). As the Alliance stated in its Response to the Motion to Dismiss at 7, permits for the discharge of dredged or fill material into waters of the United States may only be granted for a specified disposal site. 33 U.S.C. §1344(a).
[2] The Alliance did not cite this regulation in its earlier brief, but as this Court noted, Mem. Op. at 10 n.6, agency regulations can also provide the law to be applied by the courts in reviewing agency inaction.

4

effect." As the Alliance argued in its earlier brief, the 404(b)(1) Guidelines, which the Corps must follow in considering whether to issue a section 404 permit, thus also provide standards against which EPA's failure to act may be reviewed.[3] Alliance Response to Motion to Dismiss at 23. The 404(b)(1) Guidelines, codified at 40 C.F.R. Part 230, prohibit the issuance of a §404 permit if there is a practicable alternative that would have less adverse impact on the aquatic ecosystem, 40 C.F.R. §230.10(a); if the discharge will "cause or contribute to significant degradation of the waters of the United States," 40 C.F.R. §230.10(c); or if "appropriate and practicable steps" remain available to "minimize potential adverse impacts of the discharge on the aquatic ecosystem," 40 C.F.R. §230.10(d). The 404(b)(1) Guidelines further explain these standards. The "laws to apply" thus are section 404(c) and implementing regulations and the 404(b)(1) Guidelines.

As the Alliance indicated in its earlier brief, EPA's failure to veto the permit is readily assessed against these standards. For example, EPA found that the impacts from the project "would cause or contribute to significant degradation of waters of the United States, including wetlands, specifically in Cohoke Mill Creek and the Mattaponi River as described under 404(b)(1) Guidelines . . . ." Letter from Stanley L. Laskowski, EPA Region III, to Col. Allan B. Carroll, Dist. Engineer, Norfolk District of the Corps (1 May 2001) (appearing in Administrative Record at MAR041815, MAR041818) ("Laskowski Letter")(cited in Alliance Response to Motion to Dismiss at 21). According to EPA, not only would the project cause significant degradation of waters of the United States in violation of the 404(b)(1) Guidelines, but it in fact would result in "the largest single destruction of wetlands and their associated habitat" in the mid-Atlantic in the history of the Clean Water Act. *See* Laskowski Letter at MAR041816 (cited

---

[3] Moreover, EPA itself developed the 404(b)(1) Guidelines. *See, e.g., Panhandle Eastern Pipe Line Co. v. FERC*, 613 F.2d 1120, 1135 (D.C. Cir. 1979)(it is "axiomatic that an agency is bound by its own regulations").

5

in Alliance Response to Motion to Dismiss at 20-21). Nor, according to EPA, can the wetlands mitigation plan compensate for such losses. *See* Laskowski Letter at MAR041818 (cited in Alliance Response to Motion to Dismiss at 21).

At least two other important policies are relevant to assessing EPA's failure to veto the §404 permit: the no overall net loss of wetland values and functions set forth in the 1990 Memorandum of Agreement between EPA and the Corps, and the Chesapeake 2000 Agreement. The no net loss policy is applicable to both EPA and the Corps in carrying out their responsibilities under section 404 of the Clean Water Act. U.S. EPA and U.S. Dept. of the Army, Memorandum of Agreement, Section 404(b)(1) Guidelines, 55 Fed. Reg. 9210, 9211 (12 Mar. 1990). The Chesapeake 2000 Agreement embodies commitments of the federal government and the Bay states to restore and maintain the wetland resources of the Chesapeake Bay. Regarding the impacts from the proposed King William Reservoir, EPA advised the Corps that: "In light of commitments made by the federal government and the Governor of Virginia, Maryland and Pennsylvania in the Chesapeake 2000 Agreement ..., losses of this magnitude should not be authorized unless they clearly are unavoidable." Laskowski Letter at MAR041817 (cited in Alliance Response to Motion to Dismiss at 21). EPA agreed with the findings of the Norfolk District of the Corps set forth in its 2001 Recommended Record of Decision that such impacts *are* avoidable in light of the availability of other water supply options. *See* Laskowski Letter at MAR041817 (cited in Alliance Response to Motion to Dismiss at 21).

