# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____

|  |  |
|---|---|
| ALLIANCE TO SAVE THE MATTAPONI, ) | |
| 387 Shilo Road, King & Queen, VA  23085, ) | |
|  ) | |
| THE CHESAPEAKE BAY FOUNDATION, INC., ) | |
| 1108 East Main Street, Suite 1600, ) | |
| Richmond, VA  23219-3539, ) | |
|  ) | |
| and SIERRA CLUB, VIRGINIA CHAPTER, ) | Civil Action No. |
| 422 E. Franklin Street, Suite 302, ) | 1:06-cv-01268-HHK |
| Richmond, VA  23219, ) | |
|  ) | |
| Plaintiffs, ) | |
|  ) | |
| MATTAPONI INDIAN TRIBE ) | |
| and CARL T. LONE EAGLE CUSTALOW, CHIEF ) | |
| 1467 Mattaponi Reservation Circle ) | |
| West Point, VA  23181, ) | |
|  ) | |
| Plaintiff-Intervenors, ) | |
|  ) | |
|  ) | |
|  ) | |
| v. ) | |
|  ) | |
| UNITED STATES ARMY CORPS OF ENGINEERS, ) | |
| Headquarters, 441 G Street, NW, Washington, DC 20314, ) | |
|  ) | |
| PRESTON M. GEREN, in his official capacity as ) | |
| Acting Secretary of The Army, 101 Army Pentagon, ) | |
| Washington, DC  20310, ) | |
|  ) | |
| ROBERT L. VAN ANTWERP, in his official capacity as ) | |
| Chief of Engineers and Commanding General of the ) | |
| U.S. Army Corps of Engineers, Headquarters, ) | |
| 441 G Street, NW, Washington, DC  20314, ) | |
|  ) | |
| WILLIAM T. GRISOLI, in his official capacity as ) | |
| Brigadier General, Commander and Division Engineer ) | |
| of the U.S. Army Corps of Engineers, North Atlantic ) | |
| Division, 302 General Lee Avenue, Fort Hamilton ) | |
| Military Community, Brooklyn, NY  11252-6700, ) | |

UNITED STATES ENVIRONMENTAL PROTECTION     )
AGENCY, Headquarters, 1200 Pennsylvania Ave, NW     )
Washington, DC  20460,     )
               )
and STEPHEN L. JOHNSON, in his official capacity as     )
Administrator of the U.S. Environmental Protection     )
Agency, 1200 Pennsylvania Avenue, NW,     )
Washington, DC 20460,     )
               )
      Defendants     )
               )
CITY OF NEWPORT NEWS, VIRGINIA,     )
2400 Washington Street     )
Newport News, VA  23607,     )
               )
      Defendant-Intervenor.     )
_____ )

## FIRST AMENDED COMPLAINT

## NATURE OF ACTION

1.      This action challenges the Army Corps of Engineers' ("Corps") issuance of Permit 93-0902-12, authorizing the King William Reservoir ("KWR" or "project") on the grounds that it violates Section 404 of the Clean Water Act ("CWA"), 33 U.S.C. § 1344, the CWA implementing regulations, including 40 C.F.R. § 230.10, 40 C.F.R. § 230.12, and 33 C.F.R. § 320.4, and the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4332.

2.      The Army Corps of Engineers issued a Clean Water Act Section 404 permit authorizing the City of Newport News ("the City") to construct the proposed King William Reservoir in King William County, Virginia.  The KWR will withdraw water from the Mattaponi River, which borders the Mattaponi Indian Tribe's reservation, and will irreparably diminish the river's American shad population, which is central to the Tribe's history and culture.  The KWR project will also flood hundreds of acres of lands in the surrounding areas that are culturally significant to the Tribe.

3.      The construction and operation of this reservoir project will make the Tribe's cultural heritage, spiritual ceremonies, and day-to-day practices, such as operating its shad hatchery and fishing and eating shad, nearly impossible to maintain and will irreparably intrude into sites of cultural and spiritual significance that the Tribe wishes to remain undisturbed.

## JURISDICTION AND VENUE

4.      Jurisdiction is proper in this Court under 28 U.S.C. § 1331 because this action arises under the laws of the United States, including, *inter alia*, the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202; the Clean Water Act ("CWA"), 33 U.S.C. §§ 1251 *et seq.*; the National

1

Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4331 *et seq.*; and the Administrative

Procedure Act ("APA"), 5 U.S.C. §§ 701-706.

5.      Venue is proper in this Court under 28 U.S.C. § 1391(e) and 5 U.S.C. § 703

because at least one Defendant, United States Army Corps of Engineers, resides in Washington,

D.C., where its headquarters are located.

## PARTIES AND STANDING

6.      The Plaintiff-Intervenors in this action are the Mattaponi Indian Tribe and Chief

Carl T. Lone Eagle Custalow (collectively, "Tribe").  The Tribe has participated extensively in

the public proceedings relating to the Clean Water Act Section 404 permit and relating to the

state permits needed for the KWR.  The Tribe has maintained throughout the federal and state

permitting proceedings that the reservoir project will harm its interests by irreparably harming

the Mattaponi River and the river's American shad population, on which the Tribe depends, and

by damaging archeological sites of cultural and spiritual significance to the Tribe.

