

**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY
REGION III
1650 Arch Street
Philadelphia, Pennsylvania 19103-2029**

MAY 01 2001

Colonel Allan B. Carroll
District Engineer
Norfolk District, Corps of Engineers
Fort Norfolk, 803 Front Street
Norfolk, Virginia 23510-1096

Dear Colonel Carroll:

The Environmental Protection Agency (EPA) has reviewed the Norfolk District's Recommended Record of Decision (ROD) on Permit Application 93-0902-12 for construction of the King William Reservoir IV (KWR IV) on Cohoke Mill Creek. We are pleased to review this document and commend the Corps of Engineers for requesting public comment on their ROD. EPA believes that the spirit and intent of the National Environmental Policy Act and the Section 404 process is furthered by doing so.

The KWR IV project involves an impoundment on Cohoke Mill Creek, a tributary to the Pamunkey River, in King William County, Virginia. A 75 million gallon per day (mgd) raw water intake on the Mattaponi River would supply water to the reservoir. The reservoir would impound a surface area of approximately 1,526 acres at normal water surface elevation to provide a storage volume of approximately 12.2 billion gallons. The project would inundate a large portion of the Cohoke Mill Creek watershed and involves excavation, filling and flooding of 437 acres of waters of the United States, consisting of 403 acres of palustrine forested, scrub-shrub and emergent wetlands and 34 acres of shallow open water. The construction of the reservoir would also inundate 21 miles of free- flowing perennial and intermittent streams in the watershed. An additional 186 acres of wetlands between the currently proposed KWR IV dam location and the upper reaches of Cohoke Millpond may be indirectly affected by reduced flows as a result of impoundment of Cohoke Mill Creek. Other wetland impacts would be realized by construction of the pipeline, outfall and intake structures. The KWR IV project would effectively eliminate a large, intact watershed of diverse communities including not only wetland and aquatic ecosystems but terrestrial habitats interspersed among these communities. The proposed KWR IV, if approved, would represent the largest single destruction of wetlands and their associated habitat ever evaluated by the Environmental Protection Agency in Region III. We also have noted that the impacts would exceed the annual wetland impacts authorized by the Norfolk District in the entire Commonwealth of Virginia for 1996, 1997 and 1998.

The EPA has had long history of involvement with the Regional Raw Water Study Group's (RRWSG) Lower Virginia Peninsula's Water Supply Plan, dating back to the initial scoping sessions in 1989. We have had the opportunity to work closely with the Norfolk District Corps of Engineers (Corps) and the other natural resource agencies toward data collection and analysis. We have always recognized this project as an important one, not only in terms of wetland impact, but also in terms of the project purpose. EPA recognizes the need to supply

*Customer Service Hotline: 1-800-438-2474*

dependable sources of water to communities and we compliment the applicant, the RRWSG, on their efforts to try to minimize their project's impacts on the environment. However, we agree with the Norfolk District in their Recommended ROD that the permit should be denied. We believe that the substantial impacts to wetlands and other important natural resources are avoidable because there are options available to the RRWSG members to reduce water demand and optimize existing sources of water. Although these options may not be the first choice of the RRWSG we believe that, in light of the significance of environmental impact associated with the KWR IV, these steps are not only prudent, but clearly represent the least damaging practicable alternative to offset future water demands.

EPA's concerns regarding environmental impacts have been clear since the outset of project development. We worked early with the RRWSG to develop alternatives that would meet the purpose and needs of the Lower Peninsula while at the same time minimizing environmental impacts. In 1994 and 1995 EPA rated the Draft and Supplemental Environmental Impact Statements an EU-2 (environmentally unsatisfactory, insufficient information) which indicates our ongoing concern that the project's impacts were significant and impacts avoidable. If permitted, the project would have represented the largest wetland loss in the Mid-Atlantic region in the history of the Clean Water Act Section 404 program and would deal a serious blow to efforts to restore and enhance the existing wetland base within the Commonwealth of Virginia and the Chesapeake Bay Watershed. In light of commitments made by the Federal government and the Governors of Virginia, Maryland and Pennsylvania in the Chesapeake 2000 Agreement to restore and maintain the wetland resources of the Chesapeake Bay, losses of this magnitude should not be authorized unless they clearly are unavoidable. Wetland protection is integral to the goals of the Chesapeake 2000 Agreement which not only focus on wetland restoration but clearly seek to reduce wetland loss through the regulatory program. We believe that the Corps of Engineers has viewed this project in a similar manner and that the intense scrutiny of project impacts is warranted based on the magnitude and complexity of adverse affects, not only to valuable wetland resources but to the ecology of the region as a whole.

