

**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**
**REGION III**
**841 Chestnut Building**
**Philadelphia, Pennsylvania 19107-4431**

JUL 25 1997

Colonel Robert H. Reardon, Jr.
District Engineer
Norfolk District, Corps of Engineers
Fort Norfolk, 803 Front Street
Norfolk, Virginia 23510-1096

Dear Colonel Reardon:

    In accordance with the National Environmental Policy Act and Section 309 of the Clean Air Act, the Environmental Protection Agency (EPA) has reviewed the Final Environmental Impact Statement (FEIS) for the King William Reservoir Water Supply Project. These comments also represent EPA's comments on the Section 404 permit application CENAO-CO-R, 93-0902-12 for the King William Reservoir IV (KWR IV). EPA appreciates the opportunity to provide comments on these documents.

    The Regional Raw Water Study Group (RRWSG) is seeking a dependable, long-term public water supply for the Lower Virginia Peninsula. The KWR IV is one component of a 39.8 million gallon a day (mgd) regional raw water supply plan to meet the anticipated water supply needs of the Lower Peninsula through the year 2040. EPA continues to recognize the need for water in southeastern Virginia, and is committed to working with the Corps and the applicant to develop a regional water supply solution. The FEIS presents several water storage alternatives, including four variations of the King William Reservoir (KWR). EPA commends the RRWSG's efforts to avoid wetland impacts in their selection of the KWR IV as their currently proposed alternative. The identification of this new configuration places the dam 9700 feet upstream from the original KWR I location and reduces wetland impacts by approximately 216 acres. The RRWSG's commitment to reducing environmental impacts related to project construction is evidenced by the reduction of impacts to wetlands and forested areas, and by commitments to monitor for impacts to the sensitive joint vetch, a federally threatened plant species.

    Although great strides have been reached with wetland impact avoidance, EPA still has a number of concerns regarding implementation of KWR IV and compliance with the National Environmental Policy Act (NEPA). Due to the size and scope of the project some outstanding environmental and cultural issues remain to be resolved. We recognize that these issues may not have been adequately addressed largely because the Native American communities did not have the ability to fully understand the public process and evaluate the proposed project or its potential environmental impacts.

    EPA believes that the RRWSG has, in good faith, attempted to resolve most of the difficult issues surrounding this project. However, the following represent the major outstanding

*Celebrating 25 Years of Environmental Progress*

Exhibit B

issues that EPA believes need to be addressed, via additional NEPA documentation, in order to provide full public disclosure in accordance with the National Environmental Policy Act:

- Environmental Justice - The NEPA document should contain a full and complete analysis of the project's effects on the Environmental Justice communities in the area in accordance with the President's Executive Order on Environmental Justice (EO 12898).

- Cultural Resources - The NEPA document should provide a full analysis and disclosure of the presence or absence of Traditional Cultural Properties (TCP) in accordance with the National Historic Preservation Act.

- Salinity and Shad- Unresolved questions regarding salinity impacts to the flora and fauna [including *Aeschynomene virginica* (sensitive joint-vetch) and *Alosa* sp. (shad)] of the Mattaponi River as a result of freshwater withdrawals need to be addressed.

- Mitigation - Information should be made available to the public which incorporates the most recent mitigation plan elements as well as the results of the Habitat Evaluation Procedure (HEP). The conceptual mitigation plan should include a description of the HEP analysis and describe how it will be incorporated into the final, detailed mitigation plan. These elements are necessary to provide a reasonable measure of assurance that the impacts related to KWR IV construction can be adequately compensated.

The mitigation plan currently under development by the RRWSG (but not included in the FEIS) includes a combination of wetland creation, restoration and enhancement opportunities along the Mattaponi and Pamunkey Rivers. EPA is encouraged by these proposals and commits to full participation in the development of a final mitigation plan.

EPA believes that full understanding and discussion of these issues is necessary, within a public forum, in order for the Army Corps of Engineers to make a reasoned decision on the permit application for the KWR IV. We believe the best way to accommodate these concerns is through a supplement to the FEIS which would fully analyze the specific issues outlined above.

Finally, the impacts related to the loss of 437 acres wetlands within the Cohoke Mill Creek Basin are significant. The King William Reservoir IV would impact many diverse and valuable wetlands, as well as terrestrial systems interspersed among these wetland communities. If not appropriately mitigated, the proposed project may result in substantial and unacceptable impacts to Aquatic Resources of National Importance (ARNI). This determination is in accordance with Part IV 3(a) of the Clean Water Act Section 404(q) Memorandum of Agreement between EPA and the Department of the Army. Accordingly, we strongly recommend that the Corps of Engineers continue to require a superior mitigation plan to offset unavoidable adverse impacts to wetlands. EPA can not agree to the issuance of a Section 404 permit until the issue of wetland mitigation is resolved. We will continue to work with the RRWSG, the Corps of Engineers and the state and federal resource agencies to fashion an acceptable mitigation plan for the KWR IV project.

Thank you for the opportunity to comment on this project. EPA looks forward to continuing to work with the Corps, in cooperation with the RRWSG, to move quickly toward

*Celebrating 25 Years of Environmental Progress*

addressing these critical issues. Additional, detailed technical comments on the KWR IV project and FEIS are enclosed. Please feel free to contact me to discuss these issues further.

