# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____
)
ALLIANCE TO SAVE THE MATTAPONI, et al.,        )
                                               )
      Plaintiffs,                       )          Civil Action No.
                                               )          1:06-cv-01268-HH
v.                                             )
                                               )
UNITED STATES ARMY CORPS OF                    )
ENGINEERS, et al.,                             )
                                               )
      Defendants.                       )
_____)


**STATEMENT OF POINTS AND AUTHORITIES IN SUPPORT OF
PLAINTIFF-INTERVENORS' MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

TABLE OF CONTENTS ............................................................................................................. i

TABLE OF AUTHORITIES ................................................................................................... iii

TABLE OF ABBREVIATIONS ........................................................................................... viii

INTRODUCTION ..................................................................................................................... 1

STATEMENT OF FACTS ........................................................................................................ 2

        Procedural Posture ....................................................................................................... 13

STANDARD OF REVIEW ...................................................................................................... 14

ARGUMENT ........................................................................................................................... 14

I.     THE CORPS VIOLATED NEPA BY FAILING TO SUPPLEMENT THE
      FEIS IN LIGHT OF SIGNIFICANT PROJECT CHANGES AND NEW
      INFORMATION................................................................................................... 14

II.    THE CORPS VIOLATED THE CLEAN WATER ACT BY
      INADEQUATELY ANALYZING PRACTICABLE ALTERNATIVES ...................... 21

      A.  The Corps Arbitrarily and Capriciously Relied on the FEIS to Reject
          Less Damaging Practicable Alternatives to the Proposed KWR Project.................... 22

      B.  The Corps's Reliance on the FEIS Was Arbitrary and Capricious
          Because It Failed to Evaluate the Proposed KWR's Current Affordability ............... 24

      C.  The Corps Arbitrarily and Capriciously Rejected the Black Creek
          Alternative by Inaccurately Assessing the Alternative's Availability........................ 26

      D.  The Corps's Discussion of Alternatives Within Its Public Interest Review
          Does Not Meet the Requirements of a 404(b)(1) Guidelines Practicable
          Alternatives Analysis ................................................................................................ 28

III.   THE CORPS VIOLATED THE CWA BY FAILING TO ENSURE THAT
      THE PROJECT WOULD NOT SIGNIFICANTLY DEGRADE THE
      AQUATIC ECOSYSTEM.................................................................................... 30

IV.   THE CORPS VIOLATED THE CWA BY FAILING TO COMPLY WITH
      ITS PUBLIC INTEREST REVIEW REGULATIONS.................................................... 33

      A.  The Corps's Failure to Account for the Impact of the KWR project on
          Cultural Values and Fish and Wildlife Values Was Arbitrary and
          Capricious ................................................................................................................ 34

B. The Corps Arbitrarily and Capriciously Considered Irrelevant Public Interest Review Factors.................................................................................. 37

C. The Corps Arbitrarily and Capriciously Relied on a Flawed FEIS When Conducting the Public Interest Review........................................................ 38

V.    EPA'S DECISION NOT TO VETO THE KING WILLIAM RESERVOIR PERMIT WAS ARBITRARY AND CAPRICIOUS ........................................ 39

A. EPA's Decision Not to Veto the KWR Permit Has No Support in the Record.......... 41

B. EPA Ignored Relevant Statutory Factors and Relied on Irrelevant Factors................ 42

CONCLUSION.................................................................................................................... 44

# TABLE OF AUTHORITIES

**Federal Cases**

AFL-CIO v. Chao, 496 F. Supp. 2d 76 (D.D.C. 2007)..................................................14

AT & T Info. Sys., Inc. v. Gen. Servs. Admin., 810 F.2d 1233 (D.C. Cir. 1987)........42

Am. Trucking Ass'ns v. Envtl. Prot. Agency, 283 F.3d 355 (D.C. Cir. 2002).............30

Balt. Gas & Elec. v. Natural Res. Def. Council, 462 U.S. 87 (1983) ...........................15

* Bersani v. Robichaud, 850 F.2d 36 (2d Cir. 1988).........................................26, 27, 28

Buttrey v. United States, 690 F.2d 1170 (5th Cir. 1982)..............................................37

Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402 (1971) .......................42

City of Shoreacres v. Waterworth, 420 F.3d 440 (5th Cir. 2005)..................................26

Coalition on Sensible Transp., Inc. v. Dole, 826 F.2d 60 (D.C. Cir. 1987)..................18

Ctr. for Auto. Safety v. Dole, 846 F.2d 1532 (D.C. Cir. 1988) .....................................40

Davis v. Latschar, 202 F.3d 359 (D.C. Cir. 2000).........................................................15

Dubois v. U.S. Dep't of Agric., 102 F.3d 1273 (1st Cir. 1996).....................................21

Fla. Wildlife Fed'n v. U. S. Army Corps of Eng'rs, 401 F. Supp. 2d 1298
    (S.D. Fla. 2005).........................................................................................................37

Found. on Econ. Trends v. Heckler, 756 F.2d 143 (D.C. Cir. 1985).............................21

Greater Yellowstone Coalition v. Flowers, 359 F.3d 1257 (10th Cir. 2004) ...............26

Heckler v. Chaney, 470 U.S. 821 (1985)........................................................................39

Holy Cross Wilderness Fund v. Madigan, 960 F.2d 1515 (10th Cir. 1992)..................33

Hughes River Watershed Conservancy v. Glickman, 81 F.3d 437 (4th Cir. 1996)........20

Idaho v. Interstate Commerce Comm'n, 35 F.3d 585 (D.C. Cir. 1994) ........................16

James City County v. Envtl. Prot. Agency, 955 F.2d 254 (4th Cir. 1992),
    rev'd on other grounds, 12 F.3d 1330 (4th Cir. 1993)............................................24

* <u>Marsh v. Or. Natural Res. Council</u>, 490 U.S. 360 (1989)..........................................15, 19, 20, 21

* <u>Massachusetts v. E.P.A</u>, 127 S. Ct. 1438 (2007) ........................................................40, 44

* <u>Massachusetts v. Watt</u>, 716 F.2d 946 (1st Cir. 1983) ..............................................15, 17

<u>Monongahela Power Co. v. Marsh</u>, 809 F.2d 41 (D.C. Cir. 2006)................................33

* <u>Motor Vehicles Mfrs. Ass'n v. State Farm Mutual Ins. Co.</u>,
    463 U.S. 29 (1983)..........................................................................14, 21, 40, 43

<u>N.C. Alliance for Transp. Reform v. U.S. Dep't of Transp.</u>,
    151 F. Supp. 2d 661 (M.D.N.C. 2001) ......................................................21

* <u>Nat'l Audubon Soc'y v. Hoffman</u>, 132 F.3d 7 (2d Cir. 1997)..............................16, 18

* <u>Nat'l Wildlife Fed'n v. Marsh</u>, 721 F.2d 767 (11th Cir. 1983) ...........................16, 19

<u>North Carolina v. Hudson</u>, 665 F. Supp. 428 (E.D.N.C. 1987) ....................................39

<u>Olympic Forest Coalition v. U.S. Forest Serv.</u>, No. C07-5344-RBL,
    --- F. Supp. 2d -- 2008 WL 2004176 (W.D. Wash. May 9, 2008) ........................17

<u>Partlo v. Johanns</u>, Civ. Nos. 04-1462 & 04-1779, 2006 WL 1663380
    (D.D.C. June 11, 2006) ..............................................................................42

<u>Preserve Endangered Areas of Cobb's History, Inc. v. U.S. Army Corps
    of Eng'rs</u>, 915 F. Supp. 378 (N.D. Ga. 1995), <u>aff'd</u>, 87 F.3d 1242
    (11th Cir. 1996)..........................................................................................39

<u>Robertson v. Methow Valley Citizens Council</u>, 490 U.S. 332 (1989)..........................21

<u>SEC v. Chenery Corp.</u>, 332 U.S. 194 (1947) ................................................................43

* <u>Sierra Club v. Peterson</u>, 717 F.2d 1409 (D.C. Cir. 1983)....................................15, 18

<u>Sierra Club v. Sigler</u>, 695 F.2d 957 (5th Cir. 1983)....................................................38

<u>Sierra Club v. U.S. Army Corps of Eng'rs</u>, 701 F.2d 1011 (2d Cir. 1983)....................38

<u>So. Trenton Assocs. Against 29 v. Fed'l Hwy. Admin.</u>, 176 F.3d 658
    (3d Cir. 1999)..............................................................................................19

<u>The Lands Council v. Powell</u>, 395 F.3d 1019 (9th Cir. 2005)......................................21

* <u>Utahns v. U.S. Dep't of Transp.</u>, 305 F.3d 1152 (10th Cir. 2002) .................22, 24, 29

Van Abbema v. Fornell, 807 F.2d 633 (7th Cir. 1986)...................................................38

Wyo. Outdoor Council, Powder River Basin Res. Council v. U.S. Army
    Corps of Eng'rs, 351 F. Supp. 2d 1232 (D. Wyo. 2005) .......................................34

**Federal Statutes**

5 U.S.C. § 551(13) ......................................................................................................14

5 U.S.C. §§ 701-06 .......................................................................................................1

5 U.S.C. § 701(a)(2)....................................................................................................40

5 U.S.C. § 706 .............................................................................................................14

5 U.S.C. § 706(2)   ..................................................................................................14, 40

16 U.S.C. § 470(f) .......................................................................................................35

33 U.S.C. § 1344...........................................................................................................1

33 U.S.C. § 1344(b) ......................................................................................................7

33 U.S.C. § 1344(b)(1) ...............................................................................................21

33 U.S.C. § 1344(c) ................................................................................1, 13, 39, 42, 44

42 U.S.C. § 4321 et seq.................................................................................................1

**Federal Regulations**

33 C.F.R. § 230.13(b) .................................................................................................15

33 C.F.R. § 320.4 ........................................................................................................28

33 C.F.R. § 320.4(a).........................................................................................33, 34, 39

33 C.F.R. § 320.4(a)(1)....................................................................................28, 29, 34

33 C.F.R. § 320.4(a)(2)(ii) ..........................................................................................38

33 C.F.R. § 320.4(a)(3).................................................................................................43

33 C.F.R. § 320.4(d) ....................................................................................................35

33 C.F.R. § 320.4(e)..................................................................................................34, 35

33 C.F.R. § 320.4(r)(1)(iii)..............................................................................................34

40 C.F.R. § 230 et. seq..................................................................................................21

40 C.F.R. § 230.10(a)....................................................................................................22

40 C.F.R. § 230.10(a)-(c)..........................................................................................41, 43

40 C.F.R. § 230.10(a)(2).............................................................................22, 26, 28, 29, 30

40 C.F.R. § 230.10(a)(4)................................................................................................22

40 C.F.R. § 230.10(c)....................................................................................................31

40 C.F.R. § 230.10(c)(1)-(3)...........................................................................................31

40 C.F.R. § 230.3(q)......................................................................................................22

40 C.F.R. § 230.6(b)......................................................................................................26

40 C.F.R. § 230.12(a)(3)(ii)............................................................................................31

40 C.F.R. § 230.12(a)(3)(iv)...........................................................................................33

40 C.F.R. § 231.1.................................................................................................41, 42, 43

40 C.F.R. § 231.2(e)............................................................................................40, 41, 43

40 C.F.R. § 1502.9(c)(1).................................................................................................15

40 C.F.R. § 1502.14.......................................................................................................19

40 C.F.R. § 1508.27.........................................................................................15, 19, 20

40 C.F.R. § 1508.27(b)(1)..........................................................................................16, 19

40 C.F.R. § 1508.27(b)(4)...............................................................................................15

40 C.F.R. § 1508.8.........................................................................................................19

**Other Authorities**

46 Fed. Reg. 18,026 (Mar. 23, 1981)................................................................................21

51 Fed. Reg. 41,206 (Nov. 13, 1986)...............................................................................38

44 Fed. Reg. 58,076  (Oct. 9, 1979).................................................................................40

51 Fed. Reg. 22,977 (June 24, 1986) ..............................................................................26

## TABLE OF ABBREVIATIONS

| | |
|---|---|
| APA | Administrative Procedure Act |
| CWA | Clean Water Act |
| Corps | U.S. Army Corps of Engineers |
| DNR | Virginia Department of Natural Resources |
| EPA | U.S. Environmental Protection Agency |
| FEIS | Final Environmental Impact Statement (January 1997) |
| FRROD | Final Recommended Record of Decision (July 2, 2001) |
| FWS | U.S. Fish and Wildlife Service |
| IPR | Institute for Public Representation |
| IWR | Corps's Institute for Water Resources |
| JCCSA | James City County Service Authority |
| KWR | King William Reservoir |
| mgd | million gallons per day |
| MIF | minimum in-stream flow |
| NAD | North Atlantic Division |
| NEPA | National Environmental Policy Act |
| Newport News | City of Newport News |
| ROD | Record of Decision (July 29, 2005) |
| RRWSG | Regional Raw Water Study Group (Cities of Newport News, Williamsburg, Hampton, and Poquoson, and the Counties of York and James City) |
| SEIS | Supplemental Environmental Impact Statement |
| VMRC | Virginia Marine Resources Commission |
| VWP | Virginia Water Permit |

