**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **ALLIANCE TO SAVE THE MATTAPONI, et al.,** | : | |
| | : | |
| **Plaintiffs,** | : | |
| | : | |
| **v.** | : | **Civil Action No.** |
| | : | **1:06-cv-01268-HHK** |
| **UNITED STATES ARMY CORPS OF ENGINEERS,** | : | |
| **et al.,** | : | |
| | : | |
| **Defendants.** | : | |

<u>**THE ALLIANCE ET AL.'S MEMORANDUM OF POINTS AND AUTHORITIES**
**IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**</u>

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................... ii

ABBRIEVATIONS .......................................................................... iv

INTRODUCTION AND NATURE OF CASE..........................................1

FACTUAL BACKGROUND....................................................................2
The Reservoir Project............................................................................2
Related State Proceedings .....................................................................5
STATUTORY AND REGULATORY BACKGROUND ............................6
STANDARD OF REVIEW .....................................................................8
ARGUMENT..........................................................................................9

I.    THE NAD'S FINDINGS UNDER THE 404(B)(1) GUIDELINES
      REGARDING SIGNIFICANT DEGRADATION AND MITIGATION
      ARE ARBITRARY AND CAPRICIOUS .........................................9

      A.    The Permit Will Cause or Contribute to Significant Degradation
            of Waters of the United States, Including Wetlands...................9

      B.    The Mitigation Plan Approved by the Corps Fails to Comply With
            the National Requirement of "No Net Loss" of Wetlands.........12

            1.    Introduction:  Controlling Regulations and the Corps'
                  Memorandum of Agreement with EPA ..........................12

            2.    The Mitigation Proposed by Newport News Will Not
                  Replace the Wetland Functions and Values Destroyed by
                  the Reservoir ..............................................................14

      C.    The NAD's Determination that Freshwater Withdrawals Would Not
            Significantly Degrade the Mattaponi River Violates the 404(b)(1)
            Requirements ........................................................................19

II.   THE NAD VIOLATED THE 404(B)(1) BAN ON ISSUANCE OF A
      PERMIT IF THERE IS A LESS ENVIRONMENTALLY DAMAGING
      ALTERNATIVE AVAILABLE .......................................................22

      A.    The NAD's Sole Reliance on the Alternatives Set Forth in the
            1997 FEIS Violated the 404(b)(1) Guidelines...........................23
      B.    The NAD's Dismissal of Proven Alternatives to Satisfy the
            Lower Need Violates the 404(b)(1) Requirements.....................26

C.    The NAD's Limited Consideration of Other Practicable Alternatives Violates the 404(b)(1) Requirements........................................................27

1.    Reduction of "Dead Storage" in Newport News' Existing Reservoirs Together With Increased Pumping from the Chickahominy River .....................................................................28

2.    Use of the Big Bethel Reservoir…………………………………30

3.    Use of Additional Desalinization Facilities………………………30

III.    THE NAD VIOLATED THE PUBLIC INTEREST REVIEW REQUIREMENTS...........................................................................................31

IV.    EPA'S FAILURE TO VETO THE PERMIT WAS ARBITRARY AND CAPRICIOUS .............................................................................................34

V.    THE NAD'S REFUSAL TO SUPPLEMENT THE FEIS VIOLATES NEPA...........................................................................................................38

A.    Significant Change in Projected Water Demand…………………………39

B.    The Seasonal Pumping Hiatus…………………………………………40

C.    Other Environmentally Significant New Information……………………41

D.    Cumulative and Indirect Impacts……………………………………43

CONCLUSION ....................................................................................................44

Timeline for Permit Review of Proposed Reservoir Project .................................Appendix

Exhibits A-G (standing declarations)...........................Attached as separate pdf documents

# TABLE OF AUTHORITIES

**Cases**

*AFL-CIO v. Chao*, 496 F. Supp. 2d 76 (D.D.C. 2007) ................................................................ 8

*American Bird Conservancy v. Federal Communications Commission*, 516 F.3d 1027 (D.C. Cir. 2008) ........................................................................................................................................ 41

*Bahia Park v. United States,* 286 F. Supp. 2d 201 (D.P.R. 2003) ................................................ 34

*Bowen v. Georgetown University Hospital*, 488 U.S. 204 (1988) ................................................ 37

*Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402 (1971) ................................... 9, 37

*\*Dubois v. Dept. of Agriculture*, 102 F.3d 1273 (1st Cir. 1996).......................................... 40, 42

*\*Environmental Defense Fund v. Marsh*, 651 F.2d 983 (5th Cir. 1981) ...................................... 39

*\*Environmental Defense v. Army Corps of Eng'rs*, 515 F. Supp. 2d 69 (D.D.C. 2007) ............. 17

*\*Friends of the Earth v. Hall*, 693 F. Supp. 904 (W.D. Wash. 1988) .......................................... 21

*\*Friends of the Earth v. U.S. Army Corps of Eng'rs*, 109 F. Supp. 2d 30 (D.D.C. 2000) .......... 44

*Grand Canyon Trust v. FAA*, 290 F.3d 339 (D.C. Cir. 2002)...................................................... 43

*\*Hughes River Watershed Conservancy v. Glickman*, 81 F.3d 437 (4th Cir. 1996)............... 36, 39

*Idaho v. Interstate Commerce Commission*, 35 F.3d 585 (D.C. Cir. 1994) ................................. 42

*Louisiana PSC v. FERC*, 184 F.3d 892 (D.C. Cir. 1999) ............................................................ 38

*Marsh v. Oregon Natural Resources Council*, 490 U.S. 360 (1989)....................................... 39, 41

*\*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29 (1983) ... 9, 25, 27, 40

*\*North Carolina v. Hudson,* 665 F. Supp. 428 (E.D.N.C. 1987)............................................ 28, 33

*Northwest Bypass Group v. U. S. Army Corps Of Eng'rs*, 2008 U.S. Dist. LEXIS 33202 (D.N.H. 2008) ........................................................................................................................................ 34

*Northwoods Wilderness Recovery, Inc. v. U.S. Forest Service*, 323 F.3d 405 (6th Cir. 2003).... 39

*\*Ohio Valley Environmental Coalition v. United States Army Corps of Engineers*, 479 F.Supp.2d 607 (S.D.W. Va. 2007) ............................................................................................................ 13

*Panhandle Eastern Pipe Line Co. v. FERC*, 613 F.2d 1120 (D.C. Cir. 1979) ............................ 37

*Sierra Club v. Peterson*, 717 F.2d 1409 (D.C. Cir. 1983) ........................................................... 41

*\*Simmons v. U.S. Army Corps of Engineers*, 120 F.3d 664 (7th Cir. 1997)................................. 28

*\*Utahns for Better Transportation v. United States Dep't of Transp.*, 305 F.3d 1152 (10th Cir. 2002) ..................................................................................................21-22,23, 25, 27, 29

*Utahns for Better Transportation v. United States*, 305 F.3d 1152 (10th Cir. 2002)............. passim

*\*Van Abbema v. Fornell*, 807 F.2d 633 (7th Cir. 1986) ......................................................... 25, 32

*Wyoming Outdoor Council v. U.S. Army Corps of Eng'rs*, 351 F. Supp.2d 1232 (D. Wyo. 2005) ...................................................................................................................................... 33


**Other Authorities**

*Chesapeake 2000 Agreement (28 June 2000).................................................................1, 8, 37

*EPA 1990 and Dept. of the Army, Memorandum of Agreement ("MOA"), Section 404(b)(1) Guidelines, 55 Fed. Reg. 9210 (12 Mar. 1990) ...................................................7-8, 11-13, 17, 19

White House Office on Environmental Policy, Protecting America's Wetlands: A Fair, Flexible, and Effective Approach (24 Aug. 1993)...............................................................................8, 12

U.S. Army Corps of Engineers Regulatory Guidance Letter No. 02-2 (24 Dec. 2002)12-14, 17-19

Wetlands Protections and Goals, Chesapeake Executive Council Directive No. 97-2 (30 Oct. 1997) .................................................................................................................................33

Chesapeake Executive Council Directive No.97-2, Wetlands Protection and Restoration Goals 2000 Agreement (30 Oct. 1997) ............................................................................................12

**Federal Statutes**

33 U.S.C. §§1251 *et seq*............................................................................................... 1
*33 U.S.C. §1344........................................................................................................ passim
33 USC 1344(a) ...............................................................................................................7
*33 U.S.C. §1344(b) ...................................................................................................... 6
*33 U.S.C. §1344(c) ....................................................................................... 8, 32, 34-37
*42 U.S.C. §§4321......................................................................................................... 1
5 U.S.C. §§701-706 ....................................................................................................... 1
*5 U.S.C. §706(2)(A)..................................................................................................... 8

**Federal Regulations**

33 CFR 230.2520................................................................................................................20
33 C.F.R. §328.3 ............................................................................................................ 9
33 CFR 320.4 ...................................................................................................................33
*33 C.F.R. §320.4(a) .................................................................................... 7, 31, 33, 34
33 C.F.R. §325.8(b)(2)................................................................................................... 4
33 CFR § 320.4 (b) ...................................................................................... 7, 11, 31, 34
33 CFR 320.4(j)(4)......................................................................................................33-34
33 CFR 332.3(c)...............................................................................................................17
*§404(b)(1) Guidelines, codified at 40 C.F.R. Part 230........................................... passim
*40 C.F.R. § 230.10 ....................................................................................................... 7
*40 C.F.R. §230.10(a)..................................................................................... 7, 12, 23, 25
*40 C.F.R. §230.10(c).................................................................................... 7, 9, 11, 20, 35
*40 C.F.R. §230.10(d) ...............................................................................................7, 12
*40 C.F.R. § 230.11 ................................................................................................ 9, 12-13
40 C.F.R. §230.12(a)(3)(iv) .......................................................................................... 7
40 C.F.R. § 230.30 ........................................................................................................ 9
40 C.F.R. § 230.32 ........................................................................................................ 9
40 C.F.R. § 230.40 ........................................................................................................ 10
40 C.F.R. Subpart E, §230.41 .................................................................................... 7, 9
40 C.F.R. § 230.91 ................................................................................................... 12, 19
40 C.F.R. § 230.93 ................................................................................................ 12, 13, 17
40 C.F.R. §231.2(e)...........................................................................................................35
*40 C.F.R. §1502.9(c)(1)(i-ii) ...................................................................... 8, 39, 40
*40 CFR 1502.14(a)..........................................................................................................40
*40 C.F.R. §1508.7 ....................................................................................................... 43
*40 C.F.R. §1508.8(b) .................................................................................................. 44

**Procedural Provisions**

Fed. R. Civ. P. 56..............................................................................................................2

Local Rule 7(h) .................................................................................................................2

**ABBRIEVATIONS**

| | |
|---|---|
| Alliance | Plaintiffs, the Alliance to Save the Mattaponi, the Chesapeake Bay Foundation, Inc., and the Virginia Chapter of the Sierra Club |
| APA | Administrative Procedure Act |
| ARNI | Aquatic Resources of National Importance |
| CEQ | Council on Environmental Quality |
| City | City of Newport News |
| Corps | U.S. Army Corps of Engineers |
| CWA | Clean Water Act |
| DCR | Virginia Department of Conservation and Recreation |
| DEIS | 1994 Draft Environmental Impact Statement |
| DEQ | Virginia Department of Environmental Quality |
| DGIF | Virginia Department of Game and Inland Fisheries |
| District | Norfolk District |
| DOI | U.S. Department of Interior |
| EIS | Environmental Impact Statement |
| EPA | U.S. Environmental Protection Agency |
| FEIS | 1997 Final Environmental Impact Statement |
| FWS | U.S. Fish & Wildlife Service |
| HDR | HDR Engineering, Inc. |
| IPR | Institute for Public Representation |
| IWR | Corps' Institute for Water Resources |
| KWR | King William Reservoir |
| mgd | million gallons per day |
| MOA | Memorandum of Agreement |
| NAD | U.S. Army Corps of Engineers, North Atlantic Division |
| NAD Interim Decision | NAD Interim Decision Memorandum (30 Sept. 2002) |
| NEPA | National Environmental Policy Act |
| Newport News | City of Newport News |
| Norfolk District | U.S. Army Corps of Engineers, Norfolk District |
| PMCL | Planning and Management Consultants, Ltd. |
| Reservoir | Proposed King William Reservoir, King William County, Virginia |
| RGL | Regulatory Guidance Letter |
| ROD | Final Record of Decision of the North Atlantic Division of Corps of Engineers (29 July 2005) |
| RROD | Final Recommended Record of Decision of Corps of Engineers, Norfolk District (2 July 2001) |
| RRWSG | Regional Raw Water Study Group, consisting of the Cities of Newport News, Williamsburg, Hampton, and Poquoson, and the Counties of York and James City, Virginia |
| SEIS | Supplemental Environmental Impact Statement |
| SWCB | Virginia State Water Control Board |
| Tribe | Plaintiff-Intervenors Mattaponi Indian Tribe and Chief Carl T. Lone Eagle Custalow |

VIMS                    Virginia Institute of Marine Science
VMRC                    Virginia Marine Resources Commission
VWPP                    Virginia Water Protection Permit

## INTRODUCTION AND NATURE OF CASE

This action challenges the issuance of a permit to the City of Newport News ("Newport News") under section 404 of the Clean Water Act, 33 U.S.C. §1344, by the North Atlantic Division ("NAD") of the United States Army Corps of Engineers (the "Corps") to construct a 1,526-acre reservoir in King William County, Virginia (the "Reservoir"). On 2 July 2001, the Norfolk (Virginia) District of the Corps ("Norfolk District") made its final recommended record of decision to deny the permit, based on the devastating environmental and cultural impacts, and the lack of need for the reservoir. The NAD overturned this decision, first in its September 2002 Interim Decision, and then in its 29 July 2005 record of decision ("ROD").

Plaintiffs the Alliance to Save the Mattaponi, the Chesapeake Bay Foundation, Inc., and the Virginia Chapter of the Sierra Club (collectively the "Alliance") filed their complaint on 17 July 2006 challenging the NAD's action, and an amended complaint on 3 July 2007, adding the U.S. Environmental Protection Agency ("EPA") as a defendant. The Alliance alleges that the NAD's issuance of the permit violates the Clean Water Act, 33 U.S.C. §§1251 *et seq.* ("CWA"), the National Environmental Policy Act, 42 U.S.C. §§4321 *et seq.* ("NEPA"), and the Chesapeake 2000 Agreement,[1] and is arbitrary and capricious, an abuse of discretion, and otherwise not in accordance with the law in violation of the Administrative Procedure Act ("APA"), 5 U.S.C. §§701-706. In addition, EPA's failure to prohibit the issuance of the permit pursuant to its authority under §404(c) of the CWA is arbitrary and capricious.

