# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____
                                          )
ALLIANCE TO SAVE THE                      )
MATTAPONI, et al.                         )
                                          )
        Plaintiffs,                       )
                                          )
      v.                                  )     Civil Action No. 06-CV-1268
                                          )
UNITED STATES ARMY CORPS OF               )
ENGINEERS, et al.                         )
                                          )
        Defendants.                       )
_____ )

## UNITED STATES' MOTION FOR SUMMARY JUDGMENT

Pursuant to Fed. R. Civ. P. 56(c), and for the reasons stated in the accompanying

Memorandum, defendants United States Army Corps of Engineers, et al. ("Corps") and United

States Environmental Protection Agency ("EPA") (collectively "United States") hereby move that

summary judgment be entered for the United States on all claims asserted by plaintiffs Alliance to

Save the Mattaponi et al. and plaintiff-intervenors Mattaponi Indian Tribe and Chief Carl T. Lone

Eagle Custalow.

September 30, 2008               Respectfully submitted,

                                 RONALD J. TENPAS
                                 Assistant Attorney General
                                 United States Department of Justice
                                 Environment & Natural Resources Division

                                 */s Angeline Purdy*

                                 _____
                                 ANGELINE PURDY
                                 Trial Attorney
                                 D.C. Bar No. 489236

Environmental Defense Section
PO Box 23986
Washington DC 20026-3986
(202) 514-0996 (tel.)
(202) 514-8865 (fax)
Angeline.Purdy@usdoj.gov

SAMANTHA KLEIN
Trial Attorney
Natural Resources Section
PO Box 663
Washington DC  20044-0663
(202) 305-0474 (tel.)
(202) 305-0506 (fax)
Samantha.Klein@usdoj.gov


Of Counsel:

PAT M. FALCIGNO
Assistant Counsel
North Atlantic Division Regional Business Center
United States Army Corps of Engineers

DAWN M. MESSIER
U.S. Environmental Protection Agency
Office of General Counsel
Washington, D.C.

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                          )
ALLIANCE TO SAVE THE                      )
MATTAPONI, et al.                         )
                                          )
              Plaintiffs,                 )
                                          )
       v.                                 )    Civil Action No. 06-CV-1268
                                          )
UNITED STATES ARMY CORPS OF               )
ENGINEERS, et al.                         )
                                          )
              Defendants.                 )
_____  )


**COMBINED MEMORANDUM
IN SUPPORT OF UNITED STATES' MOTION FOR SUMMARY JUDGMENT
AND IN OPPOSITION TO PLAINTIFF AND PLAINTIFF-INTERVENORS' MOTIONS
FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

I.    STATUTORY AND REGULATORY BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . 2

      A.    The Clean Water Act . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

            1.  Regulation of Discharges of Dredged or Fill Material . . . . . . . . . . . . . . . . . . . 2

            2.  EPA's Veto Authority . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

      B.    The National Environmental Policy Act . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

II.   FACTUAL BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

STANDARD OF REVIEW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

I.    ISSUANCE OF THE PERMIT COMPLIED WITH THE CLEAN WATER ACT . . . . . 8

      A.    There is a Demonstrated Need for an Additional Dependable Long-Term
            Water Supply for the Lower Virginia Peninsula . . . . . . . . . . . . . . . . . . . . . . . . 9

      B.    The Reservoir is the Only Practicable Alternative to Meet That Need . . . . . . . . 12

            1.  The Corps Conducted a Proper Alternatives Analysis . . . . . . . . . . . . . . . . . . 13

            2.  The Record Supports the Corps' Conclusion That There are No
                Remaining Practicable Non-Reservoir Alternatives . . . . . . . . . . . . . . . . . . . . 16

                  a.  Additional withdrawals from the Chickahominy River are not
                      practicable . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

                  b.  Use of the Big Bethel reservoir is not practicable . . . . . . . . . . . . . . 18

                  c.  Additional groundwater desalination is not practicable. . . . . . . . . . . 19

                  d.  Conservation measures and the use of groundwater, although
                      practicable, are already being implemented. . . . . . . . . . . . . . . . . . . . 20

C.      There Is No Available Alternative Location for a Reservoir . . . . . . . . . . . . . . . . 21

D.      Construction of The Reservoir, Inclusive of Compensatory Mitigation,
        Will Not Cause Significant Degradation of Waters of the United States  . . . . . . 23

        1.  The Mitigation Plan Identifies an Adequate Number of Appropriate
            Mitigation Sites . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

        2.  The Functions and Values of Wetlands Impacted by the Reservoir
            will be Replaced  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

        3.  Construction of the Reservoir will Not Otherwise Significantly Degrade
            Waters of the United States  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

            a.  The Corps considered the impact of the pumping hiatus  . . . . . . . . . 27

            b.  Pumping associated with the reservoir project will not have a
                significant adverse effect on shad . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

E.      The Corps Reasonably Determined That Construction of the Reservoir is
        in the Public Interest  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

II.     PLAINTIFFS CANNOT ESTABLISH THAT A SUPPLEMENTAL NEPA
        ANALYSIS IS NECESSARY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

A.      The Change in Projected Water Deficit Does Not Constitute a Project Change
        Requiring Preparation of an SEIS  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

B.      The Alliance and the Tribe Fail to Present Any "New Information" Requiring
        Preparation of an SEIS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

        1.  The Corps Analyzed Potential Impacts to Traditional Cultural Properties
            Prior to Issuing the Permit  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

        2.  The Corps Analyzed Potential Impacts of Methyl Mercury Prior to Issuing
            the Permit . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

        3.  The Corps Was Not Required to Analyze Impacts of a Chemical Feed
            System Because it is Not "Reasonably Foreseeable" . . . . . . . . . . . . . . . . . . 41

        4.  The Corps was Not Required to Analyze Impacts of a Possible Future
            Expansion of the Reservoir Because it is Not a "Proposed  Action"  . . . . . . 42

        5.  The Corps Properly Analyzed Cumulative and Indirect Impacts . . . . . . . . . 43

6.  The Corps Analyzed Potential Impact Greater Than Those Allowed
Under The 2004 VMRC Permit . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

III.    EPA'S DECISION NOT TO INITIATE THE SECTION 404(C) PROCESS WAS NOT
ARBITRARY OR CAPRICIOUS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

A.    The Only Decision at Issue is EPA's Decision Not to Initiate the Section 404(c) Veto
Process . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

B.    The Declaration of Donald Welsh Establishes That EPA's Decision Not to
Initiate the 404(c) Process was Not Arbitrary or Capricious . . . . . . . . . . . . . . . 53

1.  The Welsh Declaration is an Appropriate Substitute for a Contemporaneously
Prepared Administrative Record . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

2.  The Welsh Declaration Demonstrates That EPA Appropriately Exercised its
Discretion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

3.  Plaintiffs' Approach is Inconsistent With EPA's Role Under the CWA . . . . 59

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60

# TABLE OF AUTHORITIES

## CASES

AFL-CIO v. Chao,
  496 F. Supp. 2d 76 (D.D.C. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Airport Impact Relief, Inc. v. Wykle,
  45 F. Supp. 2d 89 (D. Mass. 1999), aff'd 192 F.3d 197, 200 (1st Cir. 1999) . . . . . . . . . . . . . . 44

American Horse Prot. Ass'n v. Lyng,
  812 F.2d 1 (D.C. Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

Amigos Bravos v. EPA,
  324 F.3d 1166 (10th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

AT&T Info. Sys. v. Gen. Servs. Admin.,
  810 F.2d 1233 (D.C. Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

Buttrey v. United States,
  690 F.2d 1170 (5th Cir. 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

Cabinet Mountains Wilderness v. Peterson,
  685 F.2d 678 (D.C. Cir. 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Camp v. Pitts,
  411 U.S. 138 (1973) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27, 54

Center for Auto. Safety v. Dole,
  846 F.2d 1532 (D.C. Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

Citizens to Pres. Overton Park v. Volpe,
  401 U.S. 402 (1971) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 30, 54

City of Olmsted Falls, Ohio v. Fed. Aviation Admin.,
  292 F.3d 261 (D.C. Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34, 35

City of Olmsted Falls v. EPA,
  435 F.3d 632 (6th Cir. 2006)        . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

Coliseum Square Ass'n, Inc. v. Jackson,
  465 F.3d 215 (5th Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41, 51

Davis v. Latschar,
  202 F.3d 359 (D.C. Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35, 36

Dubois v. Thomas,
  820 F.2d 943 (8th Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

Environmental Def. v. U.S. Army Corps of Eng'rs,
  515 F. Supp. 2d 69 (D.D.C. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Federal Power Comm'n v. Transcon. Gas Pipe Line Corp.,
  423 U.S. 326 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

Florida Keys Citizens Coal. Inc. v. U. S. Army Corps of Eng'rs,
  374 F. Supp. 2d 1116 (D. Fla. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Florida Wildlife Fed'n v. U. S. Army Corps of Eng'rs,
  401 F. Supp. 2d 1298 (S.D. Fla. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

Friends of the Earth v. Hall,
  693 F. Supp. 904 (W.D. Wash. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

Friends of the Earth v. Hintz,,
  800 F.2d 822 (9th Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Fund for Animals v. Rice,
  85 F.3d 535 (11th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Gersman v. Group Health Ass'n Inc.,
  975 F.2d 886 (D.C. Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

Hammond v. Norton,
  370 F. Supp. 2d 226 (D.D.C. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41, 44

Heckler v. Chaney,
  470 U.S. 821 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52, 57

Idaho v. ICC,
  35 F.3d 585 (D.C. Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

Kleppe v. Sierra Club,
  427 U.S. 390 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 43

Marsh v. Or. Natural Res. Council,
490 U.S. 360 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 34, 35, 41, 51

Massachusetts v. EPA,
127 S. Ct. 1438 (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

Massachusetts v. Watt,
716 F.2d 946 (1st Cir. 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,
463 U.S. 29 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 35, 55

National Ass'n of Homebuilders v. Defenders of Wildlife,
127 S. Ct. 2518 (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

National Comm. for the New River, Inc. v. F.E.R.C.,
373 F.3d 1323 (D.C. Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

National Indian Youth Council v. Watt,
664 F.2d 220 (10th Cir. 1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

National Mining Ass'n v. Fowler,
324 F.3d 752 (D.C. Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

National Wildlife Fed'n v. EPA,
286 F.3d 554 (D.C. Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 15

National Wildlife Fed'n v. Marsh,
721 F.2d 767 (11th Cir. 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

Natural Res. Def. Council v. Kempthorne,
525 F. Supp. 2d 115 (D.D.C. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

North Carolina v. Hudson,
665 F. Supp. 428 (E.D.N.C. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Northwest Envtl. Def. Ctr. v. Wood,
947 F. Supp. 1371 (D. Or. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 16

Olympic Forests Coal. v. U.S. Forest Serv.,
556 F. Supp. 2d 1198 (W.D. Wash. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

Personal Watercraft Indus. Ass'n v. Dep't of Commerce,
48 F.3d 540 (D.C. Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

Public Utils. Comm'n of Cal. V. F.E.R.C.,
900F.2d 269 (D.C. Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Sierra Club v. U.S. Army Corps of Eng'rs,
295 F.3d 1209 (11th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46, 51

Simmons v. U. S. Army  Corps of Eng'rs,
120 F.3d 664 (7th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 13

South Trenton Residents Against 29 v. Fed. Highway Admin.,
176 F.3d 658 (3rd Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

Strycker's Bay Neighborhood Council v. Karlen,
444 U.S. 223 (1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

Town of Cave Creek, Ariz. v. F.A.A.,
325 F.3d 320 (D.C. Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

Township of Springfield v. Lewis,
702 F.2d 426 (3rd Cir. 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

Troy Corp. v. Browner,
120 F.3d 277 (D.C. Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Vermont Yankee Nuclear Power Corp. v. NRDC,
435 U.S. 519 (1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30, 31

West Branch Valley Flood Prot. Ass'n v. Stone,
820 F. Supp. 1 (D.D.C. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34, 39, 46

Wetlands Action Network v. U.S. Army Corps of Eng'rs,
222 F.3d 1105 (9th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

Wisconsin v. Weinberger,
745 F.2d 412 (7th Cir. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

Women Involved in Farm Econ. v. USDA,
876 F.2d 994 (D.C. Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

**STATUTES**

Administrative Procedure Act,
5 U.S.C. §§ 701-706 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

5 U.S.C. § 701(a)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

5 U.S.C. § 706(2)(A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

The Clean Water Act,
33 U.S.C. §§ 1251-1387 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

33 U.S.C. § 1251(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

33 U.S.C. § 1311(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

33 U.S.C. § 1319(a)(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

33 U.S.C. § 1344 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 2

33 U.S.C. § 1344(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

33 U.S.C. § 1344(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

33 U.S.C. § 1344(b)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

33 U.S.C. § 1344(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 3, 4, 51, 54

33 U.S.C. § 1344(e)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

33 U.S.C. § 1344(q) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60

42 U.S.C. §§ 4321-4370d . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

42 U.S.C. § 4332(C) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

**CODE OF FEDERAL REGULATIONS**

33 C.F.R. § 230.13(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

33 C.F.R. pts. 320-324 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

33 C.F.R. § 320.4(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

33 C.F.R. § 320.4(a)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 31

33 C.F.R. § 320.4(a)(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

33 C.F.R. § 320.4(b)(4) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

33 C.F.R. § 320.4(j)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

33 C.F.R. § 320.4(j)(4) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

33 C.F.R. pt. 325, App. B § 8(f)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

33 C.F.R. § 325.2(a)(6) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

33 C.F.R. § 325.8(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

33 C.F.R. § 325.8(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 3

33 C.F.R. § 325.8(b)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 6

33 C.F.R. § 325.8(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

33 C.F.R. § 328.3(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

36 C.F.R. pt. 800 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

36 C.F.R. §§ 800.6(c), 800.16(o) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

40 C.F.R. pt. 230 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

40 C.F.R. § 230.10 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

40 C.F.R. § 230.10(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 8, 12

40 C.F.R § 230.10(a)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 12

40 C.F.R. § 230.10(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 8, 23

40 C.F.R. § 230.10(d) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 8

40 C.F.R. § 230.11 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

40 C.F.R. § 230.12 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

40 C.F.R. § 230.12(a)(3)(ii) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

40 C.F.R. § 230.12(a)(3)(iii) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

40 C.F.R. § 230.91 et seq. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

40 C.F.R. pt. 231 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 52

40 C.F.R. § 231.2(e) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

40 C.F.R. §§ 231.3-231.6 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

40 C.F.R. § 231.3(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

40 C.F.R. § 231.5(e) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

40 C.F.R. § 1502.9(c)(1)(i) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 34

40 C.F.R. § 1502.9(c)(1)(ii) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 34

40 C.F.R. § 1506.5(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

40 C.F.R. § 1508.7 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

40 C.F.R. § 1508.23 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

40 C.F.R. § 1508.27 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

**FEDERAL REGISTER**

44 Fed. Reg. 58076 (Oct. 9, 1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54, 57

55 Fed. Reg. 9210 (Mar. 12, 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

**TABLE OF ABBREVIATIONS**

Alliance                Plaintiffs Alliance to Save the Mattaponi <u>et al.</u>

All. Br.                The Alliance <u>et al.</u>'s Memorandum of Points and Authorities in Support of Motion for Summary Judgment (July 16, 2008)

City                    City of Newport News

Corps                   U.S. Army Corps of Engineers

CWA                     Clean Water Act, 33 U.S.C. §§ 1251 <u>et seq</u>.

DEIS                    Draft Environmental Impact Statement

EIS                     Environmental Impact Statement

EPA                     U.S. Environmental Protection Agency

FEIS                    Lower Virginia Peninsula Regional Water Supply Plan Final Environmental Impact Statement (January 1997)

Guidelines              Guidelines issued by EPA and the Corps under Section 404(b)(1) of the Clean Water Act, 33 U.S.C. § 1344(b)(1), found at 40 C.F.R. Pt. 230.

IWR                     U.S. Army Corps of Engineers' Institute for Water Resources

mgd                     million gallons per day

Mitigation Plan         King William Reservoir Project Reservoir Mitigation Plan (June 2004)

NEPA                    National Environmental Policy Act, 42 U.S.C. § 4321 <u>et seq</u>.