Although there are in fact clear standards to apply in reviewing EPA's failure to veto the permit, EPA attempts to obfuscate the issue by arguing that the "agency inaction" here is EPA's failure to initiate the veto process. EPA Motion at 5. EPA argues that "there is no 'law to apply' to that question." *Id.* The claims against EPA are not about the various procedural steps

involved in the veto process, however,[4] but rather turn on EPA's fundamental failure to veto the permit, for which section 404(c) and the 404(b)(1) Guidelines provide the necessary laws to apply.

Moreover, the cases that EPA cites for the argument that its failure to veto the permit is unreviewable all involve enforcement-type actions, and are therefore inapposite. *New York Public Interest Group v. Whitman*, 321 F.3d 316, 330-32 (2d. Cir. 2003) ("*NYPIRG*"), involved EPA's enforcement authority under the Clean Air Act to bring sanctions against a state if it found that the state was not adequately implementing or enforcing the title V air permitting requirements. *Wood v. Herman*, 104 F.Supp.2d 43, 46-47 (D.D.C. 2000), is even farther afield, involving the Secretary of Labor's decision not to bring an enforcement action under the Occupational Safety and Health Act.

Likewise, *Center for Auto Safety v. Dole*, 846 F.2d 1532, 1534–35 (D.C. Cir. 1988) ("*Dole II*"), involved an agency's enforcement authority, specifically the Secretary of Transportation's decision not to reopen an investigation into alleged safety defects of certain automobiles. The court stated that the considerations involved in the Secretary's decision included not only safety factors, but also numerous "nonsafety factors" within the agency's discretion such as "its available resources, enforcement priorities, the likelihood of uncovering sufficient evidence to establish the existence of a defect, and the prospect of ultimately succeeding in any necessary enforcement litigation." *Id.* at 1535. The court concluded that the regulation provided it with "no way to second-guess the weight or priority to be assigned these elements." *Id.*

---

[4] We concur with the position of the Mattaponi Indian Tribe which goes into more detail on this argument in its Opposition to EPA's Partial Motion to Reconsider.

7

As this Court recognized, EPA's "'inaction' here, however, is very different from a decision not to enforce or prosecute," and it accordingly is reviewable. Mem. Op. at 11. *See also Franklin v. Massachusetts*, 505 U.S. 788, 819 (1992) ("[T]he Court has limited the exception to judicial review provided by 5 U.S.C. § 701(a)(2) to cases involving national security . . . or those seeking review of refusal to pursue enforcement actions . . . ."). This case involves EPA's failure to prevent the issuance of a section 404 permit that will result in an "unacceptable adverse effect" within the meaning of section 404(c). EPA's veto authority under §404(c) reflects the shared responsibilities of the Corps and EPA regarding §404 permitting decisions as well as the ultimate aim of the Clean Water Act "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." Clean Water Act §101(a), 33 U.S.C. §1251(a). Nor does the specter that EPA raises regarding the resources involved in determining "whether to institute [the veto] process in each of . . . thousands of [permit applications reviewed] each year, EPA Motion at 8, have any bearing on the issue before the Court. The Alliance's contention here is that, based on the particular circumstances in this case, EPA's failure to veto the permit is arbitrary and capricious.

**B.     EPA's Failure To Veto the Permit Constitutes Final Agency Action.**

EPA does not even attempt to offer any new cases for the assertion that its failure to veto the permit was not "final agency action," citing only *Sierra Club v. Thomas*, 828 F.2d 783, 793 (D.C. Cir. 1987), EPA Motion at 9, which the Court cited in its opinion for the principle regarding reviewability of agency inaction. *See* Mem. Op. at 11-12. Nor do the facts of *Sierra Club v. Thomas* support EPA's position, as that case involved a claim that EPA had unreasonably delayed a decision whether to include strip mining in certain ongoing rulemaking. *Sierra Club*, 828 F.2d at 797.