7.      Plaintiff-Intervenor Mattaponi Indian Tribe is an Indian Tribe formally

recognized by the Commonwealth of Virginia.  The Tribe's reservation consists of

approximately 150 acres and is located on the banks of the Mattaponi River in King William

County, Virginia.

8.      Plaintiff-Intervenor Chief Carl T. Lone Eagle Custalow is the Tribe's chief and

has been authorized by the Tribal Council to bring this action on behalf of the Tribe.  The

Mattaponi Tribal Council, as the governing body of the Mattaponi Indian Tribe, approved the

filing of this Complaint on its own behalf and as *parens patriae* on behalf of all individual tribal

members.

9.     The KWR will irreparably harm the Tribe's cultural and economic resources by inundating archeological sites of cultural and spiritual significance and by diminishing the Mattaponi River's American shad population, which will adversely affect the Tribe's hatchery, on which the Tribe relies for jobs and income.

10.     The Corps' issuance of Permit 93-0902-12 is the cause of this irreparable harm to the Tribe because it authorizes the construction and operation of the reservoir.

11.     Revocation of the permit will redress the Tribe's injury as this damage will not occur if the permit is revoked and not re-issued because the KWR cannot be constructed without the permit.

12.     Plaintiffs are the Alliance to Save the Mattaponi, the Chesapeake Bay Foundation, and the Sierra Club, Virginia Chapter, (collectively, "Environmental Plaintiffs").

13.     Defendants are the United States Army Corps of Engineers, Acting Secretary of the Army Preston M. Geren, Chief of Engineers and Commanding General of the U.S. Army Corps of Engineers Robert L. Van Antwerp, Brigadier General William T. Grisoli, the United States Environmental Protection Agency, and United States Environmental Protection Agency Administrator Stephen L. Johnson (collectively, "United States"). Defendant-Intervenor is the City of Newport News, Virginia.

14.     Defendant United States Army Corps of Engineers is the federal agency charged with evaluating applications for permits under CWA Section 404 for the discharge of dredged or filled materials into the waters of the United States.  In evaluating such permit applications, the Corps must abide by its own regulations and ensure that the requirements of CWA Section 404 and EPA's 404(b)(1) guidelines, as well as the requirements of NEPA, are fulfilled.

15.     The Corps' headquarters are in Washington, D.C.  The Corps operates a District Office in Norfolk, Virginia, and a North Atlantic Division Office in Brooklyn, New York.  The Corps' North Atlantic Division overturned the Norfolk District's recommended decision to deny the Section 404 permit for the KWR on September 30, 2002.

16.     Defendant Secretary Preston M. Geren is the Acting Secretary of the Army and is sued in his official capacity.  The Secretary of the Army, acting through the Corps of Engineers, has ultimate responsibility for the issuance of all Section 404 permits by the Corps.  33 U.S.C. § 1344(a), (d).  The Department of the Army's headquarters are in Washington, D.C.

17.     Defendant Lieutenant General Robert L. Van Antwerp is the Chief of Engineers and Commanding Officer of the Corps and is sued in his official capacity.  Lieutenant General Antwerp is charged with the supervision and management of all Corps' decisions and actions. The Office of the Chief of Engineers is in the Corps' headquarters in Washington, D.C.

18.     Defendant Brigadier General William T. Grisoli is the Commander and Division Engineer of the U.S. Army Corps of Engineers, North Atlantic Division, and is sued in his official capacity.  Brigadier General Grisoli supervises and manages all decisions and actions of the North Atlantic Division and signed Permit 93-0902-12, which is the subject of this lawsuit. Brigadier General Grisoli is the official successor to Brigadier General Meredith W.B. Temple, who held this position at the time of the recommended approval of Permit 93-0902-12 on July 29, 2005.

19.     The North Atlantic Division of the Corps became involved in the reservoir project's permitting process when then-Governor of the Commonwealth of Virginia, James S. Gilmore III, objected to the preliminary position of the Corps' Norfolk District that the issuance of a permit for the reservoir would be contrary to the public interest.  The former Governor's

4

objection elevated the Norfolk District's subsequent decision to deny the permit to the North

Atlantic Division, pursuant to 33 C.F.R. § 325.8(b)(2).

20.    Defendant United States Environmental Protection Agency ("EPA") is the United

States agency with ultimate and final supervisory authority over the Corps' administration of,

and compliance with, Section 404 of the CWA, specifically including EPA's authority to veto

permits under Section 404(c) of the CWA.  EPA's headquarters are in Washington, D.C.

21.    Defendant Stephen L. Johnson is the Administrator of the United States

Environmental Protection Agency and is sued in his official capacity.  Administrator Johnson is

charged with overseeing the Corps' administration of, and compliance with, the CWA,

specifically including EPA's authority to veto permits under Section 404(c) of the CWA.  EPA's

headquarters are in Washington, D.C.

22.    Intervenor-Defendant is the City of Newport News, Virginia.  The City is a part of

the Regional Raw Water Study Group ("RRWSG") that proposed the development of the King

William Reservoir.  On November 16, 2005, the Corps issued Permit 93-0902-12 to the City for

construction and operation of the KWR.

## PROCEDURAL POSTURE

23.    The Environmental Plaintiffs filed this action on July 17, 2006, alleging violations

of CWA and NEPA against the Army Corps of Engineers, Then-Secretary of the Army Francis J.