The EPA had relied on the applicant's stated water demand projections to shape our review and analysis of alternatives. However, when substantive comment was raised questioning those demand projections, EPA recommended in our July 1997 comment letter on the Final Environmental Impact Statement (FEIS) that the Corps take the necessary steps to reconcile the concerns raised. The Norfolk District responded by contracting with the Institute for Water Resources (IWR), the Corps water resource experts, to provide review not only of the RRWSG's demand projections but also of the critiques of the water demand projections. EPA believes that the Corps' independent evaluation of purpose and need was an appropriate response to the comments raised and was warranted due to the significance of the project impacts. The IWR Report entitled "Evaluation of Conflicting Views on Future Water Use in Newport News, Virginia; Final Report (October 2000)" concluded that the RRWSG significantly overestimated future demand and underestimated existing water supply sources. EPA has deferred to IWR's judgement in the past on the applicability of the water demand forecasts. We continue to defer to IWR's judgement in this case and accept their October 2000 report as appropriate information for decision-making on the KWR IV permit application.

EPA agrees with the Corps' Section 404(b)(1) analysis as stated in the Recommended ROD. We agree that the King William Reservoir IV project would cause or contribute to significant degradation of waters of the United States, including wetlands, specifically in Cohoke Mill Creek and the Mattaponi River as described under the 404(b)(1) Guidelines at 40 CFR 230.10(e). EPA believes that the adverse impacts associated with construction of the KWR IV are significant and avoidable. We concur that the individual and cumulative damages to the wetland resource outweigh the benefits of the proposed filling to the applicant. We also agree with the Corps that the KWR IV project does not represent the least damaging practicable alternative because less environmentally damaging options exist to meet future water demands in the region.

EPA continues to believe that wetlands of Cohoke Mill Creek would qualify as Aquatic Resources of National Importance (ARNI), as described under the 404(q) Memorandum of Agreement between EPA and the Department of the Army. Furthermore, we believe the FEIS and other supporting documentation clearly indicate that construction of the KWR IV project could have an unacceptable adverse effect on wildlife and fishery areas as described under Section 404 (c) of the Clean Water Act.

EPA does not agree with the assessment that the wetlands of Cohoke Mill Creek watershed are not valuable or highly diverse. These statements by the city of Newport News and their consultants (after the publication of the FEIS) are clearly biased and are not supported by any data gathered or evaluated by the EPA. Newport News' arguments that the wetlands of Cohoke Mill Creek are not unique or their loss is insignificant because they only comprise four percent of the total estimated non-tidal palustrine wetlands in King William County is not supported by the data. The information collected during the NEPA process and included in the FEIS clearly shows that these wetlands, interspersed among each other and among some very significant upland habitat, are of high quality and are structurally complex thereby providing multiple ecological functions to the watershed.

Large, intact watersheds with this level of community diversity and interspersion are increasingly rare (particularly in developing areas) and will become more so over time. Given that the King William Reservoir will effectively eliminate the bulk of the watershed in one single action exemplifies the magnitude of the impact. The Corps observes that the 437 acres of wetland and shallow water losses incurred by permitting the King William Reservoir exceed the annual permitted wetland loss for the entire state of Virginia. In this instance the KWR IV project is unique. It would more than double the wetland losses through the regulatory program in the state for a year and concentrate the losses in one watershed.

We agree with the Corps that the mitigation measures will not compensate for all losses in wetland functions, values or specific habitat losses. The proposed mitigation package cannot replicate the size, location, interspersion, and landscape context functions inherent in an intact watershed. The FEIS clearly establishes a profound alteration of a diverse and complex lotic wetland/aquatic system to a less diverse lentic system designed to provide municipal water via pump storage. EPA agrees with the Corps that the resultant lake would be of less ecological value than the existing wetland complexes despite the reservoir's size. Reservoirs managed for

MAR051499

water supply are even less likely to provide fully functioning fishery habitats due to periodic drawdowns. The KWR IV could experience significant drawdowns of up to twenty feet, further reducing habitat suitability. Additional information reveals that the KWR IV will accommodate a certain level of peripheral residential, commercial and light industrial development. Secondary development around the lake will further reduce its ability to support habitat. We believe the intrinsic value of the intact ecosystem at Cohoke Mill Creek could never be offset by the open water habitat of the King William Reservoir IV.