Sincerely,

W. Michael McCabe
Regional Administrator

Enclosure

*Celebrating 25 Years of Environmental Progress*

MAR015565

# EPA REGION III
## TECHNICAL COMMENTS
## ON THE FINAL ENVIRONMENTAL IMPACT STATEMENT
## FOR THE LOWER VIRGINIA PENINSULA
## RAW WATER SUPPLY PLAN

The following comments follow the format of the FEIS.

### Purpose and Need

Studies have been submitted by the Sierra Club and the Rocky Mountain Institute which call into question the validity of the water deficit projection methodologies and the conclusions drawn from them. We recommend that the COE review these reports and if valid arguments can be drawn from them we urge the COE to use this information when making their final permit decision on the project.

The RRWSG has described their conservation programs in the FEIS and other supporting documentation. These programs appear to be aggressive in some cases and less than aggressive in others. EPA urges the RRWSG to continue to fashion their conservation programs to be a model for the east coast. In that regard, the Lower Peninsula, which is home to many multinational industries as well as military installations, should begin an aggressive program of industrial conservation. The water deficit projections for the industrial sector appear to be too high, which apparently reflects insufficient movement towards reuse or recycling in new or existing industry. Other progressive conservation strategies include inclining block rates, such as the one currently employed by James City County, aggressive reuse of non-potable waters by industry, and aggressive community outreach to promote water conservation.

### Alternatives

The FEIS presents 3 water storage alternatives as well as two groundwater options to meet the projected raw water deficit of 39.8 mgd. These alternatives are Ware Creek Reservoir with a pumpover from the Pamunkey River, Black Creek Reservoir with a pumpover from the Pamunkey River, and the preferred alternative of the King William Reservoir IV with a pumpover from the Mattaponi River.

**King William Reservoir** - Any supplement to the FEIS should provide a more specific description of the KWR IV project as far as operating procedures, Mattaponi River withdrawal scenarios and reservoir release rates. The RRWSG has significantly reduced the wetland impacts of the KWR by moving the dam 9700 feet upstream from the original KWR I location which reduces wetland impacts by approximately 216 acres. This represents a significant reduction in project impacts and a very serious attempt at wetland impact avoidance. Although the selection of KWR IV represents changes in the project scale, EPA believes that these changes are the result of avoidance and minimization of environmental impacts in accordance with the Council on Environmental Quality Regulations at 40 CFR 1508.20. The FEIS does, for the most part,

*Celebrating 25 Years of Environmental Progress*

MAR015566

adequately address impacts associated with this new configuration except as discussed below.

**Ware Creek** - The magnitude of wetland impacts and the high quality and diversity of estuarine and palustrine wetlands at the Ware Creek site make it unacceptable and would preclude it from any further consideration by EPA for a water supply project. An impoundment on Ware Creek would eliminate a diverse aquatic ecosystem containing 590 acres of estuarine and palustrine wetlands, a Great Blue Heron Rookery and many miles of valuable anadromous fish habitat. EPA thoroughly documented our environmental concerns and objections to the Ware Creek Reservoir project in our 1989 404 (c) veto.

**Affected Environment**

**Cultural Resources** - The FEIS provides very useful information to describe the affected environment of the study area. One outstanding issue remains to be addressed in this section, however. The FEIS describes the cultural resources of the study area insofar as archaeological information is concerned per Section 106 of the National Historic Preservation Act (NHPA). The FEIS, however, has not explored the likelihood or presence of Traditional Cultural Properties (TCP). The NHPA was amended in 1992 to include TCPs which are defined as a properties that are "eligible for inclusion in the National Register because of its association with cultural practices or beliefs of a living community that (a) are rooted in that community's history, and (b) are important in maintaining the continuing cultural identity of the community." (National Register Bulletin Number 38; U.S. Department of Interior, National Park Service, Guidelines for Evaluating and Documenting Traditional Cultural Properties). The Virginia State Historic Preservation Officer and the Advisory Council on Historic Preservation have determined that TCPs may be in the study area given the proximity of current Native American communities and the historic presence of these communities throughout King William County and the entire coastalplain of Virginia. The RRWSG needs to fully explore the issue of TCPs, in cooperation with the Mattaponi and Pamunkey Indians. This information is necessary to ensure compliance with the NHPA and should provide a useful tool within which to analyze issues of Environmental Justice.

**Environmental Consequences**

**Monitoring**

The National Environmental Policy Act (NEPA) regulations (40 CFR 1500-1508) call for monitoring to be part of the Record of Decision.(e.g. 1505.2 and 1505.3). The regulations state at 1505.3 that "Agencies may provide for monitoring to assure that their decisions are carried out and should do so in important cases and at 1505.2 that (m)itigation and other conditions established in the EIS or during its review and committed as part of the decision shall be implemented by the lead agency or other appropriate consenting agency." EPA believes strongly that this is an important case and that aggressive monitoring of project impacts should be incorporated into the Record of Decision as described below.