# INTRODUCTION

This case arises because two federal agencies failed to comply with the Administrative Procedure Act ("APA") and environmental laws before allowing a massive dam and reservoir project to proceed.  Plaintiff-Intervenors Mattaponi Indian Tribe and Chief Carl T. Lone Eagle Custalow (collectively, the "Tribe") challenge the issuance of a permit under Clean Water Act ("CWA") Section 404, 33 U.S.C. § 1344, by Defendant U.S. Army Corps of Engineers (the "Corps") to Defendant-Intervenor City of Newport News ("Newport News") for the construction of a 1,526-acre reservoir in King William County, Virginia.  In permitting the King William Reservoir ("KWR"), the Corps violated the CWA by failing to consider less damaging practicable alternatives, the significant degradation of the aquatic ecosystem, and the public interest.  The Corps violated the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 et seq, by refusing to issue a supplemental Environmental Impact Statement ("SEIS") assessing the impacts of the project in light of significant new circumstances.  Defendant Environmental Protection Agency's ("EPA's") decision not to veto the permit also violates CWA Section 404(c), 33 U.S.C. § 1344(c).  The Corps's and EPA's violations were arbitrary and capricious, an abuse of discretion, and otherwise not in accordance with the law, contrary to the APA, 5 U.S.C. §§ 701–06.

The KWR will irreparably harm the Tribe by adversely affecting the shad, a fish central to the Tribe's culture and way-of-life, and by destroying archeological sites of great cultural and spiritual significance to the Tribe.  The Tribe alleges standing in its amended complaint and attaches to this motion a declaration in support of the Tribe's standing.  The Tribe asks this Court to vacate the issuance of the permit, enjoin all activities authorized under the permit, and remand the matter to the Corps for compliance with the CWA, NEPA, and the APA.

## STATEMENT OF FACTS

The proposed KWR will have a capacity of approximately 12.2 billion gallons and will flood more than 1,526 acres of land near the Tribe's reservation.  2005 Record of Decision ("ROD") at 1 [MAR023150].  To fill and replenish the KWR, water will be pumped from the Mattaponi River using an intake structure with a capacity of 75 million gallons per day ("mgd").  Id. at 1–2 [MAR023150–51].  The reservoir pool will inundate or substantially modify 437 acres of regulated waters and wetlands of the United States, including 403 acres of freshwater wetlands and 34 acres (21 linear miles) of open water streams.  Id. at 2 [MAR023151].  The Corps has *never before* permitted wetlands destruction of such magnitude under the CWA in the Mid-Atlantic Chesapeake Bay region.  See id. at 61 [MAR023210].

Newport News is the permittee for the KWR project.  Dep't of the Army Permit No. 93-0902-12 (Nov. 15, 2005) [MAR023312]; Permit Application (July 1, 1993) [MAR058789].  From the mid-1990's to the end of the permit process, EPA and the Fish and Wildlife Service ("FWS") expressed significant concerns about the project's environmental impacts.  See, e.g., Letter from EPA to Corps (Nov. 13, 1996) [MAR036438–51] (describing concerns and referencing EPA's earlier expression of concern in letter dated March 1994); Letter from FWS to Corps (Mar. 28, 1996) [MAR035957–69] (recommending denial of CWA permit and referencing FWS's earlier expression of concern in letter dated May 17, 1994).  Under CWA Section 404(c), EPA prohibited a comparable project—the Ware Creek Reservoir—because of its unacceptable effects on wetlands.  See EPA Technical Comments at 6 (July 25, 1997) [MAR037353].

The Tribe's 150-acre reservation is on the Mattaponi River, approximately three miles downstream from the proposed intake structure.  See ROD at 45 [MAR023194].  The Tribe has depended for centuries on the Mattaponi River and its shad population, which serves as an

important source of food and income and as a resource of cultural and religious significance to the Tribe.  See id. at 55 [MAR023204].  Pumping water from the Mattaponi River into the KWR will harm the shad population, which is an already depleted stock in the Mattaponi River.  See Henderson Comments on Fish Impact Assessment (May 11, 2004) [MAR022971–84] (summarizing effects to shad from pumping); EPA Comments on FEIS at 6 (July 25, 1997) [MAR015571] (any impacts on shad could devastate the Tribe's hatchery, cause significant hardship to the Tribe, and adversely affect shad's recovery in greater Chesapeake Bay area); 2001 Final Recommended Record of Decision ("FRROD") at 172 [MAR078159].  The KWR and associated wetland mitigation sites will encroach upon and flood hundreds of acres of the Tribe's ancestral lands and damage or destroy many archeological sites that are culturally important to the Tribe.  See ROD at 46–47 [MAR023195–96]; Letter from Va. Dep't of Natural Res. to Corps (Sept. 2, 2004) [MAR022057]; FRROD at 191 [MAR078127].  The Tribe raised these concerns in numerous public proceedings and comment letters to the Corps and EPA.

Newport News applied for a CWA permit on behalf of the Regional Raw Water Study Group ("RRWSG"),[1] which formed in the fall of 1987 to "examine long-term water supply needs in the Lower Peninsula area of southeast Virginia."  Phase I Summary Report at 1-1 (January 1999) [MAR076956].  The RRWSG consists of the Cities of Newport News, Hampton, Poquoson and Williamsburg, and the Counties of York, James City, New Kent, and King William.  ROD at 3 [MAR023152].  By May of 1989, Newport News and King William County had agreed to focus on the KWR project, and in late 1990, they signed an agreement that described how development of the KWR would proceed.  See KWR Project Development Agreement (Nov. 13, 1990) [MAR067841].

---

[1] References in this brief to Newport News include RRWSG, and vice versa, where appropriate.

In April of 1993, the RRWSG formally endorsed the KWR project as the preferred alternative.  <u>See</u> RRWSG, Meeting Minutes at 2 (April 20, 1993) [EPAKWR002154].  The RRWSG remained committed to the KWR despite learning in June of 1993 that building a reservoir on Black Creek in New Kent County was practicable, would be less environmentally damaging, and would save over 200 acres of wetlands from destruction.  <u>See</u> Regional Raw Water Supply Plan & Envtl. Report at 4-113, Table 4-65 (June 1993) [MAR058760–62]; Alternatives Assessment at ES-3 (June 1993) [MAR073319].  The next month, Newport News applied for a CWA permit for the KWR project, see Permit Application (July 1, 1993) [MAR058789], even though the Black Creek reservoir alternative remained feasible until September 1994.  <u>See</u> Final Environmental Impact Statement ("FEIS") at 3-35 [MAR044991].  At that point, New Kent County stopped negotiating with the RRWSG regarding that alternative.  <u>See</u> <u>id.</u>  The RRWSG then began an effort to eliminate the Black Creek project as a feasible alternative.  <u>See</u> Letter from RRWSG to Norfolk District Engineer (Oct. 27, 1994) [MAR035305–12].  The RRWSG was concerned that "the Corps, FWS and EPA may find a reservoir at [King William] unacceptable since the wetland impacts are the greatest."  Mem. of Corps Meeting with RRWSG (Nov. 3, 1994) [MAR035301].

In January of 1997, the Corps issued its FEIS addressing the environmental impacts and ability of the KWR project and alternatives to meet the RRWSG's goal of providing "a dependable long-term public water supply for the lower Virginia peninsula."  <u>See</u> FEIS at 1-2 [MAR044837].  The Corps accepted the RRWSG's forecasted long-term deficit of 39.8 mgd in 2040 and eliminated project alternatives that would not satisfy the deficit.  <u>See</u> <u>id.</u> at 3-84 [MAR045055].  The Corps also eliminated any alternatives that exceeded the RRWSG's affordability criterion.  <u>See</u> FEIS at 3-6 [MAR044941].  In developing the affordability cut-off,

the RRWSG relied on an EPA study of wastewater because there were no studies of drinking water affordability.  See id.  However, the RRWSG set the cutoff at 1.5 percent of Lower Peninsula Median Household Income instead of the 2 percent cutoff that EPA used in the wastewater study.  See id.  The affordability cutoff eliminated any project that cost over $8 million per mgd of water.  Id. at 3-7 [MAR044942].  In early 1997, the KWR's predicted cost was $5.21 million per mgd based on a safe-yield of 29 mgd.  Id. at Table 3-3 [MAR045060].

The FEIS adopted the RRWSG's assertion that wetland mitigation would offset the KWR project's wetland impacts, despite the FWS's objections that the conceptual wetlands Mitigation Plan would not adequately compensate for destroyed wetlands.  See FEIS 3-99 to 3-106 [MAR045087–103]; Letter from FWS to Corps at 2 (July 22, 1999) [MAR019169].  The FEIS did not assess the impacts of disturbing culturally-sensitive land to create new wetlands under the wetlands mitigation plan.  See FEIS 3-99 to 3-106 [MAR045087–103].

Soon after the Corps issued the FEIS, the Tribe informed the Corps of serious deficiencies that required either a new environmental impact statement or a supplemental environmental impact statement ("SEIS").  See Letter from Institute for Public Representation ("IPR") to Corps (Feb. 14, 1997) [MAR055027–30] (deficiencies included lack of information and discussion about impacts on Tribe from harms to American shad, loss of terrestrial habitat and wildlife, and loss of archeological sites).  EPA also recommended preparation of an SEIS to address major outstanding environmental and cultural issues, including concerns about salinity changes in the Mattaponi River, cultural impacts on environmental justice communities, and wetlands mitigation.  See Letter from EPA to Corps (July 25, 1997) [MAR015563–64].  Nothing in the record shows that EPA ever changed its mind about the Corps having to prepare an SEIS.

See, e.g., Letter from EPA to Corps (Feb. 24, 1999) [MAR019235] (EPA remains "committed to the preparation of a supplement to the Final Environmental Impact Statement").

In December of 1997, the Virginia State Water Control Board issued a Virginia Water Protection permit ("VWP Permit") setting monthly minimum in-stream flow ("MIF") and other requirements on Newport News's pumping activities. See VWP Permit, Part I at 1, 3 (Dec. 22, 1997) [MAR037918, 0379120] (modified in part and reissued December 27, 2002 [MAR021433–50]). The permit prohibits Newport News from withdrawing water from the Mattaponi River when water flows are below the MIF. See id. Part I at 3 [MAR037920]. If Newport News implements emergency water conservation measures, however, it may withdraw water even if the river's flow is below the MIF. Id. Part I at 4 [MAR037921].

The FEIS did not even mention, let alone evaluate, the potential impacts of the KWR project on Traditional Cultural Properties. See FEIS 5-109 to 5-112 [MAR045515–20]; Letter from EPA to Corps (July 25, 1997) [MAR015563–64]. After completion of the FEIS, the Corps decided that a study of the potential impacts of the KWR project on Traditional Cultural Properties was warranted under Section 106 of the National Historic Preservation Act. See Powhatan's Legacy (Sept. 8, 1999) [MAR079699–854]. The Traditional Cultural Properties study, titled "Powhatan's Legacy," concluded that the KWR will change the Mattaponi River and its wildlife, alter the rural character of the community, lead to further isolation of the Tribe's reservation, harm prehistoric archeological sites, frustrate the Tribe's future plans to expand its land base, and negatively affect the Tribe's morale. See id. at 105–06 [MAR055785–86]. The study determined that the "cultural loss and community disruption that would result from the project cannot be adequately compensated for." Id. at 110 [MAR055790].

The Corps's use in the FEIS of RRWSG's forecasted long-term water need of 39.8 mgd also led to further study. In response to comments by experts that the projected water need was greatly inflated, see, e.g., Michael Siegel & Dr. Thomas Muller, Comments on FEIS at 3–4 (July 14, 1997) [MAR037660–61], the Corps had its water resource expert the Institute for Water Resources ("IWR") independently review RRWSG's forecast. Following draft reports and comment periods, the IWR concluded in its August 15, 2001, report that the forecasted water use and need in the FEIS were inflated. See IWR, Revised Report at viii–ix, 34–35 (Aug. 15, 2001) [MAR014117–18, 014153–54].