Each of the Alliance plaintiffs participated extensively in the public proceedings relating to the permit review, submitting written and oral comments throughout. In addition to the standing allegations set forth in paragraphs 13-20 of the amended complaint, the Alliance

---

[1] Chesapeake 2000 at 5 (28 June 2000), *available at* http://www.chesapeakebay.net/pubs/chesapeake2000agreement.pdf.

1

submits the declarations attached hereto.  Pursuant to Local Rule 7(h) and Fed. R. Civ. P. 56, the

Alliance moves for summary judgment against the Corps and EPA for the reasons set forth

herein.  The Alliance asks this Court to invalidate the permit and remand the matter to the Corps.

## FACTUAL BACKGROUND

**The Reservoir Project**

The reservoir project consists of the Reservoir, which would be created by a dam across

Cohoke Creek, a tributary of the Pamunkey River, in King William County, Virginia; a water

supply intake structure and station to pump up to 75 million gallons per day ("mgd) of fresh

water from the nearby Mattaponi River; and a pumping station and pipeline to transfer water

from the reservoir to Newport News' existing water works in New Kent County, Virginia

(collectively the "reservoir project").[2]  ROD at 1-2, MAR023150-51.  Both the Pamunkey and

Mattaponi Rivers are tidal; they join to form the York River, which flows directly into the

Chesapeake Bay.

As EPA has repeatedly stated, the permit would result in the single largest authorized

destruction of wetlands in the entire mid-Atlantic region in the history of the Clean Water Act.[3]

The proposed project would require the excavation, fill, destruction, and flooding of over 400

acres of freshwater wetlands, and the elimination of 21 miles of free-flowing perennial and

intermittent streams in the Cohoke Creek watershed, "result[ing] in the effective loss of most of

an entire ecologically valuable and diverse watershed." EPA Mar. 2004 Ltr. at 3, MAR023772.

The wetland mitigation measures set forth in the applicant's Final Wetlands Mitigation Plan for

the project cannot offset the unprecedented and permanent destruction of these wetlands that

---

[2] The Reservoir site would be bounded by the Mattaponi River to the north and the Pamunkey River to the south.
*See* map, Final Environmental Impact Statement, fig. 3-11A (Jan. 1997), MAR045071.
[3] *See, e.g.,* Letter from EPA to Corps at 2 (1 May 2001), MAR041816 [hereinafter EPA May 2001 Ltr.]; Letter from EPA to NAD at 3 (22 Mar. 2004), MAR023772 [hereinafter EPA Mar. 2004 Ltr.]; Memorandum from R. Poeske, EPA,  to C. Coch, NAD at 1 (22 July 2003), EPAKWR004717 [hereinafter Poeske July 2003 Mem.]

both EPA and the U.S. Fish and Wildlife Service ("FWS") have found are Aquatic Resources of National Importance ("ARNI").[4]   These wetlands are critical to the ecology of the region as a whole,[5] and to the increasingly imperiled health of the Chesapeake Bay as recognized by Congress in the Clean Water Act and by the federal defendants in the Chesapeake 2000 Agreement.  As EPA recognized, the project "would deal a serious blow" to the goals of that Agreement.[6]

Additionally, the impoundment of Cohoke Creek would inundate 875 acres of upland wildlife habitat and adversely impact at least another 105 acres of wetlands downstream of the reservoir dam in Cohoke Creek because of reduced flows, permanently altering the existing flow regime.[7]  Furthermore, the freshwater withdrawals from the Mattaponi River would threaten vital spawning grounds for the American shad, and potentially alter the river's salinity patterns in ways that would adversely affect other aquatic species, including the sensitive joint vetch, a federally endangered plant species.  *See infra* at Part I.C.  These and other substantial impacts are completely avoidable because the proposed project is not needed to meet the region's water needs.  The Corps' own studies and conclusions show that Newport News' projections of its future water needs were greatly exaggerated and that construction of this Reservoir is unnecessary to meet the region's demand.  *See infra* at Part II.A. Other practicable and less damaging alternatives exist to satisfy the region's future needs. *See infra* at Part II.B.

On 1 July 1993, Newport News, acting on behalf of the Regional Raw Water Study Group ("RRWSG"), submitted to the Corps and to the Virginia Department of Environmental

---

[4] *See, e.g.*, Letter from EPA to Corps at 2 (25 July 1997), MAR015564 [hereinafter EPA July 1997 Ltr.]; EPA May 2001 Ltr. at 3, MAR041818; Letter from FWS to NAD at 1 (29 Mar. 04), MAR008968 [hereinafter FWS Mar. 2004 Ltr.].

[5] *See* EPA May 2001 Ltr. at 2, MAR041817.

[6] *Id.*

[7] Letter from EPA to Corps at 2 (25 Feb. 2000), MAR040399 [hereinafter EPA]; EPA May 2001 Ltr. at 1, MAR041816; Letter from FWS to Corps at 1-2 (1 May 2001), MAR041792-93[hereinafter FWS May 2001 Ltr.]; Letter from FWS to NAD at 1 (23 June 2005), MAR022776 [hereinafter FWS June 2005 Ltr.].

Quality ("DEQ") its joint application for the section 404 permit and section 401 certification for the construction of the reservoir project.[8]  MAR058789.  The Norfolk District issued a Draft EIS for the reservoir in February 1994, MAR077199, at MAR077222, and a supplement to it on 29 December 1995.  MAR064067.  The Norfolk District published the Final EIS on 24 January 1997 ("FEIS").  MAR044801.

Because of the serious questions raised by the federal agencies and the public regarding Newport News' projected water needs, the Norfolk District requested that the Corps' Institute for Water Resources ("IWR") provide an independent technical review of Newport News' water needs forecast.  *See* Norfolk District Recommended Record of Decision ("RROD")(2 July 2001) at 21, MAR077954.  Ultimately, as discussed more fully below, it was determined that the water shortfall projected by Newport News and reported in the FEIS was significantly overstated, and that the region's year 2040 water deficit would be less than half that set forth in the FEIS.

On 2 July 2001, the Norfolk District issued its recommended ROD denying the permit. MAR077917.  The Corps found that the project would cause or contribute to significant degradation of waters of the United States and to the aquatic ecosystem, that the reservoir was not needed, and that practicable, less damaging alternatives were available.  The Norfolk District concluded that issuing a permit for the project would be contrary to the public interest.  RROD at 338-40, MAR078276-78.  Because the then-Governor of Virginia had objected to the Norfolk District's stated intent to deny the permit, however, the matter was elevated to the NAD, pursuant to 33 C.F.R. §325.8(b)(2).  On 30 September 2002, the NAD overturned the Norfolk District's RROD, but did not grant the permit and instead directed that processing of the permit application should resume to address outstanding issues including impacts to Native Americans

---

[8] The RRWSG is a consortium of local governments in and around the Lower Peninsula of southeastern Virginia, consisting of the Cities of Newport News, Williamsburg, Hampton, and Poquoson, and the Counties of York and James City, Virginia.  Plaintiffs' references herein to Newport News include the RRWSG where appropriate.

and wetlands mitigation.  NAD Interim Decision Memorandum (30 Sept. 2002)("NAD Interim

Decision"), MAR021278.   The NAD issued its final ROD, at issue here, on 29 July 2005.

MAR023150.

Although the ROD admitted that the project would have significant and long-term

adverse impacts upon wetlands and the aquatic ecosystem, it simply relied on the applicant's

conceptual wetlands mitigation plan, submitted in June 2004, in finding that these harms would

be offset by the proposed mitigation.  The plan proposes to recreate 806 acres of wetlands at 11

locations, some of which are not in the York River Basin.  Final Wetlands Mitigation Plan at 2-

15, 4-11-12 (June 2004), MAR008768, 008789-91 [hereinafter 2004 Mitigation Plan].  *See also*

Letter from FWS to NAD at 2 (1 Feb. 2005), MAR019521 [hereinafter FWS Feb. 2005 Ltr.];

Letter from DGIF to DEQ at 1 (16 May 2005), EPAKWR005414 (both expressing concerns over

the use out-of-basin mitigation sites).  The NAD found that the project was necessary despite

agreeing with the 2001 RROD that the region's 2040 water need would be less than half that

asserted by Newport News in the FEIS.  *Compare* FEIS at 2-30, MAR044914, *with* ROD at 5,

MAR023154.  Despite the adverse impacts, the substantially reduced need, and the availability

of alternatives to meet those needs, the NAD overturned the District and found that the project

was justified.  ROD at 40-41, MAR023189-90.  The NAD issued the section 404 permit for the

reservoir on 15 November 2005.  §404 Permit, MAR023312.

**Related State Proceedings**

In 1997, the Virginia State Water Control Board ("SWCB") issued the Virginia Water

Protection permit ("VWPP"), the state §401 certification authorizing the water withdrawals from

the Mattaponi River for the Reservoir.[9]  The VWPP imposes minimum instream flow restrictions

on the amount of water that can be withdrawn in a particular month, among other conditions.

In 2003, the Virginia Marine Resources Commission ("VMRC") denied a permit for the

construction and placement of the intake structure and pipelines in the Mattaponi River, on the

grounds that the project "would not be in the best interest of the marine resources of the

Commonwealth of Virginia" because it "would adversely impact the early life history stages of

American shad that utilize the Mattaponi River as spawning and nursery grounds."[10]  Letter from

VMRC to Newport News at 2 (16 May 2003), MAR021707.  Newport News appealed.

Thereafter, on 12 August 2004, contrary to the recommendations of its own staff and the

Virginia Institute of Marine Science ("VIMS"), its scientific advisor, the VMRC reversed course

and issued the permit for the intake structure.  VMRC permit, MAR022216.  In an attempt to

protect shad, the permit prohibits water withdrawals from the river from 1 March through 31

July, unless a water emergency is declared ("pumping hiatus").  VMRC permit at 2,

MAR022220.  This hiatus significantly changed the facts upon which the FEIS was based.

## STATUTORY AND REGULATORY BACKGROUND

Section 404 of the Clean Water Act, 33 U.S.C. §1344, authorizes the Secretary of the

Army to issue permits for the discharge of dredged or fill material into waters of the United

States when certain conditions are met.  In reviewing a permit application, the Corps must follow

the binding "404(b)(1) Guidelines" developed by the EPA Administrator, which are codified at

40 C.F.R. Part 230.  *See* 33 U.S.C. §1344(b).  The 404(b)(1) Guidelines prohibit the issuance of

a section 404 permit in the following circumstances:  First, no permit shall issue if there is a

---

[9] This permit was set to expire at the end of 2007, but at the applicant's request, the SWCB extended the permit term and the deadlines for complying with its conditions.  The SWCB's action is currently on appeal in state court.

[10] A fishing moratorium has been in effect in Virginia since 1994 because of severely depleted stocks.  Bilkovic, et al. 2002 article, EPAKWR000608.  *See* Tribe's Br. at Part IV.A.

practicable alternative that would have less adverse impact on the aquatic ecosystem.  40 C.F.R. §230.10(a).  Second, no permit shall issue if the discharge "will cause or contribute to significant degradation of the waters of the United States," including wetlands.  40 C.F.R. §230.10(c).  *See* 40 C.F.R. Subpart E, §230.41.  Third, no permit shall issue if "appropriate and practicable steps" remain available to "minimize potential adverse impacts of the discharge on the aquatic ecosystem."  40 C.F.R. §230.10(d).  A three step-sequencing must be followed:  before mitigation can be proposed, the Corps must determine that there are no other practicable alternatives to the project and that all harms have been minimized to the maximum extent practicable.  *See* EPA and Dept. of the Army, Memorandum of Agreement ("MOA"), Section 404(b)(1) Guidelines, 55 Fed. Reg. 9210, at ¶ II.C. (12 Mar. 1990) ("1990 MOA").  In addition, the Corps cannot issue a section 404 permit unless there is "sufficient information to make a reasonable judgment as to whether the proposed discharge will comply with [the] Guidelines."[11] 40 C.F.R. §230.12(a)(3)(iv).

The Corps is also bound by its "public interest review" requirements, codified at 33 C.F.R. §320.4(a), which prohibit the issuance of a section 404 permit if "the district engineer determines that it would be contrary to the public interest."  This review requires the Corps to weigh the benefits of the project against its reasonably foreseeable detriments, considering all relevant factors and their cumulative impacts.  *Id.*; *see also* 33 C.F.R. §320.4(b)(1)("unnecessary alteration or destruction of [wetlands] should be discouraged as contrary to the public interest").

The Corps and EPA share responsibility for implementing section 404.  Under section 404(c), EPA has the authority to prohibit (*i.e.*, "veto") the issuance of a permit.  33 U.S.C. §1344(c).  Permits for the discharge of dredged or fill material into waters of the United States may only be granted for a specified disposal site.  33 U.S.C. §1344(a).  EPA can prohibit or

---

[11] In addition, "all requirements in §230.10 must be met" before a permit may issue.  40 C.F.R. §230.10.

withdraw the specification of a disposal site, when the discharge of such materials will have an

"unacceptable adverse effect on," among other things, "shellfish beds and fishery areas

(including spawning and breeding areas), [and] wildlife." 33 U.S.C. §1344(c).

Recognizing the ecological significance of wetlands, the United States has adopted a

policy that there will be "no net loss" of wetland functions and values.[12]  In addition, the

Chesapeake 2000 Agreement, entered into by the United States, the Chesapeake Bay

Commission, and the Bay states (Maryland, Pennsylvania, Virginia) and the District of

Columbia, includes the goals of achieving "a no-net loss of existing wetlands acreage and

function in the signatories regulatory programs" and achieving a "net resource gain" by 2010 "by

restoring 25,000 acres of tidal and non-tidal wetlands . . . . " Chesapeake 2000 at 5 (28 June

2000), *available at* http://www.chesapeakebay.net/pubs/chesapeake2000agreement.pdf.

The Council on Environmental Quality ("CEQ") NEPA regulations provide that agencies

"shall" prepare a supplement to an EIS if: "1) the agency makes substantial changes in the

proposed action that are relevant to environmental concerns; or 2) there are significant new

circumstances or information relevant to environmental concerns and bearing on the proposed

action or its impacts."  40 C.F.R. §1502.9(c)(1)(i-ii).