NHPA                    National Historic Preservation Act, 16 U.S.C. § 470 <u>et seq.</u>

Permit                  Department of the Army Permit No. 93-0902-12, authorizing installation of a raw water intake in the Mattaponi River and construction of the King William Reservoir

Reservoir               King William Reservoir

ROD                     Record of Decision Memorandum for Permit Application Number 93-0902-12 by the City of Newport News, Virginia for the King William Reservoir Project (July 29, 2005)

RROD                    Final Recommended Record of Decision of the District Commander On
                        Permit Application Number 93-0902-12 Submitted by the City of Newport
                        News on Behalf of the Regional Raw Water Study Group for the King
                        William Reservoir Project on Cohoke Creek in King William County,
                        Virginia (July 2, 2001)

RRWSG                   Regional Raw Water Study Group (consisting of the Cities of Newport
                        News and Williamsburg and the Counties of York and James City,
                        Virginia)

SDEIS                   Supplemental Draft Environmental Impact Statement

Tribe                   Plaintiff-intervenors Mattaponi Indian Tribe and Chief Carl T. Lone Eagle
                        Custalow

Tr. Br.                 Statement of Points and Authorities in Support of Plaintiff-Intervenors'
                        Motion for Summary Judgment (July 15, 2008)

VMRC Permit             Virginia Marine Resources Commission Permit No. 93-0902 (August 12,
                        2004)

## INTRODUCTION

Plaintiffs Alliance to Save the Mattaponi et al. ("Alliance") and plaintiff-intervenors Mattaponi Indian Tribe and Chief Carl T. Lone Eagle Custalow (collectively "Tribe") challenge the United States Army Corps of Engineers' ("Corps'") issuance of a permit under Section 404 of the Clean Water Act, 33 U.S.C. § 1344 ("Permit").  The Permit authorizes the City of Newport News ("City") to instal a raw water intake in the Mattaponi River and to construct the King William Reservoir ("Reservoir") on Cohoke Creek in southeastern Virginia, thereby ensuring a stable long-term water supply for the entire Lower Virginia Peninsula.

The Alliance and the Tribe challenge the Corps' decision to issue the Permit as inconsistent with the Clean Water Act and the National Environmental Policy Act.  The record demonstrates, however, that the Corps' review of the permit application complied with all applicable laws, regulations and policies, and that the Corps reasonably concluded that issuance of the Permit will serve the public interest.  The record also demonstrates that there was no need for the Corps to conduct further environmental review before issuing the Permit.  As the Alliance and the Tribe have failed to demonstrate that the Corps' issuance of the Permit was arbitrary or capricious, their motion for summary judgment should be denied and summary judgment should be entered for the Corps.

The Alliance and the Tribe also challenge EPA's choice not to exercise its discretion to initiate proceedings necessary to "veto" the Permit pursuant to its authority under Section 404(c) of the Act, 33 U.S.C. § 1344(c).  EPA's wholly discretionary choice not to veto the Permit is unreviewable; moreover, given the breadth of EPA's discretion under Section 404(c), the Alliance and the Tribe have failed to demonstrate that EPA's exercise of that discretion was arbitrary or capricious.  Summary judgment should therefore be entered for EPA.

## BACKGROUND

I.    STATUTORY AND REGULATORY BACKGROUND

A.    The Clean Water Act.

The Clean Water Act ("CWA"), 33 U.S.C. § 1251 et seq., establishes a comprehensive program designed to "restore and maintain the chemical, physical, and biological integrity of the nation's waters."  33 U.S.C. § 1251(a).  To achieve this goal, the CWA generally prohibits the discharge of pollutants, including dredged or fill material, into navigable waters unless authorized by a CWA permit.  33 U.S.C. § 1311(a).  The CWA defines "navigable waters" as "waters of the United States," which is further defined to include certain wetlands.  33 C.F.R. § 328.3(a), (b).

1.    Regulation of Discharges of Dredged or Fill Material.

Section 404 of the CWA authorizes the Corps to issue permits for the discharge of dredged or fill material into navigable waters.  33 U.S.C. § 1344.  All Section 404 permits must conform to the guidelines issued by EPA and the Corps under CWA section 404(b)(1), 33 U.S.C. § 1344(b)(1) ("Guidelines").  See 33 U.S.C. § 1344(e)(1).[1/]  The Guidelines generally  prohibit the permitting of projects where there "is a practicable alternative to the proposed discharge which would have less adverse impact on the aquatic ecosystem, so long as the alternative does not have other significant adverse environmental consequences."  40 C.F.R. § 230.10(a).  To be "practicable," an alternative must be "available and capable of being done after taking into consideration cost, existing technology, and logistics in light of overall project purposes."  40 C.F.R. § 230.10(a)(2).

The Guidelines also provide that "no discharge of dredged or fill material shall be permitted which will cause or contribute to significant degradation of the waters of the United States," and that

---

[1/]  The Guidelines are codified at 40 C.F.R. pt. 230 and are incorporated into the Corps' own regulations implementing Section 404.  33 C.F.R. § 320.4(b)(4); see also id. § 325.2(a)(6) (Corps' permit decision must include assessment of whether activity conforms with Guidelines).

no discharge shall be permitted "unless appropriate and practicable steps have been taken which will minimize potential adverse impacts of the discharge on the aquatic ecosystem." 40 C.F.R. § 230.10(c), (d).  The permitting authority must determine the potential short- and long-term effects of a discharge, and must use these factual findings to determine whether the proposed discharge complies with 40 C.F.R. § 230.10.  See 40 C.F.R. §§ 230.11 (identifying required factual determinations), 230.12 (identifying required findings).

The Corps also conducts a public interest review of all permit applications, balancing "the benefits which reasonably may be expected to accrue from the proposal . . . against its reasonably foreseeable detriments." 33 C.F.R. § 320.4(a).  This regulation identifies multiple factors that the Corps must consider, but also indicates that "how important a factor is and how much consideration it deserves will vary with each proposal." Id. § 320.4(a)(3).  Subject to this review, "a permit will be granted unless the district engineer determines that it would be contrary to the public interest." Id. § 320.4(a)(1).

Corps district engineers are authorized to grant or deny Section 404 permit applications. 33 C.F.R. § 325.8(b).  However, if a district engineer's recommended decision is "contrary to the written position of the Governor of the state in which the work would be performed," the matter is referred to the division engineer. 33 C.F.R. § 325.8(b)(2).  In that event, the authority to grant or deny the permit application lies with the division engineer. 33 C.F.R. § 325.8(c).

### 2.      EPA's Veto Authority.

Section 404(c) of the Act authorizes EPA to "prohibit the specification (including the withdrawal of specification) of any defined area as a disposal site" whenever EPA determines, "after notice and opportunity for public hearings," that a discharge will have certain "unacceptable adverse effect[s]" 33 U.S.C. § 1344(c).  This is colloquially referred to as "vetoing" a Section 404 permit. Before making the determination required to exercise its veto authority, EPA must consult with the

3

Corps and solicit public comments; moreover, EPA's determination (including the reasons therefore) must be "set forth in writing and [made] public."  Id.

EPA regulations establish the procedures to be followed in making the determination required to take action under Section 404(c).  See generally 40 C.F.R. Pt. 231.  Specifically, "[i]f the Regional Administrator has reason to believe after evaluating the information available to him" that an "unacceptable adverse effect" could result from a permit, he "may" initiate the process required to make a formal determination.  40 C.F.R. § 231.3(a).  Steps involved in this process include notification of the Corps District Engineer; public notice of the proposed determination, including publication in local newspapers and in the Federal Register; a public comment period, and in some cases public hearings; issuance of a recommended final determination (or withdrawal of the proposed determination) by the Regional Administrator, with associated intra-agency review; and, ultimately, a final determination by the EPA Administrator (following consultation with the Corps). 40 C.F.R. §§ 231.3-231.6.

## B.     The National Environmental Policy Act.

The purpose of the National Environmental Policy Act ("NEPA") is to focus the attention of federal agencies and the public on a proposed action so that the environmental consequences of the action can be studied before a decision is made.  42 U.S.C. §§ 4321-4370d.  NEPA achieves this end by imposing procedural requirements, not substantive ones: "NEPA does not work by mandating that agencies achieve particular substantive environmental results."  Marsh v. Or. Natural Res. Council, 490 U.S. 360, 371 (1989).  In short, the question is whether the agency took a "hard look' at the environmental consequences of a project.  Pub. Utils. Comm'n of Cal. v. F.E.R.C., 900 F.2d 269, 282 (D.C. Cir. 1990), quoting Kleppe v. Sierra Club, 427 U.S. 390, 410 n. 21 (1976).

NEPA provides that federal agencies should prepare a detailed environmental impact statement ("EIS") for "major Federal actions significantly affecting the quality of the human

4

environment." 42 U.S.C. § 4332(C).  "NEPA's EIS requirement is governed by the rule of reason

. . . ."  Cabinet Mountains Wilderness v. Peterson, 685 F.2d 678, 682 (D.C. Cir. 1982) (citation

omitted).  Although NEPA does not explicitly address supplementation, regulations promulgated

by the Council on Environmental Quality state that supplementation of an EIS is required when (1)

the agency makes "substantial changes" to the project or (2) "[t]here are significant new

circumstances or information relevant to environmental concerns or bearing on the proposed action

or its impacts" that were not discussed or disclosed in the existing environmental documentation.

40 C.F.R. § 1502.9(c)(1)(i) and (ii); see also 33 C.F.R. § 230.13(b).

## II.    FACTUAL BACKGROUND

The Reservoir will be located on Cohoke Creek in King William County, Virginia.  Record

of Decision Memorandum for Permit Application No. 93-0902-12 (July 29, 2005) (MAR023150-

023212) ("ROD") at MAR023150.  In combination with other water sources, the Reservoir will

"provide a dependable, long-term water supply for the Lower Virginia Peninsula."  Id. at

MAR023151.  Water will be withdrawn from the Mattaponi River, pumped to the Reservoir, and

then transmitted to the City's existing water supply system.  Final Recommended Record of

Decision, July 2, 2001 (MAR013735-014109) ("RROD") at MAR013742.  The City will receive

the majority of the safe yield from the Reservoir, but a portion will be distributed to other members

of the Regional Raw Water Study Group ("RRWSG").[2] Id. at MAR013753.

Following construction of the Reservoir, a total of 437 acres of regulated waters and

wetlands will be either filled or substantially modified by reservoir pool inundation.  ROD at

MAR023172.  Pursuant to the mitigation plan required by the Permit, however, the City will create

---

[2] The RRWSG is a consortium of local purveyors in the Lower Virginia Peninsula that supply
potable water to the Cities of Newport News, Hampton, Poquoson and Williamsburg, and the
Counties of York, New Kent, King William and James City, Virginia.  MAR023152.

or restore approximately 806 acres of wetlands, and create, enhance or preserve approximately 36.5 miles of streams.  Id.  Final approval of a detailed wetlands mitigation plan, including approval of the specific sites at which mitigation is to occur, is a condition of both the federal and state permits authorizing construction of the Reservoir.  See Department of the Army Permit No. 93-0902-12 ("Permit") (MAR023312-023321) Special Conditions D and E, MAR0233315; Commonwealth of Virginia Water Protection Permit No. 93-0902 (MAR018859.090-.108) Special Condition D, MAR018859.098.

The Reservoir project underwent 15 years of review by both federal and state agencies before the Corps issued the Permit (during which time the scope of the project was twice reduced).  ROD at MAR023159-166; see also RROD at MAR013756-767.  In 2001, the Corps' Norfolk District ("District") recommended that the permit application be denied.  RROD at MAR013741.  This recommendation was contrary to the position of the Governor of Virginia; thus, consistent with 33 C.F.R. § 325.8(b)(2), the City's application was referred to the North Atlantic Division ("Division").  See Letter of June 8, 1999 from James S. Gilmore (MAR039334-336); RROD at MAR013741.  In 2002, the Corps issued an initial decision finding that (1) there is a need for an additional dependable water source for the Lower Virginia Peninsula; and (2) the Reservoir is a practicable alternative to meet that need.  Decision Memorandum for King William Reservoir Project (Sept. 30, 2002) (MAR021279-021319) at MAR021312.  The Corps' processing of the Permit application, which had been on hold following the RROD, then resumed.  See id.  On July 29, 2005, the Corps issued its final decision concluding that the Permit should be granted.  See generally ROD, MAR023150-023212.  The Corps subsequently issued the Permit that is the subject of this lawsuit on November 15, 2005.  Permit at MAR023312.

6

## STANDARD OF REVIEW

The Alliance and the Tribe bring their claims under the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 et seq., which provides a highly deferential standard of review. A reviewing court determines whether an agency action was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). In reviewing APA claims, a court in effect "sits as an appellate tribunal;" its duty is not to resolve issues of fact, but rather "to determine whether as a matter of law the evidence in the administrative record permitted the agency to make the decision it did." Fla. Keys Citizens Coal. Inc. v. United States Army Corps of Eng'rs, 374 F. Supp. 2d 1116 (D. Fla. 2005) (citations omitted); AFL-CIO v. Chao, 496 F. Supp. 2d 76, 81-82 (D.D.C. 2007). In making this assessment, "particular deference is given by the court to an agency with regard to scientific matters in its area of technical expertise." Nat'l Wildlife Fed'n v. EPA, 286 F.3d 554, 560 (D.C. Cir. 2002) (citations omitted). The question is not whether the Court itself would have made the same decision as the agency, because "the Court is not empowered to substitute its judgment for that of the agency." Citizens to Pres. Overton Park v. Volpe, 401 U.S. 402, 415-16 (1971).

Thus, the Court must uphold the decision if the agency followed required procedures, evaluated relevant factors, and reached a reasoned decision which did not constitute a clear error of judgment or exceed the bounds of its statutory authority. Overton Park, 401 U.S. at 415-16. It is the plaintiff's burden to prove that these criteria are not met and that the agency's decision was arbitrary and capricious. Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co., 463 U.S. 29, 43 (1983). As long as an agency "examined the relevant data and articulated a satisfactory explanation for its action," that action should be upheld. Chao, 496 F. Supp. 2d at 82; see also Troy Corp. v. Browner, 120 F.3d 277, 283 (D.C. Cir. 1997) (court examines whether decision was based on relevant factors and was not clear error of judgment)

**ARGUMENT**

**I.      ISSUANCE OF THE PERMIT COMPLIED WITH THE CLEAN WATER ACT**

Under the Guidelines and applicable policy documents, adverse effects on wetlands are first to be avoided; unavoidable effects are to be minimized; and these minimized impacts are to be mitigated.   See 40 C.F.R. § 230.10(a), (c), (d).   As explained in the 1990 Memorandum of Agreement between the Corps and EPA ("MOA"):

> The Corps . . . first makes a determination that potential impacts have been avoided to the maximum extent practicable; remaining unavoidable impacts will then be mitigated to the extent appropriate and practicable to minimize impacts, and, finally, compensate for aquatic resource values.

MOA, 55 Fed. Reg. 9210, 9211-12; see also Fund for Animals v. Rice, 85 F.3d 535, 543 (11th Cir. 1996).   In this case, the record supports the Corps' conclusions that construction of the Reservoir – in combination with other sources of water supply – is the only practicable means of ensuring a reliable water supply that will meet the future needs of the Lower Virginia Peninsula.   See 12-23, infra.   Construction of the Reservoir will inevitably affect wetlands; however, that effect has been minimized (by twice reducing the size of the Reservoir), and will be appropriately mitigated.   See 23-27, infra.   Finally, the Corps properly determined that construction of the Reservoir is in the public interest.   See 31-34, infra.   The Corps' decision to issue the Permit was therefore consistent with the Clean Water Act, and should be upheld.

As a threshold matter, it is important to note that it was the Corps' decision to issue the Permit.   The Alliance points to the supposed determinations made by the District – determinations which were, in the Alliance's view, then "overturned" by the Division.   See, e.g., The Alliance Et Al.'s Memorandum of Points and Authorities in Support of Motion for Summary Judgment ("All. Br.") (Doc. 72-2) 1, 4; see generally id. 22-34.   The District's recommendation was just that – a recommendation – not a determination that was later reversed.   The mere fact that the Division

disagreed with the District's recommendation does not, in itself, render the Corps' final action arbitrary or capricious.  As the Supreme Court has recognized, courts review only <u>final</u> agency actions, and "the fact that a preliminary determination by a local agency representative is later overruled at a higher level within the agency does not render the decisionmaking process arbitrary and capricious."  <u>Nat'l Ass'n of Homebuilders v. Defenders of Wildlife</u>, 127 S.Ct. 2518, 2530 (2007).  The only question thus is whether the administrative record as a whole contains evidence sufficient to support the Corps' issuance of the Permit.  As discussed in the following sections, it does, and summary judgment should therefore be entered for the Corps.

> **A.**      **There Is a Demonstrated Need for an Additional Dependable Long-Term Water Supply for the Lower Virginia Peninsula.**

The Reservoir is the only practicable alternative that fulfills the project purpose and need to "provide a dependable, long-term water supply for the Lower Virginia Peninsula, in a manner that is not contrary to the public interest."  MAR023151.  The Alliance and the Tribe attempt to make much of the fact that there was a change in the projected water deficit between the FEIS and the ROD.  All. Br. 23-26; Statement of Points and Authorities in Support of Plaintiff-Intervenors' Motion for Summary Judgment ("Tr. Br.") (Doc. 71-2) 22-24.  However, the change is not nearly as great as they allege, in part because between the FEIS and ROD, an additional source of water became available and in part because certain assumptions changed.  More importantly, as discussed <u>infra</u> at 12-23, even with the somewhat reduced projected deficit, the Reservoir is still the only available practicable alternative that would produce the amount of water necessary to satisfy the projected regional demand for water in 2040.