8

EPA asserts that "plaintiffs can point to no definitive, final EPA decision that it will *never* exercise its authority under 404(c) with regard to the Permit." EPA Motion at 9 (emphasis added). EPA misses the point. In the terminology of the statute, section 404(c) gives EPA the options to prohibit the specification of a disposal site by the Corps in the first instance or to withdraw specification.[5] Here, EPA has clearly failed to *prohibit* the specification of the proposed King William Reservoir site. It is that failure that the plaintiffs seek to challenge here. Nor does the speculative scenario that EPA posits stand up to scrutiny given the significant amount of time that has elapsed since the North Atlantic Division of the Corps issued the Record of Decision to grant the permit (on 29 July 2005) and the issuance of the permit on 16 November 2005, and the fact that EPA has given *no* indication that it ever intends to take such action. If EPA at some later date were to *withdraw* the specification of the disposal site, such action would be completely separate and independent of its failure here to *prohibit* the issuance of the permit in the first instance. Withdrawal of specification under §404(c) would constitute separate agency action distinct from the agency inaction at issue here.

Rather, as this Court held, the case at bar "falls squarely within" the category of "agency inaction ... having the same impact as agency action." Mem. Op. at 11 (citing *Sierra Club v. Thomas*, 828 F.2d 783, 793 (D.C. Cir. 1987)). EPA has final authority over the Corps' section 404 permitting decisions by virtue of its veto authority under §404(c). As a result, specific legal consequences flow from EPA's failure to veto the permit in this case – namely, with the issuance of the permit, Newport News can proceed to construct the proposed reservoir, causing injury to the Alliance. The distinct agency process under review here, culminating in the issuance of the §404 permit nearly two years ago is ended, and EPA's inaction is reviewable.

---

[5] See text of section 404(c) at footnote 1 *supra*. For convenience, the parties have generally referred to EPA's failure to "veto" the permit, but the statute itself is more precise, outlining the options of prohibiting and withdrawing specification of a disposal site.

9

## CONCLUSION

For the foregoing reasons, the Alliance respectfully requests that the Court deny EPA's Motion for Partial Reconsideration.

Respectfully submitted this 25th day of June 2007.

/s/ *Deborah M. Murray*
Deborah M. Murray (D.C. Bar No. 362563)
Senior Attorney
Southern Environmental Law Center
201 West Main Street, Suite 14
Charlottesville, VA 22902
(434) 977-4090 Telephone
(434) 977-1483 Fax

Counsel for Plaintiffs
Alliance to Save the Mattaponi
The Chesapeake Bay Foundation, Inc.
Sierra Club, Virginia Chapter


Jon A. Mueller
Director of Litigation
The Chesapeake Bay Foundation, Inc.
6 Herndon Ave.
Annapolis, MD 21403
(410) 268-8816 Telephone
(410) 268-6687 Fax

Co-Counsel for Plaintiff
The Chesapeake Bay Foundation, Inc.

## CERTIFICATE OF SERVICE

      I hereby certify that on 25 June 2007, I electronically filed the Opposition of the Plaintiffs the Alliance et al. to the United States' Environmental Protection Agency's Motion for Partial Reconsideration and Memorandum in Support with the Clerk of Court using the CM/ECF system.

      I also hereby certify that on 25 June 2007, true and correct copies of the Opposition of the Plaintiffs the Alliance et al. to the United States' Environmental Protection Agency's Motion for Partial Reconsideration and Memorandum in Support were served by first class mail, postage prepaid, properly addressed to the following counsel who do not receive electronic notification of filings:

M. Scott Hart
Troutman Sanders LLP
222 Central Park Avenue
Suite 2000
Virginia Beach, VA 23462

James E. Ryan, Jr.
George A. Somerville
Lynne F. Rhode
Troutman Sanders LLP
PO Box 1122
Richmond, VA 23218-1122

Stuart E. Katz, City Attorney
Allen L. Jackson, Chief Deputy City Attorney
City of Newport News
2400 Washington Street
Newport News, VA  23607

Pat M. Falcigno
Office of Counsel
North Atlantic Division
U.S. Army Corps of Engineers
Fort Hamilton
302 General Lee Avenue
Brooklyn, NY  11252-6700

                                                                           */s/ Deborah M. Murray*