Harvey (succeeded by Acting Secretary Preston M. Geren), Then-Chief of Engineers and

Commanding General of the U.S. Army Corps of Engineers Carl A. Strock (succeeded by Robert

L. Van Antwerp), and Brigadier General William T. Grisoli.  The City of Newport News filed a

Motion to Intervene on August 23, 2006, which was granted on September 1, 2006.  On October

6, 2006, the City filed a Motion to Join the Mattaponi Indian Tribe as a Defendant.  On October

12, 2006, the City notified the Court of its withdrawal of that motion, based on the Tribe's stated intent to voluntarily intervene.

24.     The Tribe filed its Motion to Intervene as Plaintiff-Intervenor along with its original Complaint pursuant to Fed. R. Civ. P. 24 on November 8, 2006.  The Tribe's Complaint added the United States Environmental Protection Agency and United States Environmental Protection Agency Administrator Stephen L. Johnson as defendants in this matter.  The Complaint asserted jurisdiction under the citizen's suit provision of the CWA, 33 U.S.C. § 1365(a)(2) and the APA, 5 U.S.C. §§ 701-706, *inter alia*.  The Complaint asserted claims that both EPA and the Corps acted in violation of the CWA and that the Corps acted in violation of NEPA.

25.     On November 16, 2006, the Court granted the Tribe's Motion to Intervene and entered the Tribe's Complaint into the Court's docket.

26.     On February 23, 2007, the United States filed a Partial Motion to Dismiss all claims asserted against EPA and the Tribe's claims against the Corps asserted under the citizen suit provision of the Clean Water Act, 33 U.S.C. § 1365(a)(2).

27.     On May 30, 2007, the Court issued a Memorandum Opinion, which (1) granted dismissal of the Tribe's claims under the CWA citizen's suit provision as to both EPA and the Corps and (2) denied dismissal of claims asserted against EPA under the APA for its failure to veto the KWR under CWA Section 404(c), 33 U.S.C. § 1344(c).  On June 13, 2007, EPA filed a Motion for Reconsideration of the Court's decision to allow EPA to remain as a defendant in this matter.  On July 17, 2007, the Court denied the Motion for Reconsideration and ordered, *inter alia*, that the Tribe submit an amended complaint by July 27, 2007.  The Tribe submits this First

Amended Complaint in response to the Memorandum Opinion of May 30, 2007 and the Court's Order of July 17, 2007.

## RELATED STATE PROCEEDING

28.    When the Tribe filed its original complaint, the Tribe was involved in a lawsuit against Intervenor-Defendant City of Newport News in Virginia state trial court, which challenged the construction and operation of the KWR on state law grounds. The Tribe has since settled this lawsuit with the City and dismissed with prejudice the case pending in Virginia court. The Tribe is no longer involved in any state proceedings related to the subject matter of this case.

## FACTUAL BACKGROUND

29.    The Mattaponi Indian Tribe is one of eight American Indian tribes living in Virginia. These tribes once formed a prosperous network ruled by the Great Chief Powhatan, father of Pocahontas, and once controlled most of Virginia's shoreline.

30.    Today, approximately 65 members of the Tribe live on its 150 acre reservation. The Tribe has more than 400 members, many of whom wish to return to the reservation when space becomes available.

31.    The Tribe's reservation lies on the banks of the Mattaponi River approximately three miles below the proposed intake structure for the KWR.

32.    The Commonwealth of Virginia formally recognizes the Mattaponi Indian Tribe as an Indian Tribe.

33.    The Tribe maintains a tribal government ruled by traditional tribal laws, and the Tribe is not taxed under Virginia state or local law.

34.    The Mattaponi Indian Tribe depends on the Mattaponi River and the river's American shad population for food, jobs, spiritual ceremonies, and cultural continuity.

35.     The American shad is a member of the herring family and is a species of anadromous fish that is sensitive to changes in water salinity.

36.     The American shad population is fragile, and the stocks of shad in the York River system are severely declining.

37.     The Mattaponi River is a critically important spawning and nursing area for American shad in the York River system.  Small, steady losses or even one large loss of shad in the Mattaponi River could have a disastrous effect on the system's declining shad population.

38.     In response to the declining shad population, the Tribe operates a shad hatchery, licensed by the Commonwealth of Virginia and funded by a grant from the Virginia Marine Resources Commission.  The shad hatchery is the Tribe's primary source of income, jobs, and job training, and also provides the Tribe with food and cultural continuity.

39.     The Tribe catches most of its fish during the spring shad and herring runs, preserving the catch for year-round consumption.

40.     The Tribe's most important fishing grounds are located where the KWR water intake structure on the Mattaponi River will be constructed.

41.     The KWR will encroach upon more than 500 acres of the Mattaponi Indian Tribe's ancestral lands, damaging or destroying culturally significant archeological sites.

42.     Archeological surveys in the KWR project's proposed impoundment and wetland mitigation areas revealed more than 250 sites containing Native American artifacts, including 72 locations eligible for the National Register of Historic Places.  Some of these historically significant sites date back to 7,540-6,200 B.C.

43.     The Tribe gathers plants and medicinal herbs along the Mattaponi River's banks.

44.    The Mattaponi River plays an essential role in many of the Tribe's religious and spiritual practices.  The Tribe's heritage and culture cannot be understood or sustained without the Mattaponi River and the American shad.

45.    If the KWR is constructed, the Tribe will find it difficult, if not impossible, to maintain its economy and cultural identity.