EPA agrees with the Corps' analysis that construction of the KWR IV project would significantly and adversely affect the Mattaponi, Pamunkey and Upper Mattaponi Tribes and that these impacts could not be adequately mitigated. Although these impacts have been difficult to quantify, EPA believes (with the Corps), that these impacts are real, especially and particularly to the Native Americans in the Pamunkey Neck. EPA believes that the importance of these natural resources to the Native American tribes in the area makes the impacts related to the KWR IV project take on a larger significance. EPA agrees with the Corps that the impacts to Traditional Cultural Properties and the cultural and spiritual integrity of the Tribes is unacceptable because they are avoidable. EPA believes the Corps acted appropriately in their review of cultural impacts associated with the KWR IV project. In their analysis of environmental justice and social and cultural issues, the Corps has attempted to preserve important historic, cultural, and natural aspects of our national heritage as required by the mandates of the National Environmental Policy Act.

The Council On Environmental Quality's implementing regulations for the National Environmental Policy Act state, "NEPA procedures must insure that environmental information is available to public officials and citizens before decisions are made and before actions are taken. The information must be of high quality. Accurate scientific analysis, expert agency comments, and public scrutiny are essential to implementing NEPA. Most important, NEPA documents must concentrate on the issues that are truly significant to the action in question, rather than amassing needless detail." Notwithstanding unresolved issues regarding preparation of a supplement to the FEIS, EPA believes the Norfolk District Corps of Engineers took their responsibilities under NEPA seriously by seeking high quality and accurate information to be used in their decision-making process. They sought and considered expert agency opinion and review from not only the federal resources agencies, including EPA, but also from the Commonwealth's agencies as well. This consultation resulted in development of an interdisciplinary approach which gave consideration to important issues. EPA believes that it was appropriate under NEPA for the Norfolk District to independently evaluate complicated and contentious issues. These issues included evaluation of the salinity model used to determine impacts of the freshwater withdrawals from the Mattaponi River, evaluation of Traditional Cultural Properties by qualified ethnographers, evaluation of impacts to shad fisheries as a result of Mattaponi withdrawals, and analysis of water demand projections.

In conclusion, EPA reiterates our support of the Norfolk District Corps of Engineers' decision to deny a Section 404 permit for construction of the King William Reservoir. EPA bases its position on the body of evidence included in the NEPA process for the KWR IV. The application of the NEPA process and the data collected have provided the necessary information

to assess and evaluate the impacts associated with construction of the KWR IV, a large reservoir development in the coastal plain of Virginia. The analysis clearly states that the impacts would cause or contribute to significant degradation of waters of the United States, including wetlands, specifically in Cohoke Mill Creek and the Mattaponi River as described under the 404(b)(1) Guidelines at 40 CFR 230.10(e). EPA agrees with the Corps' assessment that impacts associated with the proposed KWR IV are avoidable. As such, the KWR IV project does not represent the least damaging practicable alternative. We agree with the Corps that a permit cannot be issued for the project because the project does not comply with the Section 404(b)(1) Guidelines. EPA believes that wetlands of Cohoke Mill Creek would qualify as Aquatic Resources of National Importance (ARNI) as described under the 404(q) Memorandum of Agreement between EPA and the Department of the Army. We believe that construction of the KWR IV project could have an unacceptable adverse effect on wildlife and fishery areas as described under Section 404 (c) of the Clean Water Act.

Should circumstances warrant a change in the permit decision for the KWR IV, EPA reserves the right to provide additional comment on unresolved impacts and conditions of the permit. EPA also continues to reserve its authority pursuant to the Clean Water Act, Section 404 (c). We appreciate the opportunity to review the Recommended ROD. Once again, we commend the Corps for their diligent efforts in information gathering and commitment to the spirit and intent of NEPA. If you have any questions regarding our comments, please contact Regina Poeske of my staff at (215) 814-2725.

Sincerely,

Stanley L. Laskowski, Director
Environmental Services Division