*Celebrating 25 Years of Environmental Progress*

MAR015567

Water Quality

Salinity

EPA has been working, in cooperation with the Norfolk District COE, to establish the validity of the salinity modeling performed on the Mattaponi and Pamunkey Rivers. The Army Corps of Engineers, Waterways Experiment Station (WES) is currently reviewing the Virginia Institute of Marine Science (VIMS) salinity model used by the RRWSG to determine the magnitude of salinity change in the Mattaponi and Pamunkey Rivers as a result of the proposed water withdrawals. WES is also reviewing reports[1] based on the model's predictions as well as several critiques of the model and critiques of the reports. WES's review is important since many of the assumptions regarding impacts to the flora and fauna (including the federally listed threatened plant species, sensitive joint vetch) of the Mattaponi River (River) rely on this information. Regardless of the outcome of WES's analysis (validating the models use or suggesting another more appropriate model) their report should become part of the supplement to the FEIS because this issue has greatly interested the public. Salinity intrusion and impacts to the Mattaponi River ecosystem are of particular interest to the Mattaponi Indian Reservation which is located on the River. Many of their members rely heavily on the River for subsistence. Also, the historic and cultural value of the Mattaponi River ecosystem to the tribe should not be overlooked.

Dioxin

A municipal solid waste landfill (Virginia Department of Environmental Quality permit #505) is located in the Cohoke Mill Creek watershed. The RRWSG has described the types of mitigation they would provide should problems arise with the landfill but the FEIS does not describe how they will determine if there is a problem. This is an important issue. As a relatively new landfill (permitted in 1988 and closed in 1993), the proper protective measures should be in place per state and federal regulations under which all new landfills are now permitted. The King William County Landfill is sampled quarterly for parameters that include a full range of chemical compounds. However, the landfill monitoring does not test for dioxin. At the request of a local citizen, EPA's Region III Emergency Response Center was asked to sample several monitoring wells near the King William Landfill in King William County, Virginia. The EPA determined it was appropriate to test water near the landfill to decide if any imminent and substantial threat to public health or the environment existed from potential dioxin contamination. The samples were analyzed for a full range of dioxin and furans. Dioxin is an abbreviated term for a family of 210 related chlorinated compounds. The most toxic is 2,3,7,8-tetra chlorinated dibenzo-p-dioxin

---

[1] Pamunkey River Salinity Impact Assessment for Black Creek Reservoir Alternative, Malcolm Pirnie 1995; Tidal Wetlands on the Mattaponi River: Potential Responses of the Vegetative Community to Increased Salinity as a Result of Freshwater Withdrawal, Hershner, et al, 1991.

*Celebrating 25 Years of Environmental Progress*

MAR015568

(2378-TCDD). Although the results showed that no 2378-TCDD was detected, 4 of the 6 locations showed parts per quadrillion (PPQ) levels of octochlorinated dibenzo-p-dioxin (OCDD), the least toxic isomer of dioxin.. EPA has determined that the concentrations found do not require a removal action. Based on the samples collected, we have further determined that the current levels of OCDD do not approach any levels of concern for drinking water from the King William Reservoir should it be built.

However, as a result of the reservoir construction there is the potential for unpredictable changes in groundwater movement. This issue is one of concern to the local citizens. EPA urges the COE to provide a groundwater quality monitoring and mitigation component (to include most specifically dioxin) in the Record of Decision (ROD) to ensure that the landfill does not impact the water quality of the reservoir or endanger groundwater wells in the area.

Hydrology

Mattaponi River (River) - The RRWSG has used the 40/20 Tenant Method to model flows in the Mattaponi River. Although the downsizing of the reservoir (KWR IV) has reduced the project safe yield this fact should not obviate the need for the RRWSG to use the most protective flow methodology for the Mattaponi and its vital natural resources. Scientific understanding of the dependence of aquatic, riparian, and riverine wetland ecosystems upon natural flow regimes has advanced rapidly in recent years. A "natural flow paradigm" has emerged from the scientific community, stating that the full range of natural intra- and inter-annual variation of hydrologic regimes, and associated characteristics of timing, duration, frequency, and rate of change, are critical in sustaining the native biodiversity of aquatic ecosystems. This means that efforts to conserve aquatic systems will require attention to high flow conditions as well as low flows, along with the frequency and timing of both regular and infrequent flow conditions and the rate at which flow conditions change.

We do not believe that the 40/20 Tenant Method is sufficiently protective of the River. EPA strongly recommends that RRWSG employ a more progressive flow methodology such as the Range of Variability Approach (RVA) developed by The Nature Conservancy. The RVA uses long-term stream gauging records or hydrologic simulation models to quantify natural flow conditions on a river. Flow-based ecosystem management targets are then selected on the basis of the natural range of variation in key flow attributes such as annual peak and drought flows, seasonal viability, timing of certain flow conditions, and rates of change in flow. The river management "system" (e.g., dam operations, water diversion schedules, effluent discharges, wetland restoration projects) is then designed to enable attainment of the selected flow targets. As the flow management system is implemented, an ecosystem monitoring program tracks the response of key indicator species or community types, or changes in key ecological processes such as nutrient and sediment transport. Information gained from the monitoring or research programs is used to modify the management system as deemed necessary to conserve the ecosystem's biological components and ecological processes.