EPA consistently stated that the KWR project did not represent the least damaging alternative required by the 404(b)(1) Guidelines, 33 U.S.C. § 1344(b), emphasizing the diverse wetland communities that "may be extremely difficult, if not impossible, to adequately replace." Letter from EPA to Corps at 1–2 (Aug. 5, 1999) [MAR040004–05]; see EPA Mem. at 2 (Feb. 4, 2005) [MAR023850] (less damaging alternatives set forth in FEIS meet future water demand) ; EPA Mem. at 2 (Jan. 20, 2005) [MAR023797] (same). The FWS recommended denial of the permit because the KWR project would cause substantial and unacceptable impacts to important aquatic resources. See Letter from FWS to Corps at 12 (Mar. 28, 1996) [MAR035968]. The FWS was concerned that the KWR water withdrawals from the Mattaponi River would cause saltwater intrusion, which could harm the American shad by reducing the tidal freshwater zone of shad spawning habitat. Id. at 10–11 [MAR035966–67]. Like EPA, the FWS believed that the KWR project does not represent the least damaging alternative. See Letter from FWS to Corps at 2 (July 22, 1999) [MAR019169]; Letter from FWS to Corps (Feb. 1, 2005) [MAR019520].

On July 2, 2001, the Corps's District Engineer recommended denial of the KWR permit after determining that the project would significantly degrade waters of the United States,

violates EPA's 404(b)(1) Guidelines, and would be contrary to the public interest. See FRROD at 329, 340 [MAR078267, 078277]. Significant degradation of waters of the United States would result from, among other things, inadequate mitigation of lost habitat and potential negative impacts on the American shad. Id. at 329–33 [MAR078267–71]. The District Engineer determined that issuing a permit would violate the 404(b)(1) Guidelines because several less damaging alternatives exist, such as groundwater, conservation, purchase of treated or raw water from the City of Richmond, withdrawal of freshwater from the James River above Richmond, desalinization of brackish water from the James River, the Pamunkey River, or the York River, and increasing withdrawals from the Chickahominy River. See id. at 234–42, 340 [MAR078170–78, 078278].

As an additional reason for denying a CWA permit, the District Engineer determined that the KWR project is not in the public interest after comparing the project's benefits to its reasonably foreseeable detriments. See FRROD at 158 [MAR078194]. Among the detriments, the District Engineer considered the possibility of reduced survival, development, and growth of the American shad resulting from water withdrawals and salinity changes in the Mattaponi River. See id. at 174–75 [MAR078110–11]. Because shad are so important to the Tribe's livelihood and culture, the District Engineer concluded that any risk of further degrading this resource is unjustifiable. See id. at 68, 223 [MAR078003, 078159]. The District Engineer also determined that flooding culturally important areas to the Tribe, even with mitigation measures, would "represent an unacceptable cultural and religious loss." See id. at 222 [MAR078158].

As part of the public interest determination, the District Engineer evaluated the KWR project in light of water supply needs through 2050. See FRROD at 4 [MAR077935]. He determined that the region did not need any new water supply or reservoir until after 2030 and

8

that more environmentally acceptable alternatives could meet future demand, making the region's need for additional water "neither immediate nor certain." Id. at 36, 341 [MAR077969, 078279]. In light of the KWR's diminished benefits compared to its "immediate and certain" environmental and cultural impacts, the District Engineer determined that the proposed KWR would be contrary to the public interest. See id.

EPA agreed with the District Engineer's conclusion that the wetland resource damages outweighed the benefits of the KWR project and that less damaging alternatives existed. Letter from EPA to Corps at 1, 4 (May 1, 2001) [MAR041815, 041818] (KWR project could have unacceptable adverse effect on wildlife and fish). EPA also agreed that mitigation measures would not compensate for wetland losses or the significant, adverse impacts on the Tribe. Id. at 5 [MAR041819]. The FWS supported the District Engineer's decision to recommend denial of the KWR permit based on significant degradation of waters of the United States. See Letter from FWS to Corps (May 1, 2001) [MAR041792–93]. The Governor of Virginia opposed the District Engineer's decision, however, which triggered automatic referral of the final permitting decision to the Corps's North Atlantic Division ("NAD"). See ROD at 3 [MAR077936]. On September 30, 2002, the NAD Commander made an interim decision that the KWR project reasonably fulfilled the region's need for additional water and directed permitting procedures to continue. Decision Mem. for KWR Project at 35 (Sept. 30, 2002) [MAR021312].

On May 16, 2003, the Virginia Marine Resources Commission ("VMRC") denied Newport News' application for a subaqueous beds permit to construct a 75-mgd intake structure in the Mattaponi River because of the project's adverse impacts on American shad. Letter from VMRC to Newport News (May 16, 2003) [MAR021706–07]. In August 2004, VMRC reversed its decision and issued the permit, but prohibited pumping from the Mattaponi River between

March 1 and July 31 every year, until Newport News can prove that a shorter pumping hiatus would equally protect the shad. <u>See</u> VMRC Permit at 2–3 (Aug. 12, 2004) [MAR022220–21]. Like the VWP permit's MIF restrictions, however, the pumping hiatus does not apply when the President or Governor of Virginia declares a water supply emergency. <u>See</u> <u>id.</u> at 4 [MAR022222].  The combined effect of the state permits' MIF restrictions and pumping hiatus is that, in an average year, Newport News will be able to pump at full capacity for only four months, with minimal pumping in a fifth month. <u>See</u> Letter from IPR to Corps at 2 (Nov. 29, 2004) [MAR022167].[2]  The pumping hiatus will be in effect during five of the highest demand months. <u>Id.</u>; FEIS at Table 3-B [MAR044947]; VWP Permit at 3 [MAR037920].

In June of 2004, the RRWSG submitted to the Corps the wetlands Mitigation Plan, which involves creating and restoring 806 acres of wetlands. <u>See</u> KWR Project Reservoir Mitigation Plan at ES-4 (June 2004) [MAR008727]; ROD at 13–14 [MAR077946–47].  The creation and restoration of wetlands could disturb countless additional acres of archeological sites of cultural importance to the Tribe.  Letter from IPR to Corps at 5 (Jan. 31, 2005) [MAR019473]; EPA Technical Comments at 6 (March 22, 2004) [MAR023775] (some proposed mitigation sites "may have significant cultural resources on them").  Other than stating that the Island and Rice sites "may have [cultural] significance," the wetlands Mitigation Plan does not discuss potential cultural impacts.  KWR Project Reservoir Mitigation Plan at 4-29 (June 2004) [MAR008814]. The Virginia Department of Historic Resources expressed a continued "level of discomfort with the wetland mitigation plan when historic properties, and most particularly, Traditional Cultural Properties, were not factored into the selection process." <u>See</u> Letter from Va. Dep't of Historic Res. to Corps at 3 (Sept. 2, 2004) [MAR022059].  The FWS objected to the net loss of wetlands

---

[2] Because the Mattaponi River flow is particularly low between the months of June through October, the permits will prohibit pumping in August and September of an average year and will allow only 17 percent of pumping capacity in October.  <u>See</u> Letter from IPR to Corps at 2 (Nov. 29, 2004) [MAR022167].

and aquatic habitats under the Mitigation Plan and remained strongly opposed to the KWR

project.  See Letter from FWS to Corps at 1 (Feb. 1, 2005) [MAR019520].

The NAD Commander granted Newport News's permit application on July 29, 2005,

concluding that the proposed KWR project would not be contrary to the public interest.  See

ROD at 62 [MAR023211].  The ROD mentioned the American shad only to state that the

concerns raised in the FRROD are obviated by the MIF requirements and pumping hiatus set

forth in the VWP and VMRC permits, respectively.  See id. at 34, 55 [MAR023182, 023204].

The ROD did not contain any reasoning to support the NAD Commander's conclusion that the

state permitting conditions would sufficiently protect, either when applied or during times of

declared water emergencies, the American shad.

The NAD Commander referred to the alternatives assessment in the 1997 FEIS in

concluding that the proposed KWR project is the least damaging practicable alternative pursuant

to the 404(b)(1) Guidelines.  See ROD at 35 [MAR023184].  He relied on the FEIS's alternatives

analysis even though he considered the IWR's revised water demand analysis and concluded that

the forecasted water need by 2040 has since fallen from 39.8 mgd to 15.9 mgd.  See id. at 5

[MAR023154].  The NAD Commander concluded that as of 2005, the total cost of the project is

expected to exceed $200 million, while the revised safe yield shrank from 29 to 19 mgd.  See

ROD at 5, 43 [MAR023154, 023192].  The ROD did not mention that the KWR would produce

water at a cost of $12.1 million per mgd, which exceeds by $1 million per mgd the inflation-

adjusted affordability cutoff used by the Corps to eliminate alternatives from detailed

consideration in the FEIS.[3]  The NAD Commander rejected the District Engineer's solution of

---

[3] The RRWSG's $8 million dollar per mgd affordability cutoff, adjusted for inflation, is $11,136,136; inflation
calculated using U.S. Department of Labor inflation calculator, http://bls.gov.  The RRWSG's cost estimate for the
project in 2000 was $202,357,500.  Regional Water Study Group, Water Supply Alternatives Cost Projection

using a combination of water sources, simply noting "unquantifiable limitations" and that a

"patchwork of small supply alternatives may not meet the long-term water supply needs of the

Lower Virginia Peninsula." See id. at 54 [MAR023203].

Michael Siegel, an expert in water-use finance and environmental science, commented on

the ROD and highlighted problems with the Corps's assumptions about water supply and

demand. See Michael Siegel, Comments on ROD (Sept. 2, 2005) [MAR023242–57]. Mr. Siegel

demonstrated that several less environmentally damaging water supply options exist that would

eliminate the forecasted water deficit. See id. at 2 [MAR023245]. For example, the ROD did

not account for several additional sources of water supply, including James City County Service

Authority (JCCSA)'s Stone and other non-central system wells (0.9 mgd), JCCSA central system

freshwater wells as a stand-by reserve (2.6 mgd), and reduced dead storage in Newport News'

existing reservoirs. See id. at 4 [MAR023247]. He also commented that water demand in the

region has not followed the Corps's projections and had "remained essentially unchanged" since

1990, meaning that even the short-term forecasted regional demand for 2010 could be overstated

by 8.5%. Id. at 6 [MAR023249].

In November 2004, the Tribe requested that the Corps issue an SEIS to reflect the new

state permit requirements, new forecasted water supply need, and new information about the

cultural impacts of the KWR project on the Tribe. See Letter from IPR to Corps (Nov. 29, 2004)

[MAR022166]. The FWS also asked the Corps to re-evaluate the mitigation activity impacts,

project need, and permitting requirements in an SEIS. Letter from FWS to Corps (June 23,

2005) [MAR022776]. The Corps rejected these requests and did not supplement the FEIS. See

ROD at 34 [MAR023183]. The Corps issued a CWA permit on November 16, 2005, authorizing

---

Notebook at 31 [MAR059104]. Adjusted for inflation alone, the 2005 cost estimate for the project was
$229,503,018. $229,503,018 divided by 19 mgd equals $12,079,106 per mgd.

the construction and operation of the KWR.  See Dep't of the Army Permit No. 93-0902-12 [MAR023312].

Under the CWA Section 404 permitting process, EPA has authority "to prohibit the specification . . .  [and] deny or restrict the use of any defined area . . . as a disposal site, whenever [the Administrator] determines . . . that the discharge of [dredged or fill material] into such area will have an unacceptable adverse effect on municipal water supplies, shellfish beds and fishery areas . . . ."  33 U.S.C. § 1344(c).  In other words, EPA has the authority to "veto" the permit issued by the Corps.  Despite years of EPA's consistent position that the KWR would have unacceptable adverse effects on the waters of the United States and violate the 404(b)(1) Guidelines, EPA Region III Administrator Donald S. Welsh decided not to exercise the agency's veto authority.  See Decl. of Donald S. Welsh ("Welsh Decl.") at ¶ 7 (Sept. 27, 2007) [Docket # 60-2].  Welsh did not memorialize his decision in writing at the time he made it or provide any contemporaneous record of the materials that influenced his decision to reverse EPA's position regarding the acceptability of the KWR.  Id. at ¶ 9.  In his declaration, Welsh did not mention any consideration of potential adverse environmental effects and admitted that he did not consider whether the project represented the least damaging alternative or complied with EPA's 404(b)(1) Guidelines.  See id. at ¶ 10(d).