## STANDARD OF REVIEW

In deciding whether to grant summary judgment regarding a final agency action, the court

must determine "whether the agency action is supported by the administrative record and

otherwise consistent with the APA standard of review." *AFL-CIO v. Chao*, 496 F. Supp. 2d 76,

82 (D.D.C. 2007).  Under the APA, 5 U.S.C. §706(2)(A), while the court may not substitute its

---

[12]White House Office on Envtl. Policy, Protecting America's Wetlands: A Fair, Flexible, and Effective Approach (24 Aug. 1993),at http://wetlands.com/fed/aug93wet.htm; 1990 MOA II.B. and in Introduction, 55 Fed. Reg. 9210 (12 Mar. 1990).

own judgment for the agency's, the review must still be "searching and careful," *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 416 (1971), and the court must be satisfied that the agency provided a "rational connection" between the record and its decision. *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). An agency's decision is arbitrary and capricious if it, *inter alia,* "relied on factors [it was not intended] to consider, . . . failed to consider an important aspect of the problem, [or] offered an explanation for its decision that runs counter to the evidence before [it]." *Id.*

## ARGUMENT

I. **THE NAD'S FINDINGS UNDER THE 404(B)(1) GUIDELINES REGARDING SIGNIFICANT DEGRADATION AND MITIGATION ARE ARBITRARY AND CAPRICIOUS.**

A. The Permit Will Cause or Contribute to Significant Degradation of Waters of the United States, Including Wetlands.

The Corps may <u>not</u> issue a section 404 permit if the proposed discharge of dredged or fill material "will cause or contribute to a significant degradation of the waters of the United States." 40 C.F.R. § 230.10(c).[13] Wetlands such as those found in Cohoke Creek are "waters of the United States." 33 C.F.R. § 328.3(a)(3). A discharge is deemed to constitute a "significant degradation" if it results in, among other things, significant adverse effects on: fish and wildlife; the life stages of aquatic life and other wildlife dependent on the aquatic ecosystem; and aquatic ecosystem diversity, productivity, and stability. 40 C.F.R. § 230.10(c)(1)-(4). In making this determination, the Corps must evaluate the short and long-term effects of a proposed discharge on the physical, chemical and biological components of the aquatic environment, 40 C.F.R. § 230.11, and must assess a broad range of specific impacts.[14]

---

[13] *See Utahns for Better Transportation v. United States*, 305 F.3d 1152, 1191 (10th Cir. 2002).
[14] These include: potential impacts to threatened or endangered species, 40 C.F.R. § 230.30; impacts to wildlife associated with the aquatic ecosystem, 40 C.F.R. § 230.32; impacts to sanctuaries and refuges which disrupt

After eight years of painstaking review, the Norfolk District determined that the harm to the Cohoke Creek wetlands complex by damming the creek and excavating and flooding 1,526 acres of land would "cause or contribute to significant degradation of the waters of the United States," which includes wetlands.  RROD at 329, MAR078267.  Accordingly, the District determined that the project "fails the Significant Degradation Restriction."  *Id.*

Throughout the permit review process, EPA and FWS repeatedly voiced concerns about the project and opposed the issuance of a permit because of the environmental impacts and availability of alternatives.[15]  Both agencies fully supported the Norfolk District's determination to deny the permit.[16]  EPA stated that it agreed that a permit "cannot be issued for the project" because it "does not comply with the Section 404(b)(1) Guidelines."  EPA May 2001 Ltr. at 5, MAR041820.[17]  The agency further found that "construction of the . . . project could have an unacceptable adverse effect on wildlife and fishery areas as described under Section 404(c)."  *Id.* at 3, 5, MAR041818, 041820.  Likewise, the FWS "share[d] [the Norfolk District's] belief that the proposed project would cause or contribute to significant degradation of waters of the United States, including wetlands."  FWS May 2001 Ltr. at 2, MAR041793.[18]  Both agencies also recognized the Cohoke Creek wetlands as Aquatic Resources of National Importance.[19]

---

breeding, spawning, migratory movements or other critical life requirements of resident or transient fish and wildlife resources, 40 C.F.R. § 230.40, and impacts to wetlands that are likely to damage or destroy habitat and adversely affect the biological productivity of the wetlands' ecosystem. 40 C.F.R. § 230.41.

[15] *See, e.g.,* Letter from EPA to Corps at 1-2 (5 Aug. 1999), MAR040004-05 [hereinafter EPA Aug. 1999 Ltr.]; EPA May 2001 Ltr. *passim,* MAR041816-20; EPA Mar. 2004 Ltr. at 2-5, MAR023771-74; Letter from FWS to Corps at 12 (28 March 1996), MAR035957, *passim*; FWS May 2001 Ltr. at 1-2, MAR041792-93; FWS Mar. 2004 Ltr. at 1-2, MAR008968-69.

[16] EPA May 2001 Ltr.at 5, MAR041816; Letter from FWS to Corps at 2 (15 Oct. 2001), MAR016744-46 [hereinafter FWS Oct. 2001 Ltr.]; Letter from FWS to NAD at 2 (1 Feb. 2005), MAR019521[hereinafter FWS Feb. 2005 Ltr.].

[17] The EPA recognized that the project, if completed, would result in the single largest authorized destruction of wetlands in the entire mid-Atlantic region in the history of the Clean Water Act.  EPA May 2001 Ltr. at 2, MAR041817.

[18] *See also* FWS Mar. 2004 Ltr. at 1, MAR008968; FWS Feb. 2005 Ltr. at 1, MAR019520.

[19] EPA Aug. 1999 Ltr. at 2, MAR040005; FWS Oct. 2001 Ltr. at 1-2, MAR016744-45.  *See infra* n.73.

In the ROD, the NAD conceded the significant impacts from the project, stating, for example, that the project "would result in a significant alteration of the natural ecosystem in Cohoke Creek" and "is expected to have a major, long-term impact upon wetlands" and "the current functions of the aquatic ecosystem."  ROD at 37, 40, MAR023186, 89.  The NAD further admitted that the project "will transform the current, ecologically diverse Cohoke Creek ecosystem into an open lake with a wetland fringe surrounded by buffer lands," *id*. at 39, MAR023188, and "would directly result in a major, long-term alteration of downstream flows and in the normal water fluctuation in Cohoke Creek."[20] *Id.*  Each one of these findings establishes that the project will significantly degrade waters of the United States.

Nevertheless, the NAD overturned the District's denial of the permit and concluded that the project would not degrade waters of the United States on the grounds that the applicant's proposed mitigation plan would adequately replace lost wetlands and their functions.  ROD at 41 MAR023190; *see also* Interim Decision at 28, MAR021306.  The NAD's conclusion on degradation is arbitrary and capricious as it is contrary not only to the NAD's own findings, but the overwhelming weight of the evidence.  The NAD's issuance of the permit thus violates its duty under the section 404(b)(1) guidelines to assure that a dredge and fill project not significantly degrade waters of the United States.[21]  Moreover, as discussed below, the NAD's

---

[20] *See also id*. at 48, MAR023197.  The NAD also stated that"[t]he wetlands in the project area perform functions important to the public interest as defined at 33 CFR § 320.4 (b)(2).  Specifically, the alteration of these wetlands would detrimentally affect environmental characteristics such as natural drainage and sedimentation patterns, and these wetlands serve significant natural biological functions." *Id*. at 44, MAR023193.  This statement also shows that the NAD's finding that the project would be in the public interest is likewise arbitrary and capricious.  *See infra* at Part III.

[21] In addition, the 1990 MOA expressly states: "It is important to recognize that there are circumstances where the impacts of the project are so significant that even if alternatives are not available, the discharge may not be permitted regardless of the compensatory mitigation proposed (40 CFR 230.10(c))."  MOA n.5. Given the severity of the impacts, the NAD's decision is contrary to the MOA's directive.

assumption that the wetlands plan would adequately mitigate the losses is likewise completely at odds with the evidence.

B.    The Mitigation Plan Approved by the Corps Fails to Comply With the National Requirement of "No Net Loss" of Wetlands.

1.    Introduction:  Controlling Regulations and the Corps' Memorandum of Agreement with EPA.

Since 1990, our Nation has maintained a policy of "no net loss" of wetlands functions and values.  *See* 1990 MOA, 55 Fed. Reg. 9210.[22]  This policy was specifically adopted by the United States for the Chesapeake Bay Watershed.[23]  Accordingly, in reviewing a §404 permit application, the Corps first must determine if there is another practicable alternative to destroying any wetlands.[24]  40 C.F.R. § 230.10(a).  If not, then the Corps next must determine if wetland impacts can be minimized.  *Id*. at (d).  Compensatory mitigation will be allowed to offset unavoidable losses *only if* practicable alternatives are not available and the harm cannot be minimized.  40 C.F.R. § 230.91(c)(2); 1990 MOA at ¶ II.  As a result of its review, "the district engineer may determine that a … permit for the proposed activity cannot be issued because of the lack of appropriate and practicable compensatory mitigation options."  40 C.F.R. § 230.91(c)(3).  *See also* 1990 MOA n 5.  In assessing whether mitigation is "appropriate and practicable," the Corps must establish the functions and values of the aquatic resource that will be impacted.[25]  40 C.F.R. § 230.93(a)(1).  *See also Ohio Valley Environmental Coalition v.*

---

[22]*See also* White House Policy; U.S. Army Corps of Engineers Regulatory Guidance Letter No. 02-2 (24 Dec. 2002) [hereinafter RGL No. 02-2] *at* http://www.usace.army.mil/cw/hot_topics/ht_2002/RGL_02-2.pdf.
[23] Wetlands Protections and Goals, Chesapeake Executive Council Directive No. 97-2 (30 Oct. 1997), http://www.chesapeake bay.net/publications/97dir2.htm [hereinafter Chesapeake Executive Directive No. 97-2]; Chesapeake Executive Council Directive No.97-2, Wetlands Protection and Restoration Goals 2000 Agreement at 1 (30 Oct. 1997), at http://www.chesapeakebay.net/content/publications/cbp_12473.pdf.  #
[24] *See infra* Part II; *See also* 1990 MOA at ¶ II.C.1.
[25] The Corps must determine the short and long-term effects of the discharge on the "physical, chemical and biological components of the aquatic environment," 40 C.F.R. § 230.11, including, among others,  impacts to the structure and function of the aquatic ecosystem and the organisms that live within it.  40 C.F.R. § 230.11(a)-(e). The section 404(b)(1) Guidelines require consideration of both primary and secondary effects on the aquatic ecosystem.

*United States Army Corps of Engineers*, 479 F.Supp.2d 607, 627 (S.D.W. Va. 2007)(Corps failed to comply with requirement to consider functions and values of waters to be impacted when selecting mitigation).

Pursuant to the 404(b)(1) Guidelines and other authority, the Corps is required to take a "watershed" approach to evaluating sites where wetlands mitigation will take place.  40 C.F.R § 230.93(c); 1990 MOA ¶ II.C.3.; U.S. Army Corps of Engineers Regulatory Guidance Letter No. 02-2  at 1-2 (24 Dec. 2002) [hereinafter RGL No. 02-2] *at* http://www.usace.army.mil/cw/hot_topics/ht_2002/RGL_02-2.pdf; *see also* Final Rule on Compensatory Mitigation for the Losses of Aquatic Resources, 73 Fed. Reg. 19594 (10 April 2008).  Thus, if on-site mitigation is not possible, mitigation should be undertaken in close proximity to the project site and in the same watershed.  Moreover, the value and the functions of the wetlands destroyed, not simply the acreage, must be replaced by the proposed mitigation. The Corps must also evaluate the likelihood of success of creating or restoring wetlands; in addition, restoration, rather than wetlands creation, is the preferred method of mitigation.  1990 MOA at ¶ II.C,3; 40 C.F.R. § 230.93.

Here, EPA and FWS continually told the Corps that the permit should not be granted due to the project's substantial impacts to the environment and cultural resources and the availability of alternatives. [26]  They participated in the mitigation review, however, in the event a permit were to be issued. [27]  In reviewing the mitigation plans, the Norfolk District, EPA, and FWS all

---

40 C.F.R. §230.11(h)(1).  Secondary effects are defined as the "effects on an aquatic ecosystem that are associated with a discharge of dredged or fill materials, but do not result from the actual placement of the dredged or fill material." *Id.* This would include the effects from inundation.

[26] EPA Feb 2000 Ltr. MAR040397; EPA May 2001 Ltr. MAR041816; EPA Mar. 2004 Ltr. MAR008968; Letter from FWS to Corps (12 Aug. 1996), MAR065143; Letter from FWS to Corps (22 July 1999), MAR053265; FWS Feb. 2005 Ltr. MAR019520.

[27] *See* Poeske July 2003 Memo at 1 EPAKWR004717; Letter from FWS to Corps at 1 (14 Oct. 2003), MAR021785. Because of the degree of impacts, FWS reserved the right to elevate any Corps decision. Letter from FWS to Corps

concluded that the wetlands that would be lost could not be replaced by the proposed

mitigation.[28]   The NAD's contrary conclusion is arbitrary and capricious.[29]   In addition, as

discussed below, the final mitigation plan does not comply with the relevant regulations and

guidance.  Thus, the NAD erred when it granted the permit based upon the final plan.

> 2.   The Mitigation Proposed by Newport News Will Not Replace the Wetland
> Functions and Values Destroyed by the Reservoir.

From 1996 to 2004, Newport News and its consultants proposed a series of mitigation

plans designed to "replace" the Cohoke Creek wetlands to be destroyed by the project.[30]   Those

plans proposed to create, or recreate, forested wetlands on farm fields at more than 10 different

locations.[31]   Throughout this process, EPA and FWS challenged the concept that several distant

farm fields, with geography and hydrology different than that of the Cohoke Creek stream valley,

could fully replace the functions and values of the wetlands slated for destruction.[32]

On 20 March 2001, the Norfolk District issued a draft RROD denying the permit and

rejecting the then-current (1999) mitigation plan proposed by the City.  Draft RROD,

MAR077689.  The draft included a meticulous analysis of each of the mitigation plans and every

aspect of the impacts on the Cohoke Creek wetlands and stream.  *Id*. at 88-101. MAR077791-

---

(14 June 1994), MAR035449; FWS Aug. 1996 Ltr., MAR 065143; Letter from FWS to Corp (11 Aug. 2005), MAR023221.  *See also* EPA May 2001 Ltr. at 5, MAR041820 (referring to EPA's veto authority).

[28]EPA Aug. 1999 Ltr. at 1, MAR040004 ("The uniqueness/heritage values of these wetland ecosystems would be lost forever and are not sufficiently replaced by the open water habitat of a 1,526 acre lake.").

[29] EPA also erred when it failed to veto the permit which is predicated upon the faulty plan.

[30] Corps, Analysis of Wetland and Habitat Impacts and the RRWSG's Proposed Compensation for the Proposed KWR at 24-38 (31 Jan. 2001), MAR049635-49 (describing each draft); KWR Draft Mitigation Plan (Dec. 2003), MAR010007; KWR Reservoir Mitigation Plan [Final] (June 2004), MAR008709.  The plans were reviewed by the other members of the mitigation planning team, consisting of the Corps, EPA, FWS, and state agencies.  The federal agencies participated as the recognized authorities on resource issues.  *See* RGL No. 02-2 at 1.  EPA was asked by the Corps to participate on the review team. Poeske July 2003 Memo at 1, EPAKWR004717.  While the FWS may comment on any such plan, *see* 33 U.S.C. § 1344(m), here, it was specifically asked by the Corps to review the plan given the Service's expertise in the area of wetland functions and values. Letter from FWS to Corps at 1 (22 July 1999), MAR053265 [hereinafter FWS July 1999 Ltr.].