The difference in projected deficit between the FEIS and ROD is based on several factors on both the supply and demand sides.  On the supply side, the Corps assumed in the FEIS that the James City Service Authority ("JCSA") would only be able to provide 2 million gallons daily

("mgd") of water.[3]  MAR044862.  However, by 2005, the maximum authorized system capacity for

the JCSA groundwater supply yield was set at 7.9 mgd, which is results in an increase of 5.9 mgd

of available groundwater.  MAR023154, citing MAR022770.  However, small differences also

resulted from the calculations of the safe yield available from the Williamsburg and York County

water supplies between the FEIS and ROD, which resulted in a decrease of 0.6 mgd of water supply,

compare MAR012448 to MAR023154, for a total of an additional supply of 5.3 mgd of water.

Second, after the FEIS, a brackish water desalination plant was constructed and put into operation

by the City of Newport News, which provides 5.7 mgd of water.  MAR023154, citing MAR022770.[4]

The plant was regarded as a possible alternative supply in the FEIS, and therefore was not subtracted

out when calculating the projected deficit.  MAR045020-21.  However, by 2005, it was in operation,

and thus the 5.7 mgd was treated in the ROD as an already existing supply, and therefore subtracted

from future demand in calculating the deficit.  MAR023154.

On the demand side, the FEIS and ROD operated under different projected calculations.

First, the FEIS conservatively assumed no savings from future conservation in calculating deficit,

but instead included conservation as a separate alternative and as part of the preferred alternative.

MAR045035; MAR045084-85.  In contrast, in the ROD, the Corps included conservation of 5.6

mgd of water in the calculation to determine the overall demand in 2040 of 85.3 mgd.

MAR014139-40; see MAR023154.  Second, even counting the savings gained by conservation

measures, there is a 7.3 mgd difference between the demand projections in the FEIS and the ROD.

Specifically, the projected demand in the FEIS was 98.2 mgd without conservation measures, or 92.6

mgd with conservation measures of 5.6 mgd.  MAR044911; MAR045037.  However, by 2005, the

_____

[3]This is because the wells have historically experienced water quality and operational problems.

[4] The Alliance admits the ROD "correctly took into account" this amount.  All. Br. 26.

Corps had determined on the basis of input from the Institute for Water Resources ("IWR") and the City that the projected demand in 2040 would be 85.3 mgd, which is the mean total demand number contained in IWR's Final Report.[5]  MAR023154, citing MAR014152.

When the figures from the supply side (5.3 mgd of additional supply and 5.7 mgd from the desalination plant) and demand side (5.6 mgd from conservation and 7.3 mgd from differences between the ultimate demand) are added together and subtracted from the 39.8 mgd project deficit in the FEIS, the projected deficit in 2040 equals 15.9 mgd, as reflected in the ROD.  The Alliance attempts to highlight this difference, however, as explained above, 12.6 mgd of that difference is due to an increase in water supply not previously anticipated from JCSA and the revised demand projection for 2040.[6]

The Tribe further attempts to argue that the 15.9 mgd figure is somehow overstated by 5.73 mgd.  Tr. Br. 23; see also All. Br. 25, n. 58.  This claim is based on a letter sent to the Corps more than a month after the ROD was approved.  MAR023242.  Although not required, the Corps nevertheless investigated the claims in the letter, requesting comments from IWR and the City, and found that nothing changed its conclusion that the need in 2040 would be 85.3 mgd.  Specifically, IWR found that its conclusions in the August 2001 IWR Final Report regarding demand were still sound for several reasons, including that while conservation results have thus far exceeded

---

[5] Although there was originally some disagreement between earlier reports issued by IWR and the City's consultant, HDR, regarding projected water deficits, following extensive analyses, IWR concluded in the August 15, 2001 report, An Evaluation of the Risk of Water Shortages in the Lower Peninsula, Virginia, Revised Report ("IWR Final Report"), that the IWR panel and HDR "are very close in their estimates of future water use and supply." MAR014185.  As the Corps explained in the ROD, the IWR Final Report presented several conclusions that the Corps took into consideration in deciding to issue the permit, including that the risk of water shortage in the region could occur as early as 2015, and would certainly fall between 2015 and 2030, depending on the criteria used by the decision-makers.  MAR 023201-02, citing MAR014185. Under the most likely scenario, the Corps found that the region would require 85.3 mgd of water by 2040.  MAR023202.

[6] This takes into account the 0.6 mgd decrease in supply from Williamsburg and York Counties.

expectations, there are limits to further demand reductions to conservation, as the City already has very little outdoor use and unaccounted for water percentage, and that while a military base closure would probably reduce the military's demand in the short-term, the long-term forecast would need to assume that the land was in use.  MAR023276-85.  Moreover, the City concluded that the transformation of the military base to civil land use would result in an increase in water use as the land was converted from water use by a daytime work population to more intensive water use. MAR023263-68.

The Corps' decision that there would still be a substantial deficit of water in 2040 is supported by the record and should therefore be upheld.  See Envtl. Def. v. U.S. Army Corps of Eng'rs, 515 F. Supp. 2d 69, 78 (D.D.C. 2007) ("if the administrative record contains evidence that supports the positions of both the agency and the party seeking relief, the agency is entitled to rely on its experts' tests and observations") (citation and quotation marks omitted).

### B.      The Reservoir is the Only Practicable Alternative to Meet That Need.

The Guidelines state that no discharge of dredged or fill material shall be permitted "if there is a practicable alternative to the discharge which would have less adverse impact on the aquatic ecosystem, so long as the alternative does not have other significant adverse economic consequences."  40 C.F.R. § 230.10(a) (emphasis added).  A "practicable" alternative is one that "is available and capable of being done after taking into consideration cost, existing technology, and logistics in light of overall project purpose."  Id. § 230.10(a)(2) (emphasis added).

As stated in the ROD, the "overall project purpose" is "to provide a dependable, long-term water supply for the Lower Virginia Peninsula, in a manner that is not contrary to the public interest."  MAR023151.  Neither the Alliance nor the Tribe has argued that this purpose is improper on its face.  This case is thus distinguishable at the outset from Simmons v. United States Army Corps of Eng'rs, 120 F.3d 664 (7th Cir. 1997) (see All. Br. 28), in which the court held that a stated

purpose of "supplying two users [with water] . . . from a single source" was "impermissibly narrow."

Simmons, 120 F.3d at 667 (emphasis added).[7]  Here, by contrast, the project definition on its face

does not limit the Corps' review to single-source alternatives.  The Alliance's suggestion that the

Corps nonetheless exhibited an improper bias towards a "single-source" method of satisfying the

project purpose, see All. Br. 28, is contradicted by the record.  Neither the City nor the Corps was

averse to the concept of combining multiple sources of supply to satisfy regional needs; as the

Alliance acknowledges, the City's plan to meet its future water supply needs already includes

multiple sources of supply – the continued use of existing reservoirs, groundwater desalination, the

use of existing wells, and the implementation of water conservation measures.  MAR023154; see

All. Br. 28.  The remaining small-supply alternatives were rejected not solely because they

constituted a "patchwork," MAR023203, but because they would not satisfy the project purpose.

## 1.    The Corps Conducted a Proper Alternatives Analysis.

The Alliance argues that the Corps should not have relied on the detailed and thorough

alternatives analysis contained in the FEIS because of the change in projected need from 39.8 to 15.9

mgd.  All. Br. 24-25, 26; see also Tr. Br. 22-23.  This argument inaccurately assumes that the only

reason alternatives were omitted from consideration in the FEIS was that they were inadequate to

meet projected need.  In fact, the Corps initially screened nearly three dozen potential alternative

sources of water supply, considering information regarding the availability, cost, and technological

---

[7] The Alliance also relies on North Carolina v. Hudson, 665 F. Supp. 428 (E.D.N.C. 1987).  See All. Br. 28.  In that case, the court stated that the Corps could not "accede to Virginia Beach's desire to have an autonomous water supply . . . without at least examining the water supply available from its current source."  North Carolina, 665 F. Supp. at 446 (emphasis added); see also id. at 444-45 (Corps never examined supplies currently available to city to meet its water needs).  Here, by contrast, the record reflects a thorough analysis of both water needs (ee 9-12, supra) and of the alternatives available to meet those needs.

13

reliability of each one.[9]   See FEIS Table 3-4 (MAR045061); see generally id. at MAR044935-045805; RROD at MAR013986.   Many of these alternatives were deemed impracticable and eliminated from further analysis – not simply because they would not meet the region's water needs, but because they were too costly, technologically infeasible, or otherwise impracticable. See id. Table 3-4 (MAR045061); see generally id. at MAR045055-072; ROD at MST023200; RROD at MAR013987 (noting multiple reasons alternatives were omitted).   The reduction in projected need did not affect any of these factors, nor did it affect the underlying goal of providing a stable, long-term water supply to meet that need; thus, there would have been no purpose (and great cost) to repeating an already extensive alternatives analysis.  See Northwest Env'tl Def. Ctr. v. Wood, 947 F. Supp. 1371, 1379 (D. Or. 1996) (Corps was not required to reinitiate alternatives analysis when project was reduced in size, but overall project purpose was not substantially altered).

Based on the analysis in the FEIS, the Corps identified four practicable alternatives: a reservoir (located at Ware Creek, Black Creek, or Cohoke Creek); fresh groundwater development; groundwater desalination; and additional conservation measures. See FEIS Table 3-4, MAR023200. By the time of the ROD, conservation measures were already being implemented, and all existing sources of water had been taken into account in considering the region's water need.  MAR023203; 9-12, supra.  Further groundwater development would provide at the very most an additional 4.4 mgd.  See ROD at MAR023203; 21 and n.14, infra.  The Corps thus logically concluded that "[n]on-reservoir alternatives, including withdrawals of brackish and fresh groundwater and

---

[9] The Tribe attempts to draw a distinction between the Corps' reliance on the "information" contained in an FEIS (which the Tribe acknowledges is proper) and the Corps' "having to conduct the actual analysis" (which the Tribe contends the Corps failed to do). Tr. Br. 22.  Other than asserting that the FEIS was "outdated and inaccurate," Tr. Br. 23 – a claim that is rebutted infra at 34-51 – the Tribe offers no evidence that could establish that the Corps' finding that "the analysis of alternatives in the [FEIS] provides sufficient information regarding alternatives to be evaluated under [the] Guidelines," ROD at MAR023184, was arbitrary or capricious.

desalinization of surface water, are insufficient to meet the area's water supply need." ROD at MAR023166. Because the Black Creek reservoir option was unavailable (and therefore by definition impracticable), see 22-23, infra, and the Ware Creek reservoir location had also been ruled out, the Corps properly concluded that construction of the Reservoir on Cohoke Creek was the only practicable alternative.[9]

The Tribe's assertion that the Corps "violate[d]" the "demanding" requirements of a practicable alternatives analysis by discussing alternatives in its public interest review, Tr. Br. 28-30, is disingenuous. The statement that certain alternatives are not "practicable" to ensure certain public benefits was made in addition to – not instead of – a full analysis of the practicability of nearly three dozen alternatives. As the Corps explained at the end of the paragraph quoted in part by the Tribe, a full analysis of alternatives to the Reservoir was contained elsewhere in the ROD; that discussion, in turn, explicitly relies on the FEIS's detailed analysis of alternatives in light of their cost, technology, and logistics. See ROD at MAR023191; see also id. at MAR023184, MAR023200-023204; FEIS at MAR044935-045805. The additional statements quoted by the Tribe, see Tr. Br. 29, similarly represent a summary of – not a substitute for – this analysis.

The Tribe's claim that the Corps should have re-evaluated the FEIS's cost and affordability calculations, Tr. Br. 24-26, is equally meritless. Initially, this issue has been waived because it was not previously raised before the Corps. See Nat'l Wildlife Fed'n, 286 F.3d at 562 (D.C. Cir. 2002). Even if this claim had been preserved, moreover, it would fail because the Tribe has offered nothing to support its assertion that the Corps should have "independently evaluated" the RRWSG's affordability analysis. Tr. Br. 25-26. The FEIS explains the basis for the RRWSG's cost and

---

[9] The ROD explains that the Ware Creek reservoir was rejected as "the most environmentally damaging of the three reservoir alternatives. . . ." MAR023201. Neither the Alliance nor the Tribe challenges this conclusion.

affordability calculations, see MAR044940-42.  The Tribe does not argue that this analysis was substantively unreasonable; it asserts only that the Corps should have double-checked certain information provided by the RRWSG.  See Tr. Br. 26.  There is, however, no rule prohibiting the Corps from relying on materials submitted by an applicant, or requiring the Corps to re-do work that has already been done.  See Friends of the Earth v. Hintz,, 800 F.2d 822, 835-36 (9th Cir. 1986) (Corps "justifiably and legally" relied on its careful review of study submitted by applicant, and was not required to do its own independent research; "to require anything further would place unreasonable and unsuitable responsibilities on the Corps, which receives over 14,000 permit applications per year").

The Alliance and the Tribe have thus failed to demonstrate that in concluding that there are no practicable alternatives to construction of the Reservoir, the Corps "failed to consider an important aspect of the problem," or relied on "false premises."  All. Br. 25.  The Corps considered all relevant "aspect[s] of the problem;" it simply reached a different conclusion than that preferred by the Alliance and the Tribe.  As discussed below, there is ample evidence in the record to support the Corps' conclusion, which should therefore be upheld.  See Northwest Env'tl Def. Ctr, 947 F. Supp. at 1380 (where there was substantial evidence in record that Corps thoroughly considered alternative sites, it was not arbitrary or capricious for Corps to conclude that it had been clearly demonstrated that there was no practicable alternative); see also Friends of the Earth, 800 F.2d at 833-34 (Corps rationally concluded that proposed alternative sites were either too costly or infeasible in light of project purposes; although argument could be made that one of sites was suitable, "it would not be appropriate for us to overturn the Corps' contrary finding").

## 2.    The Record Supports the Corps' Conclusion That There Are No Remaining Practicable Non-reservoir Alternatives.

The Alliance and the Tribe point to a variety of non-reservoir alternatives as allegedly

16

practicable means of creating a "dependable long-term water supply for the Lower Virginia peninsula": conservation measures; development of fresh groundwater resources; brackish groundwater desalination; the reduction of "dead storage" in existing reservoirs combined with pumping additional water from the Chickahominy River; use of water from the existing Big Bethel reservoir; and the use of additional non-groundwater desalination.  All. Br. 26-31; see also Tr. Br. 24.[10]  The record contains ample evidence to support the Corps' conclusion that all of these alternatives are either already in use, or are impracticable in light of project purposes.

### a.      Additional Withdrawals from the Chickahominy River Are Not Practicable.

The record contradicts the Alliance's casual statement that there is "no question" that a reduction in dead storage in Newport News' existing reservoirs, combined with additional withdrawals from the Chickahominy River, represents a practicable alternative to construction of the King William Reservoir.[11]  All. Br. 28-30; see also Tr. Br. 24.  First, there is evidence in the record that supports the Corps' conclusion that a reduction in dead storage would produce little benefit.  See IWR Report of August 15, 2001, MAR014110 at MAR014168-169 (concluding that using more dead storage does not substantially increase safe yield absent increased pumping).  The record demonstrates, moreover, that the Corps reasonably concluded that pumping additional water from the Chickahominy River is simply not feasible.  Contrary to the Alliance's statement, this

---

[10]   The Tribe also refers in passing to the possible use of wells with lapsed permits during emergencies, and the use of non-central system wells.  Tr. Br. 24 (citing Siegel letter of Sept. 2).  Not only were the comments suggesting these alternatives not even submitted until after the ROD was signed, but the non-central system wells referred to therein are already included in the ROD's calculation of existing supply.  See Letter of Sept. 30, 2005 from City of Newport News, MAR023263 at MAR023265.  As to the use of lapsed wells, moreover, it is highly unlikely that the state will permit additional groundwater withdrawals.  See note 14, infra.

[11] Dead storage is water in a reservoir that is not available for use due to physical constraints of the water supply intake or pumping system.  See FEIS at MAR044952.

option was not deemed impracticable based on potential unspecified environmental damage to the Chickahominy; instead, the Corps concluded that the Commonwealth of Virginia would not approve additional withdrawals from that river.  See Initial Decision at MAR021310.