46.    The reservoir will have a capacity of approximately 12.2 billion gallons and will cover more than 1,526 acres.

47.    A raw water intake structure and pumping station will be constructed at Scotland Landing, three miles upstream from the Mattaponi Indian Reservation.

48.    The KWR project will withdraw up to 75 million gallons of water per day from the Mattaponi River to supply the reservoir.

49.    The raw river water will be transported 1.5 miles between Scotland Landing and the KWR in a 54-inch-diameter pipeline.  A pumping station with a capacity to pump 50 million gallons of water each day will be constructed at the KWR.  This pumping station will transfer water from the reservoir to Beaverdam Creek at New Kent, Virginia, via an 11.7-mile, 48-inch-diameter pipeline.  The water will leave the pipeline through a water discharge outfall structure into Beaverdam Creek, and from there it will flow into the existing City of Newport News Waterworks' Diascund Creek Reservoir in New Kent County, Virginia.  The water from the Diascund Creek Reservoir will be diverted to the City of Newport News and used to supply water to residents of the Virginia Peninsula.

50.    The project also includes a "Streams and Wetlands Mitigation Plan," the purpose of which is to compensate for the loss of wetlands by creating or restoring 806 acres of freshwater wetlands on eleven separate sites.   Overall, the mitigation plan's components total

approximately 6,100 acres of wetlands, uplands, and open water to be restored, created, and preserved. Including the 1,526 acres for the reservoir with the mitigation sites, the geographic scope of the entire project will total approximately 7,626 acres.

51.     This diversion of water from the Mattaponi River will jeopardize the plants, fish, and other resources on which the Tribe depends.

52.     This diversion of water from the Mattaponi River will upset the ecological balance of the river and permanently harm the Tribe's traditional lifestyle, practices, culture, and ability to continue as a Tribe.

53.     The KWR project will adversely affect American shad and other river species.

54.     The KWR project's freshwater withdrawals from the Mattaponi River will increase noise and sedimentation levels in the river.

55.     The KWR project's withdrawal of freshwater from the Mattaponi River will change salinity levels within the river, adversely affecting the river ecosystem, shad spawning, and shad food sources.

56.     The KWR project's withdrawal of water from the Mattaponi River will remove nutrients that are vital to young-of-the-year shad and may, therefore, significantly impair shad survival and long-term shad population sustainability in the river.

57.     Comments submitted by the Tribe during the permitting process for the federal permit informed the Corps that the KWR will irreparably damage the river's aquatic ecosystem, numerous sites containing archeological resources, and the Tribe's economy and culture.

58.  On March 20, 2001, the Norfolk District published a Recommended Record of Decision to deny the permit and requested public comment.

59.  In a comment letter to the Corps dated May 1, 2001, EPA voiced its support for the Norfolk District's recommended denial of the permit, noting that the KWR would cause or contribute to significant degradation of Cohoke Mill Creek and the Mattaponi River as described under the 404(b)(l) Guidelines at 40 CFR 230.10(e), and that the KWR did not represent the least damaging practicable alternative.

60.    On July 2, 2001, the Norfolk District published its Final Recommended Record of Decision to deny a permit for the reservoir.

61.    Then-Governor James S. Gilmore III, objected to the preliminary position of the Norfolk District, and the application was elevated to the North Atlantic Division for its review pursuant to 33 C.F.R. § 325.8(b)(2).

62.    On September 30, 2002, the North Atlantic Division, through Brigadier General Rhoades, issued an interim decision, overturning the Norfolk District's decision.

63.    On July 29, 2005, Brigadier General Merdith W. B. Temple, Division Engineer of the North Atlantic Division of the Corps, issued a Final Record of Decision ("ROD") granting a permit for the King William Reservoir.  On November 16, 2005, Brigadier General Grisoli of the North Atlantic Division signed and issued Permit 93-0902-12.

64.    All permits necessary to construct and operate the KWR project have been issued, including a Virginia Water Protection ("VWP") permit issued by the State Water Control Board and a subaqueous beds permit issued by the Virginia Marine Resources Commission ("VMRC"), in addition to Clean Water Act Permit 93-0902-12.

65.    On December 1, 2004, the Corps requested comments on the Wetland Mitigation Plan submitted by RRWSG.

66. On January 31, 2005, the Tribe submitted comments on the Wetland Mitigation Plan, asserting, *inter alia*, that the mitigation plan will increase the damage to archaeological resources, as more than 100 archaeological sites were located within the proposed mitigation areas, and that the plan fails to offset the harm to wetland cultural values.

67. On February 25, 2005, EPA submitted comments on the Wetland Mitigation Plan, criticizing the report for discussing the impacts on cultural and natural resources in isolation and for failing "to provide the holistic picture not only of the environment but of man's integration into that environment." EPA also noted that "[t]he importance of these natural resources to the Native American tribes in the area and the public at large makes the impacts related to the KWR project take on a larger significance."

68. On January 24, 1997, the Corps published in the Federal Register a notice of issuance of the Final Environmental Impact Statement ("EIS"). The January EIS summarized the environmental impacts of, and practicable alternatives to, the KWR. The Norfolk district initially released the EIS for a 60-day comment period, the deadline of which was subsequently extended to a 180-day comment period. The comment period expired on July 25, 1997, and the EIS was not altered from the version originally published in January 1997.