EPA recommends that the COE consider an aggressive monitoring program on the Mattaponi

*Celebrating 25 Years of Environmental Progress*

River should the project be implemented. The RRWSG has assured the public, through predictive models, that the impacts to the River, from either salinity changes or reduced flows, will have minimal to no impact on the vitality and dynamics of the Mattaponi River. While models and predictive methods may be state-of-the-art in some cases, the uniqueness of each river system prevents any guarantees that adverse impacts will not be realized. In that regard, the RRWSG should develop an aggressive monitoring program, in conjunction with the River stakeholders (such as the Mattaponi Tribe, The Nature Conservatory, the Virginia Department of Conservation and Recreation's Division of Natural Heritage (DCR), Mattaponi and Pamunkey Rivers Association, and the Chesapeake Bay Foundation) to establish the effects of water withdrawals The monitoring plan should include an adaptive management component for reservoir operations which could provide for amendment of the operation schedules should it be determined that withdrawals are adversely affecting the integrity of the Mattaponi River ecosystem.

**Cohoke Mill Creek** - The FEIS describes an inadequate range of variability for waters released from the KWR IV. Correspondence from the Virginia Department of Game and Inland Fisheries (VDGIF; July 14, 1997) and the Virginia Department of Conservation and Recreation's Natural Heritage Division (DCR; July 16, 1997) on the proposed project has recommended that the proposed discharge flows be revised to mimic pre-project flows in Cohoke Mill Creek. VDGIF suggests that this revision is necessary to protect the integrity of the downstream fish populations and the downstream wetland ecosystem. DCR recommends using the RVA approach as a "management tool to determine the releases from the reservoir that will mimic the natural hydrograph of Cohoke Creek to provide adequate flows." EPA concurs with these recommendations. Furthermore, we recommend that the RRWSG implement a monitoring program on Cohoke Mill Creek to evaluate any changes in the downstream ecosystem and that any monitoring developed be committed to in the ROD..

**Beaverdam Creek** - The FEIS does not support the assertion that increasing the magnitude of flow in Beaverdam Creek from an average daily flow of 4.5 mgd to 32.6 mgd will be beneficial to the adjacent wetlands or aquatic ecosystem. EPA continues to recommend that the pipeline to Diascund Creek Reservoir be extended the entire length to avoid adverse impacts to Beaverdam Creek from erosive, high frequency flows.

**Fisheries**

**Mattaponi River** - As a result of significant comment by the Mattaponi Tribe and others, the RRWSG has contracted with Dr. Gregg Garman, of Virginia Commonwealth University, to analyze specific impacts to the shad populations in the Mattaponi River if the project is implemented. The specific focus of the study is to respond to questions raised by the Mattaponi Tribe relating to shad spawning in the vicinity of the proposed intake and also the potential effects of water withdrawals on the fishery. The scope of work includes:

- Identification of the Mattaponi River reach where shad are known to spawn

- Verification of size and weight of shad eggs and larvae - confirmation that the 1 mm

*Celebrating 25 Years of Environmental Progress*

MAR015570

intake mesh openings and 0.25 fps intake velocity will preclude the entrainment or removal of shad eggs from the River

- Verification of the FEIS assertion that the salinity changes are so minute that it will not affect the shad fishery

- Analysis of the anticipated reduction in River flow's impact on shad and the riparian habitat (adjacent wetlands and other species)

Mattaponi Tribal members, EPA Region III, the National Marine Fisheries Service (NMFS) and the USFWS were given an opportunity to review the scope of work and provide comments. EPA concurred with the scope of work as proposed.

The results of Dr. Garman's work have not been published. Regardless of the outcome of his analysis, (validating the FEIS conclusions or describing impacts) his report should become part of the public record because this issue has greatly interested the public, in particular the Mattaponi Indians. The Mattaponi Tribe relies heavily on this fishery for subsistence and other economic benefits. They own and operate a shad hatchery on the River, funded through the Virginia Marine Resources Commission, which assists in the Commonwealth's shad recovery efforts. Any impacts to shad in this area could devastate this operation and cause significant hardship to the Tribe as well as impact the rate of shad recovery in the Chesapeake Bay and its tributaries.

The FEIS suggests that the RRWSG is willing to assist in the "development and management of a long-term monitoring program to evaluate any changes in sensitive joint-vetch colonies in Mattaponi River tidal marshes" (FEIS, page 3-105, para 7). DCR recommends "expanding the monitoring program to measure long term trends in vegetative community composition, rare species populations, and hydrologic regimes" (July 16, 1997 correspondence). The monitoring plan should also include evaluation of changes in sediment distribution patterns in the Mattaponi River at Scotland Landing as a result water withdrawals and as a result of backwashing to clean the intake pipes. We recommend that the development of a detailed and defensible monitoring plan be committed to in the ROD. This would make monitoring of the Mattaponi River a binding condition of project implementation[2]. Additional measures to protect the River include designation by the Virginia Department of Environmental Quality of the Mattaponi River in this area as a Virginia Surface Water Management Area. Through mechanisms such as these the federal and state governments can provide a legitimate and enforceable measure of protection for this valuable resource.