 **Procedural Posture**

Plaintiffs Alliance to Save the Mattaponi, Chesapeake Bay Foundation, and Sierra Club (collectively, "the Alliance") filed this action on July 17, 2006, alleging violations of the CWA and NEPA against the Corps.  The Tribe filed a motion to intervene as plaintiffs on November 8, 2006, which was granted on November 16, 2006.  In July 2007, the Tribe and the Alliance added claims against EPA alleging violations of the CWA, after this Court affirmed its jurisdiction to

hear such claims.  Pursuant to Fed. R. Civ. P. 56 and Local Rule 7(h), and for the reasons set

forth in this brief, Plaintiff-Intervenors Mattaponi Indian Tribe and Chief Carl T. Lone Eagle

Custalow now respectfully request the Court to enter summary judgment against the Corps and

EPA on all claims.

## STANDARD OF REVIEW

A motion for summary judgment under Federal Rule of Civil Procedure 56(c) is

appropriate when the pleadings and the evidence demonstrate that "there is no genuine issue as

to any material fact and that the moving party is entitled to judgment as a matter of law."  In a

case involving review of a final agency action under the Administrative Procedure Act ("APA"),

the question before the Court is whether, as a matter of law, the agency action is supported by the

administrative record and otherwise consistent with the APA standard of review.  See AFL-CIO

v. Chao, 496 F. Supp. 2d 76, 81–82 (D.D.C. 2007).  The APA governs judicial review of both

agency action and inaction.  5 U.S.C. § 706; 5 U.S.C. § 551(13).  A reviewing court shall hold

unlawful and set aside agency actions that are "arbitrary, capricious, an abuse of discretion, or

otherwise not in accordance with law."  Id. § 706(2); see Motor Vehicles Mfrs. Ass'n v. State

Farm Mut. Ins. Co., 463 U.S. 29, 41 (1983).

## ARGUMENT

## I.    THE CORPS VIOLATED NEPA BY FAILING TO SUPPLEMENT THE FEIS IN LIGHT OF SIGNIFICANT PROJECT CHANGES AND NEW INFORMATION

In the eight years between the FEIS and permit issuance, project changes and new

information provided a significantly different picture of the KWR's environmental and cultural

impacts, but the Corps unlawfully failed to analyze those changes and new information in an

SEIS.  The Corps must (1) take a "hard look" at the environmental consequences of project

changes, new circumstances, and new information and (2) determine whether such consequences

have the potential to "affect the quality of the human environment in a significant manner or to a significant extent not already considered."  See Marsh v. Or. Natural Res. Council, 490 U.S. 360, 373–74 (1989) (internal quotations and citation omitted); see also Balt. Gas & Elec. v. Natural Res. Def. Council, 462 U.S. 87, 97–98 (1983).  If after taking a hard look, the consequences of project changes and new information provide a significantly different picture of a project's environmental impacts, the Corps must prepare an SEIS.  See 40 C.F.R. § 1502.9(c)(1); 33 C.F.R. § 230.13(b); Marsh, 490 U.S. at 374; Davis v. Latschar, 202 F.3d 359, 369 (D.C. Cir. 2000).

The "rule of reason" applies to the decision whether to prepare an SEIS and depends on the relevance of the changes or new information to the pending agency action.  Marsh, 490 U.S. at 374.  Agencies must prepare an SEIS if "any 'significant' environmental impact might result from the proposed agency action."  Sierra Club v. Peterson, 717 F.2d 1409, 1415 (D.C. Cir. 1983) (emphasis in original) ; see Marsh, 490 U.S. at 374 (decision whether to prepare SEIS is similar to decision whether to prepare environmental impact statement).  Whether changes or new circumstances are significant depends upon the context and intensity of the newly identified impacts.  See 40 C.F.R. § 1508.27; Marsh, 490 U.S. at 374 n.20.  Agencies must take into account localized effects and factors such as the project's proximity to cultural resources and the degree to which the project may harm such resources.  40 C.F.R. § 1508.27.  Substantial controversy or disputes over the extent of local effects and impacts can qualify as significant circumstances that require an SEIS.  Id. § 1508.27(b)(4).

Reduced benefits of a project create a significantly different picture of the intensity of the project's environmental impacts and should trigger the preparation of an SEIS.  See Massachusetts v. Watt, 716 F.2d 946, 950–51 (1st Cir. 1983) (significantly reduced oil resource

estimates likely require SEIS before auctioning oil leases).  Conversely, beneficial impacts also

require an SEIS if the impacts are significant.  Nat'l Wildlife Fed'n v. Marsh, 721 F.2d 767,

782–83 (11th Cir. 1983) (project change that has beneficial impact must be considered in an

SEIS because impact is significant); see 40 C.F.R. § 1508.27(b)(1) ("A significant effect may

exist even if the Federal agency believes that on balance the effect will be beneficial."); Nat'l

Audubon Soc'y v. Hoffman, 132 F.3d 7, 17 (2d Cir. 1997) ("[A]gencies should define

"significance" broadly and not rely on proposed mitigation measures as an excuse to avoid

preparing an [environmental impact statement].").

     When deciding not to issue an SEIS, an agency must "convincingly establish" that the

impacts are insignificant or that other project changes sufficiently reduced any impacts.  Idaho v.

Interstate Commerce Comm'n, 35 F.3d 585, 596 (D.C. Cir. 1994) (internal quotations omitted).

The party challenging an agency's decision not to prepare an SEIS must show only "a substantial

possibility that the action may have significant new impacts, not that it clearly will have such

impacts" to trigger the agency's requirement to prepare an SEIS.  Nat'l Audubon Soc'y, 132

F.3d at 18.  Here, the Corps violated NEPA by failing to prepare an SEIS after new state

permitting requirements, a revised water demand forecast, and new information and changes

related to cultural impacts presented a significantly different picture of the environmental effects

of the KWR project.

     First, the new VMRC permit significantly affects the KWR's environmental impacts

because the required pumping hiatus reduces project benefits, may cause Newport News to

withdraw more water in non-hiatus months than previously planned, and increases the likelihood

of a water emergency with eased pumping restrictions.  Although the Corps considered in the

FEIS monthly MIF restrictions like the ones adopted in the VWP permit, it did not consider the

VMRC permit's pumping hiatus or the combined effect of both state permitting restrictions.. See FEIS at 3-43 [MAR045003]. Such intervening legal requirements are significant, affected the proposed agency action, and required the preparation of an SEIS. See Olympic Forest Coalition v. U.S. Forest Serv., No. C07-5344-RBL, --- F. Supp. 2d ---, 2008 WL 2004176, at *9 (W.D. Wash. May 9, 2008) (requiring the preparation of an SEIS to consider the impact of a new law on the proposed agency action).

The proposed KWR project's benefits will decline significantly as a result of the state permitting conditions. The conditions allow Newport News in an average year to pump at full capacity for only four months, during the period of lowest water demand. See Letter from IPR to Corps, Attachment A (Nov. 29, 2004) [MAR022179]; FEIS at Table 3-B [MAR044947]. Newport News will not be able to pump water at all during five of the highest demand months. See Letter from IPR to Corps at 2 [MAR022167]. These significant pumping limitations and circumstances make it questionable whether the KWR project can still meet the region's future water demands. See id. Indeed, Newport News claimed that the MIF restrictions alone would prevent the KWR from producing enough water to justify construction. See FRROD at 4 [MAR077935]. Such reduced estimated benefits create a significantly different picture of the project's environmental effects and independently trigger the requirement for the Corps to prepare an SEIS. See Watt, 716 F.2d at 950-51 (in context of preliminary injunction, agency likely violated NEPA by not preparing SEIS despite reduced estimated benefits of project).

Although the state permitting conditions are designed to protect the American shad, they could result in significant adverse impacts on the shad. With the pumping restrictions, it is less likely that Newport News will be able to make up for lost pumping during the four months of full capacity pumping. See Michael Siegel, Comments on pumping hiatus at 1–2 (July 14, 2004)

17

[MAR022956–57]. Therefore, a water emergency is more likely to arise and cause the pumping hiatus and MIF restrictions to be suspended altogether. See id.; Siegel, Comments to VMRC at 8 (May 12, 2004) [MAR022945]. Increased pumping from the Mattaponi River in non-hiatus months, and pumping without VWP and VMRC permitting restrictions in place, would have significant and adverse impacts on American shad populations in the Mattaponi River. See VMRC Permit at 2 [MAR022220]; P.A. Henderson, Comments to VMRC at 3–13 (May 11, 2004) [MAR022973–83] (pumping during shad spawning season could harm shad by trapping fish larvae, removing food sources, and increasing salinity). The Corps should consider these impacts in an SEIS.[4] See Peterson, 717 F.2d at 1415 (agency must fully assess environmental consequences).

The Corps did not consider the reduced project benefits and potentially adverse pumping scenarios resulting from the new state permit conditions, concluding instead that permit-related changes would reduce adverse impacts on American shad and, therefore, do not "constitute significant new circumstances or information." ROD at 33 [MAR023183]. Without support or analysis, the Corps's unexplained conclusion is legally insufficient. See Nat'l Audubon Soc'y, 132 F.3d at 17 (statement that mitigation measures prevent significant environmental impacts insufficient to support agency's decision not to prepare SEIS); Coalition on Sensible Transp., Inc. v. Dole, 826 F.2d 60, 66–67 (D.C. Cir. 1987) (agency must make convincing case for finding of non-significance).

The Corps compounded its legal error of failing to consider the new state permitting conditions in an SEIS by applying the wrong legal standard. Both beneficial and adverse

---

[4] Even with state permitting restrictions in place, the VMRC permit still allows for significant loss of American shad, especially when considered in light of the already depleted shad stocks, localized effects, and the degree to which further shad loss will negatively affect cultural values. See VMRC Permit at 2 [MAR022220] (allowing for 3–5% shad loss); Letter from IPR to Corps at 2 (Nov. 29, 2004) [MAR022167].

significant impacts require preparation of an SEIS. <u>Nat'l Wildlife Fed'n</u>, 721 F.2d at 782–83

(mitigation plan caused significant beneficial impacts and required an SEIS); <u>see also</u> 40 C.F.R.

§ 1508.27(b)(1); <u>id.</u> § 1508.8;.  Therefore, by not evaluating the significant environmental

consequences of the state permit restrictions, and by incorrectly assuming that claimed beneficial

impacts do not require an SEIS, the Corps's decision not to prepare an SEIS was arbitrary,

capricious, and otherwise not in accordance with law.

Second, new information as to future water need requires the preparation of an SEIS.

The water need for 2040 has fallen 60 percent, from a forecasted deficit of 39.8 mgd in the FEIS

to 15.9 mgd, and significantly expands the range of reasonable, less-environmentally harmful

alternatives available to meet the applicant's water supply needs under the Corps' own criteria

for defining reasonable alternatives.  <u>See</u> FEIS at 3-3, 3-19 [MAR044938, 044957]; Letter from

IPR to Corps at 3 (Oct 21, 1998) [MAR054170].  Even the new 15.9 mgd water need forecast

could be overstated by 8.5%.  <u>See</u> Michael Siegel, Comments on 2005 ROD (Sept. 2, 2005)

[MAR023244].  Such significant new information undermines the requisite rigorous and

objective evaluation of reasonable alternatives in the FEIS, which "is the heart of the

environmental impact statement."  40 C.F.R. § 1502.14.  The Corps arbitrarily and capriciously

failed to issue an SEIS to re-assess the reasonableness of alternatives identified in the FEIS

despite significant new information regarding future water need.  <u>See</u> 40 C.F.R. § 1508.27.