[31] The 2004 mitigation plan proposes 11 sites.  Wetlands are proposed to be recreated on croplands that were wetlands before being converted to agriculture.  2004 Mitigation Plan at 2-15, 4–2–15, MAR008767, 008774-95.

[32] EPA Feb 2000 Ltr. at 3-4, MAR040400-01; Letter from FWS to Corps at 3-4 (25 Feb. 2000) MAR040400-01; FWS July 1999 Ltr., MAR053266.

805. The analysis repeatedly notes inaccurate statements that the applicant made regarding the values and functions of the Cohoke Creek stream valley eco-system and the feasibility of the proposed wetland and stream mitigation sites. *Id.* In the final RROD, the Norfolk District reaffirmed its findings and thoroughly repudiated each of Newport News' comments submitted in response to the draft. ROD at 91-161, MAR078027-97. The District concluded that the City's mitigation plan failed to attain "no net loss" of wetland functions and values. *Id.* at 152, MAR078088. Both EPA and the FWS fully supported the findings of the District in its draft and final RRODs.[33]

After the District's decision was elevated, the NAD required the mitigation planning process to continue, Interim Decision at 34, MAR021312, and in 2004, the City submitted its final mitigation plan. MAR008709-8959. In their comments on the plan,[34] EPA and FWS repeated their earlier objections, including among others, that:

- the functions and values of the wetlands to be destroyed could not be "offset" by efforts to reestablish wetlands on cropland;
- the integrated and diverse Cohoke Creek wetlands complex could not be replaced by the small and unconnected sites, scattered throughout several counties that the plan proposed; and
- the largest mitigation site (Terrell, 195 acres) was located in a completely different watershed.[35]

In addition to federal agency comments, the Commonwealth of Virginia and several citizens groups objected to the final plan.[36] CBF submitted a report written by experts in the

---

[33] EPA May 2001 Ltr., MAR041816, *passim*; FWS Oct. 2001 Ltr., MAR016744, *passim*.

[34] EPA and FWS continued to participate in the process with the same reservations concerning the need for the project, its impacts, and the mitigation plan. *See* Poeske July 2003 Memo, EPAKWR004717, *passim*; FWS Letter to Corps at 1 (14 Oct. 2003), MAR021785.

[35] In addition, they pointed out that the functions and values of the Cohoke Creek wetlands complex had not been adequately evaluated; the geography and hydrology of the mitigation sites had not been sufficiently characterized, nor had the functions and values of such sites been properly assessed; and the amount of stream miles being restored under the plan was far too low. Letter from EPA to NAD at 1-4 (22 July 2003), EPAKWR000031-34; Letter from FWS to NAD at 1-6 (14 Oct. 2003), MAR021785-90; Letter from EPA to NAD at 1 (22 Mar. 2004), MAR023770; Letter from FWS to NAD at 1-7(29 Mar. 2004), MAR008968-74; Letter from FWS to NAD at 1-7(1 Feb. 2005), MAR019520-26; *See also* Letter from FWS to Newport News at 1-4, 6 (28 Mar. 2005), EPAKWR004822-25, 27 ("The Service does not believe it is practical or possible to mitigate for the loss of an entire watershed."). Only a month before the NAD issued its ROD, the FWS Regional Director again expressed the FWS's concerns about the mitigation plan, FWS June 2005 Ltr. at MAR022776-79, which the NAD ignored.

fields of wetlands ecology from George Mason University, Virginia Polytechnic Institute,

Smithsonian Environmental Research Center and Old Dominion University.  Darke, A., *et al.*,

Evaluation of the King William Reservoir Final Mitigation Plan, EPAKWR004798.  These

independent researchers concurred with the objections of EPA and FWS.[37]  *Id.* at 3-4,

EPAKWR004800-01.

Perhaps most telling of all were the comments from a Corps Senior Wetland Scientist,

Paul Minkin, and the NAD's response.  Minkin to Ladd at 1-4 (29 April 2005), MAR023802-

05.[38]  Mr. Minkin specifically agreed with EPA and FWS that the mitigation sites do *not*

replicate the "same mosaic of wetland and aquatic systems that are being impacted.  The nature

of the project site is such that these features are difficult to replace." *Id.* at 2, MAR023803.[39]

Mr. Minkin's comments were analyzed by NAD, and while it disagreed with some of his

findings, the Division agreed that the final plan "will _not_ fully replace … all the functions being

lost."  *Id.* at 4, MAR023805 (emphasis added).[40]

---

[36] Letter from FWS to NAD (14 Oct. 2003), MAR021785; CBF Mitigation Report EPAKWR004798-817.  Among other things, the Virginia DEQ was concerned that the mitigation sites be located in the same watershed.  Letter from DEQ to Newport News (25 Feb. 2005), MAR022636.  The Virginia Department of Game and Inland Fisheries ("DGIF") reiterated this concern, Letter from DGIF to DEQ (16 May 2005), EPAKWR005414, and the Virginia Department of Conservation and Recreation ("DCR") expressed serious reservations about the plan.  *See also* Letter from Nature Conservancy to NAD (1 Feb. 2005), MAR019597; Letter from SELC to NAD (1 Feb. 2005), MAR019480.

[37] The professors stated that several ecosystem services would be lost or seriously reduced including:  support for plant and animal habitat; organic matter necessary for downstream aquatic food chains; areas of floodwater storage, and the ability of water to retain and/or transform nutrients and sediment during flooding.  *Id.* at 18, EPAKWR004815.

[38] The NAD had asked the New England District to review the plan.  *Id.* at 1, MAR023802.

[39] Among other concerns, Mr. Minkin questioned the fact that 81% of the mitigation acreage was prior converted cropland, and thus would not necessarily provide any additional benefits.  *Id.* at 2, MAR023803.  He observed that, as a result, "it is entirely possible that the mitigation plan as proposed will not fully compensate for impacted wetland functions, yielding a net loss of function and perhaps acreage." *Id.*

[40] The FWS, the recognized leader in wetland functional assessments, repeatedly pointed this out over a 12 year period.  Letter from FWS to Corps (17 May 1994), MAR067196; Letter from FWS to Corps (23 Aug. 1996), EPAKWR004826; FWS July 1999 Ltr., MAR053265; FWS Mar. 2004 Ltr., MAR008968.  FWS summarized its objections: "We have yet to understand how a stream valley wetland complex driven by a groundwater/surface water interface can be recreated. The majority of the Final Plan's proposed mitigation consists of farm fields with depressional surface water (i.e. perched) regimes. The proposed mitigation is hydrologically and ecologically "out-of-kind…." FWS July 1999 Ltr. at 3, MAR053267.

Thus, all of the scientific comments submitted on the proposed mitigation plan, with the exception of the applicant's own reports, uniformly agreed that the plan could not replace the wetlands functions and values that would be lost. Despite the overwhelming evidence, the NAD determined in its final ROD to issue the permit. The ROD admitted that the "project would result in direct loss or substantial hydrologic modification of approximately 437 acres of jurisdictional waters of the United States, consisting of 403 acres of freshwater wetlands and 34 acres of open water, inclusive of 21 miles of streams," ROD at 23, MAR023172, but it erroneously concluded that the 2004 mitigation plan, *if successfully implemented*, would result in no net loss of wetlands functions and values. *Id*. at 32, MAR023181(emphasis added). The NAD's decision is plainly contrary to the evidence and is arbitrary and capricious. *See Environmental Defense v. Army Corps of Eng'rs*, 515 F. Supp. 2d 69, 85 (D.D.C. 2007)(Corps' decision that proposed mitigation plan for a flood control project would offset environmental impacts was counter to evidence and thus in violation of CWA, NEPA, and the APA.).

Despite the thorough factual and scientific analysis by the District, EPA, FWS, and others, the ROD simply parrots the statements made by the applicant and its consultants.[41] When confronted with the overwhelming evidence that the mitigation sites will not replace the wetland functions that would be destroyed, the NAD simply offers the erroneous claim that the 2:1 mitigation acreage will offset the losses. However, the 1990 MOA, RGL No. 02-2, and the 404(b)(1) Guidelines provide that a simple 2 for 1 replacement of acreage does not equate to appropriate mitigation. The wetland values and functions being lost must be replaced with an equal amount of values and functions. 1990 MOA at II.B, 55 Fed. Reg. 9210; RGL No. 02-2 at 2; 33 C.F.R. § 332.3(c); 40 C.F.R. § 230.93(f).

---

[41] The ROD addresses nine years of mitigation planning in 10 pages. ROD at 23-32, MAR023172-81. The District RROD devoted more than 70 pages analyzing the issue. RROD at 91-161, MAR078026-97.

The NAD's decision is also arbitrary and capricious because it glosses over the fact that some of the mitigation sites are no longer available, one of the specific concerns FWS raised. *See* FWS Feb. 2005 Ltr. at 2, MAR019521. The NAD simply argued that the applicant will still be required "to create or restore no less than 806 acres of wetlands." ROD at 32, MAR023181. The NAD's blind adherence to numbers cannot substitute for a reasoned assessment whether the mitigation plan will result in a no net loss of wetland functions and values.

The NAD's statement also completely ignores the fact that the adequacy of the plan in part depends on the nature of the specific sites relied upon to attain functional equivalency. It also ignores the review of these specific sites by EPA and the FWS. In addition, as the record makes clear, the applicant has had great difficulty in identifying suitable sites in the York River basin, Letter from FWS to Corps at 2 (22 July 1999), MAR065140, and that at least one of the in-basin sites, Meadow Farm, is no longer available. FWS Feb. 2005 Ltr. at 2, MAR019521. For the NAD to assert that the sheer number of acres will offset lost functions, without further inquiry, ignores not only the significant concerns of both EPA and FWS that any mitigation sites should be located within the same watershed or basin as those destroyed, but also the Corps' own guidance. *See* 2002 RGL No. 02-2 at 9 ("Watershed Considerations"). The NAD's assumption that the applicant will be able to satisfy the statutory and regulatory requirements of wetlands mitigation regardless of the availability of specific sites is arbitrary and capricious.

The ROD simply repeats arguments made by the Newport News in prior iterations of the plan – sometimes to ludicrous conclusions.[42] As one instance, the ROD states that because the

---

[42] For example, the ROD merely repeats Newport News' assertions, *see* Letter from Newport News to EPA at 3 (5 Oct. 2001), EPAKWR003750, that the wetlands that would be created are more beneficial than the currently existing Cohoke Creek wetlands on the grounds that they would have a direct hydrologic connection to the Chesapeake Bay while the Cohoke Creek wetlands are cut off from the Bay by a historic millpond dam. ROD at 24, MAR023173. Disagreeing with Newport News, the FWS admonished that such "rhetoric" "should be stripped from" the plan. FWS Mar. 2004 Ltr. at 2, MAR008969.

applicant will restore some wetlands and preserve some uplands, the mitigation plan is preferable to existing conditions because they provide greater "variety of functions when viewed from a watershed perspective." ROD at 24, MAR023173. As support, the NAD relies on RGL No.02-2. Nowhere does the guidance even remotely suggest, however, that the destruction of a large fully functioning forested wetland ecosystem can be offset by an assemblage of scattered mitigation projects on farms.[43] In fact, the guidance requires the Corps to adopt a watershed-based approach to aquatic resource protection that considers entire systems and their constituent parts.[44]

In sum, the values and functions of the Cohoke Creek stream valley cannot be replaced by the mitigation plan sites.[45] The impacts to the Pamunkey River watershed, and to the Chesapeake Bay region,[46] as EPA and FWS recognized, are so significant that a permit should not issue. 1990 MOA at n. 5, 55 Fed. Reg. 9210; 40 C.F.R. §230.91(3). The Corps' decision violates the requirement of "no net loss" of wetland functions and values and the 404)(b)(1) Guidelines, and its approval and issuance of the 2005 Final ROD and section 404 permit are arbitrary and capricious as a matter of law.

    C.    <u>The NAD's Determination that Freshwater Withdrawals Would Not Significantly Degrade the Mattaponi River Violates the 404(b)(1) Requirements.</u>

---

[43] It is astonishing that the NAD would argue that uplands and attempts to recreate forested wetlands on 11 widely separated farm fields is better than an extensive, existing and fully functioning wetlands complex. Newport News made this same argument in 2000, which EPA strongly denounced. Letter from EPA to Corps at 3, 5-6 (25 Mar. 2000), MAR040398, 400-401.

[44] RGL No. 02-2, at 1-2.

[45] A comparison of the written and photographic descriptions of the Cohoke Creek stream valley wetlands to the mitigation crop fields proves the point. *See* KWR Project Mitigation Plan (June 2004) MAR008709; *Compare* MAR048889-93 (Mattaponi River) and MAR070960 (Cohoke Creek forested wetlands), with MAR066768-69 (Meadow Farm), MAR066798-80 (Lanesville) and MAR066808-08, 24-25, 32 (Island) mitigation sites.

[46] *See* EPA May 2001 Ltr. at 2, MAR041817 (project "would deal a serious blow" to efforts to restore and maintain the wetland resources of the Chesapeake Bay).

The original Mattaponi River withdrawal regime was designed, using a "high-flow skimming" method, to pump more water during periods of high river flows.  FEIS at 5-24, MAR045406.  The 2004 VMRC permit now prohibits pumping from March through July, some of the highest flow months of the year, unless a water emergency is declared.  However, the months during which pumping is now permitted correspond to the lowest flow months of the year.[47]  Pumping during low-flow periods heightens the risk of saltwater encroachment into the tidal freshwater zone, *see, e.g.,* Letter from FWS to Corps at 10-11 (28 Mar. 1996), MAR035966-67, with significant potential impacts on species near the fresh-salt water interface that are particularly vulnerable to changes in salinity.[48]  RROD at 318, MAR078256.  The NAD has never considered the environmental impacts or the potential changes to the reservoir yield from the pumping hiatus.  Without such analysis, the NAD's determination that freshwater withdrawals from the Mattaponi River would not significantly degrade the river's ecosystem is arbitrary and capricious.