There is ample evidence in the record to support this conclusion.  The FEIS cautioned against increased reliance on the Chickahominy, stating that increased withdrawals are "not considered to be available from a regulatory standpoint." FEIS at MAR044985-86.  The concern expressed in the FEIS is confirmed by the Commonwealth of Virginia's statement that it "cannot support a further increase in demands on the Chickahominy River in order to reduce demands on the Mattaponi." Letter of October 31, 2001 from Virginia DEQ to Corps at MAR 018859.157, .159; see also id. at MAR018859.158 ("VDEQ continues to believe, as it did when the idea was first proposed in the 1994 draft EIS, that additional pumping from the Chickahominy River is not a practicable solution given the extremely large existing withdrawal and minimal instream flowby protection"); Commonwealth of Virginia Public Interest Review of May 3, 2001, MAR018859.019 at MAR018859.023-.026.  The record thus supports the Corps' conclusion that "unless the stated position of the Commonwealth is reversed, [increased pumping from the Chickahominy River] cannot be considered a practicable alternative for the applicant."  Initial Decision at MAR021310.

### b.        Use of the Big Bethel Reservoir Is Not Practicable.

Relying on comments submitted by its consultant, the Alliance claims that because the Army is no longer drawing water from the Big Bethel reservoir to serve Fort Monroe, "water from Big Bethel is readily available to Newport News."  Alliance Mem. at 30; see also Tribe Mem. at 24.  The IWR reviewed these Siegel comments, concluding that they "do not undermine the prior projections" concerning future water use, as discussed supra at 11-12.  See Memo from IWR of October 24, 2005 (MAR023276); see also Letter of July 10, 2002 from Newport News to Corps (MAR021256) (explaining that closure of Big Bethel reservoir would decrease available supply);

18

Letter of September 30, 2005 from Newport News to Corps (MAR023263, 023264-65) (concluding that closure of Fort Monroe itself would increase rather than decrease region's water demands).  The Alliance's casual assumption that there is additional water available to Newport News from the Big Bethel reservoir is thus unsupported by the record.[17]

### c.   Additional Groundwater Desalination Is Not Practicable.

As the Alliance recognizes, the Corps properly took the 5.7 mgd already obtainable through brackish groundwater desalination into account in calculating the anticipated water supply deficit. All. Br. 26; ROD at MAR023154.  The FEIS determined, moreover, that additional groundwater desalination was not a practicable alternative. MAR045019.  This was not due, as the Alliance suggests, to its impracticability as a "single long-term alternative." All. Br. 30.  Rather, the FEIS explained that the Commonwealth "has taken a strong position against new large-scale groundwater withdrawals," (whether brackish or fresh) and was unlikely to permit this alternative. MAR045019.  This alternative was thus deemed unavailable and impracticable.  Id.

The Commonwealth's concern over groundwater resources, and its reluctance to allow additional groundwater withdrawals, have not altered since the FEIS.  As the Governor of Virginia explained, the southeastern area of Virginia, including James City County, has been declared a Groundwater Management Area within which groundwater withdrawals "are highly regulated and require permits."  Letter of October 31, 2001 at 2 (MAR018859.158).  The Governor further stated that "Virginia's eastern aquifers are over-stressed and . . . it is doubtful any further withdrawals could be approved."  Id.; see also infra note 14. The fact that one of the RRWSG's constituents has

---

[17]  In addition, the safe yield of the Big Bethel reservoir is only 2 mgd.  FEIS at MAR044863.  Even assuming that the reservoir water quality and safe yield remained stable ( an assumption that the FEIS calls into question), and even assuming that Big Bethel's 2 mgd is combined with the 4.4 mgd potentially available through the development of additional groundwater resources, that would yield at most 6.4 mgd – far less than the 15.9 mgd deficit projected for 2040.

recently brought a groundwater desalination plant on line (see All. Br. 30) decreases, rather than increases, the likelihood that even more such withdrawals would be approved.

### d. Conservation Measures and the Use of Groundwater, Although Practicable, Are Already Being Implemented.

The record supports the Corps' conclusion that conservation measures have already been implemented to the maximum extent feasible.  The Alliance criticizes the Corps' reliance on the FEIS, asserting that the Corps should have conducted further research into the current implementation, yield, and potential future gains from such measures.  All. Br. 27.  The FEIS, however, examined both existing conservation measures and potential additional measures.  MAR044885-044889 (including Table 2-9) (discussing water conservation measures implemented by jurisdictions within service area), see also MAR045035-MAR045039.  Included in this analysis was a comparison of the projected future demand both with and without additional conservation measures (or, put another way, a consideration of the potential yield from such measures).  MAR045039 (Table 3-H), MAR 045042.[13]  The RRWSG's Water Needs Assessment also fully discusses existing water conservation programs, including the savings generated by such programs.  Lower Virginia Peninsula Regional Raw Water Supply Plan Water Needs Assessment (November 2000) (MAR012320) at MAR012599-12606.  The record thus contains sufficient information to support the Corps' conclusion that conservation measures have already been implemented to the extent practicable, and that the RRWSG's demand projections already account for any savings generated by such measures.

The Corps also reasonably concluded that groundwater resources cannot satisfy the anticipated 15.9 mgd deficit.  The Alliance argues, however, that the Corps failed to assess whether

---

[13]  The Alliance suggests that the Corps relied only on a single statement in the FEIS.  All. Br. 27.  In fact, the Corps considered the entire FEIS.  See ROD at MAR023151, MAR023200.

additional use of <u>fresh</u> groundwater, "either alone or combined with other alternatives," would satisfy the anticipated deficit. All. Br. 26. There can be no dispute that the 4.4 mgd potentially available through fresh groundwater development will not satisfy a 15.9 mgd deficit.[14] Critically, moreover, by the time the Corps allegedly "summarily dismissed" this 4.4 mgd, All. Br. 26, it had already reasonably concluded that there were no non-reservoir alternatives left with which to combine fresh groundwater development. In sum, as the Corps explained:

> Additional water conservation measures discussed in the 1997 Final Environmental Impact Statement are presently being implemented by Newport News Waterworks and other water suppliers in the Lower Virginia Peninsula. <u>The only two remaining feasible alternatives from the [FEIS] are the 4.4 million-gallon-per-day additional fresh groundwater development and the King William IV Reservoir project.</u> The additional fresh groundwater alternative is insufficient to meet the long-term requirement for an additional 15.9 million-gallons-per-day in 2040. <u>Even if the applicant implements the additional groundwater alternative, the need would still exist for construction of the King William IV Reservoir project to achieve the project need and purpose.</u>

ROD at MAR023203 (emphasis added). The Alliance has failed to demonstrate that this conclusion was arbitrary or capricious.

### C.   There Is No Available Alternative Location for a Reservoir.

For the reasons discussed above, the Corps reasonably concluded that there is no practicable

---

[14]  Even 4.4 mgd may be optimistic, as there is a significant body of evidence in the record concerning the limited availability of groundwater resources. <u>See</u> Groundwater Availability in the Chickahominy-Piney Point Aquifer for the Lower Peninsula (October 2000) (MAR012277) at MAR012278-79; Commonwealth of Virginia Public Interest Review, King William Reservoir (May 3, 2001) at MAR018859.019, .026 ("The policy of the Commonwealth is to reserve ground water as a source of last resort in order to preserve this resource for use outside of areas where other supplies are practical"), <u>see generally id.</u> at MAR018859.023-.026; Letter of October 17, 2001 to Corps from Commonwealth of Virginia Department of Health (MAR015559.06) at MAR018859.09 (RROD's discussion of availability of groundwater was "premature . . . until DEQ has issued the requisite permits authorizing additional withdrawals. Such authorization is far from certain at this point, and may not be granted at the levels cited in the [RROD], if at all"); Email of February 15, 2005 from Virginia DEQ to Corps (MAR022585) (reiterating that groundwater is treated as "resource of last resort," and that "it is unlikely that a significant additional ground water withdrawal could be approved using the current regulatory criteria in the Newport News area.")

alternative to constructing a reservoir to satisfy the Lower Virginia Peninsula's water needs. The Corps' conclusion that the alternative location advocated by the Tribe – the Black Creek site – is not available, and therefore by definition is not practicable, is equally well-founded. See Initial Decision at 23-24 (MAR021301-02).

The Tribe argues that the Black Creek reservoir site was available at the time that the City first applied for the Permit, but that because this alternative was not pursued initially it was allowed to "disappear[]". Tr. Br. 26-28. This assertion is flatly contradicted by the record. The RRWSG began trying to negotiate an agreement with New Kent County (in which the Black Creek site is located, and which would have had to consent to use of the site) as early as 1992, before even applying for the Permit. FEIS at 3-35 (MAR044991). These negotiations came to an "abrupt halt" in September of 1994, when the New Kent County Board of Supervisors adopted a motion stating that the County had "no intent to cooperate with Newport News on the Black Creek Reservoir at this time." Id. [15] New Kent County restated its firm opposition to the use of the Black Creek site in 1996. FEIS at 3-36 (MAR044992). This alternative nonetheless was not abandoned; as recently as June 2005, only weeks before the ROD was issued, the Corps requested confirmation that New Kent County remained unwilling to grant the City the right to construct the Black Creek Reservoir. Letter of June 17, 2005 from Corps to City, MAR022707. As the City informed the Corps, New Kent County had recently adopted an ordinance authorizing a development that "will eliminate the Southern Branch of Black Creek" as a reservoir site. Letter of June 20, 2005 from City to Corps,

---

[15] Given that in September 1994 the New Kent County officially expressed its opposition to a reservoir at Black Creek – and given that the County has since reiterated that position several times – the Tribe's reliance on the County's April 1994 statement that it was "not adverse" to such a reservoir is at best disingenuous. See Tr. Br. 27. The November 1994 memorandum that the Tribe points to is of no greater help; in that memorandum, the Corps stated that Black Creek "must be carried forward in the EIS" for purposes of NEPA review but that "if it is proven to be unavailable" – as ultimately happened – it might be determined to be impracticable under the CWA. MAR035301 (emphasis in original).

MAR022710.  The record thus contains ample evidence to support the Corps' conclusion that the Black Creek site was not, and is not, available to the City, and thus that it is not a practicable alternative.

> **D.  Construction of The Reservoir, Inclusive of Compensatory Mitigation, Will Not Cause Significant Degradation of Waters of the United States.**

The Guidelines provide that "no discharge of dredged or fill material shall be permitted which will cause or contribute to significant degradation of waters of the United States," including wetlands.  40 C.F.R. § 230.10(c); see also 40 C.F.R. § 230.12(a)(3)(ii).  The Corps stated that construction of the Reservoir, without more, would "have a major, long-term adverse impact upon the current functions of the aquatic ecosystem."  ROD at MAR023189; see also Initial Decision at MAR021289 (alteration of wetlands in project area would detrimentally affect environmental characteristics).  Having fully considered all applicable regulatory criteria, however, as well as the comments of EPA and U.S. Fish and Wildlife Service ("FWS"), the Corps reasonably concluded that "[t]he net effect of the proposed discharges of fill material, inclusive of compensatory mitigation, will not cause or contribute to significant degradation of waters of the United States."  ROD at MAR023190 (emphasis added); see also id. at MAR023188 ("Incorporation of wetland mitigation measures into the overall project satisfactorily compensates for anticipated adverse effects to special aquatic sites"); City of Olmsted Falls v. EPA, 435 F.3d 632, 638 (6th Cir. 2006) ("It was neither arbitrary nor capricious for the Corps . . . to balance the environmental harm caused by the project against the benefits of the proposed mitigation and find that, on balance, the project would not contribute to a significant degradation of the waters of the United States").

> **1.  The Mitigation Plan Identifies an Adequate Number of Appropriate Mitigation Sites.**

The final conceptual mitigation plan was "the culmination of more than ten years of

interagency coordination and mitigation planning."[16]   June 2004 Reservoir Mitigation Plan ("Mitigation Plan"), MAR008706 at MAR008739; see generally id. at MAR009739-753.  The Mitigation Plan provides for mitigation at a 2:1 ratio, replacing the 403 acres of wetlands lost to the Reservoir with 806 acres of restored or created wetlands within the Chesapeake Bay watershed.  Id. at MAR008727; ROD at MAR023172-73.  The Alliance's statement that the plan merely "proposes" to restore or create 806 acres of wetlands, All. Br. 5, overlooks the existence of permit conditions that will ensure that this commitment is fulfilled.  See Permit, Special Conditions D ("The mitigation construction work shall be completed to the written satisfaction of the [Corps] prior to the permittee's commencement of raw water withdrawals from the Mattaponi River"), E ("The permittee shall not commence any discharges of dredged or fill material into the waters of the United States . . . until the final wetland mitigation plan is approved in writing by the [Corps]") (MAR 023315); see also VWP Permit, Special Condition D (MAR018859.098).  Among other things, the Mitigation Plan identifies a number of proposed mitigation sites, as well as fallback sites to be used if one of the primary sites becomes unavailable.  MAR008773.  All of the primary and contingency mitigation sites were thoroughly analyzed and were not objected to by an interagency team that included EPA, the FWS, and the Virginia DEQ.  MAR008724, 008729, 008752.

The 1990 MOA states that as a matter of policy, "[t]he Corps will strive to avoid adverse impacts and offset unavoidable impacts to existing aquatic resources, and for wetlands, will strive to achieve a goal of no overall net loss . . . ."  1990 MOA at II.B; see also Regulatory Guidance Letter No. 01-01, October 31, 2001 at 1 (referring to "the national no overall net loss policy for

---

[16]   The Alliance's discussion of prior mitigation plans, as well as agency evaluations thereof, is beside the point.  See Alliance Mem. at 14-15.  The relevant question is whether the Mitigation Plan meets applicable regulatory and policy criteria.

wetlands").[17]  In executing this policy, the Corps considers not only the sheer acreage involved in any mitigation plan, but also whether proposed mitigation will compensate for the "functional values" of affected wetlands.  See 1990 MOA at II.C.3.  Mitigation "should be undertaken in the same geographic area [as affected wetlands] if practicable (i.e., in close physical proximity and, to the extent possible, the same watershed.") Id. (emphasis added).

The Alliance overstates these guiding principles by asserting that the Corps was "required to take a 'watershed' approach" to evaluating potential mitigation sites in processing this permit application. All. Br. 13 (emphasis added).  The Alliance relies on regulations 40 C.F.R. § 230.91 et seq., which were promulgated in April 2008 – well after the Corps issued the Permit.  These regulations are thus inapplicable to this case.  See Gersman v. Group Health Ass'n Inc., 975 F.2d 886, 897-98 (D.C. Cir. 1992) ("generally . . . administrative rules will not be construed to have retroactive effect unless their language requires this result") (citation omitted).  That being said, the Mitigation Plan does take a "watershed approach."  The site selection process moved concentrically outwards, searching first for sites within the Cohoke Creek drainage area, then for sites within the Mattaponi and Pamunkey River drainage areas, then for sites within the greater York River drainage basin, and finally for sites within the Rappahanock River Basin  MAR008764-65; ROD at MAR023178.  Ultimately, all but one of the proposed mitigation sites is located in the same watershed as the wetlands that will be affected by the Reservoir.  See Mitigation Plan at MAR008772.

The Alliance's claim that the Plan does not ensure adequate mitigation because some mitigation sites are no longer available, see All. Br. 18, has already been addressed by the Corps.  ROD at MAR023181.  As the Corps explained in addressing the FWS comments that the Alliance

---

[17] Available at http://www.usace.army.mil/cw/cecwo/reg/rgls/rgl01-01.pdf (last visited September 28, 2008).

relies on, the Plan contains contingency sites to be used as fallbacks in the event that one or more

primary sites becomes unavailable or proves otherwise unsuitable.  Id.; see also Mitigation Plan at

MAR008795-99.  And as the Corps further explained, "the Department of the Army permit . . . will

still require the applicant to create or restore no less than 806 acres of wetlands" regardless of

whether any particular site is available.  ROD at MAR023181 (emphasis added).  Both the Corps

(in consultation with EPA and the FWS) and the Virginia Department of Environmental Quality

must approve a final mitigation plan before work on the Reservoir can begin.  ROD at MAR023178.

If for some unanticipated reason a large number of primary and contingency sites fell through, such

that the City could not identify sufficient suitable mitigation sites – a possibility which remains

entirely speculative – then presumably the final mitigation plan would not be approved, and work

on the Reservoir could not begin.[18]

**2.      The Functions and Values of Wetlands Impacted By the Reservoir Will Be Replaced.**

The Alliance has failed to demonstrate that the Corps' conclusion that the mitigation plan

will ensure that the functions and values of the affected wetlands are compensated for was arbitrary

or capricious.  The record demonstrates that the Corps conducted the "reasoned assessment," All.

Br. 18, that the Alliance claims is missing.  Nor does the Corps' conclusion rest solely on a "blind

adherence to numbers" (i.e., the 2:1 replacement ratio).  See All. Br. 18.  Both the wetlands that will

be impacted by the Reservoir and the proposed mitigation sites were thoroughly evaluated, with

multiple studies being conducted to determine their exact nature and function.  See generally FEIS

(Vol. II) (MAR003706); King William Reservoir Habitat Evaluation Procedures, Gross Losses

Report (MAR007957); King William Reservoir Habitat Evaluation Procedures Main Report

(MAR008003); Mitigation Plan at MAR008916-48.  The Corps considered all of these assessments

---

[18] Likewise, an SEIS was not required to study the Mitigation Plan prior to issuing the Permit.

before determining that "successful completion of the elements of the [Mitigation Plan] will as a whole offset anticipated losses in these functional areas, thereby meeting all applicable wetland mitigation policies and regulations."  ROD at MAR023175.