69. The Tribe submitted a comment letter on the EIS dated July 25, 1997 expressing its concerns, *inter alia*, that the EIS did not address the project's impact on the Mattaponi Tribe, its fishing practices, its cultural traditions, or its archeological and sacred sites, nor did it adequately address the impact of the project on salinity levels in the Mattaponi River and on the shad population.

70. EPA submitted a comment letter dated July 25, 1997 stating, *inter alia*, its view that the EIS did not adequately address the presence or absence of Traditional Cultural Properties

("TCP") or adequately examine the impacts of water withdrawals from the Mattaponi River on salinity levels and, in turn, on the river's flora and fauna, including the American shad, and recommending that the Corps address these concerns in a supplemental EIS ("SEIS").

71.    On November 29, 2004, the Tribe submitted a letter to the Norfolk District, asserting that the EIS did not reflect significant changes to the project that occurred subsequent to its issuance in 1997 and requesting that the Corps prepare an SEIS.

72.    The Corps has not supplemented the Final EIS since its issuance on January, 24, 1997.

73.    The alternatives analysis in the EIS depends on the RRWSG's projected water demand for the Virginia peninsula that existed in 1997.

74.    The RRWSG's original projection of water demand has fallen sixty percent since the EIS was issued in January 1997 (from 39.8 million gallons per day to 15.9 million gallons per day).

75.    The KWR may be unnecessary in light of the decreased regional water demand and the availability of practicable alternatives.

76.    The record does not establish that the reservoir can reasonably be expected to provide the region with 15.9 million gallons of water per day.

77.    Because the projected water demand has dropped to 15.9 million gallons a day, alternatives that were dismissed or overlooked in the 1997 EIS may be viable today.

78.    Practicable available alternatives to the KWR include building groundwater desalinization facilities, taking additional water from existing reservoirs, and increasing withdrawals from the Chickahominy River.  These alternatives, together with keeping the Big Bethel Reservoir open, could produce 16.2 million gallons of water a day.  This figure exceeds

the City's projected water demand of 15.9 million gallons of water a day and does not include

potential benefits from other practical available alternatives, like increasing water conservation

and expanding the Beaver Creek Reservoir.

79.     When conducting the alternatives analysis required by the Clean Water Act, the

Corps relied on its alternatives analysis prepared for the 1997 EIS.

80.     In May 1998, subsequent to the issuance of the EIS, the Corps' consultants issued

a report entitled, "Review of Water Supply Needs Assessment for the Regional Raw Water

Study Group, Newport News, Virginia," which refuted the City's analysis of its need for the

KWR project and concluded that RRWSG tended to overestimate future water demand and

underestimate future supply.

81.     In October 1998, subsequent to the issuance of the 1997 EIS, the Bragdon

Moretti-Langholtz Traditional Cultural Properties Study concluded that the KWR will

significantly and irreversibly impact the Tribe because it will change the Mattaponi River and its

wildlife, alter the rural character of the community, lead to further isolation of the Mattaponi and

Pamunkey reservations, harm prehistoric archeological sites, impact the Tribe's future plans to

expand its land base, and negatively affect the Tribe's morale.

82.     The VWP permit specifies minimum in-stream flow ("MIF") restrictions for each

month.  The permit prohibits water withdrawals when water flow in the Mattaponi River is at or

below the MIF.

83.     The VWP allows the MIF restrictions to be lifted if "the permitee has instituted

mandatory emergency drought conservation measures."

84.     The VWP permit's MIF requirement was added on December 22, 1997, when the VWP permit was issued.  The adoption of this condition was subsequent to the issuance of the January 1997 EIS.

85.     The VMRC permit prohibits all water withdrawals from the Mattaponi River between March 1 and July 31 of any year until the City can prove that a shorter pumping hiatus would be equally protective of the American shad.

86.     The VMRC permit allows pumping to resume at any time during the summer-month hiatus period if "a water supply emergency has been declared."

87.     The VMRC permit along with its conditions, including the pumping hiatus, was granted in August 2004, subsequent to the issuance of the 1997 EIS.

88.     There is no evidence in the record that the VWP permit's MIF restrictions and the VMRC permit's pumping hiatus will prevent harm to aquatic life, especially the American shad.

89.     The City seeks to use the Mattaponi River as the reservoir's sole water source.

90.     Due to the pumping hiatus, the City cannot withdraw water from the river for five of the six months of the year with the highest water demand unless there is a water supply emergency.

91.     In addition to the VMRC permit's five-month pumping hiatus, in a typical year, the MIF restrictions will result in an additional three months of decreased or ceased pumping.

92.     On average, the City will only be able to pump at full capacity four months of the year.

93.     The Corps has not evaluated whether the City will be able to meet its projected water demand of 15.9 mgd given the MIF restrictions and the pumping hiatus.

94.    To compensate for the five-month hiatus, the City may withdraw more water than previously planned in other months. The state permitting conditions do not prohibit the City from pumping an extra volume of water during the hiatus period under certain conditions.

95.    The Corps has not evaluated whether such increased pumping would harm the American shad or otherwise increase the reservoir project's environmental impact.

96.    The combined effects of the VWP and VMRC permits will create circumstances that make a "water supply emergency" likely to arise.

97.    Allowing emergency withdrawals during these restricted summer months, especially during a dry season, will devastate young-of-the-year shad.