Cohoke Mill Creek - The VDGIF and the U.S. Fish and Wildlife Service (USFWS) have determined that Cohoke Mill Creek, upstream of the KWR IV dam site, is potential spawning habitat for anadromous fish. EPA supports the RRWSG efforts to provide off-site fish passage to

---

[2] NEPA regulations state at 1503.2 that in the Record of Decision "(a) monitoring and enforcement program shall be adopted and summarized where applicable for any mitigation."

*Celebrating 25 Years of Environmental Progress*

compensate for these riverine impacts. We recommend that mitigation for loss of anadromous fish habitat be committed to in the ROD.

**Wetlands**

Approximately 437 acres of non-tidal freshwater wetlands would be inundated as a result of project implementation. Additional wetland impacts would be realized as a result of pipeline construction (approximately 10.36 acres of stream/wetland impacts). The wetlands associated with Cohoke Mill Creek are a mixture of palustrine forested, scrub-shrub and emergent wetlands. The FEIS states the KWR impoundment area "contains a diverse wetland complex". The FEIS further determines that the wetlands provide multiple ecological functions at the KWR site, ranging from water quality enhancement to wildlife migration, feeding and breeding habitat. These functions would be lost for many wetland dependent wildlife species as a result of project construction. The uniqueness/heritage values of these wetland ecosystems would be lost forever and are not sufficiently replaced by the open water habitat of a 1,526 acre lake. Due to the diverse type, quantity and functional capacity of wetlands at the project site, EPA maintains that these wetland areas would qualify as an Aquatic Resources of National Importance (ARNI). This determination is in accordance with Part IV 3(a) of the Clean Water Act Section 404(q) Memorandum of Agreement between EPA and the Department of the Army.

As discussed above, the FEIS states that 10.36 acres of wetlands will be impacted by pipeline construction. The document is not clear on the nature of these impacts and does not seem to provide adequate compensation for these losses or changes in functional capacity. EPA would like to see these impacts specifically addressed and mitigation for them committed to in the ROD.

**Wetland Mitigation** - The compensation plan submitted in the FEIS is unacceptable because it fails to fully compensate for the type, quantity and functional capacity of wetlands lost at the project site. The FEIS mitigation plan does not incorporate the results of a Habitat Evaluation Procedure (HEP) that was conducted in July 1996. These results should be available and should have been included in the FEIS. EPA believes that supplemental information should be made available to the public which incorporates the most recent mitigation plan elements. This information should also contain a description of the HEP analysis and describe how it will be incorporated into the final, detailed mitigation plan. These elements are necessary to provide assurance that the impacts related to KWR IV construction can be adequately compensated. The plan should provide a reasonable measure of success (such as the Meadow Farm pilot plan) and should include an aggressive monitoring component. EPA believes that the present plan in the FEIS falls short of this goal.

Should the COE decide that a Supplement is not necessary, EPA strongly recommends that the COE withhold permit issuance until the RRWSG submits a detailed mitigation plan which has been approved by the resource agencies actively involved in the project (including EPA and the U.S. Fish and Wildlife Service).

**Specific comments on mitigation**- The mitigation plan currently under development by the

*Celebrating 25 Years of Environmental Progress*

RRWSG includes a combination of wetland creation, restoration and enhancement opportunities along the Mattaponi and Pamunkey Rivers. EPA is encouraged by the floodplain enhancement elements of these proposals. While these sites may represent "off-site" and perhaps "out-of-kind" mitigation, there are compelling reasons to consider them to be the most ecologically sound mitigation sites. Enhancement of these agricultural land use areas would provide segments which fill gaps in vegetated river corridors which provide water quality services and protection against non-point source runoff (NPS), a major contributor to water quality problems in the Chesapeake Bay and its tributaries.

We recommend that the RRWSG seek large contiguous areas for mitigation to accommodate a mixture of uplands and wetland areas. Small isolated sites should be avoided (such as Lanesville). EPA further recommends that the plan avoid significant amounts of hydrologic manipulation and excavation to achieve wetland hydrology. The RRWSG's August 1996 Conceptual Mitigation Plan submitted to the Virginia Department of Environmental Quality states at page 1-2 that "...successful implementation of the this plan will ... establish fully functional, self-sustaining ecosystems." The reliance on weirs and berms to control water at sites flooded by the Mattaponi and Pamunkey Rivers would likely result in either continued maintenance or site degradation, and thus stand in contrast to the goal of self-sustaining ecosystems. Excavation is often used to increase flooding depth and duration (i.e., to increase the hydroperiod) at a site. Negative effects include (1) the loss of organic matter that may have been present in the surficial horizons, (2) establishment of an unfavorable substrate (having poor tillage, texture, structure, etc) for plant growth, (3) compaction from the equipment required to perform the excavation, and (4) difficulty in predicting the hydrologic conditions at a site once thus disturbed.