Finally, new information and project changes related to cultural impacts show that the

KWR may affect the quality of the human environment in a significant manner or to a significant

extent not already considered.  <u>See</u> <u>Marsh</u>, 490 U.S. at 373–74; <u>So. Trenton Assocs. Against 29</u>

<u>v. Fed. Hwy. Admin.</u>, 176 F.3d 658, 663 (3d Cir. 1999).  The Traditional Cultural Properties

study provides new information about how the KWR's impact on the Mattaponi River and its

wildlife will alter the rural character of the community, further isolate the Tribe's reservation, harm prehistoric archeological sites, frustrate the Tribe's future plans to expand its land base, and negatively affect the Tribe's morale.  See Powhatan's Legacy (Sept. 8, 1999), at 105–06 [MAR055785–86].  The cultural loss and community disruption experienced by the Tribe "cannot be adequately compensated."  Id. at 110 [MAR055790].  In addition, the 2004 wetlands Mitigation Plan would more than double the number of sites of cultural importance that the KWR project will harm, disturb, or destroy.  See Letter from IPR to Corps at 5 (Jan. 31, 2005) [MAR019473].  This new information about, and changes to, the KWR project present a significantly different picture of the project's adverse affects on cultural values, requiring the Corps to prepare an SEIS.  See 40 C.F.R. § 1508.27.

For the above reasons, the Corps's decision not to supplement the FEIS violates NEPA and is arbitrary and capricious.  The new state permitting requirements, revised future water need, and new information and project changes regarding the cultural impacts of the proposed KWR provide a significantly different picture of the KWR's environmental impacts.  The Corps must conduct further analysis in an SEIS before making a decision that will irretrievably commit federal resources to the project.  See Marsh, 490 U.S. at 374.  Such an analysis provide the public and decision makers the information necessary to "balance a project's economic benefits against its adverse environmental effects."  Hughes River Watershed Conservancy v. Glickman, 81 F.3d 437, 446 (4th Cir. 1996).

If the Corps had taken the requisite "hard look" at these new circumstances and impacts—which it did not—the agency would have had to conclude that preparation of an SEIS

was necessary.[5]  See Marsh, 490 U.S. at 371, 385 (agency must consider impacts before making

determination of significance and regardless of determination eventually made because "NEPA

ensures that the agency will not act on incomplete information, only to regret its decision after it

is too late to correct"); State Farm, 463 U.S. at 43 (agency must consider relevant data in order to

make a reasoned connection between the facts found and choice made); Found. on Econ. Trends

v. Heckler, 756 F.2d 143, 151 (D.C. Cir. 1985) (courts must ensure agencies take a "hard look"

at potential environmental impacts).  Preparation of an SEIS is important to fully inform the

Tribe and the public of the proposed KWR, its impacts, and all major points of view.  See

Dubois v. U.S. Dep't of Agric., 102 F.3d 1273, 1291 (1st Cir. 1996) (citing Robertson v.

Methow Valley Citizens Council, 490 U.S. 332, 349 (1989)).  Therefore, the Tribe asks the

Court to grant summary judgment in favor of the Tribe, vacate the Section 404 permit, and

remand the matter to the Corps for  compliance with NEPA.

## II.    THE CORPS VIOLATED THE CLEAN WATER ACT BY INADEQUATELY ANALYZING PRACTICABLE ALTERNATIVES

The Corps issued a permit for the KWR despite the availability of less damaging

practicable alternatives that are capable of meeting the region's long-term water supply needs

without harming the Tribe, its culture, and the environment as significantly as the KWR.

Issuance of a CWA Section 404 permit must comply with EPA's 404(b)(1) Guidelines.  See 33

U.S.C. § 1344(b)(1); 40 C.F.R. § 230 et. seq.  Under the Guidelines, the Corps cannot issue a

---

[5] A careful reexamination of the environmental impacts of a proposal is especially appropriate when five years have passed since the preparation of the FEIS.  Council on Environmental Quality, Forty Most Asked Questions Concerning CEQ's National Environmental Policy Act Regulations. 46 Fed. Reg. 18,026, 18,036 (Mar. 23, 1981); see The Lands Council v. Powell, 395 F.3d 1019, 1031 (9th Cir. 2005) (concluding that reliance on six year-old and thirteen year-old data "prevented the Forest Service from making an accurate cumulative impact assessment of the Project"); N.C. Alliance for Transport Reform v. U.S. Dept. of Transp., 151 F. Supp. 2d 661, 688, 695 (M.D.N.C. 2001) (If the "EIS sets forth statements that are materially false or inaccurate, [the district court] may properly find that the EIS does not satisfy the requirements of NEPA, in that it cannot provide the basis for an informed evaluation or a reasoned decision.").  Here, the Corps issued a CWA permit over eight years after it issued the FEIS.

permit for a project if there is a practicable alternative that has less adverse impact on aquatic ecosystems and has no other significant adverse environmental consequences. 40 C.F.R. § 230.10(a); Utahns, 305 F.3d at 1189 (if less damaging practicable alternative exists, it must be selected, and the permit must be denied). "An alternative is practicable if it is available and capable of being done after taking into consideration cost, existing technology, and logistics in light of overall project purposes." 40 C.F.R. §§ 230.3(q), 230.10(a)(2). In this case, the Corps's practicable alternative analysis was arbitrary and capricious because it rejected less damaging and otherwise practicable alternatives by relying on the outdated and erroneous analysis in the FEIS and by failing to apply the market entry test for determining whether an alternative is available. The Corps's rejection of less damaging non-reservoir alternatives in its public interest review does not comply with 404(b)(1) Guidelines because it unlawfully considered irrelevant and impermissible factors.

### A.    The Corps Arbitrarily and Capriciously Relied on the FEIS to Reject Less Damaging Practicable Alternatives to the Proposed KWR Project

In its practicable alternatives analysis, the Corps summarily relied on the alternatives analysis in the FEIS to conclude that the proposed KWR is the least damaging practicable alternative. See ROD at 35, 51 [MAR023184, 023200] (noting that the FEIS assessed 31 alternatives). The 404(b)(1) Guidelines anticipate that an FEIS could supply the information needed for analyzing practicable alternatives, but not that an FEIS would absolve the Corps of having to conduct the actual analysis. See 40 C.F.R. § 230.10(a)(4) (alternatives analysis under NEPA "will in most cases provide *the information for* the evaluation of alternatives" under the Guidelines (emphasis added)). The Corps's failure to conduct an evaluation of practicable alternatives violated the Guidelines and was, therefore, arbitrary and capricious.

22

In addition, the Corps's reliance on the FEIS in rejecting alternatives was arbitrary and capricious because the FEIS was outdated and inaccurate. A major flaw in the FEIS was its projected long-term water need of 39.8 mgd, whereas the Corps recognized in the ROD a reduced future need of 15.9 mgd. See supra Part I; FEIS at 3-84 [MAR045055]; ROD at 5, 35 [MAR 023154, 023184]. By summarily relying on the FEIS, the Corps thereby rejected otherwise practicable and less damaging alternatives that did not meet the inflated long-term water need of 39.8 mgd.

Moreover, even the reduced future water need of 15.9 mgd assumed in the ROD was exaggerated. The increase in regional water demand from 1990 to 2005 amounts to only 0.39 mgd. From 2000 to 2005, the region's demand actually decreased 0.1 mgd. Letter from Michael Siegel to Corps, at 6 (Sept. 2, 2005) [MAR023249]. However, the Corps relied on a 2010 projection of water demand that anticipated an increase of 11.56 mgd between 2000 and 2010. IWR, An Evaluation of the Risk of Water Shortages in the Lower Peninsula, Virginia (August 2001) at 33 [MAR014152]. Even if regional water demand changed course from its 15-year-long stagnation and began to increase as described in the ROD's forecast, water demand in 2040 would still be 5.73 mgd less than indicated in the ROD. Siegel at 7 [MAR023250]. In light of the amount of water currently available to the region from existing sources and the reduced water demand, there will actually be a water surplus of 6.03 mgd by the year 2040 without the addition of the KWR. Id. at 4 [MAR023247]. For these reasons, it was arbitrary and capricious for the Corps to summarily rely on the FEIS rather than conduct a meaningful and lawful evaluation of practicable alternatives in light of updated water need forecasts.

Several less environmentally damaging water supply options that were considered feasible in the FEIS could collectively provide 16.2 mgd and eliminate the forecasted long-term

23

water deficit.  See Letter from Michael Siegel to Corps at 2 (Sept. 2, 2005) [MAR023245]; EPA

Mem. at 2 (Feb. 4, 2005) [MAR023850] (less damaging alternatives set forth in FEIS meet

future water demand); EPA Mem. at 2 (Jan. 20, 2005) [MAR023797] (same).  The Corps did not

consider such options in its practicable alternatives analysis.  It failed to recognize additional

water supply options that included reducing dead storage, reopening the Big Bethel reservoir,

using wells with lapsed permits during emergencies, non-central system wells, and the likely

construction of another brackish groundwater desalinization plant.[6]  Siegel at 4 [MAR023247].

The Corps's failure to consider available water supply options was arbitrary and capricious.

**B.      The Corps's Reliance on the FEIS Was Arbitrary and Capricious Because It
         Failed to Evaluate the Proposed KWR's Current Affordability**

By relying on the FEIS, the Corps also unlawfully failed to reevaluate the proposed

KWR's cost in comparison to alternatives and the affordability cut-off used in the FEIS.

Increased cost can render an alternative impracticable.  See James City County v. Envtl. Prot.

Agency, 955 F.2d 254, 259–60 (4th Cir. 1992) (rejecting EPA's finding that alternative costing

fifty percent more than proposed project was practicable), rev'd on other grounds 12 F.3d 1330

(4th Cir. 1993).  However, increased cost does not support an impracticability determination, if

the Corps fails to independently verify and evaluate cost estimates provided by the applicant.

Utahns, 305 F.3d at 1165–66, 1187.

The Corps erroneously concluded that the KWR was practicable because, under current

cost and mgd projections, the KWR fails to meet the RRWSG's own affordability criterion that

---

[6] Reducing the dead storage would add 5 mgd to the safe yield.  IWR Report at 58 [MAR014176].  The Big Bethel
Reservoir was shut down because the military decided it wanted to obtain its water directly from Newport News, but
nothing prevents the reopening of the reservoir to provide 2 mgd.  Letter from Michael Siegel to Corps at 2
[MAR023245].  The Big Bethel Reservoir could be readily integrated with the current water supply system as it is
located only a few miles from reservoirs already connected to the system.  Id.  Wells with lapsed permits could
provide 2.6 mgd during a drought emergency.  Siegel at 2 [MAR023245].  The water from non-central system wells
has not been counted and would add .9 mgd to the safe yield.  Siegel at 2 [MAR023245].  The region plans to build
a third 5.7 mgd brackish groundwater desalinization plant within the next decade.  Siegel at 3 [MAR023246].

was adopted by the Corps in the FEIS.  The application of RRSGW's affordability criterion excluded as too costly those alternatives with cost estimates greater than $8 million per mgd of treated water safe yield.  <u>See</u> FEIS at 3-7 [MAR044942].  The FEIS concluded that the KWR was feasible, based on a safe yield of 29 mgd at $5.21 million per mgd.  FEIS at Table 3-3 [MAR045060].  In the 2005 ROD, the Corps recognized that the project now has a reduced safe yield of 19 mgd and that the current cost of the project is expected to exceed $200 million.  ROD at 5, 43 [MAR023154, 023192].  These values result in KWR's costs now being well over $8 million per mgd, thus rendering the project impracticable by the RRWSG's own affordability criterion.[7]  It was arbitrary and capricious for the Corps to conclude that the KWR is practicable and to fail to reevaluate otherwise practicable alternatives that the Corps had deemed economically infeasible in the FEIS as too costly.

In addition, the Corps failed to evaluate independently the affordability criterion provided by the RRWSG.  The criterion was "an affordability cutoff of 1.5 percent of Lower Peninsula MHI [Median Household Income]."  FEIS at 3-6 [MAR044941].  In developing the criterion, the RRWSG relied on an EPA study of wastewater affordability because there were no studies of drinking water affordability.  <u>See</u> <u>id.</u>  However, the RRWSG used a 1.5 percent of MHI affordability cutoff rather than the 2 percent cutoff applied by EPA in the wastewater study.  <u>See</u> <u>id.</u>  The RRWSG claimed that a 1.5 increase in costs "is conservatively high since it equates to nearly a tripling of consumer drinking water costs."  <u>Id.</u>  The Corps accepted the RRWSG's cost methodology without any evaluation of whether it established an accurate affordability threshold.

---

[7] The RRWSG's cost estimate for the project in 2000 was $202,357,500.  Regional Water Study Group, Water Supply Alternatives Cost Projection Notebook at 31 [MAR059104].  Ignoring the project's consistently increasing costs and solely accounting for inflation, the 2005 cost estimate for the project was $229,503,018.  <u>See</u> http://www.bls.gov/ (link to U.S. Department of Labor inflation calculator). The RRWSG's $8 million dollar per mgd affordability cutoff, adjusted for inflation, is $11,136,136  <u>See</u> <u>id.</u>; FEIS at 3-7 [MAR044942].  With the 2005 cost estimate of $229,503,018 and the revised safe yield of 19 mgd , the KWR will produce water at a cost of $12,079,106 per mgd (229,503,018/19 = 12,079,106).  This means the proposed KWR exceeds the affordability cut-off by $942,970 per mgd.