The §404 (b)(1) Guidelines specifically require the Corps to consider a project's impact on natural salinity gradients.  40 C.F.R. §§230.10(c), 230.25. The NAD relied solely on the FEIS to conclude that "potential salinity changes which may result from the withdrawal of water would generally be within the natural salinity function of the estuarine system."  ROD at 36, MAR023185.  The FEIS modeling, however, was based on the high-flow skimming system and does not reflect the significant change in the pumping regime.  Letter from Siegel to VMRC at 1-2 (12 May 2004), MAR022937-38; Siegel comments to VMRC (12 Aug. 2004), MAR022960-61.  As the FWS stated, "[i]t is unknown if this change in the pumping regime may also affect the salinity modeling results, upon which many other determinations of potential environmental

---

[47] Typically, June through November are the lowest flow months.  FEIS at Table 5-7, MAR045392.
[48] *See also* King William Reservoir Fisheries Panel, King William Reservoir-Mattaponi River Fish Impact Assessment and Mitigation Report at 4-18 (1 April 2004) [hereinafter 2004 Panel Report].

effects were judged." Letter from FWS to NAD at 2 (23 June 2005), MAR022777 [hereinafter FWS June 2005 Ltr.]. The NAD's failure to consider the potential impacts and its finding of no significant degradation, in the face of "data gaps and scientific uncertainty," is arbitrary and capricious. *Friends of the Earth v. Hall*, 693 F. Supp. 904, 946 (W.D. Wash. 1988)(finding Corps' determination of no significant degradation arbitrary and capricious based on lack of sufficient analysis)

The NAD's faulty assessment of salinity impacts likewise invalidates its determination that impacts to the sensitive joint vetch, a federally threatened plant species, "would be less than previously determined." ROD at 22, MAR023171. Again, the NAD ignores the possibility of increased withdrawals when pumping is allowed. *See* Letter from Rouse at 1 (14 Dec. 2004), MAR022378; Letter from Place to NAD at 1 (1 Feb. 2005), MAR019603. Additional withdrawals during sensitive seed germination, set, and dispersal could prevent the necessary reseeding for the annual plant the following year. Rouse 2000 Report at 17-18, MAR042185-86; Letter from Rubino to NAD at 9 (29 Aug. 2005), MAR023230. Adverse impacts on the sensitive joint vetch from the project is of particular concern because the Mattaponi and Pamunkey Rivers are the core strongholds for this plant. Rouse comments to VMRC (22 Apr. 2003), MAR022375.[49]

In addition, the NAD's assumption that the hiatus would be sufficient to protect shad in the Mattaponi River does not satisfy its obligation under the Guidelines. The NAD disregarded the impacts that could occur from lifting the hiatus, merely dismissing this possibility as an "extraordinary circumstance," ROD at 34, MAR023183, without any attempt to consider the likelihood and frequency of such an event. *See Utahns for Better Transportation v. United*

---

[49] Rouse, a field botanist who studied the Mattaponi River's sensitive joint vetch populations for nearly a decade, also found that low-flow, high salinity periods cause the plant to produce significantly less seed and be more prone to seed predation. *Id.*

*States*, 305 F.3d 1152, 1192 (10th Cir. 2002)(Corps' determination of no significant degradation was arbitrary and capricious where its analysis of wildlife impacts was impermissibly narrow). In fact, because the hiatus may prevent Newport News from realizing its desired yield from the reservoir, its suspension could occur more frequently than what Newport News represented at the VMRC hearing.[50]  The location of the intake structure poses "some of the highest potential risk to juvenile anadromous fish populations," as VIMS has recognized.  VIMS June 2004 Ltr. at 6, MAR022793.  Pumping during the spawning and nursery season could cause significant mortality to shad populations,[51] resulting in significant degradation to aquatic organisms under 40 C.F.R. §230.31.  Further, because of the importance of the Mattaponi River,[52] it would also threaten the recovery of shad in the Chesapeake Bay and its tributaries. EPA July 1997 Ltr. at 8, MAR015571.

## II.    THE NAD VIOLATED THE 404(B)(1) BAN ON ISSUANCE OF A PERMIT IF THERE IS A LESS ENVIRONMENTALLY DAMAGING ALTERNATIVE AVAILABLE.

The §404(b)(1) Guidelines forbid the issuance of a §404 permit if there is a "practicable alternative to the proposed discharge which would have less adverse impact on the aquatic

---

[50] Michael Siegel, an expert retained by the Sierra Club, pointed out that the Panel Report failed to model the effect of the hiatus itself on the likelihood of a drought emergency, thereby significantly understating the possibility that the hiatus would be lifted. Siegel Review at 3-4 (12 May 2004), MAR022940-41.  Newport News conceded at the 2004 hearing that the hiatus would cause it to seek new sources of water sooner, begging the question of the practicability of the reservoir.  *See* Letter from Newport News to King William Fisheries Panel at 7 (18 Feb. 2004), MAR016121; SELC letter to NAD at 2-3 (21 Dec. 2004), MAR022370-71; IPR letter to NAD at 2 (29 Nov. 2004), MAR022167.  Many other documents in the record questioned the feasibility of the project while maintaining the hiatus, a concern the NAD completely ignored. *See* Letter from VIMS to VMRC at 6 (25 June 2004), MAR022793 (hiatus "effectively implemented" may prevent the City from realizing a satisfactory water yield); FWS June 2005 Letter at 1-2, MAR022776-77; Letter from Rouse (22 Apr. 2003), MAR022378; Henderson comments on 2004 Panel Report at 3 (1 Apr. 2004), MAR022973; Letter from Place to NAD (1 Feb. 2005), MAR019603.

[51] Shad eggs and larvae are particularly vulnerable to impingement on the pump intake screens and alterations in salinity.  *See* Henderson comments to VMRC at 4-5, 11-12 (11 May 2004), MAR022974-75, 022981-82.  Mortality of shad eggs and larvae leads to a cyclical decline in shad populations.  VMRC Habitat Management Division Evaluation at 13-14 (22 Apr. 2003), EPAKWR000160-61; Letter from VIMS to VMRC at 18 (12 Mar. 2003), MAR021631.

[52] On a national scale, the site of the proposed intake in the Mattaponi River is "the most productive region, of one of the most productive sub-estuaries of the Chesapeake Bay with respect to American shad." Letter from VMRC to Newport News at 2 (16 May 2003), MAR021707.

ecosystem" and which "does not have other significant adverse environmental consequences."[53]
40 C.F.R. §230.10(a).  As the court stated in *Utahns,* 305 F.3d at 1188-89, "[i]f such an
alternative exists … then the [Clean Water Act] compels that the alternative be considered and
selected unless proven impracticable."  The applicant bears the burden of proving that no
practicable alternative exists.  *Id*. at 1163.

The NAD's conclusion that construction of the proposed reservoir is necessary to meet
the project purpose and need and that it is the least environmentally damaging practicable
alternative violates the Guidelines and is arbitrary and capricious for several reasons:  First, as
the NAD acknowledges in the ROD, its findings regarding alternatives are based solely upon the
alternatives presented in the 1997 FEIS.  ROD at 35, MAR023184.  The FEIS alternatives were
based on a greatly exaggerated water need of 39.8 mgd.  Although the NAD found the actual
need to be 15.9 mgd, it failed to revisit the alternatives analysis.  Second, the NAD failed to
explain why other practicable alternatives presented in the FEIS as part of Newport News'
overall supply plan are not adequate to satisfy the lower need.  Third, the NAD failed adequately
to examine additional feasible alternatives identified in the RROD.

A.    The NAD's Sole Reliance on the Alternatives Set Forth in the 1997 FEIS
Violated the 404(b)(1) Guidelines.

Based on Newport News' own projections, the 1997 FEIS estimated that the regional
water supply deficit (that is, the difference between estimated future demand and projected
supply) for the year 2040 planning horizon would be 39.8 mgd. FEIS at 2-30, MAR044914.[54]

---

[53]"An alternative is "practicable" if "it is available and capable of being done after taking into consideration cost, existing technology, and logistics in light of overall project purposes."  40 C.F.R. §230.10(a)(2).

[54] In all the various projections of water need, a 50-year planning horizon was used.  Newport News initially used a planning horizon for the year 2040, *see, e.g.*, July 1993 permit application, MAR058787, as did the NAD in the ROD.  ROD at 5, MAR023154.  The RROD and the IWR Reports also carried the projections out to 2050.  *See, e.g.*, RROD at 35-36, MAR077968-69.  The NAD's statement that the RROD had "redefined" the project purpose from the need for "a dependable, long-term" supply to satisfying area needs "through the year 2050," *see* ROD at 2, MAR023151, is therefore nonsensical.

23

The alternatives analyzed in the FEIS were identified and selected in the light of that projected need, and the FEIS specifically excluded certain alternatives because they failed to meet the applicant's needs. *See* RROD at 233-234, MAR078169-70. In contrast, the ROD determined the need to be only 15.9 mgd for the year 2040, nearly 24 mgd lower than that set forth in the FEIS, yet it nevertheless relied on the FEIS alternatives.[55]

This dramatic reduction in the projected need was a result of independent reviews of Newport News' projections. Three expert reports reviewing the 1997 FEIS showed that Newport News' projected water needs were greatly inflated, making the proposed reservoir unnecessary.[56] The Norfolk District responded by requesting that the Institute for Water Resources ("IWR"), the Corps' water resource experts, provide an independent technical review of Newport News' water needs forecast. The IWR assembled a panel of water resource experts, ultimately issuing three reports, with its final report issued in August 2001. The IWR reports all confirmed that the region's year 2040 deficit was significantly lower than that projected in the FEIS, even with the most conservative assumptions used.[57] *See, e.g.,* IWR Special Study, Revised Report, An Evaluation of the Risk of Water Shortages in the Lower Peninsula, Virginia at 34 (15 Aug. 2001), MAR014153 [hereinafter IWR Aug. 2001 Rep.].

---

[55] As the EPA permit reviewer stated: "All projections represent a significant reduction from the water supply deficit projected in the FEIS. Such a significant decrease in the projected water supply deficit substantially affects the size and scope of a project necessary to meet the projected water demand." Memorandum from R. Poeske to J. Haggerty, NAD at 3 (revised 4 Feb. 2005), MAR023853 [hereinafter Poeske Feb. 2005 Mem.].

[56] Comments of Rocky Mountain Institute on FEIS (23 July 1997), MAR037414; Comments of D. Phillips on FEIS (17 July 1997), MAR037576; Comments of M. Siegel and T. Muller on FEIS (14 July 1997), MAR037658.

[57] IWR initially contracted with Planning and Management Consultants, Ltd. ("PMCL"),which issued a report in May 1998, concluding that the year 2040 needs would likely range between 16 to 19 mgd. PMCL Review of Water Supply Needs Assessment for the RRWSG, Final Report at 34 (May 1998), MAR059377. IWR issued its first report by its expert panel in May 1999, in which it concluded that Newport News had significantly overestimated demand and that it had not justified the need for the project. *See* IWR Special Study: Evaluation of Conflicting Views on Future Water Use in Newport News at iii (May 1999), MAR026949. In November 2000, Newport News' submitted a report from its consultant, HDR Engineering, Inc., ("HDR"), but even that report projected a deficit of only about 15 mgd in the year 2040 and 20 mgd by the year 2050, based on Virginia water planning guidelines. HDR Water Needs Assessment 2000-2050 (Nov. 2000) at 7-2, MAR012477 [hereinafter HDR Nov. 2000 Rep.]. In response to Newport News' submittals, IWR issued another draft report in March 2001, MAR013605, and its final report in August 2001, MAR014110.

The NAD relied on the IWR August 2001 report and concluded that the region would need an additional 15.9 mgd of water to meet expected demand in 2040. ROD at 5, 53, MAR023154, 023202.[58] Despite the NAD's implicit agreement with the RROD that the FEIS need was not justified, the NAD overturned the RROD's finding that the reservoir was not necessary. In doing so, it relied entirely on the FEIS alternatives analysis that was based upon more than twice the need. Nowhere does the NAD even address that fact. The NAD's failure to analyze alternatives based upon the lower need violates the APA by "fail[ing] to consider an important aspect of the problem." *State Farm*, 463 U.S. at 43. *See also Van Abbema v. Fornell*, 807 F.2d 633, 639 (7th Cir. 1986)(Corps' conclusion cannot be described as reasoned if based on false premises). Because the NAD failed to require a new analysis based on the lower need, the NAD's issuance of the §404 permit violated 40 C.F.R. §230.10(a).[59] *See Utahns*, 305 F.3d at 1189 (§404 alternatives analysis was flawed where the Corps did not assess whether a narrower median for a proposed highway was practicable, rendering the Corps' permit decision arbitrary and capricious).

The ROD's lack of analysis and rational basis for its decision stands in sharp contrast to the Norfolk District's comprehensive analysis in the 355-page RROD. The Norfolk District examined in detail the critiques of the 1997 FEIS needs projections, RROD at 20-54, MAR077953-87, and concluded that the need set forth in the 1997 FEIS was "unjustified," *see, e.g.,* RROD at 337, MAR078275, and that practicable alternatives were available to satisfy the

---

[58]In fact, the need could be considerably less because, among other reasons, water demand has remained flat for the past decade, contrary to Newport News' predictions. *See* RROD at 264, MAR07795970; M. Siegel, Comments on ROD at 6 (2 Sept. 2005), MAR023249 [hereinafter Siegel Sept. 2005 Comments]. In addition, the projected shortfall is based on the most conservative assumptions. It is also important to note that the risk of shortage is not that the region will run out of water, but that drought curtailment measures would need to be used. RROD at 36, MAR077969.

[59] Such failure also violates NEPA. *See infra* at Part V.A.

revised water need, i*d*. at 234-42, 335-41, MAR078170-78, 078273-79. [60]  Because the NAD's

review focused solely on the flawed FEIS alternatives, the NAD's issuance of the permit was

unlawful and arbitrary and capricious.

       B.     The NAD's Dismissal of Proven Alternatives to Satisfy the Lower Need Violates the 404(b)(1) Requirements.

As set forth in the FEIS and the ROD, Newport News' overall plan to meet its projected

water shortfall included not only the reservoir but three other components: 1) additional

conservation measures and use restrictions that were projected to save between 7.1 to 11.1 mgd;

2) development of new fresh groundwater resources, projected to add 4.4 mgd; and 3) additional

brackish groundwater desalinization with a yield of 5.7 mgd.  ROD at 51, MAR023200; FEIS at

3-74, 3-92, MAR045042, 045080.  Thus, according to Newport News' own projections, these

non-reservoir alternatives would supply between 17.2 mgd and 21.2 mgd of water.

The ROD correctly took into account the 5.7 mgd brackish groundwater desalinization

plant, which became operational in 1998, in its revised estimate of the year 2040 shortfall.  ROD

at 5, 52, MAR023154, 023201.  But the ROD failed adequately to assess whether the other two

components of the plan, either alone or combined with other alternatives, would satisfy the

revised need of 15.9 mgd.  The NAD summarily dismissed the 4.4 mgd from groundwater

sources, stating that it "is insufficient to meet the long-term requirement for an additional 15.9

[mgd] in 2040." ROD at 54, MAR023203.  That this component alone is not sufficient to meet

the expected shortfall is not an adequate basis for eliminating it as a practicable alternative, given

the existence of additional available alternatives.