The Alliance relies on comments criticizing the Mitigation Plan on the ground that it will not "fully replace" all of the functions being lost to the Reservoir.  See All. Br. 16 (citing Minkin comments), 17 (asserting that scientific comments "uniformly agreed" that plan could not "replace" wetlands functions that would be lost).[19]  Full replacement is not, however, the applicable standard. As the Corps explained, "[n]either policy nor statutes require a mitigation site to fully replicate all impacted wetlands functions, nor do they require mitigation to be completely in-kind."  ROD at MAR023177.

> **3.      Construction of the Reservoir Will Not Otherwise Significantly Degrade Waters of the United States.**

> **a.      The Corps Considered the Impact of the Pumping Hiatus.**

In concluding that the Reservoir project will not unduly impact the aquatic ecosystem of the Mattaponi River (from which water will be pumped to the Reservoir), the Corps relied in part on the fact that "the state-issued permits for intake construction contain measures to minimize adverse impacts. . . ."  ROD at MAR023185; see also id. at MAR023183.  In particular, in order to preserve shad populations, the 2004 Virginia Marine Resources Commission permit ("2004 VMRC Permit") currently prohibits pumping from the Mattaponi River between March 1 and July 31.[20]

---

[19] The Alliance also relies on a report that was not even submitted to the Corps.  See Alliance Mem. at 16.  As evidenced by the bates number, the Darke report cited by the Alliance was produced from EPA's files; it is not part of the Corps administrative record, and thus cannot be used to attack the Corps' conclusions.  See Camp v. Pitts, 411 U.S. 138, 142 (1973) ("[T]he focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court").

[20]   The pumping hiatus helps to minimize mortality of shad eggs and larvae, thereby enhancing
(continued...)

MAR022221.  The Alliance argues that (1) this hiatus limits pumping from the Mattaponi to "low flow" months, and (2) the Corps failed to consider the possibility that pumping during these "low flow" months will increase the risk of drawing in additional saltwater, thereby significantly increasing the Mattaponi's salinity.  All. Br. 20-22.  Both of these assumptions are false.

The very page of the FEIS cited by the Alliance in support of its claims demonstrates that the pumping hiatus does <u>not</u> limit pumping to low-flow periods.  <u>See</u> All. Br. 20 n. 47, citing FEIS Table 5-7 MAR045392.  It is true that the FEIS shows March and April as the highest-flow months of the year, at 840.8 and 810.8 mgd respectively.  MAR045392.  January and February (during which pumping is permitted) nonetheless both show higher streamflows than May, June, or July, and streamflows in November and December (which are again permissible pumping months) are also higher than those in June and July.  <u>Id.</u>  The record thus does not support the Alliance's claim that the existing pumping hiatus allows pumping only during "the lowest flow months of the year."  All. Br. 20.[21]

Nor has the Alliance shown that the Corps failed to consider the potential salinity impacts of pumping from the Mattaponi River.  The ROD states the Corps' conclusion that "the available information indicates that potential salinity changes which may result from the withdrawal of water would generally be within the natural salinity fluctuation of the estuarine system," and that therefore "it is reasonable to conclude that the potential impacts from salinity changes in the Mattaponi River would be minor."  MAR023185.   The Alliance's sole challenge to this conclusion is to argue that the Corps did not take the pumping hiatus into account.  <u>See</u> All. Br. 20, 21-22.  As is discussed in

---

[20](...continued)
overall shad populations in the river.  ROD at MAR023183.

[21] It is true that pumping is permitted during the <u>single</u> month with the lowest streamflow (<u>i.e.</u>, September).  MAR045392.  The Alliance's claim that the <u>multiple</u> months during which pumping is permitted are all low-flow months remains unsupported.

greater detail below, see 48-49, infra, this is not the case; in fact, the record demonstrates that the Corps fully considered the possible effect of the pumping hiatus before reasonably concluding that withdrawals from the Mattaponi will not meaningfully affect the river's salinity.[22]

The Tribe argues that state permits allow pumping "at any time in the event of a water supply emergency," and thus are insufficiently protective of Mattaponi River water quality. Tr. Br. 32. The Tribe understates the actual permit conditions, which are that the pumping hiatus "shall not apply during any water emergency declared by either the Governor or President." MAR022220. The Tribe offers no evidence that the pumping hiatus makes it any more likely that the Governor or the President will declare such an emergency; indeed, as the City has explained, during most years no water will be lost at all during the hiatus. See Tr. Br. 32; MAR022455-56; 48-49, infra. The chain of impacts that allegedly could arise if emergency withdrawals were allowed during the hiatus period thus remain wholly speculative, and as a consequence insufficient to demonstrate any flaw in the Corps' conclusion that the protective conditions imposed in state-issued permits will minimize any adverse impacts from the Reservoir project.

> **b.**    **Pumping Associated with the Reservoir Project Will Not Have a Significant Adverse Effect on Shad.**

The Tribe argues that the Reservoir project will harm the aquatic ecosystem because it will allegedly "harm various life stages and habitat of the American shad." Tr. Br. 31; see 40 C.F.R. § 230.12(a)(3)(iii). The Tribe claims first that the protective pumping hiatus contained in the 2004

---

[22] The Alliance cites to Friends of the Earth v. Hall, 693 F. Supp. 904 (W.D. Wash. 1988) for the proposition that a determination that there would be no significant degradation of waters of the United States was arbitrary and capricious where it was not based on sufficient analysis. All. Br. 21. In that case, however, the Corps had issued a dredging permit that relied on the use of a disposal technique characterized by the court as "experimental, subject to a significant degree of uncertainty, and [presenting] a significant risk of failure." Friends of the Earth, 693 F. Supp. at 922-23. There is nothing "experimental" about the pumping hiatus, and as discussed below the record demonstrates that the Corps fully considered the potential effects of this hiatus. See 48-49, infra.

VMRC Permit is based on information that may not correlate to Mattaponi River temperature conditions, and that therefore it may prove inadequate to "minimize adverse impacts" as found by the Corps.  Tr. Br. 31-32; MAR023185.  The Tribe ignores the fact that the existing March-July pumping hiatus will be replaced with a more refined hiatus period that "shall be defined by Mattaponi River water temperature triggers" developed following an eight-year study of local water temperatures.  MAR022220-21 (emphasis added); 47-48, infra. The Tribe also argues that withdrawals will threaten shad by increasing salinity levels; as discussed below, infra at 46-47, this claim finds no support in the record.

Relying on materials submitted to the Corps only two weeks before the ROD was signed – and hence well after the close of any public comment period – the Tribe also asserts vaguely that "other factors" than river temperature may influence shad spawning, and that water withdrawals from the Mattaponi "could" harm shad by depriving them of a food source.  Tr. Br. 31-32; see MAR022931 (Tribe comment letter of July 15, 2005 enclosing, inter alia, Henderson letter).[23] Initially, the Corps was not required to consider this material – as the Supreme Court has recognized, even though new information may come to light after the record closes, the administrative process must come to a close at some point.  Vermont Yankee Nuclear Power Corp. v. NRDC, 435 U.S. 519, 554-55 (1978); see also Pers. Watercraft Indus. Ass'n v. Dep't of Commerce, 48 F.3d 540, 542-43 (D.C. Cir. 1995) (agencies are free to ignore late comments).

Even if this submission had been timely, it is far too vague to have presented these issues to

_____

[23]   The Tribe also argues more generally that unidentified "[c]omments submitted during the permitting process informed the Corps that the KWR may be harmful to the aquatic ecosystem," and that therefore it was arbitrary or capricious for the Corps to issue the Permit.  Tr. Br. 33.  The Corps met its obligation to fully consider all public comments.  See ROD at MAR023164.  The mere fact that the Corps did not agree with some comments does not, without more, establish that the Corps' decision was arbitrary or capricious.  See Overton Park, 401 U.S. at 416 (where decision is based on consideration of relevant factors, court not empowered to substitute its judgment for that of the agency).

the Corps in a manner requiring a response.  See Vermont Yankee, 435 U.S. at 553-54.  The

Henderson letter relied on by the Tribe states that temperature is "not the only factor" determining

shad spawning times; beyond alluding generally to "river flow," however, the letter does not identify

any other factors that may be relevant.  MAR022980-81.  The record otherwise establishes,

moreover, that the Tribe's claims of damage to shad remain without merit.  The City's consultant,

Dr. Garman, determined that based on the available information "there does not appear to be a

substantial or scientific basis to claims of significant and detrimental impacts to migratory fish in

the Mattaponi River . . . as the direct result of the construction and operation of [the Reservoir]."

MAR038326; see also FEIS at MAR045441 (concluding that with screens "it is unlikely that

appreciable impingement and entrainment impacts would occur").[24]

### E.    The Corps Reasonably Determined That Construction of the Reservoir Is in the Public Interest.

In determining whether to issue a Section 404 permit, the Corps conducts a "general

balancing process" that weighs a proposed project's benefits against its reasonably foreseeable

detriments in light of a number of factors.  33 C.F.R. § 320.4(a)(1).  Subject to the requirement that

a permit also comply with the Guidelines, "a permit will be granted unless the district engineer

determines that it would be contrary to the public interest."  Id.  The public interest review process

also attaches significant weight to the views of local authorities:

> In the absence of overriding national factors of the public interest that may be
> revealed during the evaluation of the permit application, a permit will generally be
> issued following receipt of a favorable state determination provided the concerns,
> policies, goals, and requirements as expressed in 33 CFR parts 320-324, and the
> applicable statutes have been considered and followed . . . .

---

[24] The Tribe asserts that "[w]ater withdrawals during the four non-hiatus months" could threaten
shad food sources. Tr. Br. 32 (emphasis added).  This grossly overstates both the length of the
existing hiatus (which extends for five months, leaving seven non-hiatus months) and the anticipated
44 to 83-day length of the more refined hiatus to be imposed once the required study of Mattaponi
River temperatures is complete.  See 47-49, infra.

33 C.F.R. § 320.4(j)(4).[25] Having thoroughly weighed all of the required public interest factors, the Corps determined that issuance of the Permit was in the public interest.  See ROD at MAR023157-023159, 023190-023211.  In particular, the Corps concluded that there were no "overriding national factors" present in this case to counteract the Commonwealth of Virginia's approval of the project. Id. at MAR023165-166.

The Alliance argues that the Corps "gloss[ed] over" the part of the regulation that requires that other statutory and regulatory criteria "have been considered and followed."  All. Br. 33-34. The Alliance's claim that the Permit "would violate the [Guidelines] and NEPA," id. at 34 is, however, entirely unsupported.  See generally 12-31 supra; 34-51, infra.  The Alliance's claims that the Reservoir project does not conform to the Guidelines, and that the reduction in the anticipated water deficit renders the Reservoir unnecessary, All. Br. 31-33, have already been rebutted; thus, the Alliance cannot establish that the Corps' public interest determination was arbitrary or capricious on this basis.  As discussed below, moreover, see infra at 43-45, there is no merit to the Alliance's (or the Tribe's) assertion that the Corps failed to consider the cumulative effects of the Reservoir project on the Chesapeake Bay watershed, or failed to consider the state-imposed pumping hiatus. See All. Br. 33; Tr. Br. 34.  The Alliance has thus failed to show anything lacking in the Corps' public interest review.

The Tribe further argues that the Corps failed to consider the effect of the 2004 Mitigation Plan on "cultural values."  Tr. Br. 34-37.[26]  As discussed below, infra at 36-39, the Corps fully

---

[25] "[O]verriding national issues" include matters such as "national security, navigation, national economic development, water quality, preservation of special aquatic areas, including wetlands, with significant interstate importance, and national energy needs."  33 C.F.R. § 320.4(j)(2).

[26] The Tribe also argues that the Corps failed to account for the potential impact on culturally-important shad.  Tr. Br. 35-36.  This is merely a variation of arguments that have already been rebutted.  See 29-31, supra; 36-39, infra.

considered the potential cultural impacts of the Reservoir project and the associated Mitigation Plan through the review conducted under Section 106 of the National Historic Preservation Act. The Corps thus properly concluded that the administrative record documents a careful consideration of the potential impacts on local Native American tribes. ROD at MAR023194-196. The Tribe claims that the Corps was required to "independently investigat[e]" the potential cultural impacts of the Reservoir project as part of the public interest review, Tr. Br. 35, but never explains what such an "independent investigation" could have added to the detailed cultural review already undertaken through the Section 106 process. The Tribe cites no legal authority, and the Corps is aware of none, that might support the proposition that the Corps was required to do the same work twice.

Finally, the Tribe asserts that the Corps took "unlawful economic benefits" into account as part of the public interest review.[27] Tr. Br. 37. In so doing, the Tribe relies on a single statement taken out of context. The Corps' discussion of the economic benefits of the Reservoir project begins by stating that the Reservoir is necessary "to provide a dependable, long-term water supply for the Lower Virginia Peninsula," ROD at MAR023191 – the precise objective that the Tribe acknowledges the Corps was entitled to consider. Tr. Br. 37. The Corps elaborated on this conclusion by explaining that the Reservoir will "ensure a stable, uninterrupted, safe supply of water for community needs and human health," that it will "ensure that the project area maintains its current economic base," and that it will meet the objective of attracting new businesses and employment to the area. ROD at MAR023191. The Tribe points to only this final statement, wholly ignoring the multiple factors that the Corps considered in analyzing the economic impact of the

---

[27] The Tribe's additional argument that the FEIS was flawed, Tr. Br. 38, is addressed below. See 34-51, infra.

33

Reservoir project.[29]

## II.    PLAINTIFFS CANNOT ESTABLISH THAT A SUPPLEMENTAL NEPA ANALYSIS IS NECESSARY

In Marsh, the Supreme Court set forth the standard for determining whether a supplemental EIS is required.  The Court explained that under NEPA regulations, which are binding on federal agencies and entitled to substantial deference by the courts, federal agencies may be required to prepare supplements to existing EISs where "[t]he agency makes substantial changes in the proposed action," 40 C.F.R. § 1502.9(c)(1)(i), or where "[t]here are significant new circumstances or information . . . bearing on the proposed action or its impacts," 40 C.F.R. § 1502.9(c)(1)(ii), and where such project changes, new circumstances, or new information are relevant to environmental concerns in a significant manner or to a significant extent not already considered in the EIS.  Marsh, 490 U.S. at 372-74.  In making this determination, the agency is to take a "hard look" at the environmental impacts and apply a "rule of reason" in determining if the subsequent information requires preparation of a supplemental EIS.  Id., 490 U.S. at 378.

As the D.C. Circuit has explained, to warrant supplementation, any new information must present "a seriously different picture of the environmental landscape."  Nat'l Comm. for the New River, Inc. v. F.E.R.C., 373 F.3d 1323, 1330 (D.C. Cir. 2004) (emphasis in original), quoting City of Olmsted Falls, Ohio v. Fed. Aviation Admin., 292 F.3d 261, 274 (D.C. Cir. 2002); West Branch

---

[29]  Buttrey v. United States, 690 F.2d 1170 (5th Cir. 1982), is distinguishable.  See Tr. Br. 37.  In Buttrey, the plaintiff argued that the Corps should have considered the jobs that would be created during the process of constructing his proposed housing addition as an economic benefit.  Buttrey, 690 F.2d at 1180.  The court stated that this is not the sort of economic benefit that the public interest review is designed to consider.  Id.  In this case, however, the Corps considered only the economic impacts of the eventual existence of the Reservoir (not those that would derive from the process of constructing it).  In addition, unlike the speculative future benefits discussed in Florida Wildlife Federation v. United States Army Corps of Engineers, 401 F. Supp. 2d 1298, 1332-33 (S.D. Fla. 2005) (many of which were attributed to possible future phases of the project at issue), the benefits considered by the Corps in this case do "flow directly" from creation of the Reservoir.  Tr. Br. 37.

Valley Flood Control Ass'n v. Stone, 820 F. Supp. 1, 6 (D.D.C. 1993); Wisconsin v. Weinberger, 745 F.2d 412, 420 (7th Cir. 1984). The DC circuit has also emphasized that "not every change requires[ a supplemental EIS]; only those changes that cause effects which are significantly different from those already studied require supplementary consideration." Davis v. Latschar, 202 F.3d 359, 369 (D.C. Cir. 2000) (citation omitted). Indeed, a supplemental EIS is not required "every time new information comes to light after the EIS is finalized. To require otherwise would render agency decisionmaking intractable, always awaiting updated information. . . ." Marsh, 490 U.S. at 373-374.