98.    If several "emergencies" occur in succession, the shad population could be destroyed, and the Tribe's shad hatchery could be rendered futile.

99.    The shad spawning season varies from year to year.

100.    The proposed KWR has the potential to harm young-of-the-year shad notwithstanding the VMRC pumping hiatus because the hiatus may not always correlate with shad spawning season.

101.    The long-term plan to use temperature measurements to determine when to resume pumping is based on data from the Hudson River.

102.    Shad larvae swim more slowly than juvenile and adult shad.

103.    Shad larvae will likely be unable to escape the KWR's intake pipes' suction.

104.    If the pumping station operates when the shad are spawning, the intake pipes' suction will likely trap shad larvae.

105.    Fragile shad eggs will likely be destroyed when they touch the screens covering the intake pipes.

106.    Young-of-the-year shad cannot live in salt water because they do not have gills and cannot control the salt levels in their bodies.

107.    The increased salinization of the Mattaponi River caused by freshwater withdrawals to supply the reservoir will be particularly harmful to young-of-the-year shad.

108.    Withdrawals from the river are likely to have adverse effects on both juvenile and adult shad by increasing salinity and decreasing water levels in the river, regardless of when during the year the withdrawals occur.

109.    Screens covering the intake pipes will not prevent the shad's major food sources that provide needed nutrients, like small planktonic organisms, from being removed from the water.

110.    Heavy water withdrawals during the non-hiatus months could harm the shad population by depriving shad of its major food sources.

111.    The withdrawals could particularly harm young-of-the-year shad which rely primarily on microscopic organisms for nourishment.

112.    Malnourished young-of-the-year shad could significantly impair the fish's long-term population viability and sustainability in the Mattaponi River and the York River systems.

113.    EPA did not exercise its authority to veto the issuance of Permit 93-0902-12 under CWA, 33 U.S.C. § 1344(c).

## CLAIMS FOR RELIEF

114.    EPA, in conjunction with the Secretary of the Army, is responsible for promulgating regulations that provide guidance for the issuance of permits under CWA Section 404. 33 U.S.C. § 1344(b)(1). These are known as the "404(b)(1) Guidelines" and are codified at 40 C.F.R. Part 230. The Administrator of EPA also has the authority to veto the issuance of

17

any permit under CWA, 33 U.S.C. § 1344(c) "whenever he determines . . . that the [proposed] discharge of such materials into such area will have an unacceptable adverse effect on municipal water supplies, shellfish beds and fishery areas (including spawning and breeding areas), wildlife, or recreational areas."

115.    The Corps has the authority under the CWA to issue Section 404 permits, 33 U.S.C. § 1344(a), and shall issue permits in accordance with the 404(b)(1) Guidelines, 33 U.S.C. § 1344(b)(1).  Additionally, the Corps must abide by its own regulations under the Clean Water Act, in particular, the requirement to conduct a "Public Interest Review."  33 C.F.R. § 320.4.

### <u>Count I</u>

### Failure to Evaluate Less Harmful, Practicable Alternatives in Violation of the Clean Water Act 404(b)(1) Guidelines

116.    Paragraphs 1 through 115 are incorporated herein by reference.

117.    The Corps violated its mandatory duty under 40 C.F.R. § 230.10(a) to evaluate less harmful, practicable alternatives to the KWR project when it relied on an analysis of alternatives prepared for the 1997 EIS, which included RRWSG's outdated water demand figures.

118.    The Corps violated its mandatory duty under 40 C.F.R. § 230.10(a) to evaluate less harmful, practicable alternatives to the KWR project when it failed to reevaluate the feasibility of less harmful alternatives in light of the region's decreased water demand.

119.    The Corps' issuance of Permit 93-0902-12 was arbitrary and capricious, and otherwise not in accordance with law because the Corps failed to reevaluate less harmful practicable alternatives as required by 40 C.F.R. § 230.10(a).

120.    By failing to veto the issuance of Permit 93-0902-12, despite the Corps failure to reevaluate less harmful practicable alternatives as required by 40 C.F.R. § 230.10(a), EPA acted arbitrarily and capriciously, and otherwise not in accordance with law.

<u>**Count II**</u>

**Failure to Investigate and Balance Factors Relevant to the Public Interest Review in Violation of Section 320.4(a) of the Corps' Regulations**

121.    Paragraphs 1 through 120 are incorporated herein by reference.

122.    The Corps violated its mandatory duty under 33 C.F.R. § 320.4(a) when it failed to investigate fully and consider carefully factors relevant to the KWR, including the need to conserve water and protect cultural resources.

123.    The Corps violated its mandatory duty under 33 C.F.R. § 320.4(a) when it failed to give appropriate weight to public comments and to verify relevant factual information after that information was challenged by the Tribe and other plaintiffs in this case.

124.    The Corps violated its mandatory duty under 33 C.F.R. § 320.4(a) when it issued a permit when the ROD did not show that the reservoir will be able to produce an adequate water supply or even if the project was needed.

125.    The Corps violated its mandatory duty under 33 C.F.R. § 320.4(a) when it did not carefully examine the extent to which the KWR will damage archeological sites of cultural and spiritual significance to the Tribe.

126.    The Corps violated its mandatory duty under 33 C.F.R. § 320.4(a) when it approved the City's Wetland Mitigation Plan after the Tribe filed comments with the Corps that asserted that the Wetland Mitigation Plan ignores more than one hundred archeological sites that will be affected by the project's mitigation efforts.