As a consequence of avoiding significant hydrologic manipulation and excavation, most of the areas currently selected as potential mitigation sites will not be able to maintain sufficient hydrology to develop very wet wetlands (e.g. PFO1C or PFO1E) which comprise approximately 40% of the wetland types lost. These sites will achieve restoration or creation of PFO1A wetlands which are at the upland edge of wetlands and are therefore under colonization pressure from nearly all species. Only the most exceptionally accurate hydrology predictions could ensure that these areas would truly become wetlands. Conversely, most other creation targets should yield wetlands, regardless of planting success (since only hydrophytic species are likely to be successful in these areas). As a consequence, the plan will not be able to achieve full functional replacement. EPA will continue to work with the COE and the RRWSG to ensure that adequate compensation is realized for this project.

Many of the mitigation sites lie somewhat upriver from the impact site. Given the geologic and topographic changes that occur along the length of these river courses, it is probable that some wetland types are more typical of downstream wetlands and others are more typical of upstream sections. Selections of "target" wetland types should be based on what is appropriate for the local geologic/topographic region, rather than attempting In-Kind mitigation per se. The latter approach would likely lead to mitigation sites that fail to resemble either region's wetlands.

The RRWSG should keep in mind that if the headwaters of the Mattaponi and Pamunkey Rivers

*Celebrating 25 Years of Environmental Progress*

MAR015573

were to experience increased development, the increase in impervious surface and decline in wetland acreage would certainly increase both the frequency and severity of flood events in each river. Since nearly all of the mitigation plans within these River's floodplains are sensitive to river flooding, an element of unpredictability in mitigation success is introduced. The RRWSG should be aware of these issues when selected mitigation sites and monitoring for success.

## Monitoring

The wetlands of the Cohoke Creek site have been shown to be of high structural complexity and ecological value. Further, available literature on restoration of palustrine forested and scrub-shrub wetlands indicates that these types are among the most difficult to mitigate (please see several chapters in Kusler and Kentula's Status of the Science, 1989; and subsequent papers in the journal, Wetlands). Because of the ecological risk (combination of high wetland value and high probability of failure based on the literature) associated with compensatory mitigation, an extensive monitoring plan is appropriate.

Elements of a monitoring plan should include a minimum of the points listed below. Monitoring criteria can be divided into three categories, including (1) structural parameters, (2) functional parameters, and (3) self maintenance indicators. All three categories should include statistically valid comparisons with ecologically relevant reference sites. Most of the monitoring points relate to restoration within Mattaponi and Pamunkey River floodplains; and, other points might be added as appropriate for other types of compensatory mitigation sites.

## Structural parameters

(a) Soil development - The development of hydric soils is thought to be a slow process and is downweighted in Corps delineations (87 Manual suggests that hydric soils may take "hundreds of years" to develop). Recent publications suggest that transformations can be observed in less time (Atkinson et al., 1996). Monitoring of soil color changes (especially chroma) should be included at all sites, but success criteria may not be strict on this parameter. Low chroma in restored sites may be a relic of earlier conditions and may not be a reliable indication of soil development.

(b) Hydrologic regime - The hydrologic regime at each site is of paramount importance to success in all three categories, and made more critical due to the downweighting of soil parameters. Continuous recording wells, coordination with U.S. Geologic Survey (USGS) Stream Gauging stations, and other sources of hydrologic data should be collected biweekly or more during each growing season, and monthly thereafter.

(c) Vegetation establishment - Survivorship of planted vegetation and weighted average (Prevalence Index) and richness of colonizing vegetation should be monitored at permanently established plots. The presence of any invasive species should be monitored throughout each site, rather than limiting the search to established survey plots.

## Functional parameters

*Celebrating 25 Years of Environmental Progress*

MAR015574

Functional parameters should be selected based on goals (desired values or services) established at each site. Functional parameters that are known to support desired services should be selected on a site-by-site basis.

### Self Maintenance

It is desirable that compensatory mitigation sites function indefinitely. Since maintenance expenditures will be limited to the monitoring period, dependable evidence of self-maintenance is needed for satisfactory compliance. Long-term monitoring is called for due to the stochastically driven conditions of Mattaponi and Pamunkey River floodplains. Either prolonged drought or significant flood events could redirect succession even after several years. Response to stochastic conditions should be measured in order to remediate any damages and to validate the goal of ecosystem self-maintenance.

In an overview paper to the Kusler and Kentula (1989) book: "Status of the Science," Zedler and Weller recommend that research be incorporated into mitigation monitoring. The large number of acreages associated with this project and the permit dependence on compensatory mitigation, enhances the role of mitigation in providing feedback to help future mitigation attempts.

### Terrestrial Mitigation

The conversion of 1,686 acres of upland habitat raises concern over forest fragmentation, decreased biological diversity and impacts to forest interior species. The FEIS maintains that these impacts will be adequately mitigated for primarily as a result of the establishment of a 100 foot buffer around the perimeter of the reservoir. EPA questions these assumptions due to the quality of potential habitat development around the reservoir and the potential for development to occur within the watershed. DCR, in their July 16, 1997 correspondence, raises the issue of future planned development in the watershed based on the 1991 King William County Comprehensive Plan. This plan outlines an area around the reservoir which will include residential, light industrial and planned unit developments. The FEIS never fully describes this type of future development. It is important that the nature of this development be taken into consideration when developing any mitigation plan within the reservoir buffer area. The DCR letter further questions the quality of the reservoir fringe habitat which they maintain will not compensate for forest fragmentation but will enhance "edge effects." The results of the HEP should provide a better insight into the benefits of the fringe habitat.