See FEIS at 3-5 to 3-7 [MAR044940–42].  For example, the Corps did not question whether an

EPA wastewater cost study had any rational connection to the costs of drinking water.  The

Corps also did not independently verify that an increase of 1.5 percent would be too costly or

actually triple consumers' drinking water costs.  It was arbitrary and capricious for the Corps to

accept the RRWSG's affordability criterion without independently evaluating its accuracy and

applicability to the proposed KWR's current safe yield and costs.

C.    **The Corps Arbitrarily and Capriciously Rejected the Black Creek
        Alternative by Inaccurately Assessing the Alternative's Availability**

The only alternative considered by the Corps in its practicable alternatives analysis was

the Black Creek reservoir alternative.  The Corps unlawfully failed to acknowledge that this less

damaging alternative was available at the time Newport News entered the market for a long-term

water supply and, therefore, practicable.  Although a project alternative may be impracticable if

it is logistically infeasible, City of Shoreacres v. Waterworth, 420 F.3d 440, 448 (5th Cir. 2005),

an alternative is available if "an area not presently owned by the applicant . . . could be

reasonably obtained, utilized, expanded or managed in order to fulfill the basic purpose of the

proposed activity."  See 40 C.F.R. 230.10(a)(2).  In determining practicability, the Corps must

utilize varying amounts of effort and documentation in accordance with the significance,

complexity, and adverse impacts of the proposed activity.  See 40 C.F.R. § 230.6(b); Greater

Yellowstone Coalition v. Flowers, 359 F.3d 1257, 1271 (10th Cir. 2004).  According to EPA's

interpretation of its own regulations, see 51 Fed. Reg. 22,977 (June 24, 1986), the Corps should

consider the availability of alternatives at the time the applicant entered the market for the

proposed project.  See Bersani v. Robichaud, 850 F.2d 36, 44 (2d Cir. 1988) ("[A] common-

sense reading of the statute can lead only to the use of the market entry approach used by

EPA."). This interpretation is necessary to provide an applicant with an incentive to search for alternatives, rather than wait from them to disappear. See id.

It is undisputed that the Black Creek alternative is less environmentally damaging than the KWR. See ROD at 35 [MAR023184]; Mem. of Corps Meeting with RRWSG (Nov. 3, 1994) [MAR035301]. Despite the environmental advantages and earlier availability of the Black Creek alternative, Newport News did not pursue it or even discuss the alternative with New Kent County until August of 1992, which was two years after Newport News had entered an agreement with King William County to develop the KWR. See Newport News Mem. of Water Issues with New Kent County at 4 (Oct. 27, 1994) [MAR035317]. The agreement with King William County foreclosed any potential negotiation with New Kent County. Id. Even though Newport News knew that the Black Creek alternative was available and less environmentally damaging, Newport News applied for a CWA permit for the KWR project in July 1993. See Regional Raw Water Supply Plan & Envtl. Report at 4-113, Table 4-65 (June 1993) [MAR058760–62] (comparing environmental impacts of alternatives including Black Creek and the KWR); Mem. of Corps Meeting with RRWSG (Nov. 3, 1994) [MAR035301] (Black Creek "remains a viable alternative"); FEIS at 3-35 [MAR044991] (New Kent County told the Corps in 1994 that it was "not adverse to the Construction of a regional reservoir [in its county] at Black Creek").

In the ROD, the Corps acknowledged that the Black Creek reservoir alternative has fewer adverse impacts, but concluded that the alternative is unavailable because the necessary land was rezoned in 2005, which occurred at least fifteen years after Newport News entered the market for long-term water supplies. See id. at 35–36 [MAR023184–85]. The Corps made no effort to determine the availability of the Black Creek alternative prior to 2005 and thereby allowed

Newport News to avoid pursuing the less damaging alternative until it disappeared.  See FRROD at 240 [MAR078176] (Corps's District Engineer concluded in the FRROD that the Black Creek alternative was practicable and feasible).  EPA's regulations require the Corps to consider practicability at the time Newport News entered the marketplace for long-term water supplies so that it has incentive to search for alternatives rather than waiting for them to disappear.  See Bersani, 850 F.2d at 44.  It was arbitrary and capricious for the Corps to consider the Black Creek alternative's practicability at so late a stage in the application process.

**D.    The Corps's Discussion of Alternatives Within Its Public Interest Review Does Not Meet the Requirements of a 404(b)(1) Guidelines Practicable Alternatives Analysis**

The Corps's consideration of a handful of non-reservoir alternatives in its public interest review analysis was arbitrary and capricious because it violates the more demanding requirements of a practicable alternatives analysis.  The Corps may only issue a permit to a project that both (1) conforms to the 404(b)(1) Guidelines *and* (2) is in the public interest.  See 33 C.F.R. 320.4.  The public interest review regulation requires that a permit be denied if the discharge it authorizes would violate the 404(b)(1) Guidelines.  Id. § 320.4(a)(1).  The 404(b)(1) Guidelines and public interest regulations require different analyses by the Corps.  Under the 404(b)(1) Guidelines, the Corps may issue a permit only to the least damaging alternative that is practicable, which means "available and capable of being done after taking into consideration cost, existing technology, and logistics in light of overall project purposes."  40 C.F.R. § 230.10(a)(2).  By contrast, the Corps's public interest review involves balancing a project's benefits against its reasonably foreseeable detriments, while considering *all factors* relevant to the project.  See 33 C.F.R § 320.4(a)(1); Bersani, 850 F.2d at 40.  For example, the Corps may consider all economic effects relevant to a proposal in its public interest review.  See 33 C.F.R §

28

320.4(a)(1).  However, the only economic consideration allowed by the 404(b)(1) Guidelines is whether the cost of an alternative would render it impracticable.  See 40 C.F.R. 230.10(a)(2).

When analyzing alternatives, the Corps must first identify the overall project purpose. See 40 C.F.R. § 230.10(a)(2).  The Corps cannot eliminate alternatives for lacking incidental or irrelevant aspects of the stated project purpose.  Utahns v. U.S. Dep't of Transp., 305 F.3d 1152, 1189–90 (10th Cir. 2002) (Corps's failure to consider highway project alternative without a berm and utility corridor was arbitrary and capricious because those features were incidental to project's purpose of meeting 2020 travel demand).

In this case, the Corps considered some alternatives in its public interest review and discounted them for economic reasons not related to the alternatives' cost and for lacking incidental aspects of the stated project purpose.  The Corps considered alternatives impracticable if they do not "ensure that the project area maintains its current economic base, and meets the Commonwealth of Virginia's objective of attracting new business and additional employment opportunities to the Lower Virginia Peninsula."  Id. at 42 [MAR023191].  These considerations have nothing to do with the cost of implementing the alternatives, which is the only economic consideration allowed in a practicable alternatives analysis.  See 40 C.F.R. 230.10(a)(2). Moreover, the goal of attracting new business and employment is incidental to the project's purpose, as defined by the Corps, of providing "a dependable, long-term water supply for the Lower Virginia Peninsula in a manner that is not contrary to the public interest."  ROD at 2 [MAR023151].

The Corps further justified discounting alternatives within its public interest review because they "have known but unquantifiable limitations, development problems, difficulty with varying State agency support, and uncertainty of supply in the most critical situations."  ROD at

54 [MAR023203].  The Corps concluded, without explanation, that "the patchwork of small

supply alternatives may not meet the long-term water supply needs of the Lower Virginia

Pennisula and could place risks of adverse impacts and environmental damages on groundwater

supplies, the Chickahominy River, Pamunkey River, and the James River."  Id.  The Corps's

vague discussion and conclusion do not explain how "cost, existing technology, and logistics in

light of overall project purposes" affects the alternatives' availability, as set forth in the

404(b)(1) Guidelines.  40 C.F.R § 230.10(a)(2); Am. Trucking Ass'ns v. Envtl. Prot. Agency,

283 F.3d 355, 362 (D.C. Cir. 2002) (agency action is not valid unless a rational basis for it is

presented); see also Alliance Mot. Summ. J. at Part II.C (explaining in detail the legal error of

the Corps's conclusion).  These vague statements also prevent this Court from reviewing the

Corps's decision because it is impossible to know what particular defect or defects caused the

Corps to deem a particular alternative impracticable.  For the above reasons, the Corps's

discussion of alternatives within its public interest review does not meet the requirements of a

practicable alternatives analysis under 40 C.F.R § 230.10(a)(2).

    The Corps's 404(b) analysis and rejection of otherwise practicable alternatives was

arbitrary and capricious.  The Tribe asks this Court to grant summary judgment in favor of the

Tribe, vacate the Section 404 permit, and remand the matter to the Corps for a lawful

reconsideration of practicable alternatives.

## III.  THE CORPS VIOLATED THE CWA BY FAILING TO ENSURE THAT THE PROJECT WOULD NOT SIGNIFICANTLY DEGRADE THE AQUATIC ECOSYSTEM

    The Mattaponi River is "the most productive tributary of a critically important river

system necessary for the sustained recovery of the American shad."  Letter from Edward F.

Cheslak, Cheslak & McLean Envtl., to VMRC at 2 (Apr. 18, 2003) ("Cheslak Letter")

[MAR022204].  By authorizing the KWR project, the Corps violated its nondiscretionary duty to ensure that the KWR will not result in significant degradation of this critical aquatic ecosystem. See  40 C.F.R. § 230.12(a)(3)(ii); see id. § 230.10(c).  When considering whether significant degradation of an aquatic ecosystem will occur, the Corps must put special emphasis on persistent and permanent effects.  See id. § 230.10(c).  Individual and collective adverse effects must be considered, including, but not limited to effects on (1) all life stages of fish and wildlife, (2) aquatic ecosystem diversity, productivity, and stability, and (3) loss of fish and wildlife habitat.  Id. § 230.10(c)(1)–(3).  Here, the Corps has authorized a project that will harm various life stages and habitat of the American shad because protective permit conditions are not based on relevant information, do not protect against adverse salinity and food source effects, and will likely be lifted.

Although the MIF and pumping hiatus conditions in the state permits were designed to prevent adverse effects to aquatic life, specifically the American shad, they are not sufficiently protective.  The proposed KWR has the potential to harm young shad because timing of the VMRC Permit pumping hiatus is based on water temperature and Hudson River information, which may not correlate with shad spawning season in the Mattaponi River.  Letter from Va. Inst. Of Marine Sci. to VMRC at 3, 6 (June 25, 2004) ("VIMS Letter") [MAR022790, 022793].  Further, although shad spawning is correlated with temperature, other factors influence spawning as well.  See Peter Henderson, Pisces Conservation Ltd, Comments on the KWR Mattaponi Fish Impact Assessment and Mitigation Report at 10–11 (May 11, 2004) ("Henderson Letter") [MAR022980–81].  If incorrect timing of the pumping hiatus results in pumping during the shad spawning season, the intake pipes' suction will likely trap and kill young shad larvae.  Cheslak

Letter at 4 [MAR022206]. Fragile shad eggs will also likely collide with the screens over the intake pipes and be destroyed. Id.

The withdrawals from the river are likely to have adverse effects on both adult and juvenile shad by increasing salinity and decreasing water levels in the river, regardless of when during the year the withdrawals occur. Cheslak Letter at 3 [MAR022205]; Henderson Letter at 11 [MAR022981]. Water withdrawals during the four non-hiatus months could also harm the shad population by depriving them of a major food source. Id. at 9 [MAR022979]. The screens covering the intake pipes will not prevent the removal of needed nutrients, like small planktonic organisms, from the water. Id. The withdrawals could significantly impair long-term population sustainability of young-of-the-year shad because they rely primarily on in-river production for food. See id. at 9–10 [MAR022979–80].