---

[60] Notably, EPA and the FWS, in supporting the Norfolk District's RROD to deny the permit, concurred that the substantial impacts to wetlands and other important natural resources were avoidable because there were other water supply options available to the applicant.  EPA May 2001 Ltr. at 2, MAR041817; FWS May 2001 Ltr. at 2, MAR041793; Poeske July 2003 Mem. at 4, EPAKWR004720; FWS Mar. 2004 Ltr. at 1-2, MAR008968-69; FWS June 2005 Ltr. at 3, MAR022778.

For the conservation measures, the NAD relied simply on a statement in the FEIS "that the participating jurisdictions …had already begun to implement and take advantage of these additional conservation measures" in the service area.  *Id*. at 52, MAR023201(citing FEIS at 3-93, MAR045081).  The NAD makes no attempt to ascertain or discuss the extent to which the conservation alternative was being implemented, the yield from such measures, or the additional gains that could be expected.  *See Utahns*, 305 F.3d at 1187 ("where insufficient information is provided to determine compliance, the Guidelines require that no permit be issued")(citations omitted).  *See also* Letter from Phillips to NAD at 5-6 (31 Oct. 2001), MAR090006-07.

In short, the NAD has failed to provide a rational basis for why other less damaging alternatives were not adequate to satisfy the applicant's water needs.  *See State Farm*, 463 U.S. at 48 (agency's action was arbitrary and capricious where it failed to supply findings and analysis to justify its decision).  The EPA permit reviewer likewise questioned the NAD's unjustified elimination of alternatives deemed "feasible and practicable by the applicant" in the FEIS. Poeske Feb. 2005 Mem. at 4, MAR023850.  *See* FWS Mar 2004 Ltr. at 2, MAR008969 (asking the Corps to reexamine alternatives sufficient to meet the lower need).[61]  The NAD's cursory elimination of proven, practicable alternatives violates the Clean Water Act and is arbitrary and capricious.

C.    The NAD's Limited Consideration of Other Practicable Alternatives Violates the
       404(b)(1) Requirements.

In the RROD, the Norfolk District identified other potential alternatives including, among others, reducing "dead storage" in Newport News' existing reservoirs to increase "safe yields,"[62]

---

[61] *See also* Letter from SELC  to NAD at 1-3(1 Feb. 2005), MAR019480-82; Letter from SELC to NAD at1-2, 4-5 (17 Oct. 2001), MAR042664-65, 67-68; Letter from IPR to NAD at 9-10 (29 Nov. 2004), MAR022174-75.

[62] "Dead storage" refers to the lower elevation of a reservoir that may be unusable as a result of technological, cost or water quality limitations.  *See* IWR Aug. 2001 Rep. at 50, MAR014168.  "Safe yield" is the minimum amount of

27

combined with using the full pumping capacity from the Chickahominy River; use of the existing "Big Bethel" reservoir; additional groundwater supplies and desalinization facilities.[63]  In three short paragraphs (at 54-55, MAR023203-04), the NAD rejected these alternatives, concluding that the "patchwork of small supply alternatives *may not* meet the long-term water supply needs of the Lower Virginia Peninsula and *could* place risks of adverse impacts and environmental damages on groundwater supplies [and] the Chickahominy River …."  *Id*. at 54 (emphasis added), MAR023203.  The NAD's summary dismissal of these and other alternatives based only on supposition ignores the legal standard of the Clean Water Act and is arbitrary and capricious.

First, regardless of whether or not the supply sources are a "patchwork," a single water source was never expected to solve the projected need, as Newport News' own multi-source water supply plan shows.  Moreover, a bias toward a single source alternative is contrary to the Corps' proper review of alternatives.  In *Simmons v. U.S. Army Corps of Engineers*, 120 F.3d 664, 669-70 (7th Cir. 1997), the court found that the Corps' alternatives analysis under NEPA was faulty where the Corps looked only at single-source alternatives.  *See id*. at 669 (project's "real purpose is supplying [two jurisdictions] with more water, and there are reasonable alternatives to that beyond relying on a single reservoir").  *See also North Carolina v. Hudson,* 665 F. Supp. 428, 446 (E.D.N.C. 1987)(under Corps' public interest regulations, it could not "accede to Virginia Beach's desire to have an autonomous water supply").  Second, as discussed below, there is record support that each of the alternatives discussed above is practicable.  The NAD offered insufficient justification for its elimination of these alternatives.

      1.      <u>Reduction of "Dead Storage" in Newport News' Existing Reservoirs Together With Increased Pumping from the Chickahominy River.</u>

---

water the system will produce over a long period of time.  *Id*. at viii, MAR014117.  According to the IWR, a system generally will produce more water than the safe yield about 98% of the time.  *Id*.

[63] The NAD did not even mention one of the alternatives referred to in the RROD at 240-43, MAR078176-78, the potential use of surplus water from Norfolk.

There is no question that the "safe yield" from Newport News' five existing reservoirs could be increased by allotting a lower percentage to "dead storage," combined with increased pumping from the Chickahominy River, the source for the reservoirs. The ROD referenced the IWR's use of 33% dead storage, ROD at 53, 59-60, MAR023202, 023208-09, but it neglected to note that the IWR made clear that such a large allocation was neither necessary nor required.[64] *See* IWR Aug. 2001 Rep. at 50, MAR014168. According to the IWR report, only 10 to 12% of a reservoir capacity cannot be used, at least without extraordinary measures. *Id.* *See* RROD at 35, MAR077968. The IWR Report found that using a still highly conservative dead storage of 25%, and increasing pumping from the Chickahominy River to the system's existing full capacity, would increase the safe yield of the current system by at least 5.2 mgd.[65] IWR Aug. 2001 Rep. at viii, 51, MAR014117, 014169; RROD at 45, MAR077978. As a result, the IWR stated that this alternative should be revisited. IWR Aug. 2001 Rep. at viii, MAR014117.

The ROD, however, dismissed it on the grounds that it "*could* place risks of adverse impacts and environmental damages on … the Chickahominy River…." ROD at 54 (emphasis added), MAR023203. Such speculation does not satisfy the Corps' obligations under the §404 Guidelines. *See Utahns*, 305 F.3d at 1166 (Corps' finding that highway alignment was infeasible because of high cost was speculative where Corps failed to verify cost estimates provided by the applicant). While the risks to the Chickahominy from increased pumping would need to be considered, as the RROD pointed out, the alternative was dismissed early on in the EIS process

---

[64] IWR noted that a DEQ memorandum reported that "Newport News could get a waterworks certificate based on [11.8% of total storage] from the [Virginia] Health Department." IWR Aug. 2001 Rep. at 50, MAR014168. The RROD also found that the "Virginia Department of Health has agreed to a much lower dead storage for existing reservoirs than the 33% used in the HDR [Newport News' consultant] calculation." RROD at 29, MAR077962.
[65] Current pumping is limited to 40 mgd; the full system capacity is 61 mgd. *See* RROD at 39, MAR077972.

"*before* the environmental impacts associated with the increase were fully evaluated." RROD at 44 (emphasis added), MAR077977.

<div align="center">

2.    Use of the Big Bethel Reservoir.

</div>

The Big Bethel reservoir is an existing reservoir in York County in the RRWSG service area with a safe yield of 2 mgd, which was used by the military to provide water to Fort Monroe until around 2003. *See* Siegel Sept. 2005 Comments at 2, MAR023245; RROD at 25, MAR077958. Because of Fort Monroe's decision to cease operation of the reservoir, water from Big Bethel is readily available to Newport News. Siegel at 2, MAR023245. The ROD does not even mention the Big Bethel reservoir, however. *See* ROD at 5 (not included in NAD's table of sources of supply), MAR023154. The NAD's failure to consider this feasible, practicable source of water is arbitrary and capricious.

<div align="center">

3.    Use of Additional Desalinization Facilities.

</div>

The ROD impermissibly rejected groundwater desalinization as a potential alternative on the grounds that the 1997 FEIS had eliminated desalinization as a single long-term alternative (with a yield of up to 30 mgd), and it likewise dismissed any additional fresh or brackish groundwater proposals on the basis of the FEIS. ROD at 55, MAR023204. The NAD does not discuss the practicability of smaller-yield desalinization facilities that were not considered in the FEIS. Information developed since the 1997 FEIS demonstrates that such facilities may provide a practicable alternative. For example, James City County, part of the RRWSG, developed and brought online phase I of a new desalinization plant in 2005, with an initial yield of 2.5 mgd, *see* ROD at 52, MAR023201, which was not considered in the FEIS.[66] As the RROD pointed out,

---

[66] The plant is expected to double its capacity by 2010. *See* James City Service Authority, *The Five Forks Groundwater Treatment Facility, at* http://www.jccegov.com/jcsa/five-forks.html (last visited 14 June 2008). Newport News insisted that this facility not be considered by the IWR because the plant was planned but not yet operational. *See* IWR Aug. 2001 Rep. at 37-38, MAR014156-57; Poeske Feb. 2005 Mem. at 4, MAR023850.

<div align="center">

</div>

"the rapidly improving technology of recent years has made desalination more cost effective and reliable than it has been in the past…."  RROD at 238, MAR078174.  The NAD's limitation of its alternatives review to those included in the FEIS violates the CWA.

## III.    THE NAD VIOLATED THE PUBLIC INTEREST REVIEW REQUIREMENTS.

The Corps' "public interest" requirements, codified at 33 C.F.R. §320.4(a), prohibit the issuance of a section 404 permit if "the district engineer determines that it would be contrary to the public interest."  This review requires the Corps to weigh the benefits of the project against its reasonably foreseeable detriments, considering all relevant factors and their cumulative impacts.[67]  *Id*.; *see also* 33 C.F.R. §320.4(b)(4).  The Corps' regulations also specifically prohibit the issuance of a permit that involves the alteration of "important" wetlands unless the Corps determines that "the benefits of the proposed alteration outweigh the damage to the wetlands resource."  33 C.F.R. §320.4(b)(4).  In addition, the Corps' regulations specifically require an objective assessment of the "public and private need for the project" and reasonable alternative locations and methods to accomplish the applicant's objective.  *See* 33 C.F.R. §§320.4(a)(2)(i), (a)(2)(ii).  The NAD's issuance of the §404 permit without having undertaken an adequate and objective public interest review is arbitrary and capricious.[68]

In its public interest review, the Norfolk District concluded that "[t]he risk to the environment, the risk to an entire watershed and the risk to the continued way of life of Native Americans in the Pamunkey Neck area, especially the Mattaponi Tribe, are too great when weighed against the unjustified need."  RROD at 337, MAR078275.  Both EPA and the FWS agreed.  In comments on the RROD, EPA stated that the project "could have an unacceptable

---

[67] Included among these factors are conservation, general environmental concerns, wetlands, fish and wildlife values, water supply and conservation, water quality, and the general needs and welfare of the people.  33 C.F.R. §320.4(a).

[68] In addition to the arguments herein, the Alliance incorporates the Tribe's arguments in its brief on this issue.

adverse effect on wildlife and fishery areas," within the meaning of §404 (c), and that "the individual and cumulative damages to the wetland resource outweigh the benefits of the proposed filling to the applicant." [69]  EPA May 2001 Ltr. at 3, MAR041818; *see supra* at Part I.A.

The NAD's contrary finding regarding the public interest is invalid, in part because it is based on the NAD's flawed assessments of the §404 (b)(1) Guidelines.  As discussed above, the NAD's conclusion that the Final Mitigation Plan will compensate for the significant loss of aquatic resources is erroneous.  In addition, the NAD's faulty assessment of the need for the project and the availability of alternatives completely undercut its ability to reasonably weigh the benefits and detriments of the project.

In *Van Abbema v. Fornell*, 807 F.2d 633 (7th Cir. 1986), the court found that the Corps' public interest review was invalid because it relied on inaccurate and unverified information in its consideration of alternatives.  *See id*. at 636, 642-43.  Notably, the §404 review posture was identical to that in this case.  In *Van Abbema*, initially the district engineer concluded that the proposed project to construct a facility for offloading coal from trucks to barges on the Mississippi River was not in the public interest.  *Id*. at 635.  Because the Governor of Illinois objected to the district's decision, the permit application was elevated to the Corps' division level.  The division, like here, then issued a permit for the project.  *Id*.  In overturning the Corps' decision, the court stated the Corps had "a duty to ensure the accuracy of information" that was important to its decision, which it failed to meet, particularly where specific criticisms had been made regarding the Corps' analysis.  *Id*. at 642-43.

Here the record is replete with specific factual information showing that the reservoir is not necessary because of the greatly reduced need and availability of alternatives.  *See supra* at

---

[69] *See* FWS May 2001 Ltr, MAR041792; Letter from FWS to Corps at 3-4 (22 July 1999), MAR019170-71.

Part I.A. The NAD's reliance on the FEIS alternatives, in the face of the significant change in need, likewise renders its public interest review invalid. *See also North Carolina v. Hudson*, 665 F. Supp. 428, 447 (E.D.N.C. 1987)("Corps erred in not making a determination, as part of its public interest review, of the *extent* of the applicant's [water] need.")(emphasis in original).

The NAD's review is also faulty because it failed to consider specific factors set forth in the regulations, including cumulative effects. 33 C.F.R. §320.4(a). The NAD ignored the cumulative impacts on the Chesapeake Bay watershed from the significant wetlands losses from the project, despite EPA's objection that the project will deal a "serious blow to efforts to restore and enhance the existing wetland base within . . . Virginia and the Chesapeake Bay Watershed." EPA May 2001 Ltr. at 2, MAR041817. *See Wyoming Outdoor Council v. U.S. Army Corps of Eng'rs*, 351 F. Supp.2d 1232, 1256 (D. Wyo. 2005)(Corps erred in failing to assess cumulative effects on all relevant factors). Moreover, the issuance of the permit is contrary to the terms of the Chesapeake 2000 Agreement to maintain and restore the Bay's wetland resources.[70] The NAD likewise ignored another relevant factor, the impact on aquatic resources, including plant species, by failing adequately to consider the impacts from the pumping hiatus imposed by the VMRC in violation of 33 C.F.R. §320.4. *See supra* at Part I.C.

Finally, the NAD misinterpreted the legal standard under 33 C.F.R. §320.4(j)(4). Citing the regulation, the NAD stated that "in the absence of overriding national factors of public interest," a permit will generally be issued "following receipt of a favorable state determination." ROD at 9, 15-16, MAR023158, 023164-65. The NAD concluded that "there are no overriding national issues of the public interest" to overcome the state's approval of the project. *Id.* at 17,

---

[70] *See also* Chesapeake Directive No. 97-2 (reaffirming 1989 commitment in Bay Wetlands Policy to no net loss goal and long-term goal of net resource gain in acreage and function).