An agency's failure to supplement an existing EIS can be set aside only if, through a review of the record, the court finds that action to be arbitrary and capricious. Marsh, 490 U.S. at 377-38; Olmsted Falls, 292 F.3d at 274. The determination of the environmental significance of new information involves issues of fact requiring "a high level of technical expertise" for which reviewing courts typically defer to agency expertise, allowing an agency's decision to stand unless it is found to be arbitrary or capricious. Marsh, 490 U.S. at 377 (citation omitted). The only role of a court in a NEPA claim "is to ensure that the agency has considered the environmental consequences; it cannot interject itself within the area of [agency] discretion. . . ." Strycker's Bay Neighborhood Council v. Karlen, 444 U.S. 223, 227-228 (1980).

It is the plaintiff's burden to prove that the agency's decision was arbitrary and capricious. Motor Vehicle Mfrs. Ass'n, 463 U.S. at 43. The Alliance and the Tribe have failed to carry their burden here. As the administrative record in this matter demonstrates, before issuing the Permit, the Corps carefully re-evaluated the FEIS and determined that there were not any substantial changes in the scope of the project that would warrant an SEIS. Further, none of the information presented by the Alliance presents a *seriously* different picture of the environmental landscape.[29]

---

[29] As the Corps stated in the ROD, it performed this analysis in part because CEQ's "40 Most Asked
(continued...)

A.    **The Change in Projected Water Deficit Does Not Constitute a Project Change Requiring Preparation of an SEIS.**

The change in projected deficit between the FEIS and ROD is not a project change necessitating preparation of a SEIS.  As discussed above, the change is not nearly as great as the Alliance alleges, because between the FEIS and ROD an additional source of water became available and certain assumptions changed.  See 9-11, supra.  More importantly, as also discussed above, even with the somewhat reduced projected deficit in the ROD, the Reservoir is still the only available practicable alternative that would produce the amount of water necessary to satisfy the projected regional demand for water in 2040.  See 12-23, supra.  The Corps was therefore not required to prepare an SEIS to analyze alternatives based on the change in projected water deficit.  See Davis, 202 F.3d at 369 ("only those changes that cause effects which are significantly different from those already studied require supplementary consideration") (citations omitted).

B.    **The Alliance and the Tribe Fail to Present Any "New Information" Requiring Preparation of an SEIS.**

1.    **The Corps Analyzed Potential Impacts to Traditional Cultural Properties  Prior to Issuing the Permit.**

The Corps fully considered impacts to Traditional Cultural Properties, including consideration of information supplied in "Powhatan's Legacy: Traditional Cultural Property Study for the Proposed Regional Raw Water Study Group's Water Supply Reservoir King William County, Virginia," ("1999 Traditional Cultural Property Study"), MAR055670-056134, as well as consideration of the Mitigation Plan, despite the Tribe's assertion to the contrary.  See Tr. Br. 19-20.  First, the information contained in the 1999 Traditional Cultural Property Study and the Mitigation Plan was considered during the review by the Corps under Section 106 of the National Historic

---

[29]/(...continued)
Questions" regarding NEPA "states as a rule of thumb," if a proposed action has not been implemented after five years, the FEIS should be carefully re-examined.  MAR023182.

Preservation Act ("NHPA"), which is designed to take into account the impacts of a proposed action

on historic and archaeological resources.  Second, the information gathered during the NHPA review

and the mitigation required under the NHPA, were taken into consideration during the NEPA review

prior to adopting the ROD.

Like NEPA, the NHPA is a procedural statute.  Nat'l Mining Ass'n v. Fowler, 324 F.3d 752,

755 (D.C. Cir. 2003).  The Advisory Counsel on Historic Preservation ("ACHP") has promulgated

regulations at 36 C.F.R. Part 800, which sets forth a four-step procedure for compliance with Section

106, including the identification of historic properties, the assessment of whether there are adverse

effects on those historic properties, and the resolution of such effects.  As it did here, this process

often culminates in a memorandum of agreement, which reflects an understanding of how historic

properties are to be managed, including references to mitigation.  See 36 C.F.R. §§ 800.6(c),

800.16(o).  The Memorandum of Agreement ("MOA")[30] in this case was taken into consideration

during the NEPA review prior to signing the ROD and issuing a permit.  Therefore, it was not

arbitrary for the Corps to not prepare an SEIS to further examine impacts to cultural resources.

Pursuant to the NHPA, the Corps engaged in the required consultation with the state and

federal historic resource agencies, as well as a number of consulting parties, including the Tribe,

which was an active participant in the NHPA review process.[31]  The consultation included holding

a series of meetings.  MAR021887-94; 079979-83; 080025-30; 080106; see also MAR023161-63.

---

[30] Memorandum of Agreement Among the United States Army Corps Of Engineers, the Virginia Department of Historic Resources, and the Advisory Council on Historic Preservation for Treatment of Adverse Effects to Historic Properties Affected by the Construction and Development of the King William Reservoir, King William County, Virginia, June 21, 2005.

[31] The NHPA review process, which had been initiated prior to the FEIS, resumed following the September 30, 2002 interim decision to continue processing the City's permit application.  In that decision, the Corps determined there were three procedural matters that must be concluded before a decision could be made, including review under the NHPA.  MAR023153.  In April of 2003, the Corps directed the City to restart consultation with the Tribe.  MAR021682.

During at least three of the meetings attended by the Tribe, there were discussions regarding potential mitigation for impacts to parcels of land that would be used for wetland mitigation purposes. MAR021889-92; 079979-83; 080027-28. The Tribe also had the opportunity to provide written comments on the draft MOA, and the vast bulk of the Tribe's detailed comments were incorporated into the final version of the MOA. MAR022773-75; 022690-702; EPAWR005148-49. While the Tribe was invited to be a signatory, MAR022773-75, it did not accept.

The MOA contains detailed provisions regarding the treatment of Traditional Cultural Properties, including any discovered during the course of construction. MAR022837-55. In outlining the treatment of Traditional Cultural Properties, the MOA specifically states in Stipulation III(A) that Traditional Cultural Properties include those identified and documented in the 1999 Traditional Cultural Property Study.[32] MAR022847. Thus, the Tribe's contention that this study presented "new information" is clearly contradicted by the record. See Tr. Br. 19-20.

Stipulation III, "Traditional Cultural Properties," also contains provisions concerning wetland mitigation parcels, requiring the City to negotiate with the Indian tribes, including the Mattaponi Indian Tribe, to establish a Traditional Cultural Properties Mitigation Program in the event that certain parcels are used. MAR022847. The MOA also requires coordination with Indian tribes for any newly discovered sites, including any later identified as mitigation parcels. MAR022847-48. Because the MOA provides a framework for treatment of any mitigation parcels that are also Traditional Cultural Properties, the Tribe's contention that the Mitigation Plan presents a significantly different picture requiring the Corps to prepare an SEIS is also contradicted by the administrative record. See Tr. Br. 20.

---

[32] Further, the MOA lists it as one of the studies sponsored by the City and the Corps to identify archaeological sites and traditional cultural properties. MAR022839. The RROD also contains an extensive discussion of this report and comments received on it. MAR13945-48.

It is important to note that the Tribe has not attempted to state a claim under the NHPA or alleged that the Corps failed to comply with the MOA. Rather, the Tribe asserts only that additional review for potential impacts on cultural properties is required under NEPA. However, the MOA and the mitigation it provides for Traditional Cultural Properties were taken into consideration by the Corps as it completed the NEPA review. As the Corps stated in the ROD, in response to comments on the final draft version of the wetlands mitigation plan[33] and the potential for adverse effects on archaeological sites, the MOA "prescribes appropriate measures for protection of historic and cultural resources, including Traditional Cultural Properties." MAR 023176; see also MAR023164 (the MOA "specifies procedures for identification and protection of cultural and historic resources, including Traditional Cultural Properties, identified now and during final construction"). The Corps also specifically found that the MOA and its procedures for identification and protection of cultural and historic resources, including Traditional Cultural Properties, is not the type of change that would increase adverse environmental impacts, thereby necessitating an SEIS. MAR 023183. As it is clear that the Tribe's concern regarding Traditional Cultural Properties was evaluated and addressed prior to issuing a permit, the determination that an SEIS was not necessary should be upheld.

**2.      The Corps Analyzed Potential Impacts of Methyl Mercury Prior to Issuing the Permit.**

The Alliance's assertion that an SEIS is necessary to examine the issue of the potential for methyl mercury, All. Br. 42, is a simply unfounded, as this information does not present a *seriously* different picture of the environmental landscape. This issue was raised for the first time by the FWS in a June 23, 2005 letter to the Corps. MAR022776-78. In response, the Corps twice requested

---

[33]   The FEIS included a detailed discussion of a conceptual wetland mitigation plan that included over 7,000 acres of land. MAR003709-3878. Although the Mitigation Plan contained changes from the conceptual plan, subsequent changes to a mitigation plan do not require an SEIS where "the mitigation measures discussed in the EIS are sufficient to demonstrate a realistic look by the agency at the adverse impacts of the project." See West Branch Flood Protection Ass'n, 820 F. Supp. at 8-9.

information from the City.   MAR023046.   The City's second response provided detailed information, including a letter from the United States Geological Survey ("USGS") regarding the status of the science with respect to this issue, additional documentation regarding the State's response to methyl mercury contamination, information about a similar nearby reservoir, and a discussion about why the Reservoir would be different from an example relied upon by FWS in its comment letter.   MAR023142-46, citing MAR023047-79.

Following an independent analysis of the information submitted, the Corps reasonably concluded that there "is no site-specific evidence to indicate that this will be a problem for the proposed King William Reservoir."   MAR023205.   This conclusion was based in part on an investigation by the City, as recommended by the USGS, of Beaverdam Creek Reservoir, which is located in close proximity to, and in the same geologic setting as, the Reservoir, and also contained extensive wetlands prior to its inundation.   MAR023205; 023048; 023145.   The City found that there is no mercury problems of any kind at that reservoir, and thus the Corps found it reasonable to conclude that there is no greater than a small risk of methyl mercury formation in the Reservoir. Further, the Reservoir, as proposed by the City, is consistent with several recommendations made by the USGS to minimize the potential for methyl mercury, including minimizing the surface area, maintaining a steady pool elevation and establishing clean water conditions.   MAR023145.   Finally, as the Corps noted in the ROD, Virginia requires the City to submit water quality and ecological monitoring plans, which will include sampling and analytical programs to address the potential for methyl mercury formation.   The ROD further states that if methyl mercury were to become present in the Reservoir, Virginia "would require the applicant to take appropriate measures to address water quality issues."   MAR023206.

The Alliance relies on <u>Idaho v. ICC</u>, 35 F.3d 585, 596 (D.C. Cir. 1994), in an attempt to assert that the Corps improperly relied on the information provided by the City.   All. Br. 42.

However, in that case the court found that the agency failed to take a "hard look" under NEPA because the agency failed to prepare an EIS or in any way analyze potential environmental harm. 35 F.3d at 595.  In contrast, here, the Corps, once this issue was brought to their attention, twice requested information from the City in order to determine whether methyl mercury could be an issue, as the City's first response was not sufficient.   MAR023046; see MAR022914-21 at MAR022917-18.   This is in keeping with the NEPA regulations, which expressly anticipate situations where an agency may request information from an applicant in order to complete an environmental review, as long as the agency independently evaluates the information.  See 40 C.F.R. § 1506.5(a); 33 C.F.R. Part 325, App. B § 8(f)(2); see also Coliseum Square Ass'n, Inc. v. Jackson, 465 F.3d 215, 236-37 (5th Cir. 2006) (no violation of NEPA where the agency inquired into an issue raised and, on consideration of the evidence submitted, chose to continue to rely on the information provided for sound reasons).  Thus the Corps' conclusion that methyl mercury would not be a problem for the Reservoir was not arbitrary or capricious.  This determination is entitled to deference.  See Marsh, 490 U.S. at 375 (an agency's determination of whether new information is significant such as to require an SEIS is afforded great deference).

### 3.    The Corps Was Not Required to Analyze Impacts of a Chemical Feed System Because It Is Not "Reasonably Foreseeable."

The Alliance's assertion that the Corps must prepare an SEIS to evaluate a chemical feed system allowed under the 2004 VMRC Permit is also incorrect because there are no current plans to use such a system.  See All. Br. 42-43.  "The starting point in any analysis of an agency's compliance with ... NEPA is the 'rule of reason,' under which a federal agency proposing a major action must consider only the reasonably foreseeable environmental effects of the action." Hammond v. Norton, 370 F. Supp. 2d 226, 245 -246 (D.D.C. 2005) (emphasis added) (citation omitted).  Agencies "need not address 'remote and highly speculative consequences.'"  Id. at 246

(citation omitted).

As the Corps stated in the ROD in response to concerns raised by FWS, the City has indicated they do not currently envision an immediate need to activate and use a chemical feed system to control biofouling organisms, as invasive species do not currently inhabit the Mattaponi River.  MAR021370; MAR022917 (letter from City).  Therefore, it is not a reasonably foreseeable environmental impact.  The Corps added a special condition in the permit that requires the City to submit to the Corps and FWS for approval an Operational Plan for installation and operation of a chemical feed system.  MAR023318.  The plan must detail the proposed chemicals or other measures to be utilized and include a technical assessment of the potential impact on river habitat and fishery resources, including a specific assessment for listed species.  The permit further specifies that until the Corps has notified the City in writing that permission has been granted to install and activate the chemical feed system, the City may not do so.  MAR021370-71.

The Corps reasonably concluded that it was not necessary to reinitiate Section 7 consultation under the Endangered Species Act regarding the theoretical chemical feed system, a decision which was relayed to the FWS in a July 14, 2005 letter.  See MAR021371, citing MAR022927-30.  On August 5, 2005, the FWS informed the Corps that this special permit condition was acceptable and concurred in the Corps' judgment that was not necessary to reinitiate Section 7 consultation.  MAR023219-20.  Therefore, the Corps adequately considered this concern and determined this was not a reasonably foreseeable environmental impact requiring preparation of an SEIS.

### 4.   The Corps Was Not Required to Analyze Impacts of a Possible Future Expansion of the Reservoir Because It Is Not a "Proposed Action."

The Alliance also asserts, incorrectly, that the Corps is required to prepare an SEIS to evaluate an area of land directly below the Reservoir that they assert has been "reserved" for "possible future enlargement of the reservoir."  See All. Br. 41-42.  However, that possibility is

simply not a proposed action requiring analysis at this point.

The NEPA regulations state that a proposed action "exists at that stage in the development of an action when an agency subject to [NEPA] has a goal and is actively preparing to make a decision on one or more alternative means of accomplishing that goal and the effects can be meaningfully evaluated").  40 C.F.R. § 1508.23.  Here, the "possible future enlargement of the reservoir" does not rise to the level of a "proposed action."  As the Corps founds in the RROD, a future reservoir expansion, if permitted, would result in the filling and/or alteration of an additional 137 to 216 acres of wetlands.  However, the RROD stressed that such an expansion, no matter how probable, is not included in the application currently before the Corps.  MAR014000.  The Corps similarly noted in the ROD that the County has a right to pursue a future dam downstream of the currently proposed Reservoir.  MAR023173.  It is plain from the discussion in both the RROD and ROD, as well as from the Alliance's description, that such a project has not been proposed, and therefore the Corps is not required to prepare an SEIS to analyze it.  See Kleppe, 427 U.S. at 410 n. 20 (NEPA "speaks solely in terms of proposed actions; it does not require an agency to consider the possible environmental impacts of less imminent actions").

### 5.    The Corps Properly Analyzed Cumulative and Indirect Impacts.

The Alliance also suggests that an SEIS is necessary to examine the cumulative and indirect impacts of the Reservoir.  All. Br. 43-44.  However, both were adequately studied by the Corps prior to issuing the permit, and the Alliance does not suggest there was any new information or project changes that would impact these analyses.  Instead, curiously, the Alliance points to the Corps' analysis in the RROD of cumulative impacts, and in doing so, point to the very analysis that the Corps performed.  While the Alliance attempts to spin the RROD as a separate review process, the Corps' decision to issue the permit necessarily took into consideration all of the previous analyses, including the discussion in the RROD.

Further, the two issues the Alliance points to were properly dealt with by the Corps.  First, the Alliance point to the possible future expansion of the Reservoir as a cumulative impact that the Corps should have analyzed.  However, in addition to not being a "proposed action" as discussed above, it also does not rise to the level of a "reasonably foreseeable" future action requiring analysis as a cumulative impact.  See 40 C.F.R. § 1508.7.  For example, in Airport Impact Relief, the plaintiffs claimed the agency's review of a road project should have included an analysis of a potential move and expansion of a nearby service road near Logan Airport. Airport Impact Relief, Inc. v. Wykle, 45 F.Supp.2d 89, 105 (D. Mass. 1999), aff'd 192 F.3d 197, 200 (1st Cir. 1999).  Emphasizing that the state had not received the necessary permits and approvals to expand the airport and there was no evidence of plans or funding for such a project, the district court found that the potential project could not be considered a "cumulative impact."  Id. at 206.  Similarly, here, there is no evidence that the Corps has received an application to pursue a future dam downstream of the Reservoir or that any funding has been secured.  See RROD at MAR014000 (the potential future expansion was not included in the City's application).  Further, before any new permit could be issued, the Corps would have to engage in a review under the appropriate statutes.  It was thus not arbitrary and capricious for the Corps to exclude this potential project from its cumulative impacts analysis.  See Natural Res. Def. Council v. Kempthorne, 525 F. Supp. 2d 115, 122-23 (D.D.C. 2007) (agency not required to include projects in the cumulative impacts analysis that had only begun to work their way through the NEPA approval process when the FEIS was compiled); see also Hammond, 370 F. Supp. 2d at 245 (the task of identifying the "cumulative impacts" is "committed 'to the special competency' of the agency").