127.    The Corps violated its mandatory duty under 33 C.F.R. § 320.4(a) when it failed to consider the potential harmful effects of wetlands mitigation activities on culturally significant sites.

128.    The Corps violated its mandatory duty under 33 C.F.R. § 320.4(a) to balance all relevant factors when it did not investigate challenges made by the Tribe to the City's conclusions throughout the permitting process.

129.    The Corps' issuance of Permit 93-0902-12 was arbitrary and capricious and otherwise not in accordance with law when the Corps ignored, or failed to fully investigate, pertinent information, and, therefore, could not have balanced all relevant factors, including the reservoir's ability to meet the region's water demand and the project's potential impact on cultural resources, as required by 33 C.F.R. § 320.4(a).

## Count III

### Issuance of a Permit that Will Significantly Degrade the Aquatic Ecosystem in Violation of the Clean Water Act 404(b)(1) Guidelines

130.    Paragraphs 1 through 129 are incorporated herein by reference.

131.    The Corps violated its mandatory duty to ensure that authorized projects will not "result in significant degradation of the aquatic ecosystem," 40 C.F.R. § 230.12(a)(3)(ii), when it issued a permit for a project that, based on available information, will significantly harm fish and aquatic life.

132.    The Corps violated its mandatory duty to ensure that permitted projects will not "result in significant degradation of the aquatic ecosystem," 40 C.F.R. § 230.12(a)(3)(ii), when it issued Permit 93-0902-12 despite evidence placed in the record by the Tribe that the state permit conditions will not protect against degradation of the aquatic environment.

133.    The Corps violated its mandatory duty to ensure there was "sufficient information to make a reasonable judgment as to whether the proposed discharge will comply with these Guidelines," 40 C.F.R. § 230.12(a)(3)(iv), when it issued Permit 93-0902-12 without further investigating the potential combined effects of the MIF restrictions and VMRC permit conditions despite evidence in the record that the state permit conditions will not protect against degradation of the aquatic environment.

134.    The Corps violated its mandatory duty to ensure that authorized projects will not "result in significant degradation of the aquatic ecosystem," 40 C.F.R. § 230.12(a)(3)(ii), when it issued Permit 93-0902-12 despite evidence in the record to show that the proposed KWR project has the potential to harm the river's shad by altering water salinity, removing nutrients from the river, and damaging shad eggs and larvae.

135.    The Corps violated its mandatory duty to ensure that authorized projects will not "result in significant degradation of the aquatic ecosystem," 40 C.F.R. § 230.12(a)(3)(ii), when it issued Permit 93-0902-12 despite evidence in the record to show that the long-term plan to use temperature measurements to determine when to resume pumping after a hiatus will not sufficiently protect the shad.

136.    The Corps violated its mandatory duty to ensure that authorized projects will not "result in significant degradation of the aquatic ecosystem," 40 C.F.R. § 230.12(a)(3)(ii), when the Corps issued Permit 93-0902-12, despite information in the record and comments submitted during the permitting process informing the Corps that the KWR may harm the aquatic ecosystem.

137.    The Corps' issuance of Permit 93-0902-12 despite evidence in the record that the project will "result in significant degradation of the aquatic ecosystem" in violation of 40 C.F.R. § 230.12(a)(3)(ii) was arbitrary and capricious, and otherwise not in accordance with law.

138.    By failing to veto the issuance of Permit 93-0902-12 despite its acknowledgment of evidence in the record that the project will "result in significant degradation of the aquatic ecosystem," 40 C.F.R. § 230.12(a)(3)(ii), and "will have an unacceptable adverse effect on . . . fishery areas (including spawning and breeding areas,)" EPA acted arbitrarily and capriciously, and otherwise not in accordance with law.

## Count IV

### Issuance of a Permit Contrary to the Public Interest in Violation of Section 320.4(a)(1) of the Corps' Regulations

139.    Paragraphs 1 through 138 are incorporated herein by reference.

140.    The Corps violated its mandatory duty under 33 C.F.R. § 320.4(a)(1) to deny a permit if not in the public interest after evaluating its probable impacts when it issued Permit 93-0902-12 despite evidence in the record that the KWR will damage the river's aquatic ecosystem, numerous archeological sites containing cultural resources, and the Tribe's economy and culture.

141.    The Corps violated its mandatory duty under 33 C.F.R. § 320.4(a)(1) to deny a permit if not in the public interest after evaluating its probable impacts when it issued Permit 93-0902-12 despite evidence in the record that the KWR may be unnecessary because of decreased regional water demand and the availability of practicable alternatives.

142.    The Corps violated its mandatory duty under 33 C.F.R. § 320.4(a)(1) to deny a permit if not in the public interest after evaluating its probable impacts when it issued Permit 93-0902-12 despite a lack of evidence in the record to establish that the reservoir project can reasonably be expected to provide the region with 15.9 million gallons of water per day.

143.    The Corps' issuance of the Permit 93-0902-12 was arbitrary and capricious, and otherwise not in accordance with law when the Corps found that the KWR project's benefits outweigh its costs and concluded that the project is in the public interest.