EPA continues to encourage the implementation of terrestrial mitigation into the overall mitigation strategy. We will continue to work with the RRWSG and the federal and state resource agencies in that regard. We recommend that an upland restoration and/or preservation plan be committed to in the ROD.

### Environmental Justice

The issues associated with Environmental Justice (EJ) can be broad and complex and this case

*Celebrating 25 Years of Environmental Progress*

presents no exception. Executive Order 12898, "Federal Actions to Address Environmental Justice in Minority Populations and Low-Income Populations," provides that "each Federal agency make achieving environmental justice part of its mission by identifying and addressing, as appropriate, disproportionately high and adverse human health and environmental effects of its programs, policies, and activities on minority populations and low-income populations." Simply put, EJ means the fair treatment of people of all races, income, and cultures with respect to the development, implementation, and enforcement of environmental laws, regulations and policies. Fair treatment implies that no person or group of people should shoulder an unequal share of negative environmental impacts resulting from the execution of federal programs or policies.

In the memorandum to heads of departments and agencies that accompanied Executive Order 12898, the President specifically recognized the importance of procedures under the National Environmental Policy Act (NEPA), for identifying and addressing environmental justice concerns. The memorandum states that "[e]ach Federal agency shall analyze the environmental effects, including human health, economic and social effects, of Federal actions, including effects on minority communities and low-income communities, when such analysis is required by NEPA." These issues are clearly within the scope of analysis required by the NEPA document for the KWR IV.

The Presidential Memorandum emphasizes the need for public participation and access to information. The Memorandum further states that each federal agency "shall provide opportunities for community input in the NEPA process, including identifying potential effects and mitigation measures in consultation with affected communities and improving the accessibility of meetings, crucial documents and notices."

The key ideas from the Executive Order and memorandum include:

    1. Determining if and when there is an unequal share of negative environmental impacts (environmental impacts include impacts to cultural resources)

    2. Identifying and addressing concerns

    3. Analyzing the environmental effects, including human health, economic and social effects

    4. Public participation and access to information

    5. Identifying potential effects and mitigation measures in consultation with affected communities

While the FEIS has begun to address these concepts, additional effort is needed in identifying potential effects and addressing concerns, in consultation with the affected communities. We recommend that when attempting to contact and coordinate with the EJ communities, the COE consider the historic discrimination practices experienced by these communities. These practices,

*Celebrating 25 Years of Environmental Progress*

in many cases, may have contributed to a lack of educational opportunities which in turn limits the communities ability to fully evaluate the proposed project or its potential environmental impacts.

Many of the recommendations below specifically address issues or concerns of the Native American community in the area. It is not clear at this juncture whether or not other minority or low income communities are affected by the implementation of the KWR IV project. EPA recommends that any analysis completed to provide full disclosure of EJ issues should attempt to identify other EJ communities that may be impacted.

EPA believes that because the FEIS lacks the necessary information per the EO on Environmental Justice, a supplement to the FEIS should be prepared to provide full public disclosure on this important matter. EPA provides the following suggestions as means to facilitate this process, however we do not intend these recommendations to be all inclusive. The COE and the RRWSG should work directly with the affected EJ communities as well as seek expert advice in this matter as they would any other environmental issue. The methods developed to determine Traditional Cultural Properties (TCP) may provide a good insight into the how the RRWSG can fully address some of these issues.

The Draft <u>Guidance for Addressing Environmental Justice Reviews Conducted Pursuant to Section 309 of the Clean Air Act</u> (July 19, 1995) suggests that the following factors should be addressed in the EIS process:

Social/Economic/Cultural

a) impacts or possible violation of a community's customs or religious practices

b) impacts to cultural and/or historic properties and areas, the degree to which the effects of the actions can be absorbed by the affected population without harm to its cohesiveness

c) impacts to fish and wildlife on which a minority population or low income population depends, cultural differences in environmental expectations (endangered species vs traditional cultural hunting or ceremonial use)

d) impacts on the health and sustainability of the ecosystem or watershed within which a population is located (e.g. religious use of natural resources)

e) degradation of aesthetic values

Finally, the analysis of Environmental Justice issues must provide full disclosure on the analytical process undertaken to identify environmental justice concerns and all findings and conclusions should be disclosed to and discussed with all affected parties.