Finally, the state permits are not sufficiently protective because they allow pumping to resume at any time in the event of a water supply emergency. See, e.g., VWP Permit Part I at 3 [MAR021436]. A water emergency is, in turn, more likely to happen in light of the pumping restrictions. Newport News seeks to use the Mattaponi River as the reservoir's sole source of water, yet it cannot withdraw water from the river for five of the six months with the highest water demand. In a typical year, the MIF restrictions will also result in an additional three months of decreased or no pumping. See VWP Permit at 3 [MAR037920]; FEIS at Table 3-B [MAR044947]; Letter from IPR to Corps, Att. A (Nov. 29, 2004) [MAR022179]. Allowing emergency withdrawals during these restricted summer months, particularly during a dry summer, could devastate young shad. See Henderson, Comments on Fish Impact Assessment at 3–13 [MAR022973–83]; Letter from VIMS to VMRC at 18 (Mar. 12, 2003) [MAR021631]. Shad eggs and larvae may lose their food sources to operation of the pump intake and are

particularly vulnerable to changes in salinity and being trapped and killed by the pump intake

screen.  Henderson, Comments on Fish Impact Assessment at 4–13 [MAR022974–83].  The

Corps failed to mention or consider these possibilities in its ROD.  See ROD at 34

[MAR023183] (noting emergency provisions without discussion).

     Comments submitted during the permitting process informed the Corps that the KWR

may be harmful to the aquatic ecosystem.  By issuing the permit notwithstanding this

information, the Corps violated its duty to ensure that the KWR permit complies with the CWA

guidelines.  The Corps violated this duty because, by failing to investigate the effects of the state

permit conditions, it lacked "sufficient information to make a reasonable judgment" as to

whether the KWR will comply with the CWA guidelines.  40 C.F.R. § 230.12(a)(3)(iv); accord

Monongahela Power Co. v. Marsh, 809 F.2d 41, 51 (D.C. Cir. 2006).  Therefore, the Corps's

decision to issue the permit was arbitrary and capricious.

     The Tribe joins Plaintiffs' arguments concerning the Corps's determination of significant

degradation of waters of the United States.  Based on these APA and CWA violations, the Tribe

asks the Court to grant the motion for summary judgment in favor of the Tribe, vacate the

Section 404 permit, and remand the matter to the Corps for a lawful reconsideration of whether

the proposed KWR project would significantly degrade waters of the United States.

## IV.    THE CORPS VIOLATED THE CWA BY FAILING TO COMPLY WITH ITS PUBLIC INTEREST REVIEW REGULATIONS

     The Corps must evaluate the probable impacts of the "proposed activity and its intended

use on the public interest" before issuing a permit under § 404 of the CWA.  33 C.F.R. §

320.4(a); see also Holy Cross Wilderness Fund v. Madigan, 960 F.2d 1515 (10th Cir. 1992)

(Corps must balance project benefits against project detriments under public interest review).

The Corps shall not issue a permit if, after weighing the relevant public interest considerations,

"it would be contrary to the public interest." 33 C.F.R. § 320.4(a). When reviewing the permit

application for the KWR project, the Corps violated its own regulations by not considering all

relevant public interest factors, impermissibly considering irrelevant public interest factors, and

relying on a flawed FEIS.

### A.    The Corps's Failure to Account for the Impact of the KWR project on Cultural Values and Fish and Wildlife Values Was Arbitrary and Capricious

The Corps must consider all relevant public interest review factors, one of which is the

impact of the permitted activity on cultural and historical values.[8] 33 C.F.R. § 320.4(a), (e). The

Corps must also consider the cumulative effects of the proposed project, such as the effects of

mitigation activities, on each relevant factor. See id. § 320.4(a), (r)(1)(iii) ("[M]itigation should

be developed and incorporated within the public interest review process."); Wyo. Outdoor

Council, Powder River Basin Res. Council v. U.S. Army Corps of Eng'rs, 351 F. Supp. 2d 1232,

1243 (D. Wyo. 2005) (failure to assess all cumulative impacts of project is arbitrary and

capricious). Here, the Corps did not take into account all the likely impacts, including

cumulative impacts, of the KWR project on cultural and fish and wildlife values.

The Corps failed to consider the impact of the KWR Project Mitigation Plan, an integral

part of the permitted activity, on cultural values. See Letter from Virginia Department of Natural

Resources to Corps at 3 (Sept. 2, 2004) [MAR022059]; cf. ROD at 45–47 [MAR023194–96].

The Mitigation Plan will more than double the number of sites of cultural importance that will be

harmed, disturbed, or destroyed by the KWR project. Letter from IPR to Brigadier General

Meredith W.B. Temple at 5 (Jan. 31, 2005) [MAR019473]; see Letter from Va. Dep't of Natural

---

[8]  "All factors which may be relevant to the proposal must be considered including the cumulative effects thereof: among those are conservation, economics, aesthetics, general environmental concerns, wetlands, historic properties, fish and wildlife values, flood hazards, floodplain values, land use, navigation, shore erosion and accretion, recreation, water supply and conservation, water quality, energy needs, safety, food and fiber production, mineral needs, considerations of property ownership and, in general, the needs and welfare of the people." 33 C.F.R. § 320.4(a)(1).

Res. to Corps at 3 (Sept. 2, 2004) [MAR022059].  The Plan does not address its numerous

cultural impacts, but rather merely states that two potential mitigation sites, the Island and Rice

sites, "may have significance."  KWR Project Reservoir Mitigation Plan at 4-29 (June 2004)

[MAR008814].

    Instead of independently investigating and weighing the effects the project will have on

the cultural values of the Tribe, the Corps deferred to the Programmatic Agreement signed

pursuant to Section 106 of the National Historic Preservation Act ("NHPA").  ROD at 27, 46–47

[MAR023176, 023195–96].  Although the NHPA does not prohibit all adverse effects on all

culturally important sites, 16 U.S.C. § 470(f), it does not negate the Corps's duty to consider the

full impact of the KWR and associated mitigation activities on cultural values, 33 C.F.R. §

320.4(e) ("Full evaluation of the general public interest requires that due consideration be given

to the effect [of the proposed project on] Indian religious and cultural sites.").  The Corps

violated its own regulations by failing to consider the cumulative cultural impacts of the KWR

and its Mitigation Plan.  See Letter from EPA to Corps at 4 (May 1, 2001) [MAR041819]

(KWR's effects on the Tribes cannot be adequately mitigated).

    The Corps violated its duty to weigh all the potential detrimental effects of the KWR

project on fish and wildlife values and the cultural values of the Tribe by also failing to account

for the full impact of river withdrawals on the Mattaponi River shad, the vitality of which are

crucially important to the culture of the Tribe.  See 33 C.F.R. § 320.4(e); ROD at 46

[MAR023195] (taking into consideration only the impact of increased salinity caused by reduced

water flow on historic and cultural values).  The Corps did not take account of the fact that the

state-issued VMRC Permit allows an annual 3% to 5% loss of shad; nor did it assess how such

an additional loss of an already-depleted stock would affect the Tribe's culture.[9]  See VMRC

Permit (Aug 17, 2004) [MAR022038]; Letter from IPR to Corps (Nov. 29, 2004) [MAR022166];

EPA Comments on FEIS at 6 (July 25, 1997) [MAR015571] (any impacts on shad could

devastate the Tribe's hatchery, cause significant hardship to the Tribe, and adversely affect

shad's recovery in greater Chesapeake Bay area).  Moreover, the state permits decrease the

feasibility of the project as a dependable water source, making it more likely that permit

conditions will be eased or lifted, which could result in greater adverse impacts.  Letter from IPR

to Corps (Nov. 29, 2004) [MAR022167–68].  Such detrimental effects should have weighed

against a finding that the project was in the public interest, especially when the Corps recognized

that shad are "critically important to the Mattaponi Tribe as a source of both food and income,

and as a resource of cultural and religious significance."  ROD at 55 [MAR023204]..

     The Corps's failure to consider the cumulative impacts on cultural values from the KWR,

its wetlands mitigation, and river withdrawals in culturally sensitive areas stands in marked

contrast to the public interest review in the 2001 FRROD.[10]  In 2001, the District Engineer

considered (1) the cumulative effects of the project on shad, (2) the cumulative cultural and

environmental impacts, and (3) the interrelatedness of cultural and environmental impacts.  *See*

FRROD at 172–78, 212, 226 [MAR078108–14, 148, 162].  In its final decision, however, the

Corps summarily claimed that it considered the cumulative impacts of the KWR project on fish

---

[9] Instead of considering the cultural effects of river withdrawals, the Corps deferentially declared that state permitting requirements "appropriately address" those concerns.  ROD at 55 [MAR023204].  However, CWA regulations give state permitting requirements conclusive weight only with respect to water quality issues, and not as to cultural values or fish and wildlife values.  See 33 C.F.R. § 320.4(d) ("Certificate of compliance with applicable effluent limitations and water quality standards required under provisions section 401 of CWA will be considered conclusive with respect to water quality considerations.).

[10] Because the Division Engineer did not follow the recommendation of the District Engineer when making the permitting decision, the Corps may not claim that consideration of the proper factors in the FRROD counts in support of the decision to issue a permit.

and wildlife values.  ROD at 48 [MAR023197].  The Corps stopped unlawfully short of actually considering how the expected negative effects on fish and wildlife would harm cultural values.

Based on all of the above, the Corps's failure to consider the cultural impacts of the KWR, its mitigation plan, and river withdrawals and the potential detrimental effects of the project on fish and wildlife values was not in accordance with law.

### B.     The Corps Arbitrarily and Capriciously Considered Irrelevant Public Interest Review Factors

The Corps unlawfully took into account economic benefits beyond those which would flow directly from completion of the KWR Project.  The Corps may not consider factors beyond the scope of the public interest review.  See Buttrey v. United States, 690 F.2d 1170, 1180 (5th Cir. 1982) (job creation during construction of proposed project "is not the kind of 'economic' benefit the Corps's public interest review is supposed to consider").  Considering benefits that do not flow directly from the project under consideration is arbitrary and capricious.  Fla. Wildlife Fed'n v. U. S. Army Corps of Eng'rs, 401 F. Supp. 2d 1298, 1332–33 (S.D. Fla. 2005).

The Corps concluded that the KWR Project will ensure that the project area meets Virginia's objective of attracting new businesses and additional employment opportunities to the Lower Virginia Peninsula.  See ROD at 42 [MAR023191].  However, the scope of the benefits analysis should have been limited to consideration of the benefits flowing from the contribution of 19 mgd of water towards RRWSG's stated objective of providing a dependable, long-term water supply.  See id. at 2 [MAR023151].  The Corps's impermissible consideration of the indirect benefits from an excess water supply, rather than only considering the direct benefits of the project in relation to the project's stated goals, renders the permitting decision arbitrary and capricious.

C.       The Corps Arbitrarily and Capriciously Relied on a Flawed FEIS When
         Conducting the Public Interest Review

The Corps may not rely on a flawed Final Environmental Impact Statement ("FEIS")

when making a public interest determination.  Sierra Club v. Sigler, 695 F.2d 957, 983 (5th Cir.

1983) (Corps's reliance on "skewed" FEIS tainted the public interest review and made

permitting decision unlawful).  Similarly, the Corps must make a "serious attempt to discover"

reliable information on which to base a decision.  Sierra Club v. U.S. Army Corps of Eng'rs, 701

F.2d 1011, 1032–33 (2d Cir. 1983)[11]; see also Van Abbema v. Fornell, 807 F.2d 633, 639–42

(7th Cir. 1986) (refusing to approve public interest review when Corps relied on unsupported

pricing data and "substantially wrong" mileage estimates).

As argued earlier in Part I, the FEIS assumed substantially inflated water demand

projections.  See FEIS at 3-7 [MAR044942]; ROD at 5 [MAR023154] (recognizing lower water

demand projection).  In addition, the KWR project's anticipated cost per mgd of water now

exceeds the affordability cut-off applied to alternatives in the FEIS.  See supra Part II.B.

Because the Corps relied on the flawed FEIS's elimination of alternatives and did not consider

the current affordability of the KWR, it failed to weigh the benefit of otherwise feasible

alternatives against the cost of the KWR in the public interest review.  See 33 C.F.R. §

320.4(a)(2)(ii) (Corps must consider alternatives in public interest review); ROD at 54–55

[MAR023203–04].  As a result, the Corps could not have accurately determined whether the

project was in the public interest.