MAR023166.[71]  The NAD glosses over the crucial part of the regulation, however, which

provides that this is only the case "*provided* the concerns, policies, goals, and requirements as

expressed in 33 CFR parts 320-324, and the applicable statutes have been considered and

followed," including, for example, NEPA and the CWA and regulations.  33 C.F.R

§320.4(j)(4)(emphasis added).  Thus, where, as here, the permit would violate the mandatory

§404(b)(1) Guidelines and NEPA, that the state supports the project is irrelevant.  The NAD's

contrary interpretation "defies logic," "for the regulation plainly states that a permit 'will

generally be issued' ***provided that*** . . . 'the applicable statutes have been considered and

followed.'" *Bahia Park v. United States,* 286 F. Supp. 2d 201, 208 (D.P.R. 2003) (emphasis in

original); *see Northwest Bypass Group v. U. S. Army Corps Of Eng'rs*, 2008 U.S. Dist. LEXIS

33202, at p. 56 (D.N.H. 2008)(agencies may "defer to a "favorable state determination" *only

when* federal requirements are also met")(emphasis in original).

## IV.  EPA'S FAILURE TO VETO THE PERMIT WAS ARBITRARY AND CAPRICIOUS.

        Under section 404(c) of the Clean Water Act, EPA can prohibit or withdraw the

specification of a disposal site when the discharge of such materials will have an "unacceptable

adverse effect on," among other things, "shellfish beds and fishery areas (including spawning

and breeding areas), [and] wildlife."  33 U.S.C. §1344(c).  EPA's determination of an

"unacceptable adverse effect" is governed by its own regulations implementing 404(c), which

define the term as an

> impact on an aquatic or wetland ecosystem which is likely to result in significant
> degradation of municipal water supplies (including surface or ground water) or
> significant loss of or damage to fisheries, shellfishing, or wildlife habitat or
> recreation areas. *In evaluating the unacceptability of such impacts, consideration*

---

[71] The NAD stated that while the wetlands are "regionally important," they are not of "significant interstate importance."  *Id.*  As discussed above, the NAD's finding is incorrect, as the wetlands are significant on an interstate and national basis.  *See supra* n.4 and accompanying text and *infra* Part IV.

> *should be given to the relevant portions of the section 404(b)(1) guidelines (40 CFR Part 230.*

40 C.F.R. §231.2(e) (emphasis added).  As highlighted above, the regulations also specifically provide that EPA should consider the binding §404(b)(1) Guidelines in assessing the unacceptability of impacts.

EPA's failure to veto the permit is readily assessed against these standards and is arbitrary and capricious.  The record shows that EPA believed that the issuance of the permit would violate the §404(b)(1) Guidelines and would result in "unacceptable adverse effects" under §404(c).  EPA May 2001 Ltr. at 3-5, MAR041818-20.  Throughout the 404 process, EPA took the position that other less damaging, practicable alternatives are available; that the project would result in the significant degradation of waters of the United States, including wetlands; and that the proposed mitigation cannot offset the unprecedented destruction of wetlands and impacts upon the aquatic resources.[72]  Any one of these determinations dictates that no permit shall issue.

In EPA's comments supporting the 2001 RROD's analysis and determination to deny the permit, EPA summarized its position as follows:

> The analysis clearly states that the impacts would cause or contribute to significant degradation of waters of the United States, including wetlands, specifically in Cohoke Mill Creek and the Mattaponi River as described under the 404(b)(1) Guidelines at 40 CFR 230.10(e).  EPA agrees with the Corps' assessment that impacts associated with the proposed [project] are avoidable.  As such, the [project] does not represent the least damaging practicable alternative.  We agree with the Corps that a permit cannot be issued for the project because the project does not comply with the Section 404(b)(1) Guidelines.  EPA believes that wetlands of Cohoke Mill Creek would qualify as Aquatic Resources of National Importance (ARNI) as described under the 404(q) Memorandum of Agreement between EPA and the Department of the Army.  We believe that construction of the [project] could have an unacceptable adverse effect on wildlife and fishery areas as described under Section 404(c) of the Clean Water Act.

---

[72] *See id.*; EPA Comments on Applicant's Environmental Issues Summary, at 1-4, 7-8 (25 Feb. 2000), MAR040398-401, 040404-05; Letter from EPA to Corps at 1-2 (5 Aug. 1999), MAR019153-54; Letter from EPA to Corps at 1-2 (18 Aug. 1998), MAR039259-60.

EPA May 2001 Ltr. at 5, MAR041820.[73]  According to EPA, not only would the project violate

the significant degradation prohibition of the 404(b)(1) Guidelines, but it in fact would result in

"the largest single destruction of wetlands and their associated habitat" in the mid-Atlantic in the

history of the Clean Water Act.[74]  *Id.* at 1, MAR041816.

        EPA also agreed with the Norfolk District that the mitigation measures "will not

compensate for all losses in wetland functions, values or specific habitat losses," because the

proposed mitigation "cannot replicate the size, location, interspersion, and landscape context

functions inherent in an intact watershed."[75]  *Id.* at 3, MAR041818.  EPA maintained this

position throughout.  In its last official comments on the project, regarding the wetlands

mitigation plan, EPA similarly stated that the impacts of the project would represent a "dramatic

alteration of a functioning stream valley ecosystem in the Chesapeake Bay watershed."  EPA

Mar. 2004 Ltr. at 3, MAR023772.  These statements all show that EPA knew that the issuance of

the permit would violate the mandatory prohibitions set forth in the 404(b)(1) Guidelines, and

that the permit would result in "unacceptable adverse effects" under §404(c).  *See* EPA May

2001 Ltr. at 5, MAR041820.

---

[73] *See also* Letter from EPA to Corps at 2 (25 July 1997)(referring to resource as ARNI), MAR015564.  Designation of a resource as an ARNI, as here, automatically allows EPA and the FWS to seek elevation of specific permits because of the importance of the resource, pursuant to 1992 Memoranda of Agreement between the Corps and EPA and the Department of Interior.  Under the MOA, elevation is "limited to those cases where the net loss . . . will result in unacceptable adverse effects to aquatic resources of national importance.  As a basis for comparison, these cases will cause resource damages similar in magnitude to cases evaluated under Section 404(c) of the Clean Water Act . . . ."  MOA at 2, EPAKWR005404.  *See also Hughes River Watershed Conservancy v. Glickman*, 81 F.3d 437, 442 (4th Cir. 1996)(overturning under NEPA Corps' issuance of 404 permit for a dam that would impact an ARNI).

[74] EPA noted that the wetlands losses that would be incurred by permitting the project "would exceed the annual permitted wetland loss for the entire state of Virginia.  In this instance the [project] *is* unique.  It would more than double the wetland losses through the regulatory program in the state for a year and concentrate the losses in one watershed."  EPA May 2001 Ltr. at 3 (emphasis in original), MAR041818.  *See also* Poeske July 2003 Mem. at 1, EPAKWR004717 (EPA "coordination on mitigation planning should not be construed as abandonment of [EPA's] previous positions").

[75] EPA also found that "the substantial impacts to wetlands and other important natural resources are avoidable because there are options available . . . to reduce water demand and optimize existing sources of water."  *Id.* at 2, MAR041817.

EPA's failure to veto the permit is also contrary to the policy of no net loss of wetlands values and functions set forth in the 1990 MOA between EPA and the Corps, and to the Chesapeake 2000 Agreement.  The no net loss policy is applicable to both EPA and the Corps in carrying out their responsibilities under section 404 of the Clean Water Act.  55 Fed. Reg. at 9211 (12 Mar. 1990).  Referring to the commitments of the U.S. in the Chesapeake 2000 Agreement, EPA stressed in its letter supporting the permit denial that, because the substantial impacts are avoidable, "losses of this magnitude should not be authorized . . . . ."  EPA May 2001 Ltr. at 2, MAR041817.

The Declaration of Donald S. Welsh, EPA Regional Administrator, Doc. 60-2 (filed 1 Oct. 2007), provides further proof that EPA's failure to veto the project was arbitrary and capricious.[76]  The Administrator admitted that his decision was not based on *any* assessment of the §404(b)(1) Guidelines despite the binding nature of these requirements, which EPA itself developed,[77] and the specific reference to them in the 404(c) regulations.  In the declaration, the Administrator states that his decision was not based "on any determination whether the . . . project represented the least damaging practicable alternative," nor "on any analysis of whether or not the . . .  project complied with the Guidelines promulgated by EPA pursuant to Section 404(b) of the CWA, 40 C.F.R. Part 230."  Declaration at 4, ¶10(d).

In addition, many of the Administrator's assertions are plainly contrary to EPA's consistent, official position during the permit review regarding the availability of alternatives and the inability to mitigate the harm from the project.  The Administrator refers to "competing

---

[76] The Alliance believes that the declaration is improperly before the Court because it is a post-hoc rationalization. *See, e.g., Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 420 (1971); *Bowen v. Georgetown University Hospital*, 488 U.S. 204, 213 (1988). Nevertheless, the declaration on its face shows that EPA's failure to veto the permit was arbitrary and capricious.

[77] It is "axiomatic that an agency is bound by its own regulations." *Panhandle Eastern Pipe Line Co. v. FERC*, 613 F.2d 1120, 1135 (D.C. Cir. 1979).

studies" on the projected water need, Declaration at 3-4 ¶10(c), but he omits the facts that, as the EPA permit reviewer pointed out, all the studies agreed that the shortfall was significantly less than that projected in the FEIS, s*ee* Poeske Feb. 2005 Mem. at 2-3, MAR023852-53, and that EPA officially took the position during the permit review that alternatives existed to satisfy the lower need. *See* EPA May 2001 Ltr. at 2, MAR041817; EPA Aug. 1999 Ltr. at 1, MAR019153.[78]

Likewise, the Administrator admits that he was aware that the project "would result in the loss of an intact and functioning ecosystem, and that it would be difficult to fully mitigate for these impacts," but he states that he balanced this consideration against his "understanding" that the goal of the mitigation plan was "full functional replacement." Declaration at 4, ¶10(e). Again, his statement is contrary to EPA's official position that the mitigation "*cannot* replicate the size, location, interspersion, and landscape context functions inherent in an intact watershed." EPA May 2001 Ltr. at 3 (emphasis added), MAR041818.[79] The Administrator's rationale thus ignores not only the criteria relevant to his decision whether to veto the permit but also the agency's own official comments, and, as such, is arbitrary and capricious. *Cf. Louisiana PSC v. FERC*, 184 F.3d 892, 897 (D.C. Cir. 1999) (holding that the agency's "180 degree turn" from its prior precedent without persuasive explanation was arbitrary and capricious).

## V. THE NAD'S REFUSAL TO SUPPLEMENT THE FEIS VIOLATES NEPA.

The CEQ NEPA regulations direct that agencies "shall" prepare a supplemental environmental impact statement ("SEIS") if "there are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its

---

[78] *See also* Letter from EPA to Corps at 1 (24 Feb. 1999), MAR039547; Letter from EPA to Corps at 1-2 (18 Aug. 1998), MAR039259-60.

[79] EPA further stated that it agreed with the Corps "that the mitigation measures will not compensate for all losses in wetland functions, values or specific habitats," *id.*, a view that EPA repeated to Newport News in the Fall 2004. *See* Letter from Newport News to EPA at 2 (15 Nov. 2004), EPAKWR003369.

38

impacts."[80]  40 C.F.R. §1502.9(c)(ii). Since the issuance of the 1997 FEIS, there have been

significant changes in the project design, including the dramatic decrease in the future water

need and the imposition of the seasonal pumping hiatus, and other significant new information

relating to the environmental impacts of the project, all of which were repeatedly brought to the

NAD's attention.[81]  The NAD's refusal to prepare an SEIS violates NEPA and is arbitrary and

capricious.

A.    Significant Change in Projected Water Demand.

As discussed above, the FEIS alternatives analysis was based upon a projected need of

39.8 mgd, while the NAD itself found that the anticipated year 2040 deficit was 15.9 mgd.[82]  The

extent of the region's future water needs is fundamental to the NAD's review, yet the NAD did

not even mention this significant change.  In *Hughes River Watershed Conservancy*, 81 F.3d

437, 448 (4th Cir. 1996), the court held that the agency's refusal to prepare an SEIS where it

relied on inflated estimates of the project's benefits violated NEPA because it impaired "fair

consideration of the . . . adverse environmental impacts."  Likewise, where, as here, a "key

assumption underlying the plan" changes, an SEIS must be prepared.  *Northwoods Wilderness*

*Recovery, Inc. v. U.S. Forest Service*, 323 F.3d 405, 411 (6th Cir. 2003)(SEIS required where

timber sale exceeded that contemplated in EIS).  *See also Environmental Defense Fund v.*

*Marsh,* 651 F.2d 983, 1006 (5th Cir. 1981)(SEIS required where new information showed

---

[80] *See Marsh v. Oregon Natural Resources Council*, 490 U.S. 360, 374 (1989)(agencies must take a "hard look" at the environmental effects when circumstances change or new facts come to light, even after initial approval of a project).

[81]  *See, e.g.,* FWS June 2005 Ltr. at 1, MAR022776 ( "very important information has surfaced and the proposed project has changed significantly" since the 1997 FEIS); Letter from SELC to NAD (21 Dec. 2004), MAR022369; Letter from IPR to NAD (29 Nov. 2004), MAR022166; M. Siegel, Comments to NAD (2 Sept. 2005), MAR023244; Letter from Alliance to Save the Mattaponi to NAD (29 Aug. 2005), MAR023222; Letter from CBF to NAD (17 Oct. 2001), MAR042771.

[82] As discussed above, the actual need likely will even be less.  *See supra* at Part II.

significant departure from the designs and economic and traffic estimates of navigational project).

The NAD's reliance on the FEIS alternatives also violates its obligation under NEPA to "[r]igorously explore and objectively evaluate all reasonable alternatives," 40 C.F.R. §1502.14(a), "the heart" of the NEPA analysis. *Id.* at §1502.14. *See Dubois v. Dept. of Agriculture*, 102 F.3d 1273, 1286 (1st Cir. 1996)(new, preferred alternative in FEIS required an SEIS despite arguments that the selected alternative was simply a scaled-down version of an earlier one). Here an SEIS is required to assess a full range of alternatives based on the lower need.

B.    The Seasonal Pumping Hiatus.

The VMRC imposed hiatus significantly changes the design of the project from a "high flow skimming" operation. *See supra* at Part I.C. The NAD's conclusion that the hiatus "results in fewer impacts than previously considered," ROD at 34 (MAR023183),[83] ignores several important considerations and thus fails to "examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *State Farm*, 463 U.S. at 43 (quotation omitted). First, as discussed above, the NAD simply relied on the FEIS for its conclusion that the salinity effects were expected to be within the normal range of variability, ROD at 37, 46, MAR023186, 023195, ignoring the fact that the FEIS modeling was based on an entirely different pumping regime, and that no analysis has been done of how the "pumping hiatus period would affect the pumping patterns during other seasons

---

[83] *See also Dubois v. Dept. of Agriculture*, 102 F.3d at 1293. In finding that a change in a project required an SEIS, the court stated that "commenters might have pointed out, if given the opportunity – and the [agency] might have seriously considered – wholly new problems posed by the new configuration (even if some of the environmental problems present in the prior alternatives have been eliminated)."

of the year . . . , especially during the drier summer period." FWS June 2005 Ltr. at 1, MAR022776.