Second, the Alliance points to the potential wetland losses from the Reservoir.  However, the Corps did consider the potential wetland losses and determined that such losses would be mitigated, and as discussed in detail above, the mitigation required by the Permit will ensure that

"no net loss" goal is met.  See 23-27, supra.  Additionally, as the Corps stated in the ROD, the wetland mitigation plan "is expected to result in positive secondary impacts to the Chesapeake Bay watershed because of the net increase in wetland acreage and stream restoration, preservation and enhancement."  MAR023189.  In addition, the ROD states that the reservoir will result in the preservation of almost 5300 acres of land in the Chesapeake Bay watershed.  Id.

The Alliance also argues that the Corps failed to consider indirect impacts on aquatic resources near the Reservoir.  All. Br. 44.  That claim is flatly contradicted by the record.  As the Corps stated in the FEIS, the area around the Reservoir is remote and primarily rural in nature, and the land in the reservoir buffer area is to be maintained in its natural state to protect the water quality of the Reservoir.  MAR045483.  The FEIS specifically found that the Reservoir is not expected to promote much new residential or business growth because the area is relatively inaccessible and central water and sewer service is not available, and because there are mechanisms in place to prevent development in the watershed, including zoning.  MAR045484-85.  Additionally, in the ROD, the Corps found that the State Water Protection Permit/Water Quality Certificate addressed secondary impacts to wetlands downstream of the proposed dam.  MAR023189.  Therefore, the Corps concluded future development in the area of the Reservoir would not occur.  Thus, no SEIS is necessary to further examine cumulative or secondary impacts.

> ### 6. The Corps Analyzed Potential Impact Greater Than Those Allowed Under The 2004 VMRC Permit.

The Alliance's and the Tribe's arguments that the seasonal pumping hiatus presents "a *seriously* different picture" requiring an SEIS also fail.  See All. Br. 40-41; Tr. Br. 16-18.  MAR023183.  As the Corps stated in the ROD in direct response to comments made by the Alliance and the Tribe requesting an SEIS, the pumping hiatus results in fewer impacts than previously considered in the FEIS.  MAR023182-83.  Courts have long recognized that NEPA supplementation

is not necessary, where, as here, changes to a proposed action will reduce the impacts of the project. For example, in <u>West Branch Flood Protection Ass'n</u>, the court found that mitigation plan refinements which decreased the number of pumping stations and reduced the diameter of ponding area did not require supplementation of the EIS.  802 F. Supp. at, 8-9; <u>see also</u> <u>Sierra Club v. U.S. Army Corps of Eng'rs</u>, 295 F.3d 1209, 1221-22 (11th Cir. 2002) (finding that a new road alignment that resulted in a reduction of impacts did not require an SEIS); <u>South Trenton Residents Against 29 v. Fed. Highway Admin.</u>, 176 F.3d 658, 664-66 (3rd Cir. 1999) (changes in highway project that would reduce impacts do not require supplemental NEPA analysis); <u>Township of Springfield v. Lewis</u>, 702 F.2d 426, 437-38 (3rd Cir. 1983) (same); <u>Nat'l Indian Youth Council v. Watt</u>, 664 F.2d 220, 224-25 (10th Cir. 1981) (changes in mining operation that reduce area impacted do not require supplemental NEPA analysis).  Similarly, here the 2004 VMRC Permit would reduce the impact of the Reservoir as originally analyzed in the FEIS, and no SEIS is required.

The Alliance argues, incorrectly, that the Corps failed to analyze impacts on the Mattaponi River's salinity levels, as well impacts on the sensitive joint vetch.  All. Br. 20-21; 40.  As the Corps specifically found in the ROD, because "the available information indicates that potential salinity changes which may result from withdrawal of water would generally be within the natural salinity fluctuation of the estuarine system, it is reasonable to conclude that the potential impacts from salinity changes in Mattaponi River would be minor."  MAR023185.  This conclusion took into consideration the seasonal pumping hiatus.  <u>Id.</u>; <u>see also</u> MAR022914–17 (June 29, 2005 letter from City responding to concerns raised by FWS regarding salinity).

The Corps also reviewed the Biological Opinion issued by FWS in light of the pumping hiatus in order to determine if there would be any impacts on listed threatened plant species not previously considered.  MAR023171.  However, the Corps found that the maximum withdrawal ratios allowed "are much less than the simulated withdrawal regime used in the 1991 Virginia

Institute for Marine Sciences study (Appendix VI of the Final Environmental Impact Statement) which formed the basis for the Mattaponi River salinity analysis in the Corps of Engineers' Final Environmental Impact Statement." MAR021371. The ROD further notes that Section 5.2.3 of the FEIS (MAR045377-416), "states that natural Mattaponi River salinity fluctuations greatly exceed any salinity changes that are predicted due to the earlier simulated raw water withdrawal regime. The currently proposed raw water withdrawal regime would result in lesser impact than those described in the Final Environmental Impact Statement. On the basis of this information, we believe potential salinity impacts to the sensitive joint-vetch plant would be less than previously determined." MAR021371; see also MAR045379. The Corps concluded that it was not necessary to reinitiate Section 7 consultation with regard to the sensitive joint vetch, a decision which was relayed to the FWS in a July 14, 2005 letter. MAR021371, citing MAR022927-30. On August 5, 2005, the FWS concurred in the Corps' judgment. MAR023219-20. Therefore, the Corps adequately considered this concern and determined it did not require the preparation of an SEIS.

The Alliance and the Tribe's concerns regarding impacts on shad were likewise addressed, and the Corps found that the pumping hiatus instead would provide additional protection to shad. MAR023183. For example, the Alliance's assertion that the Corps failed to consider the likelihood of increased water emergencies with the pumping hiatus, see All. Br. 21-22, is directly contradicted by the record, which contains an April 2004 report prepared by the King William Reservoir Fisheries Panel that examined the probability of the occurrence of severe drought conditions that would potentially lead to a drought emergency declaration. The report found that the probability of drought emergency declarations in the next 30 to 40 years would likely be lower than 2 in 74 years. MAR015865.

The Alliance also points to a FWS statement regarding the location of the pump intake and impacts on shad. All. Br. 41. However, as the Corps found in the ROD, the 2004 VMRC Permit

47

and its associated restrictions on raw water withdrawals "has not resulted in a material alteration" of the Reservoir, as it had always contained a raw water intake at this location, and the impacts of the intake were assessed in the FEIS.   MAR023182-83.   The Alliance and the Tribe also assert that the pumping hiatus is based on temperature triggers for spawning of shad in the Hudson River and seem to regard the hiatus as forever fixed at five months, March through July.   See All. Br. 20, 41; Tr. Br. 17-18, 30-31.   Neither assumption is true.   Rather, as clearly stated in the 2004 VMRC Permit, the March-July restriction is an interim condition, intended only to apply during an eight year pre-operational monitoring program, during which the City of Newport News is required to collect data in order to propose temperature trigger values specific to the Mattaponi River. MAR022468 (Special Condition 23).   Once this has been done, the seasonal pumping hiatus will be based on Mattaponi River water temperature triggers, and not a specific time period. MAR022467 (Special Condition 19).   Thus, the true hiatus period has not yet been defined, however it is thought to fluctuate between 44 and 83 days from year to year depending upon the parameters specified in the 2004 VMRC Permit.   MAR022455.   This is significantly less than the five month interim period asserted by the Alliance and the Tribe.   The Corps' Permit specifically incorporates all Special Conditions contained in the 2004 VMRC Permit.   MAR023318.

The Alliance and the Tribe also assert that the pumping hiatus will result in reduced project benefits.   All. Br. 22, 41; Tr. Br. 15, 17.   That is simply not true.   The Tribe presented these same comments and criticisms to the Corps in a November 29, 2004 letter.   MAR022166-67. However, the record, which included a response by the City to that letter, MAR022448-500, along with the long state permit history, and the FEIS, effectively dismiss these concerns.   This is because the Alliance's and the Tribe's allegation ignore basic facts.   First, they forget that the Reservoir is a storage facility and that the purpose of the Mattaponi River withdrawal is to supplement the natural

drainage that would flow into the Reservoir from Cohoke Creek.[34]  The withdrawal of water from

the Mattaponi River is not the sole source for meeting the 15.9 mgd deficit.  The basic idea is to

withdraw river water when it is plentiful and store it for future use in the Reservoir.[35]  In essence,

the City is using the water withdrawn from the river to top-off the Reservoir so that water will be

stored and available if a drought occurs.

Next, the pumping hiatus imposed by the 2004 VMRC Permit grew out of the recognition

that during most years it would not be necessary for the City to withdraw water during spawning

seasons to meet its water supply needs.  MAR022454.  Only during periods of significant drought,

as it declared by the Governor of Virginia or the President of the United States, would Virginia

suspend the hiatus.  MAR022467.  Further, the duration of the hiatus, once the temperature triggers

are set, is thought to fluctuate between 44 and 83 days, not five months, as the Alliance and the

Tribe contend.  MAR022455.  The City will likely recoup the water not pumped during the hiatus

by increased pumping at other times of the year.  MAR022455.

Finally, even in very wet years or very dry years, water will not be lost due to the hiatus.  In

very wet years, the Reservoir will be full due to the watershed drainage into the reservoir and there

will be no need to pump.  In very dry years, the rate of flow in the Mattaponi River will be below

the Commonwealth- designated minimum instream flow requirement and no pumping would be

allowed even if there were no hiatus, except in the event of a drought emergency as explained above.

MAR022455.  Consequently, the hiatus does not reduce the Reservoir's benefits.[36]

---

[34] The Reservoir will drain 8.92 square miles and store 12.2 billion gallons at normal pool elevation.
MAR045001.  The Reservoir will also impound Cohoke Creek.  Id.

[35] The withdrawal criteria is intended to preserve the general shape of the Mattaponi River's natural
seasonal hydrograph.  MAR045003.

[36] The Tribe relies on Massachusetts v. Watt, 716 F.2d 946 (1st Cir. 1983) to press this point.
(continued...)

The Tribe makes a number of other unconvincing statements in support of their argument that an SEIS is warranted.  For example, the Tribe states, without any foundation, that the Corps has "assumed that claimed beneficial impacts do not require an SEIS."[37]  Tr. Br. 18-19.  However, the Corps has assumed no such thing.  Rather, the Corps determined that the 2004 VMRC Permit conditions did not require a SEIS because they resulted in decreased adverse impacts.  The Tribe also asserts that the 2004 VMRC Permit is an "intervening legal requirement" that requires preparation of an SEIS, relying on <u>Olympic Forests Coal. v. U.S. Forest Service</u>, 556 F. Supp. 2d 1198 (W.D. Wash. 2008).  However, in that case, the court was concerned with a previous judicial decision that set aside a ROD issued by the Forest Service.  Once the ROD had been set aside, the court found that a subsequently prepared environmental assessment was also invalid because it relied upon the ROD.  <u>Id.</u> at 1204-08.  The court's holding is simply not applicable in this situation, as a judicial decision setting aside an earlier NEPA analysis is simply not akin to the issuance of a state

---

[36]/(...continued)
However, that case is easily distinguishable.  First, in <u>Watt</u>, there was a 97% reduction in the project benefits.  In contrast, here, as discussed above, there is no decrease in project benefits due to the hiatus.  Rather, the only decrease in project benefits is that the FEIS predicted the Reservoir could provide a safe yield of 23.2 mgd, MAR045085, whereas the ROD assumed 19.0 mgd, MAR023154, a reduction of only 18%.  Second, the court was concerned in that case because it found there was no way of "visualiz[ing] the environmental harms" of alternatives under the vastly reduced predicted project benefit because the agency failed to also quantify by how much the likely environmental harm would be reduced.  716 F.2d at 948-50.  This is not a concern here, as the Corps took into consideration the springtime pumping hiatus and found the Reservoir was still the only alternative that would satisfy the proposed deficit.  <u>See</u> MAR023151.

[37]/ The Tribe relies on language from the Eleventh Circuit's decision in <u>Nat'l Wildlife Fed. v. Marsh</u>, 721 F.2d 767 (11th Cir. 1983) to argue that entirely beneficial post-EIS significant changes require an SEIS.  <u>See</u> Tr. Br. 18-19.  However, the Eleventh Circuit subsequently revisited this holding in 2002, and while finding that it was not presented with an issue that required it to inquire into the "continued wisdom of that holding," the Eleventh Circuit did note that other circuits have questioned it.  <u>See</u> <u>Sierra Club</u>, 295 F.3d at 1221 n. 17 (citations omitted).  The Eleventh Circuit also went on to note that "there has been a 'growing awareness that routinely requiring such statements would use resources better spent on careful study of actions likely to harm the environment substantially.'"  <u>Id.</u> (citation omitted).

permit that requires changes to a project that would result in fewer adverse environmental impacts.[38]

Therefore, the Corps' decision to not prepare an SEIS to analyze the seasonal pumping hiatus should

be upheld.  See Marsh, 490 U.S. at 375.[39]

## III.   EPA'S DECISION NOT TO INITIATE THE SECTION 404(C) PROCESS WAS NOT ARBITRARY OR CAPRICIOUS

The Alliance and the Tribe both challenge what they characterize as EPA's decision not to

veto the Permit pursuant to Section 404(c) of the Act, 33 U.S.C. § 1344(c).  All. Br. 34-38; Tr. Br.

39-44.  That section reads in full:

> The Administrator [of EPA] is <u>authorized</u> to prohibit the specification (including the withdrawal of specification) of any defined area as a disposal site, and he is authorized to deny or restrict the use of any defined area for specification (including the withdrawal of specification) as a disposal site, <u>whenever he determines, after notice and opportunity for public hearing</u>, that the discharge of such materials into such area will have unacceptable adverse effect on municipal water supplies, shellfish beds and fishery areas (including spawning and breeding areas), wildlife, or recreational areas.  <u>Before making such determination, the Administrator shall consult with the Secretary.  The Administrator shall set forth in writing and make public his findings and his reasons for making any determination under this subsection</u>.

---

[38] The Tribe also incorrectly implies that this is a case where there is "controversy," as defined under NEPA, such that an SEIS is required.  See Tr. Br. 15, citing 40 C.F.R. § 1508.27.  However, the Tribe and the Alliance have failed to establish "controversy" as this term is used in the NEPA context.  First, their opposition to placing a reservoir on the Mattaponi River does not render the project "controversial," as defined under NEPA.  See Wetlands Action Network v. U.S. Army Corps of Eng'rs, 222 F.3d 1105, 1122 (9th Cir. 2000) (finding that opposition to a use "does not render an action controversial").  Second, while the Tribe and the Alliance have been vocal opponents of the impacts of the Reservoir, such concerns have been addressed by the Corps in the FEIS, and for concerns expressed after the FEIS, in the ROD, as discussed above.  Therefore, it was not arbitrary and capricious for the Corps to determine that an SEIS was not necessary.  See Town of Cave Creek, Arizona v. F.A.A., 325 F.3d 320, 331-32 (D.C. Cir. 2003) (finding a project was not "controversial" where evidence presented did "little to undercut" the agency's analysis); see also Coliseum Square Ass'n, Inc., 465 F.3d at 233 -234 (the factors listed in 40 C.F.R. § 1508.27 "do not appear to be categorical rules that determine by themselves whether an impact is significant...[a]s such, all that would have to be shown is that all the factors were in some way addressed and evaluated; whether this was done in factor-by-factor fashion is irrelevant") (citations omitted).

[39] In addition, the Alliance's concerns regarding the Mitigation Plan do not require an SEIS, see All. Br. 42, for the reasons discussed above.  See 23-27, supra.

33 U.S.C. § 1344(c) (emphasis added).  EPA has adopted implementing regulations setting forth the process EPA must follow to make the required determination.  See generally 40 C.F.R. Pt. 231; 3-4, supra.