## Count V

**Failure to Adequately Evaluate Environmental Impacts in the 1997 Environmental Impact Statement in Violation of the National Environmental Policy Act**

144.    Paragraphs 1 through 142 are incorporated herein by reference.

145.  The 1997 EIS is inadequate under NEPA, 42 U.S.C. §§ 4331 *et seq.*, and its implementing regulations, codified at 40 C.F.R. §§ 1500-1508, because it does not adequately address the KWR's potential impact on the Mattaponi Tribe or on Traditional Cultural Properties, 42 U.S.C. § 4332(2)(C); 40 C.F.R. § 1502.16; 40 C.F.R. § 1508.8(b).

146.    The 1997 EIS is inadequate under NEPA, 42 U.S.C. §§ 4331 *et seq.*, and its implementing regulations, codified at 40 C.F.R. §§ 1500-1508,  because it does not adequately address the KWR's potential impact on salinity levels in the Mattaponi River or on the river's population of American shad, 42 U.S.C. § 4332(2)(C); 40 C.F.R. § 1502.16.

147.    The Corps' issuance of Permit 93-0902-12 despite the inadequacy of the 1997 EIS violated NEPA, 42 U.S.C. §§ 4331 *et seq.*, and its implementing regulations, codified at 40 C.F.R. §§ 1500-1508, and was arbitrary and capricious.

## Count VI

**Failure to Supplement the 1997 Environmental Impact Statement in Violation of the National Environmental Policy Act**

148.    Paragraphs 1 through 147 are incorporated herein by reference.

149.    The Corps violated NEPA, 42 U.S.C. §§ 4331 *et seq.*, and its implementing regulations, codified at 40 C.F.R. §§ 1500-1508, when it did not supplement the EIS, nor take a

"hard look" to determine whether a supplemental EIS was necessary, despite evidence in the record to show that the balance between environmental costs and economic benefits has shifted since the creation of the 1997 EIS.  42 U.S.C. § 4332(2)(C); 40 C.F.R. § 1502.16; 40 C.F.R. § 1502.9(c).

150.    The Corps violated NEPA, 42 U.S.C. §§ 4331 *et seq.*, and its implementing regulations, codified at 40 C.F.R. §§ 1500-1508, when it did not supplement the EIS, nor take a "hard look" to determine whether an SEIS was necessary, despite evidence in the record that the KWR is more likely to harm the environment and the community's cultural resources and is less likely to provide for the region's water needs than was thought when the EIS was issued in 1997. 42 U.S.C. § 4332(2)(C); 40 C.F.R. § 1502.9(c)

142.    The Corps violated NEPA, 42 U.S.C. §§ 4331 *et seq.*, and its implementing regulations, codified at 40 C.F.R. §§ 1500-1508, when it did not supplement the EIS, nor take a "hard look" to determine whether an SEIS was necessary, despite evidence in the record that less harmful, practicable alternatives have come available since the 1997 EIS was prepared.  42 U.S.C. § 4332 (C); 40 C.F.R. § 1502.9(c).  In failing to supplement the EIS, the Corps has not satisfied its duty to "[r]igorously explore and objectively evaluate all reasonable alternatives." 40 C.F.R. § 1502.14.

143.    The Corps violated NEPA, 42 U.S.C. §§ 4331 *et seq.*, and its implementing regulations, codified at 40 C.F.R. §§ 1500-1508, when it did not supplement the EIS, nor take a "hard look" to determine whether an SEIS was necessary, despite the fact that new information in the record provides a seriously different picture of the environmental landscape than existed when the EIS was prepared in 1997. 42 U.S.C. § 4332(2)(C); 40 C.F.R. § 1502.9(c). Specifically, the pumping hiatus and the minimum instream flow conditions imposed by

Virginia's agencies have dramatically altered the project, the geographic scope of the project has increased five-fold, and new information on the project's impacts on archeological sites has come to light.

144.     The Corps' issuance of Permit 93-0902-12 despite its failure to prepare an SEIS violated NEPA, 42 U.S.C. §§ 4331 *et seq.*, and its implementing regulations, codified at 40 C.F.R. §§ 1500-1508, and was arbitrary and capricious.

## PRAYER FOR RELIEF

Wherefore, Plaintiff-Intervenors respectfully pray for the following relief:

1.      A declaration that Permit 93-0902-12 was issued in violation of the Clean Water Act, the National Environmental Policy Act, and the Administrative Procedure Act.

2.      An injunction requiring the Corps to withdraw the permit and not re-issue a CWA Section 404 permit until the aforementioned violations are remedied.

3.      An injunction requiring the Corps to prepare a Supplemental Environmental Impact Statement before issuing a new permit for the discharge of dredged or fill material related to the construction of the KWR.

4.      An award to Plaintiff-Intervenors of all costs and expenses related to this action, including reasonable attorneys' fees, pursuant to the Equal Access to Justice Act, 5 U.S.C. § 504.

4.      Any Additional relief as the Court should deem proper.


July 26, 2007

                    Respectfully Submitted,

                    /s/ Emma E. Garrison_____
                    Emma E. Garrison, Staff Attorney / Graduate Fellow
                    Hope M. Babcock, Senior Attorney / Director
                    Institute for Public Representation
                    600 New Jersey Avenue, NW
                    Washington, D.C.  20001
                    (202) 662-9535
                    (202) 662-9634 (Facsimile)
                    *Counsel for the Mattaponi Indian Tribe and*
                    *Chief Carl T. Lone Eagle Custalow*