**Public Participation and Access to Information**

*Celebrating 25 Years of Environmental Progress*

The standard public outreach methods employed by the RRWSG and the COE may not have been effective with the EJ communities in the area. Although the public participation and access to information opportunities were not made specifically available to the Tribes (as separate from any other sector of the public) early on in the NEPA process, we do recognize that the Corps of Engineers has recently (January 1997 to present) made every effort to live up to the spirit of the President's EO and Memorandum. The Corps, along with EPA and the USFWS, have met with the representatives of both the Mattaponi and Pamunkey Indians on several occasions to discuss issues of concern to both Tribes. Key among those concerns are lack of input in the process, impacts to shad fisheries, impacts to the health and vitality of the Mattaponi River, and loss of cultural artifacts as a result of reservoir construction. Underlying all these concerns, of course, is the cultural heritage (historic, cultural and spiritual) of the tribes with the area. This heritage spans back in time to well before Europeans came to Virginia. The Tribes have described a sense of spiritual and historic connectedness to the Mattaponi River and Cohoke Valley. The Mattaponi have expressed their mission to "build a sustainable community on the Mattaponi River that will extend the thousands of years of Mattaponi history and heritage and, in doing so, demonstrate to all people how they may live successful and rewarding lives in harmony with the earth." (Carl Custalow, Assistant Chief, Mattaponi Indian Reservation Mission Statement). Although these issues may be difficult to grasp for many non-Natives, EJ emphasizes the need to take them seriously. The National Historic Preservation Act (NHPA) also recognizes the Native American connectedness to places or objects in the natural environment in the evaluation of Traditional Cultural Properties (TCP).

### Identification of Potential Effects

**Fish and Wildlife** - The Tribes have described in their correspondence to EPA and the COE that they rely heavily on the River and forests in the area for subsistence fishing, hunting and foraging. The EJ analysis should identify impacts to the Tribes should they lose the ability to hunt or forage on ancestral lands (particularly in light of the historic diminution of tribal lands over the last two centuries). Differential patterns of subsistence consumption of natural resources should be considered including differing rates of consumption of fish, vegetation, water and wildlife. The analysis should also discuss the cultural values that the Tribes may place on the natural resources to be impacted.

As discussed above, the Mattaponi Tribe relies heavily on shad and other fishery resources for subsistence and economic benefit. They also own and operate a shad fish hatchery on the Mattaponi River. Efforts are underway to determine the specific impacts to the shad fishery should the project be implemented. The results of Dr. Garman's analysis (as described above under Fisheries) and any necessary mitigation measures included to offset adverse impacts to the Tribe (economic or social) should be included in the EJ analysis.

**Spiritual and Cultural Issues** - The EJ analysis should include information to describe the impacts that construction and operation of a water supply/recreational reservoir will have on the tribe's spiritual and cultural association with the River and the Cohoke Valley. In order to achieve this in any meaningful way, the analysis needs to consider the Tribes within the context of

*Celebrating 25 Years of Environmental Progress*

a sovereign nation. The Mattaponi and Pamunkey Indian Tribes are state recognized and continue to maintain their own distinct sovereign governments. Through colonization and encroachment, they have lost nearly all of their historic land base. The Mattaponi view the reservoir and the subsequent land development around the reservoir as further trespass on their historical lands.

The draft Council on Environmental Quality (CEQ) Guidance for Addressing Environmental Justice under the National Environmental Policy Act (May 1996) states on page 11 paragraph 2 that "Where environments of Indians or communities may be affected, agencies should consider pertinent treaty rights and consult with tribal governments in a manner consistent with the government-to-government relationship." Although the Tribe is not federally recognized there are existing treaties (Treaty of 1646 and 1677) which establish certain rights of the tribes on their lands and three miles surrounding Indian land. The impacts to treaty protected resources should not be overlooked in the EJ analysis.

The land which would be inundated by the proposed KWR IV contains the archaeological record of the Tribe's history. Although the Tribe has been invited to fully participate in the Section 106 process (per the National Historic Preservation Act), this fact alone does not satisfy the need under EJ to "fully analyze environmental effects" (NEPA requires agencies to consider both impacts on the natural or physical environment and related social, cultural and economic impacts; 40 CFR 150814) of federal actions on minority communities. The FEIS does not discuss the Tribes' historical, cultural and spiritual interests in these artifacts.

Secondary Development - Secondary development around the reservoir (such as that described in the 1991 King William County Comprehensive Plan) may have serious impact on the Tribe's ability to acquire new land to expand the existing reservation. The Mattaponi have developed a "legacy plan" which includes among other things the acquisition of additional lands to enable off-reservation members to return. The Mattaponi Reservation today consists of only 150 acres situated on the Mattaponi River, much of which are wetlands. According to the Tribe, many of the Mattaponis who live off the reservation would like to return to their traditional homeland to continue the Tribe's culture and tradition. Residential and commercial development as a result of increased water supplies (King William County receives 3 mgd from the project) and the attractiveness of lake developments may drive real estate prices out of the reach of Tribal resources. The EJ analysis should identify impacts to the Tribes related to secondary development as well as issues associated with increased tourism and increased automobile traffic in the area.

Mitigation - The draft CEQ Guidance (May 1996) states that "agencies should elicit the views of the affected populations on measures to mitigate disproportionately high and adverse effects on a low-income or minority populations, and should carefully consider community views in developing and implementing mitigation strategies. Mitigation measures identified in an EIS...should reflect the needs and preferences of the affected low-income or minority populations to the extent practicable." (Draft CEQ Guidance, page 13). The present EJ analysis does not examine ways to offset adverse impacts to EJ communities. Subsequent EJ analysis should

*Celebrating 25 Years of Environmental Progress*

MAR015579

include a thorough discussion of adverse impacts and document efforts to mitigate them to the extent practicable. Appropriate mitigation measures should be committed to in the ROD.

*Celebrating 25 Years of Environmental Progress*

TOTAL P.19

MAR015580