The Corps overstated the benefits of the proposed KWR project and understated the

detriments by, among other things, failing to consider negative impacts on fish, wildlife, and

---

[11] The court also held that the Corps failed to give "great weight" to Fisheries Service and Wildlife Service opinions.
Sierra Club, 701 F.2d at 1032.  However, section 320.4 no longer requires the Corps to give such weight to FWS
opinions.  See Final Rule for Regulatory Programs of the Corps of Engineers, 51 Fed. Reg. 41,206, 41,207 (Nov. 13,
1986) (explaining elimination of "great weight" requirement in favor of full consideration requirement).

cultural values, considering irrelevant and indeterminate economic benefits, and indirectly

relying on an exaggerated future water need to justify the project.  The Corps's balance of public

interest factors was, therefore, skewed and did not result in a reasonable determination whether

the proposed KWR project was "contrary to the public interest."  33 C.F.R. § 320.4(a); see, e.g.,

North Carolina v. Hudson, 665 F. Supp. 428, 446 (E.D.N.C. 1987) (Corps must conduct "more

searching analysis" of water need issue to meet public interest review requirements).

   The Corps's failure to consider all the relevant public interest review factors,

consideration of irrelevant public interest factors, reliance on a flawed FEIS, and failure to

consider the proposed project's increased costs rendered its public interest review arbitrary and

capricious and its permitting decision not in accordance with law.  Based on these violations, the

Tribe asks the Court to grant the motion for summary judgment in favor of the Tribe, vacate the

KWR permit, and remand the matter to the Corps for a lawful reconsideration of the public

interest review criteria.

## V. EPA'S DECISION NOT TO VETO THE KING WILLIAM RESERVOIR PERMIT WAS ARBITRARY AND CAPRICIOUS

   The CWA grants authority to EPA "to prohibit the specification . . . [and] deny or restrict

the use of any defined area . . . as a disposal site, whenever [the Administrator] determines . . .

that the discharge of [dredged or fill material] into such area will have an unacceptable adverse

effect on municipal water supplies, shellfish beds and fishery areas . . . ." 33 U.S.C. § 1344(c).

This veto power is discretionary. Mem. Op. (May 30, 2007) [Doc. No. 36] at 5; accord Preserve

Endangered Areas of Cobb's History, Inc. v. U.S. Army Corps of Eng'rs, 915 F. Supp. 378, 380–

81 (N.D. Ga. 1995), aff'd, 87 F.3d 1242, 1249–50 (11th Cir. 1996).  A court may not review

discretionary agency decisions only when "the court would have no meaningful standard against

which to judge the agency's exercise of discretion."  Heckler v. Chaney, 470 U.S. 821, 830

(1985); see 5 U.S.C. § 701(a)(2). This Court held that such a standard exists in this case: the CWA provides that EPA "may, pursuant to its discretion, veto a § 404 permit whenever [it] determines . . . that the discharge . . . will have an unacceptable adverse effect." Mem. Op. at 10 (May 30, 2007). The Court reviews such discretionary agency inaction under the "arbitrary and capricious" standard of the APA, 5 U.S.C. § 706(2)(A). Id. at 14.

Because arbitrary and capricious review evaluates the connection between the facts found after an examination of the relevant data and the choice made by the agency, "[i]t is well established that the agency's action must be upheld, if at all, on the basis articulated by the agency itself." State Farm, 463 U.S. at 50. The reviewing court may not provide a reasoned basis for the agency's action that the agency itself has not given. Id. at 43. Agency action is arbitrary and capricious if the "agency relied on factors which Congress has not intended it to consider [or] entirely failed to consider an important aspect of the problem." Id. at 43. An agency must ground its reasons for action or inaction in the relevant statutory factors. Massachusetts v. E.P.A, 127 S.Ct. 1438, 1463 (2007) (holding agency inaction arbitrary and capricious under judicial review provision of the Clean Air Act, which sets forth the same arbitrary and capricious standard as the APA). The reviewing court should also look to federal regulations for judicial review standards of agency action. See Ctr. for Auto Safety v. Dole, 846 F.2d 1532, 1534 (D.C. Cir. 1988).

EPA's 404(c) regulations establish the process "to be used when EPA is considering the use of Section 404(c) . . . ." Denial or Restriction of Disposal Sites; Section 404(c) Procedures, 44 Fed. Reg. 58,076, 58,076 (Oct. 9, 1979). The 404(c) regulations define an "unacceptable adverse effect" as a change to a wetland or aquatic ecosystem that is likely to cause "significant degradation of municipal water supplies [] or significant loss of or damage to fisheries,

shellfishing, or wildlife habitat or recreation areas."  40 C.F.R. § 231.2(e).  When determining

whether a project will have unacceptable adverse impacts, EPA must take into account all

available information and should consider the project's compliance with the 404(b)(1)

Guidelines.  40 C.F.R. §§ 231.1, 231.2(e); see 40 C.F.R. § 230.10(a)–(c) (prohibiting issuance of

404 permit if less damaging practicable alternative exists or if project will significantly degrade

aquatic ecosystem, including aquatic life and other wildlife); supra Parts II & III.

### A.       EPA's Decision Not to Veto the KWR Permit Has No Support in the Record

Nothing in the administrative record supports EPA's decision not to veto the KWR

Permit.  The record consistently indicates that EPA considered the permitted activity to violate

the 404(b)(1) Guidelines and to have a potentially unacceptable adverse environmental impact.

See Letter from EPA to Corps (May 1, 2001) [MAR051497–501] (KWR's significant

degradation of aquatic ecosystems, cultural adverse impacts, and other environmental impacts

are avoidable because less damaging practicable alternatives exist); Letter from EPA to Corps at

2 (July 25, 1997) [EPAKWR003764] ("If not appropriately mitigated, the proposed project may

result in substantial and unacceptable impacts . . . .")[12]; cf. EPA Mem. at 2 (Feb. 4, 2005)

[MAR023850] (less damaging alternatives set forth in FEIS meet future water demand) ; EPA

Mem. at 2 (Jan. 20, 2005) [MAR023797] (same).  The lack of record support, especially in light

of record statements indicating justification for a veto, renders EPA's decision not to veto the

KWR permit arbitrary and capricious.

The Court should not consider the September 27, 2007, declaration of Regional III

Administrator Donald S. Welsh in determining the adequacy of the record support for EPA's

decision not to veto the KWR project.  See Welsh Decl. (Sept. 27, 2007) [Doc. No. 60-1].  The

---

[12] EPA requested a number of extensions to comment on the wetland Mitigation Plan in early 2005, see Letter from Corps to EPA (Mar. 24, 2005) [EPAKWR00326], but ultimately never commented.

Welsh declaration cannot substitute for the lack of record support of EPA's decision not to veto because it is a *post hoc* rationalization prepared for litigation that goes far beyond the evidence in the record.  See Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 419 (1971) (*post hoc* rationalizations are traditionally "an inadequate basis for review"); AT & T Info. Sys., Inc. v. Gen. Servs. Admin., 810 F.2d 1233, 1236 (D.C. Cir. 1987) (post hoc rationalizations may not contain new information beyond administrative record); cf. Partlo v. Johanns, Civ. Nos. 04-1462 & 04-1779, 2006 WL 1663380, *14 (D.D.C. June 11, 2006) (*post hoc* declaration considered because applicable review standard was "any conceivable justification" for agency action, and not actual basis for action).

## B.    EPA Ignored Relevant Statutory Factors and Relied on Irrelevant Factors

Even if the Court considers Welsh's *post hoc* declaration in reviewing EPA's decision, the declaration compounds the arbitrary and capricious nature of EPA's decision not to veto the KWR permit.  According to his declaration, Welsh relied on a number of factors when deciding not to act: limitations on Region III resources, his belief that proceeding with a 404(c) veto would not yield more information on the impacts of the KWR project, his awareness that some means of increasing water supply would be necessary, his belief that the goal of the wetland mitigation plan was full functional replacement of impacted wetland resources, the perceived inevitability of litigation, prior reconfigurations of the KWR proposal, and the prior rejection of the Ware Creek project.  Welsh Decl. at ¶ 10.

By his own admission, Welsh failed to consider whether the project would have unacceptable adverse effects on municipal water supplies, shellfish beds, or fishery areas—the factors that the CWA and its implementing regulations expressly require EPA to consider.  See 33 U.S.C. § 1344(c); 40 C.F.R. 231.1.  Further, Welsh did not take into account information

about practicable alternatives or significant degradation of the aquatic ecosystem, both of which are relevant under Section 404(b)(1) Guidelines and, therefore, should be considered. 40 C.F.R. §§ 230.10(a)–(c) (significant degradation analysis includes consideration of adverse effects on life stages of aquatic life), 231.2(e). Welsh admitted that he did not determine "whether or not the King William Reservoir project complied with the [404(b)(1)] Guidelines." Welsh Decl. at ¶ 10. Welsh's failure to base his decision on a consideration of relevant factors renders his decision arbitrary and capricious. State Farm, 463 U.S. at 43.

In violation of EPA's own regulations, Welsh also failed to "take into account all information available to him." 40 C.F.R. § 231.1. He did not take into account or explain EPA's previous position that the KWR project "could have unacceptable adverse effects on wildlife and fishery areas as described under Section 404(c)" and would violate 404(b)(1) Guidelines. See Welsh Decl. at ¶ 10; Letter from EPA Envt'l Servs. Div. Dir. to Norfolk District Eng'r at 4 (May 1, 2001) [MAR041818].[13] Welsh mentioned wetland impacts, but failed to consider whether the related changes to wetlands would cause unacceptable adverse effects on municipal water supplies, shellfish beds, or fishery areas. See Welsh Decl. at ¶ 10. He did not consider at all, much less in "full," 33 C.F.R. § 320.4(a)(3), FWS's conclusion that the KWR project would significantly degrade the aquatic ecosystem and result in a net loss of wetland resources, even with the wetland mitigation plan in place. See Welsh Decl. at ¶ 10; Letter from FWS to Corps at 2 (Feb. 1, 2005) [MAR019521].

Instead of even mentioning the acceptability or unacceptability of the KWR project's adverse affects, Welsh offered a laundry list of factors unrelated to adverse effects—such as agency resources, project changes, a prior 404(c) veto at a different site, and the perceived

---

[13] Even if Welsh had intended to reverse EPA's earlier position, he should have articulated a basis in the record for doing so because the courts cannot supply an answer EPA itself did not give. See SEC v. Chenery Corp., 332 U.S. 194, 196 (1947).

inevitability of litigation—to justify his decision not to veto the KWR permit.  In the United

States Supreme Court's recent <u>Massachusetts v. EPA</u> decision, the relevant statute required EPA

to exercise its discretion in making particular scientific judgments, but according to the Court,

the direction from Congress to exercise discretion "was not a roving license to ignore the

statutory text."  127 S.Ct. at 1462–63.  Similarly, Section 404(c)'s conditional grant of authority

does not give Welsh *carte blanche* to ignore the relevant statutory factors.  <u>See</u> 33 U.S.C. §

1344(c).  Welsh's reliance on a list of reasons completely divorced from the statutory text

renders his decision arbitrary and capricious.  <u>See</u> <u>Massachusetts</u>, 127 S.Ct. at 1462–63.  Based

on these violations of the APA and CWA, the Tribe asks the Court to grant the motion for

summary judgment in favor of the Tribe and remand to EPA for a lawful decision whether to

exercise its Section 404(c) authority.

## CONCLUSION

For the foregoing reasons, Plaintiff-Intervenors respectfully request that this Court grant

their motion for summary judgment, vacate the Corps's issuance of the Section 404 permit,

enjoin any activities authorized under the permit, and remand the matter to the Corps for

compliance with the CWA, NEPA, and the APA.

Respectfully Submitted,

    /s/ Melanie Kleiss Boerger                 .
Melanie Kleiss Boerger, Staff Attorney
Hope M. Babcock, Senior Attorney
Institute for Public Representation
600 New Jersey Avenue, NW
Washington, D.C.  20001
(202) 662-9535
(202) 662-9634 (Facsimile)

*Counsel for the Mattaponi Indian Tribe and*
*Chief Carl T. Lone Eagle Custalow*

## CERTIFICATE OF SERVICE

I hereby certify that on this day, July 15, 2008, I caused to be served a true and correct copy of the foregoing Motion for Summary Judgment and Statement of Points and Authorities in support thereof by first class mail, postage prepaid, properly addressed to the following counsel:

Jon A Mueller
Chesapeake Bay Foundation, INC.
6 Herndon Ave.
Annapolis, MD 21403

George A. Somerville
Troutman Sanders LLP
P.O. Box 1122
Richmond, VA 23218-1122

M. Scott Hart
Troutman Sanders LLP
222 Central Park Avenue
Suite 2000
Virginia Beach, VA 23462

_ /s/ Melanie Kleiss Boerger            .
Melanie Kleiss Boerger