Second, the NAD's assumption that the state permit conditions would adequately protect shad is faulty. *See supra* at Part I.C. Even with the hiatus in place, "the fact that the chosen intake location poses some of the highest potential risk to juvenile anadromous fish populations in the area remains unchanged." FWS June 2005 Ltr. at 1, MAR022776 (quoting VIMS June 2004 Ltr. at 6, MAR022793). The pumping hiatus is based on temperature triggers for the spawning cycle of shad in the Hudson River, not the Mattaponi River, and the conditions are not similar.[84] *See* VIMS June 2004 Ltr. at 2-3, MAR022789-90. Without site-specific data, there is no way of knowing the impacts on shad in the Mattaponi. *Id.* at 3-4, 6, MAR022790-91, 93. Moreover, the pumping hiatus means less water to the system, thus potentially affecting the practicability of the project when balanced against the environmental impacts, as numerous commenters pointed out. *See supra* at Part I.C. The NAD must prepare an SEIS to examine the potential impacts from the pumping hiatus, including alterations in salinity patterns and impacts on aquatic species such as shad, and the sensitive joint vetch.[85]

C. Other Environmentally Significant New Information.

Other significant new information since the 1997 FEIS mandates an SEIS. First, as noted in the RROD, Newport News has specifically reserved the lands directly below the reservoir site for possible future enlargement of the reservoir, which would cause the destruction of an additional 137 to 216 acres of wetlands.[86] RROD at 246, MAR078182. While the ROD

---

[84] The 2004 Panel Report also conceded that such triggers "might not be reliable" for shad in the Mattaponi. 2004 Panel Rep. at vi, MAR015836.

[85] An EIS is required if the action "may" have a significant environmental impact. *See American Bird Conservancy v. Federal Communications Commission*, 516 F.3d 1027, 1033-1034 (D.C. Cir. 2008); *Sierra Club v. Peterson*, 717 F.2d 1409, 1415 (D.C. Cir. 1983). The standards for preparing an EIS and an SEIS are essentially the same. *Marsh v. Oregon Natural Resources Council*, 490 U.S. at 372-73.

[86] *See* Newport News and King William County Agreement, Addendum 3 at p.3 (Mar. 1997), MAR066735.

acknowledges this "right to pursue a future dam downstream," ROD at 24, MAR023173, it fails

to consider the impacts of such an expansion, in violation of NEPA.  *See Dubois v. Dept. of*

*Agriculture*, 102 F.3d at 1286 (agency "must evaluate the reasonably foreseeable significant

effects of the proposed action").

    Second, certain mitigation sites relied upon in the Final Wetlands Mitigation plan are no

longer available. FWS Feb. 2005 Ltr. at 2, MAR019521.[87]  This change undercuts the NAD's

conclusion that mitigation will be adequate to avoid the significant impacts from the project.[88]

*See id.* at 2-3, MAR019521-22.   *See supra* at Part I.B.

    Third, the FWS and others pointed out that the FEIS did not explore the potential for the

formation of methyl mercury in the reservoir.  The NAD acknowledged that newly flooded

reservoirs mobilize mercury in soils, making it more likely that heightened mercury levels will

be present in fish.  ROD at 56-57, MAR023206-07.  But it improperly dismissed this risk as

"small," *id.* at 56, MAR023206, based on unverified data from the applicant in violation of its

NEPA obligations.[89]  *See Idaho v. Interstate Commerce Commission*, 35 F.3d 585, 596 (D.C.

Cir. 1994)(agency decision was "blatant departure" from NEPA where it deferred to judgment of

other agencies and applicant).

    Finally, an SEIS is required to examine the impacts on aquatic life from a chemical feed

system, allowed under the 2004 VMRC permit, which is intended to prevent lodging of invasive

species on the intake structure.  *See* FWS June 2005 Ltr. at 2, MAR022777.  The NAD dismissed

---

[87] *See* Letter from DEQ to Newport News at 2 (25 Feb. 2005), MAR022636.

[88] *See also* FWS Feb 2005 Ltr. at 1, MAR019520 ("project constitutes a net loss of wetlands and aquatic habitats, and will result in significant degradation of the aquatic ecosystem").

[89] Relevant to this inquiry, the NAD ignored the "troubling new information" regarding the Virginia Department of Health's issuance of fish consumption advisories in the Mattaponi and Pamunkey Rivers in 2004 based on dangerous mercury levels.  FWS June 2005 Ltr. at 2, MAR022777.  *See* Virginia Department of Health, Fish Consumption Advisory: York River Basin (last updated 13 Feb. 2008), at http://www.vdh.virginia.gov/epidemiology/PublicHealthToxicology/Advisories/YorkRiver.htm.

this concern on the grounds that Newport News has no current plans to use the system.  ROD at

21-22, MAR023170-71.  Such use is reasonably foreseeable, however.

        D.     <u>Cumulative and Indirect Impacts.</u>

An SEIS is also necessary to examine the cumulative impacts of the project.[90]  In the

RROD, the Norfolk District specifically found that the project could result in cumulative adverse

impacts, citing, among other things, the potential future expansion of the reservoir itself, and

EPA and FWS statements that wetland losses from the project would contribute significantly to

ongoing cumulative adverse effects in the Chesapeake Bay.  RROD at 245-247, MAR078181-

83.[91]  The NAD simply swept any concerns aside, stating "there are no additional projects of this

scope or magnitude anticipated in the project area.  Therefore, no cumulative impacts are

expected to occur." ROD at 40, MAR023189.  The assessment of cumulative impacts, however,

is not limited to projects of comparable size and scope.[92]  The Corps must consider the impacts

from the project in relation to the losses that have already occurred in the Chesapeake Bay

watershed, as a result of Newport News' existing reservoirs and other development.[93]  *See* EPA

Feb. 2000 Ltr. at 8, MAR040405.  Finally, the NAD improperly failed to consider indirect

---

[90] Under NEPA, cumulative impacts are those "which result] from the incremental impact of action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions." 40 C.F.R. §1508.7.

[91] *See* RROD at 245, MAR078181 (referencing EPA Feb. 2000 Ltr. at 8, MAR040405). Despite the national importance of the Chesapeake Bay, the 1997 FEIS completely ignored the potential cumulative impacts on the Bay. The FEIS's only cursory references to cumulative impacts of any type are inadequate under NEPA.

[92] The regulations specifically state that actions that are "individually minor but collectively significant" may result in cumulative impacts.  40 C.F.R. §1508.7. The ROD even went so far as to claim that the applicant's Final Wetlands Mitigation Plan will benefit the watershed, completely disregarding EPA's and the FWS's comments, the RROD's comprehensive evaluation, and numerous other comments in the record,.  ROD at 40, MAR023189.  Only the self-serving statements of the applicant would support such a position.  *See supra* at Part I.B.

[93] *See Grand Canyon Trust v. FAA*, 290 F.3d 339, 345 (D.C. Cir. 2002)(FAA must look at cumulative, and not simply incremental, increases in noise levels from proposed airport on national park).

impacts to aquatic resources, as required by 40 C.F.R. §1508.8(b), as a result of likely development around the reservoir if constructed.[94]

## CONCLUSION

For the reasons set forth above, the Alliance requests that this Court grant its motion for summary judgment in all respects against the defendants, that the Court order the Corps to revoke the section 404 permit and enjoin any activities authorized under the permit, and that the Court award the Alliance their reasonable attorneys fees.

Respectfully submitted this 15th day of July 2008.

*/s/ Deborah M. Murr*ay
Deborah M. Murray (D.C. Bar No. 362563)
Southern Environmental Law Center
201 West Main Street, Suite 14
Charlottesville, VA   22902
(434) 977-4090 Telephone
(434) 977-1483 Fax

Counsel for Plaintiffs
Alliance to Save the Mattaponi
The Chesapeake Bay Foundation, Inc.
Sierra Club, Virginia Chapter

Jon A. Mueller
The Chesapeake Bay Foundation, Inc.
6 Herndon Ave.
Annapolis, MD 21403
(410) 268-8816 Telephone
(410) 268-6687 Fax

Co-Counsel for Plaintiff
The Chesapeake Bay Foundation, Inc.

---

[94] *Friends of the Earth v. U.S. Army Corps of Eng'rs*, 109 F. Supp. 2d 30, 41(D.D.C. 2000) (Corps required to analyze growth-inducing effects of casino projects in coastal Mississippi).

APPENDIX A

Timeline for Permit Review of Proposed Reservoir Project

- **30 July 1990**: Norfolk District of the Corps issued a notice of intent to prepare a Draft EIS on Newport News' regional raw water supply proposal.  MAR033446 (ROD at 10, MAR023159).
- **13 November 1990**: King William Reservoir Project Development Agreement. MAR067841.
- **1 July 1993**: Newport News applied to the VMRC for a permit. MAR058789.
- **6 July1993**: Newport News submitted its joint permit application for the KWR-I project to Virginia DEQ and U.S. Army Corps. ROD at 10, MAR023159.
- **February 1994**: Draft EIS issued. MAR077199.
- **17 May 1994**: FWS requested Supplement to Draft EIS. MAR034983.
- **1 June 1994**: EPA requested Supplement to Draft EIS.  MAR034944.
- **13 June 1994**:  FWS letter to Corps reserved right to seek elevation of decision on permit. MAR035449.
- **14 June 1995**: Revised permit application for KWR-II. MAR058928.
- **29 December 1995**: Corps issued Supplement to the Draft EIS. MAR064067 (ROD at 11, MAR023160).
- **28 March 1996**: FWS recommended denial of the Section 404 permit.  MAR035957.
- **13 November 1996**: EPA Region III rated Draft and Supplemental EIS as "Environmentally Unsatisfactory."  MAR036438.
- **30 December 1996**: Revised permit application submitted for KWR-IV. MAR076495.
- **24 January 1997**: Final EIS. MAR044801.
- **25 July 1997**:  EPA Region III letter expressed concerns regarding impacts of project. MAR037349.
- **25 July 1997**: FWS letter recommended denial of 404 permit. MAR037368.
- **22 December 1997**: Virginia DEQ issued VWP Permit No. 93-0902 to Newport News. MAR037348.
- **May 1998**: Planning and Management Consultants, Ltd. report issued.  RROD at 13, MAR077946.
- **May 1999**:  IWR initial report issued evaluating the risk of water shortages for the region. MAR026946.
- **4 June 1999:** Colonel Allan B. Carroll, Norfolk District Commander issued intent to recommend denial of 404 permit. MAR039340.
- **8 June 1999**: Virginia Governor James Gilmore issued written position on KWR-IV project disagreeing with Norfolk District. MAR039335.
- **22 July 1999**: FWS letter outlined opposition to Final Mitigation Plan and recommending denial of permit. MAR053265.
- **5 August 1999**: EPA Region III letter questioned Final Mitigation Plan and KWR-IV project. MAR019153.
- **1 March 2001**:  IWR issued draft report evaluating the risk of water shortages for the region. MAR013605.

- **20 March 2001:** Norfolk District issued for public comment Draft Recommended Record of Decision in favor of denial. MAR077688.
- **1 May 2001**: EPA Region III letter supported permit denial, stating that project would violate section 404(b)(1) guidelines and cause unacceptable adverse effects. MAR041816.
- **1 May 2001**: FWS letter supported permit denial. MAR041792.
- **2 July 2001**: Norfolk District issued its Final Recommended Record of Decision affirming that the 404 permit should be denied. MAR013735.
- **15 August 2001**: IWR final report issued evaluating the risk of water shortages for the region. MAR014110.
- **15 October 2001**: FWS stated that project will affect Aquatic Resources of National Importance and cause significant degradation of waters of the U.S. MAR016744.
- **31 October 2001**: Governor Gilmore comment letter on Final RROD objecting to denial and requesting approval for KWR-IV permit. MAR18859.148.
- **30 September 2002**: Gen. Rhoades of NAD announced decision to continue processing application and overturns Norfolk Final RROD. ROD at 4, MAR023153.
- **27 December 2002**: Virginia DEQ Permit modification issued. MAR021433.
- **22 July 2003**: EPA Region III memo repeated that project would represent the largest wetland loss in the history of the CWA in the Mid-Atlantic region. EPAKWR004717.
- **14 October 2003**: FWS letter opposed KWR-IV project. MAR021773.
- **22 March 2004**: EPA Region III letter outlined objections to Mitigation Plan. MAR023770.
- **29 March 2004**: FWS letter outlined objections to Mitigation Plan. MAR019485.
- **17 August 2004**: VMRC permit issued. ROD at 13, MAR023162.
- **1 February 2005**: FWS letter to Gen. Temple of NAD stated strong opposition to KWR-IV project. MAR019520.
- **23 March 2005**: FWS to Newport News outlined objections to project and mitigation plan. EPAKWR004822.
- **23 June 2005**: FWS to Corps raised significant new information. MAR022776.
- **29 July 2005**: Gen. Temple of NAD issued Record of Decision stating intent to issue 404 permit. MAR023150.
- **11 August 2005**: FWS Region recommended that July decision be elevated to Corps Headquarters. MAR023221.
- **1 September 2005**: DOI indicated that it would not seek further review before Corps Headquarters on decision to issue 404 permit. MAR023240.
- **15 November 2005**: Section 404 permit issued. MAR023312.

**CERTIFICATE OF SERVICE**

I hereby certify that on 15 July 2008, I electronically filed the Motion for Summary Judgment, Memorandum of Law in Support of Motion for Summary Judgment, and attached affidavits, and Proposed Order with the Clerk of Court using the CM/ECF system, which will send notification of such filing to all parties in this matter.

I also hereby certify that on 16 July 2008, true and correct copies of the Motion for Summary Judgment, Memorandum of Law in Support of Motion for Summary Judgment, and attached affidavits, and Proposed Order were served by first-class mail, postage prepaid, properly addressed to the following counsel who do not receive electronic notification of filings:

M. Scott Hart
Troutman Sanders LLP
222 Central Park Avenue
Suite 2000
Virginia Beach, VA 23462

James E. Ryan, Jr.
George A. Somerville
Lynne F. Rhode
Troutman Sanders LLP
PO Box 1122
Richmond, VA 23218-1122

Stuart E. Katz, City Attorney
Allen L. Jackson, Chief Deputy City Attorney
City of Newport News
2400 Washington Avenue
Newport News, VA 23607

Pat M. Falcigno
Office of Counsel
North Atlantic Division
U.S. Army Corps of Engineers
Fort Hamilton
302 General Lee Avenue
Brooklyn, NY 11252-6700

/s/ *Deborah M. Murray*