For reasons discussed in its prior filings, EPA's position remains that the Court lacks jurisdiction over the Alliance's and the Tribe's claims against EPA.[40/]  As further discussed in the following sections, there is no standard by which to judge EPA's exercise of discretion under Section 404(c).  Because there is no "law to apply" to the claims against EPA, those claims are not reviewable under the APA.  See 5 U.S.C. § 701(a)(2) (APA does not apply where "agency action is committed to agency discretion by law"); Heckler v. Chaney, 470 U.S. 821, 830 (1985) (Section 701(a)(2) applies "where statutes are drawn in such broad terms that in a given case there is no law to apply") (citation omitted).  Even assuming the claims against EPA are reviewable, however, those claims must fail.  The Alliance and the Tribe have failed to demonstrate that EPA's decision not to initiate the Section 404(c) process was based on factors that EPA was not entitled to consider or was otherwise arbitrary or capricious.  Summary judgment should thus be entered for EPA.

## A.    The Only Decision at Issue is EPA's Decision Not to Initiate the Section 404(c) Veto Process.

The Alliance and the Tribe face a fundamental threshold problem: under the statute, EPA cannot veto a permit until it has "determine[d]" that use of a disposal site will have certain "unacceptable adverse effect[s]."   Such determinations may be made only "after notice and opportunity for hearing" and "consult[ation] with the [Corps]," and must be "set forth in writing." There is no dispute that the required public process and consultation have not occurred in this case,

---

[40/] See generally EPA's Motion for Partial Reconsideration and Memorandum in Support (June 13, 2007; Dkt. No. 39) ("Recons. Mot."); EPA's Reply in Support of Motion for Partial Reconsideration (June 29, 2007; Dkt. No. 44) ("Recons. Reply").  To the extent that they are not set forth herein, EPA reserves its jurisdictional arguments for appeal.

52

and certainly no findings have been set forth in writing.  Because the Regional Administrator exercised his discretion not to begin the 404(c) process, by definition EPA cannot have made the statutorily required determination.

The Alliance and the Tribe attempt to gloss over this fatal flaw by mischaracterizing EPA's positions as stated during the Corps' permit process as constituting the requisite "determination." All. Br. 35-37; see also Tr. Br. 41.  Given the explicit statutory directives cited above, this is untenable.  Statements made by EPA in commenting on the Permit pursuant to EPA's duties under other statutes are not the formal agency determinations explicitly required by Section 404(c). See 44 Fed. Reg. 58076 (Oct. 9, 1979) (EPA's Section 404(c) authority not to be confused with its right to comment on and object to permit applications).

The absence of a formal EPA determination under Section 404(c) means that the Court can, at most, review the only decision EPA did make – i.e., the decision not to initiate the process that might result in such a determination.[41/] As discussed in the following section, the Alliance and the Tribe have failed to meet their burden of demonstrating that this decision was arbitrary or capricious.

**B.**     **The Declaration of Donald Welsh Establishes That EPA's Decision Not to Initiate the 404(c) Process Was Not Arbitrary or Capricious.**

  **1.**     **The Welsh Declaration Is an Appropriate Substitute for a Contemporaneously Prepared Administrative Record.**

Both the Alliance and the Tribe argue that the Court should not even consider the Welsh Declaration, dismissing it as a "post hoc rationalization" that extends beyond the evidence in the

---

[41/] EPA argued in its Motion for Reconsideration that the Court could not consider any question other than whether EPA acted arbitrarily and capriciously in failing to initiate the process necessary to make the statutorily-required determination.  See Recons. Mot. at 4-5; Recons. Reply at 1-4.  The Court denied this Motion without comment.  See Order of July 17, 2007.  EPA does not understand the Court's denial of EPA's Motion for Reconsideration to suggest that the Court has concluded that EPA could have made the requisite determinations, or vetoed the Permit, without first going through the process required by the statute and by EPA's regulations.  Judicial review is thus necessarily limited to considering EPA's decision not to initiate the 404(c) process.

record.  All. Br. 37 n.76; Tr. Br. 41-42.  The flaw in this argument is that it assumes that there was a contemporaneously prepared administrative record explaining the basis for the Regional Administrator's decision.  See Tr. Br. 42.  There simply was not – the Regional Administrator decided not to initiate the 404(c) process, and thus the explanatory materials that would ordinarily be part of the administrative record never came into existence.  See 33 U.S.C. § 1344(c) (requiring written findings); 40 C.F.R. § 231.5(e) (administrative record includes, inter alia, proposed 404(c) determination, public notice, written comments, and transcript or recording of any public hearing).  Because EPA did not initiate the 404(c) process, an obligation to develop the record and provide written findings containing a contemporaneous explanation for EPA's actions never arose.  EPA is thus entitled to present an explanation for its decision via the sworn statement of the agency official who made that decision. See Women Involved in Farm Econ. v. USDA, 876 F.2d 994, 999 (D.C. Cir. 1989); see also Camp v. Pitts, 411 U.S. 138, 143 (where record contained inadequate explanation of decision, remedy was "to obtain from the agency, either through affidavits or testimony, such additional explanation of the reasons for the agency decision as may prove necessary")

This case is thus distinguishable from those relied on by the Tribe.  See Tr. Br. 42.  In Overton Park, there was no dispute that there was an administrative record; it simply had not been placed before the court, which had instead considered affidavits from agency officials.  Overton Park, 401 U.S. at 419 and 420 n.34.  AT&T Info. Sys. v. Gen. Servs. Admin., 810 F.2d 1233 (D.C. Cir. 1987) similarly involved an agency's request to supplement an existing administrative record that contained no explanation of the agency's decision.  Id. at 1236.  The Welsh Declaration, by contrast, does not replace or supplement the record – it is the record, providing as it does the only

statement of EPA's reasons for not initiating the 404(c) veto process.[42/]

## 2. The Welsh Declaration Demonstrates That Epa Appropriately Exercised its Discretion.

Even assuming that EPA's inaction with regard to the Permit is reviewable, the Alliance and the Tribe still bear the burden of demonstrating that EPA:

> relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

State Farm, 463 U.S. at 43. As the D.C. Circuit has explained, moreover, "review under the 'arbitrary and capricious' tag line . . . encompasses a range of levels of deference to the agency." American Horse Protection Ass'n v. Lyng, 812 F.2d 1, 4 (D.C. Cir. 1987). Where, as here, an agency has opted not to initiate administrative proceedings, deference is "at the highest end of the range," with the agency's decision "to be overturned only in the rarest and most compelling of circumstances." Id. at 4-5 (citations and quotations omitted). Neither the Alliance nor the Tribe can meet this substantial burden.

The first question to be answered is precisely what law will be applied in assessing EPA's exercise of discretion under Section 404(c). The Alliance and the Tribe argue that EPA's decision may be "readily assessed" against the standards found in Section 404(c) itself and in EPA's implementing regulations. All. Br. 35; see also id. at 34-35; Tr. Br. 39-40, 42-43. As discussed above, however, the only decision at issue is EPA's decision not to initiate the Section 404(c)

---

[42/] Pursuant to the order entered by Magistrate Judge Kay on January 29, 2008, EPA produced "a record consisting of the information and materials that were before the Agency in reviewing the proposed King William Reservoir permit." See Order of January 29, 2008 at 9. That "record" is not, however, an "administrative record" in the classic sense; i.e., EPA has not presented those materials to the Court as the evidence on which its decision was based. See Fed. Power Comm'n v. Transcon. Gas Pipe Line Corp., 423 U.S. 326, 331 (1976) (ordinarily review of administrative decisions is to be confined to consideration of the decision of the agency and of the evidence on which it was based) (citation omitted).

process – and neither Section 404(c) nor its implementing regulations provide any standard by which that decision may be judged.   Section 404(c) states that EPA is authorized to veto a permit "whenever [it] determines" – after prescribed procedures – that a proposed discharge will have certain adverse effects, but the fact that EPA may take action once it has made a determination provides no assistance in assessing whether EPA acted reasonably in declining to initiate the process statutorily required to make that determination in the first place.

Nor do the Guidelines or other regulations relied on by the Alliance and the Tribe provide a usable standard.   EPA's regulations state that pertinent portions of the Guidelines are to be considered "in evaluating the unacceptability of" certain impacts through the Section 404(c) process. 40 C.F.R. § 231.2(e); see also 44 Fed. Reg. 58076/3 (Guidelines provide "the substantive criteria by which the acceptability of a proposed discharge is to be judged").   There is, however, nothing in EPA's regulations that may be used to assess whether EPA should have initiated the Section 404(c) veto process in the first place.   Indeed, in promulgating these regulations, EPA rejected a commenter's proposal that EPA include a requirement that the Regional Administrator initiate the 404(c) process "immediately" after he or she has reason to believe that a discharge may have unacceptable adverse effects.   As EPA explained, such a limit "ignores the Regional Administrator's necessary discretion in deciding when to act or whether to act at all."   44 Fed. Reg. 58076, 58079/1 (emphasis added).

The Alliance and the Tribe thus still have not identified, and cannot identify, any law that provides guidance in assessing EPA's decision not to initiate the 404(c) process.   See Memorandum Opinion and Order of May 30, 2007 ("Order") at 10 n. 6 (noting that EPA's regulations "may" provide further guidance to assist Court, although plaintiffs had not then identified such regulations). Still less have they shown that there are any limitations on the factors EPA may consider in making that decision.   Even if the CWA and the Guidelines are viewed as identifying some of the factors

EPA may consider, the Alliance and the Tribe have not established that this is an exclusive list.[43]

Plaintiffs thus have not met their burden of demonstrating that the Regional Administrator's consideration of factors other than the potential for "unacceptable adverse effect[s]" represents a reliance on factors that he was not entitled to consider.

In fact, many of the factors considered by the Regional Administrator are factors that courts have recognized as appropriate considerations where authorizing statutes provide no guidance on when action should be taken. Given the extensive process that is required before EPA can make a Section 404(c) determination, the decision to undertake that process is similar to an agency's decision not to initiate enforcement proceedings – a decision that, the Supreme Court has explained, properly involves consideration of a wide range of highly discretionary and case-specific factors:

> [A]n agency decision not to enforce often involves a complicated balancing of a number of factors which are peculiarly within its expertise. Thus, the agency must not only assess whether a violation has occurred, but whether agency resources are best spent on this violation or another, whether the agency is likely to succeed if it acts, whether the particular enforcement action requested best fits the agency's overall policies, and, indeed, whether the agency has enough resources to undertake the action at all . . . . The agency is far better equipped than the courts to deal with the many variables involved in the proper ordering of its priorities. . . .

Heckler, 470 U.S. at 831-32; see also Ctr. for Auto Safety v. Dole, 846 F.2d 1532, 1535 (D.C. Cir. 1988).[44]

---

[43] The Court has stated that Section 404(c)'s reference to "unacceptable adverse effects" provides "guidance, however minimal," that may assist the Court in reviewing EPA's exercise of discretion. Order at 10. EPA does not understand that statement to suggest that the Court viewed this as the only applicable criterion; indeed, it appears that the Court specifically contemplated that additional guidance might be identified. Id. at 10 n. 9.

[44] An agency's discretion in this area is so broad that courts construing the CWA have concluded that what might otherwise appear to be mandatory statutory language in Section 309(a)(3) – i.e., the statement that EPA "shall" issue a compliance order under certain circumstances – nonetheless leaves EPA free to exercise its discretion not to pursue an enforcement action. 33 U.S.C. § 1319(a)(3); see Amigos Bravos v. EPA, 324 F.3d 1166, 1171-72 (10th Cir. 2003) (relying on Heckler and holding that despite "shall" language, "the weight of authority is that § 309(a)(3) does

(continued...)

These are precisely the sort of factors that Mr. Welsh considered in deciding not to initiate the 404(c) process. See generally Welsh Decl. ¶ 10. Among other things, he considered the prioritization of agency resources, the unlikelihood that a further process would produce any additional information, and the delay that would result from such a process. Id. ¶ 10 a, b, g. Section 404(c) does not preclude consideration of any of these factors. Although it is correct that Mr. Welsh did not personally determine whether the Reservoir project complies with the Guidelines, moreover, this does not mean that he failed to consider relevant factors. See All. Br. 43; Tr. Br. 42-43. The declaration makes it clear that Mr. Welsh was fully aware of the environmental concerns surrounding the Reservoir project, and in fact specifically considered the concerns expressed by EPA during the Corps process (which necessarily includes concerns expressed regarding compliance with the Guidelines). Welsh Decl. ¶¶ 5, 10 d, e, f. The fact that the Alliance and the Tribe would have preferred a different weighting of these concerns against considerations of agency resources and the limited benefit of additional proceedings is insufficient to render his decision arbitrary or capricious.

The Tribe's reliance on Massachusetts v. EPA, 127 S.Ct. 1438 (2007) is misplaced. See Tr. Br. 44. In that case, the Supreme Court considered a statute providing that EPA "shall by regulation prescribe" certain standards for air pollutants "which in [EPA's] judgment" cause or contribute to certain air pollution. Massachusetts, 127 S.Ct. at 1447 (citation omitted, emphasis added). Section 404(c) contains no such mandatory language. In this case, moreover, EPA has not "refus[ed] to decide" anything. Id. at 1463. It decided not to initiate the 404(c) process, for the reasons stated

---

44/(...continued)
not impose a mandatory duty on [EPA]"); Dubois v. Thomas, 820 F.2d 943, 946-47 (8th Cir. 1987) ("In light of the language of § 309(a)(3), its legislative history viewed as a whole, and certain well established principles governing statutory interpretation and judicial review of agency decisions, we hold the conclusion to be inescapable that the duties imposed by the statute must be viewed as discretionary.")

in the Declaration of Donald Welsh.  The Tribe and the Alliance cannot overcome the deference due

that decision, and summary judgment should therefore be entered for EPA.

### 3.     Plaintiffs' Approach Is Inconsistent with EPA's Role under the CWA.

Both the Alliance and the Corps point to critical comments made by EPA in the course of

the Corps' permitting process.  All. Br. 35-38; Tr. Br. 43-44.  The Corps processes thousands of

individual Section 404 permit applications annually.[45]  EPA routinely comments on these permit

applications pursuant to its duties under NEPA and Section 404 of the CWA.  As was the case here,

those comments may often be critical.  Under the Alliance's and the Tribe's theories, every time

EPA submits a negative comment on a permit application in one of these thousands of permit

reviews, EPA has automatically made the determination required by Section 404(c), despite the

absence of the required public and administrative process.  Having transmuted negative comments

into the statutorily required determination, the Alliance and the Tribe go on to theorize that the

failure to veto a permit in the face of this supposed determination is necessarily arbitrary or

capricious.

This theory is entirely unsupported in the law for the reasons discussed above, but it is also

inconsistent with the CWA's allocation of authority.  The CWA gives the <u>Corps</u> the authority to

issue Section 404 permits; EPA's duty is to promulgate the guidelines that govern the Corps' review

of permit applications.  33 USC § 1344(a), (b).  EPA also has authority to veto a permit under

Section 404(c); however, EPA views this authority as extraordinary and highly discretionary.  EPA

has thus rarely chosen to overrule another federal agency's permitting decision.[46]Adopting the

---

[45] <u>See</u> <u>http://www.uwace.army.mil/cw/cecwo/reg/2003webcharts.pdf</u> (last visited Sept. 29, 2008)
(showing over 4000 standard permit applications evaluated in FY02 and FY03).

[46] To date, EPA has vetoed only 12 permits.  <u>See</u> <u>www.epa.gov/owow/wetlands/regs/404c.html</u> ;
<u>www.epa.gov/404c/</u> (last visited Sept. 29, 2008).

Alliance's and the Tribe's theories would convert Section 404(c) from a rarely-used backstop measure into a <u>requirement</u> that EPA pursue the veto process <u>every time</u> it expresses any concern that a proposed permit appears to be in violation of applicable regulations.  In effect, EPA would become a second, superior federal decisionmaker for each of the thousands of Section 404 permits issued each year by the Corps – an outcome that is inconsistent with the roles ascribed to the two agencies under the CWA.

## <u>CONCLUSION</u>

For the foregoing reasons, the Alliance's and the Tribe's motions for summary judgment should be denied, and summary judgment should be entered for the United States.

September 30, 2008                           Respectfully submitted,

                                     RONALD J. TENPAS
                                     Assistant Attorney General
                                     United States Department of Justice
                                     Environment & Natural Resources Division

                                          */s Angeline Purdy*
                                     _____
                                     ANGELINE PURDY
                                     Trial Attorney
                                     D.C. Bar No. 489236
                                     Environmental Defense Section
                                     PO Box 23986
                                     Washington DC 20026-3986
                                     (202) 514-0996 (tel.)
                                     (202) 514-8865 (fax)
                                     Angeline.Purdy@usdoj.gov

                                     SAMANTHA KLEIN
                                     Trial Attorney
                                     Natural Resources Section
                                     PO Box 663
                                     Washington DC  20044-0663
                                     (202) 305-0474 (tel.)
                                     (202) 305-0506 (fax)
                                     Samantha.Klein@usdoj.gov

Of Counsel:

PAT M. FALCIGNO
Assistant Counsel
North Atlantic Division Regional Business Center
United States Army Corps of Engineers

DAWN M. MESSIER
U.S. Environmental Protection Agency
Office of General Counsel
Washington, D.C.