## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

<table>
<tr><td>

**ALLIANCE TO SAVE THE MATTAPONI, et al.,**

**Plaintiffs,**

**v.**

**UNITED STATES ARMY CORPS OF ENGINEERS, et al.,**

**Defendants.**

</td><td>

**Civil Action 06-01268 (HHK)**

</td></tr>
</table>

## MEMORANDUM OPINION

Plaintiffs Alliance to Save the Mattaponi ("Alliance"), Chesapeake Bay Foundation, Inc., Sierra Club, Virginia Chapter, and intervenor-plaintiffs Carl T. Lone Eagle Custalow, chief of the Mattaponi Indian Tribe ("Tribe"), and the Tribe (collectively, "plaintiffs") bring this action against the United States Army Corps of Engineers ("Corps"), the United States Environmental Protection Agency ("EPA"), and against Peter Green, Secretary of the Army and Robert L. Van Antwerp, Chief of Engineers and Commanding General of the Corps, in their official capacities (collectively, "defendants"). The City of Newport News, Virginia ("Newport News") also intervened as a defendant. Plaintiffs allege that the Corps acted arbitrarily and capriciously when it approved a permit sought by Newport News to build a reservoir on the Cohoke Creek and that the EPA acted arbitrarily and capriciously when it failed to veto the permit issued by the Corps. All of the parties have moved for summary judgment [##71, 72, 76, 78]. Upon consideration of the motions, the oppositions thereto, and the summary-judgment record of this case, the court concludes that plaintiffs' motions must be granted in part and denied in part and defendants' motions must be granted in part and denied in part.

# I. BACKGROUND

**A.**     **Statutory and Regulatory Background**

### 1. The Clean Water Act

The goal of the Clean Water Act is to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters."  33 U.S.C. § 1251(a).  To achieve this goal, the Clean Water Act generally prohibits the discharge of dredged or fill materials into waters of the United States unless authorized by a permit.  *Id*. § 1311(a).  Section 404 of the Clean Water Act authorizes the Secretary of the Army to issue permits for the discharge of dredged or fill material into waters of the United States when certain conditions are met.  *Id*. § 1344.  When it reviews a permit application, the Corps must follow binding guidelines established by the Corps and the EPA (the "Guidelines" or the "404(b) Guidelines"), which are codified at 40 C.F.R. Part 230. *See* 33 U.S.C. § 1344(b).

The Guidelines prohibit the permitting of projects in two instances relevant to this case. First, a permit may not be issued where there "is a practicable alternative to the proposed discharge which would have less adverse impact on the aquatic ecosystem, so long as the alternative does not have other significant adverse environmental consequences."  40 C.F.R. § 230.10(a).  To be "practicable," an alternative must be "available and capable of being done after taking into consideration cost, existing technology, and logistics in light of overall project purposes."  *Id*. § 230.10(a)(2).  Second, a permit may not be issued where it "will cause or contribute to significant degradation of the waters of the United States," which includes significantly adverse effects on the "life stages of aquatic life and other wildlife dependent on aquatic ecosystems" and "loss of fish and wildlife habitat."  *Id*. § 230.10(c).

Section 404 of the Clean Water Act also authorizes the EPA to "prohibit the specification (including the withdrawal of specification) of any defined area as a disposal site" whenever the EPA determines "that the discharge of such materials into such area will have an unacceptable adverse effect on [the aquatic environment]."  33 U.S.C. § 1344(c).

### 2.  Public Interest Review

The Corps has promulgated a regulation which prohibits the issuance of a section 404 permit if "the district engineer determines that it would be contrary to the public interest."  33 C.F.R. § 320.4(a).  This regulation requires the district engineer to weigh the benefits that reasonably may be expected to accrue from the proposal against its reasonably foreseeable detriments, considering all relevant factors.  *Id*.

### 3.  The National Environmental Policy Act

The purpose of the National Environmental Policy Act ("NEPA") is to "encourage productive and enjoyable harmony between man and his environment."  42 U.S.C. § 4321.  To that end, NEPA requires federal agencies to prepare a detailed environmental impact statement ("EIS") for "major Federal actions significantly affecting the quality of the human environment" to inform the agency's decision whether to go forward with the action.  *Id*. § 4332(C).  Regulations promulgated by the Council on Environmental Quality state that an agency must supplement this EIS when "[t]he agency makes substantial changes in the proposed action that are relevant to environmental concerns," or "[t]here are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts."  40 C.F.R. § 1502.9(c).

**B.**     **Factual Background**

This action challenges the issuance of a permit to Newport News by the Corps under section 404 of the Clean Water Act to build a 1,526-acre reservoir on the Cohoke Creek in King William County, Virginia (the "Reservoir Project" or the "Project").  The permit was issued on November 15, 2005, but the Project has a long history.

In 1984, the Norfolk District of the Corps (the "Norfolk District") published a Water Supply Study concluding a nine-year study process and projecting that the Lower Peninsula of Virginia would need 40 million gallons per day (mgd) of additional water by 2030.  Responding to that prediction, Newport News organized the Regional Raw Water Study Group ("RRWSG") in 1987 to develop a plan to meet the future need.  In 1993, Newport News, on behalf of the RRWSG, submitted to the Corps and the Virginia Department of Environmental Quality an application for permits for construction of the Reservoir Project.  The proposed Project consisted of a reservoir, which would be created by a dam across the Cohoke Creek thereby flooding nearby wetlands and streams.  To fill the reservoir, the Project would pump water from the nearby Mattaponi River into the reservoir.  The goal was to "provide a dependable, long-term water supply for the Lower Virginia Peninsula."  AR 023151.

As required by NEPA, the Norfolk District published a draft EIS for the Reservoir Project in 1994, a supplement to the draft in 1995, and a final EIS in 1997.  During this time, Newport News twice revised its application, moving the dam upstream and thereby reducing its wetland and stream effects.  Responding to comments that the water need projection was inflated, the Norfolk District also requested the Corps' Institute for Water Resources ("IWR") to provide an independent technical review of Newport News' projected water needs.  The IWR concluded that the forecasted water need was inflated by about 16 mgd, making the actual need closer to 24 mgd by 2040.

In 2001, in accordance with the Corps' procedures, the Norfolk District issued its final recommended record of decision.  It recommended that the Corps deny the permit, finding that the Project would cause or contribute to significant degradation of the waters of the United States, that practicable, less damaging alternatives were available, and that the Project was not in the public interest.  The EPA and the Fish and Wildlife Service ("FWS") agreed with the Norfolk District's recommended decision.  The Governor of Virginia, however, objected to the proposed denial of the permit and therefore, in accordance with the Corps' procedures, the application was referred to the North Atlantic Division of the Corps ("North Atlantic Division").

In 2002, the North Atlantic Division issued an initial decision finding that there was a need for a dependable source of water and that the Reservoir Project was a practicable alternative to meet that need.  It therefore resumed processing the permit application, which had been on hold following the Norfolk District's recommended decision, to address outstanding issues including how to mitigate the environmental effects on wetlands.  In June 2004, Newport News submitted a wetlands mitigation plan ("Mitigation Plan"), which proposed to restore or create 806 acres of wetlands in eleven locations, and to create, enhance or preserve approximately 36.5 miles of streams.

Meanwhile, the Reservoir Project also required permits from two state agencies in Virginia, which were concerned about the effect of the Project on the American shad.  In 1997, the Virginia State Water Control Board issued a Virginia Water Protection permit setting a monthly minimum in-stream flow for the Mattaponi River, which prohibits pumping when water flows are below the minimum in-stream flow unless Newport News implements emergency water conservation measures.  In 2003, the Virginia Marine Resources Commission ("VMRC")

denied a permit for the construction and placement of the intake structures and pipelines in the

Mattaponi River because it would adversely effect the early life history stages of the shad.  In

2004, however, VMRC reversed its decision and issued the permit with restrictions.  To protect

shad, the VMRC permit prohibits water withdrawals from the Mattaponi River for several

months during shad spawning season (which is defined as extending from March 1 to July 31 of

each year until Newport News can prove that a shorter pumping hiatus would equally protect the

shad) except when a water emergency is declared by the President or the Governor of Virginia.

The Corps issued its final record of decision ("ROD"), at issue in this case, on July 29,

2005, and issued the permit on November 15, 2005.  The Corps concluded that the Project was in

the public interest and would not cause or contribute to significant degradation of the waters of

the United States.  Stating that the forecasted water need by 2040 was now 15.9 mgd and relying

on the 1997 final EIS, the Corps concluded that the Reservoir Project, which would provide 19

mgd, was the least damaging practicable alternative.  Although it has the authority to veto the

Corps' issuance of a permit, the EPA did not.

The permitted Reservoir Project consists of the reservoir, which would be created by a

dam across the Cohoke Creek, a water supply intake structure and station that could pump up to

75 mgd of fresh water from the nearby Mattaponi River, and a pumping station and pipeline to

transfer water from the reservoir to Newport News' existing water works.  The Reservoir Project

would flood over 1,500 acres of land and require the excavation, fill, destruction and flooding of

approximately 403 acres of freshwater wetlands and the elimination of 21 miles of free-flowing

streams.  Its cost is estimated to be over $200 million.  Construction of the Reservoir Project

cannot begin until 2010 at the earliest and the Project will not become operational until 2013 or

later.  In the meantime, Newport News is conducting the necessary environmental and

archeological studies to satisfy the conditions of the permits issued by the Corps and Virginia and

is acquiring land.

The EPA has stated that "[t]he proposed [Project], if approved, would represent the

largest single permitted wetland loss in the Mid-Atlantic region in the history of the Clean Water

Act Section 404 program . . . ."  AR 023772.  The Tribe's 150-acre reservation is on the

Mattaponi River, approximately three miles downstream of the proposed intake structure, and the

Tribe has depended for centuries on the Mattaponi River and its shad population.  Shad are an

important source of food and income, as well as a resource of cultural and religious significance,

to the Tribe.

## II.  ANALYSIS

Plaintiffs challenge the Corps' issuance of the permit on the grounds that the

determinations of the Corps that the Project was the least damaging practicable alternative, that it

would not cause or contribute to significant degradation of the waters of the United States, and

that it was in the public interest were arbitrary and capricious.  Plaintiffs also contend that the

Corps' failure to supplement the final EIS was arbitrary and capricious as was the EPA's failure

to veto the permit.

**A.     Standard of Review**

This court reviews plaintiffs' claims under the Administrative Procedure Act ("APA")

because the claims challenge the final action of an administrative agency.  In conducting its

review, this court shall "hold unlawful and set aside agency action, findings, and conclusions

found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with

the law." 5 U.S.C. § 706(2).  An agency decision is arbitrary and capricious if

> the agency has relied on factors which Congress has not intended it to consider,
> entirely failed to consider an important aspect of the problem, offered an
> explanation of its decision that runs counter to the evidence before the agency, or
> is so implausible that it could not be ascribed to a difference in view or the
> product of agency expertise.

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

Agency actions are presumed to be valid.  *See Ethyl Corp. v. EPA*, 541 F.2d 1, 34 (D.C.

Cir. 1976).  As long as an agency considers relevant factors and can articulate a rational

connection between the facts found and the choices made, then its decision will be upheld.  *See*

*State Farm*, 463 U.S. at 42-43; *Marsh v. Or. Natural Res. Council*, 490 U.S. 360, 378 (1989)

(holding that agency action will not be reversed absent a clear error of judgment).  Moreover,

when an agency's action relies on scientific and technical information touching upon the

agency's area of expertise, a court is particularly deferential.  *See Marsh*, 490 U.S. at 377; *Huls*

*Am., Inc. v. Browner*, 83 F.3d 445, 452 (D.C. Cir. 1996) ("we will give an extreme degree of

deference to the agency when it is evaluating scientific data within its technical expertise")

(internal citations and quotations omitted).  The court must, however, conduct a "searching and

careful" review of the record to establish that the agency's decision is rational and based on

consideration of all relevant factors.  *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402,

416 (1971).  When a final agency action is challenged, the court's review is limited to the

administrative record and the grounds for decision invoked by the agency.  *See Camp v. Pitts*,

411 U.S. 138, 142 (1973); *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947).

The parties have filed cross-motions for summary judgment as to all of plaintiffs' claims.

Summary judgment is the proper mechanism for deciding, as a matter of law, whether an agency

action is supported by the administrative record and consistent with the APA standard of review.

*Stuttering Found. of Am. v. Springer*, 498 F. Supp. 2d 203, 207 (D.D.C. 2007) (citing *Richards v.*

*INS*, 554 F.2d 1173, 1177 & n. 28 (D.C. Cir. 1977)).  This court does not apply typical summary

judgment standards, however, when reviewing a final action of an administrative agency under

the APA:

> Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is appropriate when the pleadings and the evidence demonstrate that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c).  In a case involving review of a final agency action under the [APA], however, the standard set forth in Rule 56(c) does not apply because of the limited role of a court in reviewing the administrative record.  *See Sierra Club v. Mainella*, 459 F. Supp. 2d 76, 89-90 (D.D.C. 2006). Under the APA, it is the role of the agency to resolve factual issues to arrive at a decision that is supported by the administrative record, whereas "the function of the district court is to determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did."  *See Occidental Eng'g Co. v. INS*, 753 F.2d 766, 769-70 (9th Cir. 1985); *see also Nw. Motorcycle Ass'n v. U.S. Dep't of Agric.*, 18 F.3d 1468, 1472 (9th Cir.1994) ( "[T]his case involves review of a final agency determination under the [APA]; therefore, resolution of th[e] matter does not require fact finding on behalf of this court. Rather, the court's review is limited to the administrative record.").

*Stuttering Found.*, 498 F. Supp. 2d at 207.  Accordingly, in reviewing the cross-motions for

summary judgment, the court evaluates whether the evidence in the administrative record

permitted the Corps to issue the permit to Newport News and the EPA to not veto the permit.

**B.      The Corps Has Not Adequately Explained Why the Reservoir Project Is the Least Damaging Alternative and Therefore Issuance of the Permit Was Arbitrary and Capricious.**

The Corps is prohibited from issuing a permit if there is a less damaging practicable

alternative.  40 C.F.R. § 230.10(a).  "An alternative is practicable if it is available and capable of

being done after taking into consideration cost, existing technology, and logistics in light of the

overall project purposes." *Id*. § 230.10(a)(2).  Plaintiffs argue that the Corps' issuance of the permit was arbitrary and capricious because it rejected less damaging and otherwise practicable alternatives by relying on the outdated and erroneous analysis in the final EIS.  Defendants rejoin that regardless of the passage of time and lower water need, the Reservoir Project remains the least-damaging practicable alternative.

In its ROD, the Corps found "that the analysis of alternatives in the Final Environmental Impact Statement provides sufficient information regarding alternatives to be evaluated under these Guidelines, consistent with the provisions of [40 C.F.R. § 230.10(a)(5)]."  AR 023184.  It therefore limited its scope to those alternatives found practicable in the final EIS.  AR 023204. Based on the final EIS, the Corps "conclude[d] that the . . . Reservoir Project is the least environmentally damaging practicable alternative."  AR 023184.  Plaintiffs contend that it was arbitrary and capricious to rely on the alternatives presented in the 1997 final EIS because of several important changes that occurred between 1997 and 2005.

First, the projected water need decreased substantially.[1]  Even taking into account that some of the decrease was due to the implementation of other practicable alternatives considered in the final EIS, plaintiffs argue that the decrease that occurred as a result of the initial need estimate being too great was substantial.  Second, plaintiffs contend that between 1997 and 2005, the cost of the Project increased, while the amount of water it would produce decreased.

---

[1]  The final EIS alternatives analysis was based on a projected need of 39.8 mgd.  AR 044914.  By the time the Corps decided to issue the permit in 2005, however, the projected need was only 15.9 mgd.  AR 023154.  This difference is due in part to the implementation of some of the other alternatives considered in the final EIS, specifically conservation measures accounting for a 5.6 mgd reduction in demand, *see id.*, and the construction of a desalination plan that provides 5.7 mgd to the area, *id*.  Corp's Mot. Summ. J. at 10.  The remainder of the difference, 13.6 mgd, is due to inaccuracies in the initial projections.

Consequently, the cost per mgd for the Project now exceeds the affordability criterion used in the final EIS, even accounting for inflation, according to plaintiffs.  Plaintiffs point to the Norfolk District's recommended ROD, which states that of the thirty-one alternatives included in the final EIS, the RRWSG eliminated all but six because they would not meet the projected needs, were too costly, or presented other practicability concerns.  AR 078169.  Only alternatives that included reservoirs were carried forward for a detailed environmental review.  *Id.*

Plaintiffs argue that given the reduced water need and the increased cost of the Project, some of these alternatives were improperly eliminated and other practicable alternatives may now exist.  This position is supported, plaintiffs note, by a letters from the FWS to the Corps in both 2004 and 2005 stating the FWS's belief that "other project alternatives, or combinations of alternatives, exist which are less environmentally-damaging practicable alternatives than the [Reservoir Project]" and "request[ing] that the Corps re-examine the alternatives which may meet this lower need . . . ."  AR 008989, 019520-21.  Nowhere in the ROD, argue plaintiffs, does the Corps even address these changes.

Plaintiffs point to several potentially practicable alternatives included in the final EIS that they contend could, in combination, satisfy the water need.  Plaintiffs assert that the combination of conservation measures and development of new fresh groundwater resources, both found to be practicable in the final EIS, could potentially meet the reduced need, and that the ROD did not adequately assess the viability of this alternative.  Plaintiffs further identify several alternatives not carried forward for a complete evaluation in the final EIS that they contend the Corps arbitrarily and capriciously failed to evaluate in the ROD, including reducing "dead storage" in existing reservoirs to increase yields from those reservoirs combined with using the full pumping

11

capacity from the Chickahominy River, using the existing "Big Bethel" reservoir, and developing additional groundwater supplies and desalination facilities.

The Corps responds that even with the reduced project deficit, the Reservoir Project is still the only available practicable alternative that would produce the amount of water necessary to satisfy the projected demand.  Explaining that it is wrong to assume that the only reason alternatives were omitted from consideration in the final EIS was that they were inadequate to meet the projected need, the Corps asserts that "many of these alternatives were deemed impracticable and eliminated from further analysis – not simply because they would not meet the region's water needs, but because they were too costly, technologically infeasible, or otherwise impracticable."  Corps' Mot. Summ. J. at 14.

The Corps contends that the ROD found that the only unimplemented practicable non-reservoir alternative considered in the final EIS was further development of groundwater, which would provide at most an additional 4.4 mgd and would therefore not meet the projected need, and that the other reservoir locations were impracticable.  The Corps points out that the ROD also states that additional water conservation measures discussed in the final EIS are presently being implemented and therefore implies that further conservation measures are impracticable. Plaintiffs have the better argument.

In the ROD, the Corps states that it "find[s] that the analysis of alternatives in the Final Environmental Impact Statement provides sufficient information regarding alternatives to be evaluated under these Guidelines . . . ."  AR 023184.  The Corps never explains, however, why in the face of the reduced need and the higher cost of the Reservoir Project, the final EIS remains sufficient.  There is no evidence in the ROD that the Corps re-analyzed whether any projects

rejected in the final EIS were rejected based on need or cost considerations that have now changed. To the contrary, the Corps explains that it did not investigate greater groundwater desalination because it was found impracticable in the final EIS and was therefore outside of the scope of the ROD. AR 023204.

In the ROD, the Corps addresses many of the specific alternatives identified by plaintiffs. For example, with respect to additional groundwater desalination, the ROD states that such development "could place risks of adverse impacts and environmental damages on groundwater supplies [and] such impacts may be as deleterious as the anticipated impacts from the loss of wetlands associated with construction of the reservoir. Excessive groundwater withdrawal may result in widespread saltwater intrusion and a non-sustainable supply of potable water." AR 023203. In its motion, the Corps supplements this explanation with a cite to the final EIS, which states that Virginia "has taken a strong position against new large-scale groundwater withdrawals," and therefore was unlikely to permit this alternative. AR 045019. This explanation is not a sufficient basis for the Corps to determine that groundwater withdrawals were impracticable. The fact that this option *may* be as deleterious as the Reservoir Project does not establish that the Reservoir Project is the least-damaging alternative. And the fact that Virginia had taken a strong position against groundwater withdrawals does not convince the court that the alternative was impracticable, especially in light of the fact that the State of Virginia initially denied Newport News' permit for the Reservoir Project. With respect to the conservation alternative, the ROD suggests that conservation efforts have been maximized, but does not explain the discrepancy between the 7.1 to 11.1 mgd that the final EIS predicted would be practicable from conservation measures and the 5.6 mgd reduction in demand based on

13

already implemented conservation measures factored into its new calculation of water needs.  *See* AR 023203, 045042.

Other alternatives are similarly treated in the ROD, which concludes that "the patchwork of small supply alternatives *may* not meet the long-term water supply needs . . . and *could* place risks of adverse impacts and environmental damages to [other water resources]."  AR 023203 (emphasis added).  Before determining that a Project that would flood 403 acres of functioning wetlands is the least-damaging practicable alternative, the Corps must do more than give vague explanations about the potential adverse effects of or potential political opposition to other alternatives.  It must explain fully, based an analysis adequate to the task, why other alternatives are either impracticable or more damaging.

The Clean Water Act "compels that the [least-damaging] alternative be considered and selected unless proven impracticable."  *Utahns for Better Transp. v. U.S. Dep't of Transp.*, 305 F.3d 1152, 1189 (10th Cir. 2002).  The court finds that the Corps acted arbitrarily and capriciously when it found that the Reservoir Project was the least damaging practicable alternative based on its assertions that other alternatives *may* not meet needs and *could* be more damaging. The Corps must adequately explain why there is no less-damaging practicable alternative.  If the Corps cannot so explain based on the record before it, it must reconsider its determination based on an adequate analysis of the alternatives.

C.     **The Corps' Determination that the Reservoir Project Would Not Cause or Contribute to Significant Degradation of the Waters of the United States Was Arbitrary and Capricious.**

The Clean Water Act prohibits the Corps from issuing section 404 permits if the proposed discharge of dredged or fill material "will cause or contribute to significant degradation

14

of the waters of the United States." 40 C.F.R. § 230.10(c). Effects contributing to significant degradation include "significantly adverse effects" on "the life stages of aquatic life and other wildlife dependent on aquatic ecosystems" and on "aquatic ecosystem diversity, productivity and stability" including "loss of fish and wildlife habitat." *Id*. In the ROD, the Corps determined that the permit would not significantly degrade waters of the United States. AR 023190. Plaintiffs contend that this determination is arbitrary and capricious.

All of the parties agree that the project will have significant effects on the natural environment. *See* AR 023186-89 (stating, in the ROD, that the project "would result in a significant alteration of the natural ecosystem in Cohoke Creek" and "is expected to have a major, long-term impact upon wetlands" and "the current functions of the aquatic ecosystem"). In concluding that the project would not cause or contribute to significant degradation of the waters of the United States, however, the Corps concluded that Newport News' proposed Mitigation Plan would adequately compensate for lost wetlands and their functions and therefore overall there would be no significant degradation. AR 023190. Plaintiffs argue that this conclusion is arbitrary and capricious because it violates the Corps' no-net-loss policy and watershed requirement, and because it runs counter to the evidence before the Corps. The court will address plaintiffs' concerns as they relate to (1) the Corps' Mitigation Plan, (2) the effect of the Reservoir Project on certain species, and (3) the effect of the Project on the salinity of the Mattaponi River.

### 1. *Mitigation Plan*

Plaintiffs argue that the Corps' finding that the Mitigation Plan will adequately compensate for the wetland functions and values lost due to the Reservoir Project is arbitrary and

15

capricious because it violates Corps' policies and runs counter to the evidence before the Corps.

As an initial matter, the court concludes that the Corps' determination was not contrary to its no-

net-loss policy or watershed requirement.[2]  This conclusion, however, does not end the court's

inquiry because the Clean Water Act prohibits the Corps from issuing a permit that will cause or

contribute to significant degradation of the waters of the United States.  *See* 40 C.F.R. §

230.10(c).  Plaintiffs argue that the Corps' decision that the permit would not cause or contribute

to significant degradation because of the Mitigation Plan was contrary to the evidence before it,

pointing to a series of letters from the EPA, the FWS, and others, and to the recommended ROD.

They argue that "all of the scientific comments submitted on the proposed mitigation plan, with

the exception of the applicant's own reports, uniformly agreed that the plan could not replace the

wetland functions and values that would be lost."  All. Mot. Summ. J. at 17.  The Corps responds

that letters that assessed plans prior to the proposed Mitigation Plan are irrelevant to whether the

Mitigation Plan would compensate for the lost wetlands, and that while it is required to consider

agencies' and others' comments, it is not required to agree with them.  Newport News rejoins

that the EPA and the FWS were not entirely consistent in their views, and that the EPA did not

even comment on the Mitigation Plan.

---

[2]  The Corps correctly points out that the no-net-loss policy "expressly recogniz[es] that no net loss of wetland functions and values may not be achieved in each and every permit action."  *See* 55 Fed. Reg. 9210, 9210-11 (March 12, 1990).  Therefore, plaintiffs' argument that the Mitigation Plan will not compensate for the loss of all functional values does not establish that the issuance of the permit is contrary to the no-net-loss policy.  Moreover, the no-net-loss policy states that "[c]ompensatory actions . . . should be undertaken, when practicable, in areas adjacent or contiguous to the discharge site."  *Id*. at 9212.  If such "on-site" mitigation "is not practicable, off-site compensatory mitigation should be undertaken in the same geographic area if practicable (i.e., in close physical proximity and, to the extent possible, the same watershed)."  *Id*.  Plaintiffs try to convert this language into a requirement that all mitigation occur within the same watershed as the Project.  At the time of the ROD, there was no such requirement.

The record is replete with letters from the FWS and the EPA expressing opposition to the issuance of the permit.  *See, e.g.*, AR 008968-69 (2004 letter from the FWS to the Corps "reiterat[ing] our strong opposition to permit issuance," and stating that the FWS "does not believe that mitigation areas fully compensate for the stream valley wetland complex of Cohoke Creek that would be lost."); AR 040401 (2000 letter from the EPA to the Corps, stating the "EPA has consistently acknowledged that the complex mosaic ecosystem which will be impounded by the reservoir can not be replicated").  Importantly, in February 2005, after the completion of the Mitigation Plan, the FWS wrote, "[t]he Service reiterates our strong opposition to permit issuance. . . .  We believe this project constitutes a net loss of wetlands and aquatic habitats, and will result in significant degradation of the aquatic ecosystem."  AR 019520.  The gist of the Corps' response to these comments is that the Corps admits that replication of all affected wetlands functions is impossible, but that neither policy nor statutes require such replication.  AR 023177.

The court agrees with the Corps that letters and findings that preceded the proposed Mitigation Plan are relevant only insofar as they apply equally to the Project including the Mitigation Plan.  The court also agrees with the Corps that the Corps need only consider and respond to these agencies' and scientists' comments, and need not agree with them.  The Corps, however, must demonstrate that it has considered significant comments and criticisms by explaining why it disagrees with them; it may not dismiss them without adequate explanation.  *See ARCO Oil & Gas Co. v. FERC*, 932 F.2d 1501, 1504 (D.C. Cir. 1991) ("conclusory statements cannot substitute for the reasoned explanation that is wanting in this decision").

17

While the Corps is surely correct that precise replication of the destroyed wetlands is not possible and not required, its finding that the Project will not cause or contribute to significant degradation of the waters of the United States is "based upon successful implementation of the Streams & Wetlands Mitigation Plan that results in no net loss of wetland functions and values." AR 023190.  Thus, the Corps cannot simply say that it is not required to replicate the destroyed wetlands as it argues; it must explain how the Mitigation Plan will adequately compensate for lost wetland functions and values such that it results in no net loss of wetland functions and values.  In the ROD, the Corps purports to do so.  It states:

> Based upon Wetland Evaluation Technique and Evaluation for Planned Wetlands studies of the wetlands to be impacted, and the subsequent Habitat Evaluation Procedures analysis, the applicant performed functional assessments for this project which focused on four priority functions: total net primary productivity; water quality as quantified by sediment retention and nutrient assimilation; habitat functions using the Habitat Evaluation Procedures; and landscape interspersion and connectivity. . . .

AR 023174.  The ROD then briefly discusses how Newport News' functional assessment showed gains in each of these areas, and then concludes:

> On the basis of the increase in Total Net Primary Productivity, improved water quality, net habitat gains and improved landscape interspersion and connectivity, the Corps of Engineers has determined that successful completion of the elements of the Streams & Wetlands Mitigation Plan will as a whole offset anticipated losses in these functional areas . . . .

AR 023175.  The Corps, however, does not address anywhere the fact that the same Wetland Evaluation Technique ("WET"), Evaluation for Planned Wetlands ("EPW") studies, and Habitat Evaluation Procedures ("HEP") on which Newport News based its functional assessments were seriously critiqued by the Norfolk District in the recommended ROD.  AR 049614-21 (concluding, among other things, that (1) "the Corps disagrees with the RRWSG's inferences and

conclusions that the WET results are an estimate of the magnitude that the Cohoke Creek

wetlands in the . . . Reservoir project area perform different wetland functions," (2) "the RRWSG

can make no claims that their EPW study compares the wetland functions of the Cohoke Creek

wetland system to the proposed mitigation sites," and (3) "HEP accounting alone should not

completely decide the mitigation package for wetland losses"); *see also* AR 023771-75 (2004

EPA letter noting the "severe limitations of some of the methods applied" and particularly the

limitations of the RRWSG's application of the WET analysis).[3]  In the face of such criticism, the

Corps must explain why it believes that the methods used by Newport News in the functional

assessment are a reliable basis for concluding that "successful completion of the elements of the

Streams & Wetlands Mitigation Plan will as a whole offset anticipated losses in these functional

areas."  *See* AR 023175.

In addition, the Corps does not address comments that without more site-specific

information it is impossible to determine whether the Mitigation Plan will replace functional

values to the point where the Project does not cause or contribute to significant degradation.  *See*

AR 023802-05 (2005 letter from the Corps' New England District to the Corps, stating "[t]he

mitigation plan is lacking much detail on grading, soil amendments, planting, and structural

features for the mitigation sites. . . . Lacking this information, it is difficult to determine the

likely success of the specific mitigation proposals . . . ."); AR 023772 (2004 letter from the EPA

to the Corps stating that the "RRWSG has not provided any site specific data that compares the

---

[3]  The Norfolk District also concluded, with respect to almost all of the sites it analyzed, that the mitigation sites would not replace the functions of the lost system.  *See* AR 078078-83 (concluding, with respect to the Burlington Farm, Davis, Gulasky, Lanesville, Meadow Farm, Terrell and Townsend sites, all of which are included in the Mitigation Plan, that the restored or created wetlands "would not replace the functions of the impacted system").

sites of impact with the proposed mitigation sites"); EPA KWR 004800 (undated evaluation by individual scientists stating that the "Final Wetland Mitigation Plan" "is based on insufficient site-specific soil and hydrologic data to form the basis for an acceptable final plan"). The recommended ROD also raised this concern. AR 078079-83 (noting the "lack of site-specific data" and the attendant uncertainties with respect to many of the proposed mitigation sites). The FWS raised additional concerns that a great deal of the mitigation would be driven out-of-basin due to costs. AR 019520-22.

The Corps fails to respond to these concerns in the ROD. The ROD concludes that "[t]he net effect of the proposed discharges of fill material, inclusive of compensatory mitigation, will not cause or contribute to significant degradation of waters of the United States. This determination is based upon successful implementation of the . . . Mitigation Plan that results in no net loss of wetland functions and values." AR 023190. Nowhere in the ROD, however, does the Corps address the comments that it is not possible to conclude that the Project will not cause or contribute to significant degradation absent greater site-specific information about the mitigation sites, nor the FWS's concern that mitigation will be driven out of basin. Therefore, the Corps' conclusion that the issuance of the permit will not cause or contribute to significant degradation of the waters of the United States is arbitrary and capricious.[4]

---

[4] The Court also notes that the no-net-loss policy advises, with respect to wetlands mitigation, that "careful consideration should be given to its likelihood of success." 55 Fed. Reg. at 9212. The ROD's observation that "the plan has a high probability for success because it involves mostly restoration of formerly existing wetlands on approximately 80 percent of the 806 acres proposed for mitigation," AR 023176, appears to the court to be cursory and insufficient to merit the "Corps' conclusion that the mitigation plan will *ensure* that the functions and values of the affected wetlands are compensated for." *See* Corps' Mot. Summ. J. at 26 (emphasis added).

### 2. Indicator Species

Second, plaintiffs contend that to comply with the significant degradation standard, the Corps must find that the proposed project will not likely result in significant loss of habitat.  The Corps' own decision, however, acknowledges that the mitigation plan will not fully offset the loss of redfin pickerel habitat and the Mitigation Plan acknowledges that it will not fully compensate for habitat losses for the pine warbler, field sparrow, and pileated woodpecker as well.  AR 023174, 008935.  These species were chosen as indicator species to evaluate how the issuance of the permit would affect species with similar habitat needs.  Thus, the findings of the Mitigation Plan concerning loss of habitat would affect more than the studied species.  *See* AR 008934.  Plaintiffs assert that the Corps' conclusion nonetheless that the Mitigation Plan will result in a net gain in habitat, allegedly without any analysis, shows that the issuance of the permit is arbitrary and capricious.  The Corps responds that it concluded that "taken as a whole, successful completion of the [Mitigation Plan] will result in an overall net gain in habitat," AR 023174, and argues that the plaintiffs fail to demonstrate that this conclusion in unsupported by the record or inconsistent with a policy of no net loss.

The Corps' regulations state that effects contributing to significant degradation include "[s]ignificantly adverse effects . . . on aquatic ecosystem diversity, productivity and stability.  Such effects may include . . . loss of fish and wildlife habitat."  40 C.F.R § 230.10(c)(3).  "[W]hen an agency approves a project that the record before a reviewing court reveals will have a significant adverse impact on marine wildlife, the agency determination must be reversed."  *Sierra Club v. U.S. Army Corps of Eng'rs*, 772 F.2d 1043, 1051 (2d Cir. 1985).  Here, the Mitigation Plan and the ROD disclose adverse effects on fish and wildlife habitat.  *See* AR

008935, 023174.  Plaintiffs do not explain how this disclosed loss of habitat is a *significant* adverse effect in the context of the Project and Mitigation Plan.  Consequently, the Corps' conclusion that the loss of some habitat is not a "significantly adverse effect" because of the net gain in habitat is not arbitrary and capricious.

### 3.  Salinity Levels

Plaintiffs argue that the pumping hiatus and the provision for the emergency lifting of the hiatus will have significant adverse effects not adequately considered by the Corps.[5]  Specifically, plaintiffs argue that the Corps failed to consider the effect of a pumping hiatus, required by the State of Virginia after the completion of the Final Environmental Impact Statement, on the salinity of the Mattaponi River, and therefore lacked "sufficient information to make a reasonable judgment" as to whether the permit would comply with the Clean Water Act.  *See* 40 C.F.R. § 230.12.  The hiatus, plaintiffs argue, will result in greater pumping during non-hiatus months, which correspond to the lowest flow months of the year and heightens the risk of saltwater encroachment into the tidal freshwater zone with a significant potential effect on species vulnerable to salinity.  Further, plaintiffs argue, the Corps did not consider the potential effects of

---

[5]  The Tribe also argues that the Corps' approval of the permit is arbitrary and capricious because the pumping hiatus period is based on inappropriate information and therefore the hiatus will not adequately protect the shad.  The Tribe points to (1) the fact that the hiatus is based on water temperature information from the Hudson River, which may not correlate with the shad spawning season in the Mattaponi River, and (2) factors other than water temperature that influence spawning.  The Corps rejoins that the existing pumping hiatus will be replaced with a more refined hiatus period defined by Mattaponi River water temperature triggers, and that the material on which the Tribe bases its second assertion was submitted to the Corps only two weeks before the ROD was signed and well after the close of the comment period.  The Corps' arguments have merit and the court does not find that the Corps was arbitrary and capricious on this basis.

the provision that allows the hiatus to be lifted during "extraordinary circumstances," an occurrence that plaintiffs allege may not be infrequent because of the hiatus itself.  Because the Corps did not consider these potential effects, plaintiffs argue, its decision was arbitrary and capricious.

The Corps rejoins that plaintiffs are incorrect in their assertion that the hiatus limits pumping to low-flow months, pointing to evidence that pumping will be allowed in relatively high-flow months.  Moreover, the Corps argues that the record demonstrates that the Corps fully considered the possible effect of the pumping hiatus before concluding that the project would not meaningfully affect the river's salinity.  The Corps studied the salinity effects of the originally proposed Project, prior to the imposition of the pumping hiatus, and concluded that the natural salinity of the Mattaponi River greatly exceeds any salinity changes predicted due to the proposed withdrawals.  This conclusion, the Corps argues, applies with even greater force to the approved Project which, because of the pumping hiatus, will result in fewer withdrawals from the Mattaponi River.  Plaintiffs reply that "the fact that salinity changes stay within the natural fluctuation *does not* necessarily mean that impacts from those salinity changes are minor or not detrimental."  All. Reply at 22.  This is because chronic exposure to higher levels may have different effects than acute exposure, according to plaintiffs.  Moreover, plaintiffs contend, the authors of the simulation expressly limited their conclusions to the studied scenario, which was different than the approved Project.

In the ROD, the Corps addressed the potential effects on the physical and chemical characteristics of the aquatic ecosystem, disagreeing with the Norfolk District over the adverse salinity effects that could result.  AR 023185.  The ROD states, "[s]ince the available information

23

indicates that potential salinity changes which may result from the withdrawal of water would generally be within the natural salinity fluctuation of the estuarine system, it is reasonable to conclude that the potential impacts from salinity changes in the Mattaponi River would be minor."  *Id*.  What the Corps does not address at all, however, is the Norfolk District's conclusion that even very small increases in salinity, because "they would be sustained for as long as the withdrawal exists," could harm vulnerable species and cause a "significant decrease in growth and reproduction for these organisms."  AR 078256.  Because the Corps failed to consider the effects of this chronic exposure, its decision that changes in salinity will not have a significant adverse effect on species is arbitrary and capricious.

As to plaintiffs argument that the Corps did not consider the effects of the provision that allows for pumping during the hiatus in times of emergency, the Corps states that any claim of "impacts that allegedly could arise if emergency withdrawals were allowed during the hiatus" were "wholly speculative" and thus "insufficient to demonstrate any flaw in the Corps' conclusion."  Corps' Mot. Summ. J. at 29.  Newport News adds that computer modeling showed that suspensions during droughts were likely to occur in fewer than two out of seventy-four years. Plaintiffs reply that this frequency is unsubstantiated and does not take into account the effect of the hiatus itself on how soon and how frequent suspensions would occur.  The Corps' arguments are well taken.  The occurrence of an emergency lifting of the hiatus is too speculative to be a basis for finding that the Corps' issuance of the permit was arbitrary and capricious.

Because the court concludes that the Corps' determination that the Project is the least damaging practicable alternative and that the Project will not cause or contribute to significant degradation of the waters of the United States is arbitrary and capricious in some respects, the court grants summary judgment to plaintiffs on these claims.

**D.** **The Corps' Determination that Issuance of the Permit Was in the Public Interest Was Arbitrary and Capricious.**

Plaintiffs argue that the issuance of the permit violates the Corps' public interest requirement, which prohibits the issuance of a section 404 permit if the "district engineer determines that it would be contrary to the public interest." 33 C.F.R. § 320.4(a). This regulation requires the district engineer to weigh the benefits that reasonably may be expected to accrue from the proposal against its reasonably foreseeable detriments, considering all relevant factors. *Id*. It states that "[f]or activities involving 404 discharges, a permit will be denied if the discharge that would be authorized by such permit would not comply with the [EPA's] 404(b)(1) guidelines." *Id*. Because the court concludes that the Corps' determination that the issuance of the permit complied with the 404(b)(1) guidelines (namely, the requirements that the project be the least damaging practicable alternative and not cause or contribute to significant degradation) was arbitrary and capricious, it also concludes that the Corps' determination that issuance of the permit complies with the public interest requirement is arbitrary and capricious. Summary judgment is therefore appropriate in favor of plaintiffs on this claim.

**E.** **The Corps' Decision Not to Supplement the Final EIS Was Not Arbitrary and Capricious.**

The final EIS in this case was issued in 1997, eight years before the ROD. The Corps must supplement an EIS when it "makes substantial changes in the proposed action that are relevant to environmental concerns," or when there are "significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts." 40 C.F.R. § 1502.9(c). In order to successfully challenge the Corps' decision to not issue a supplemental EIS, plaintiffs must present information that is both new and would provide a "seriously different picture of the environmental landscape." *See Nat'l Comm. for the New*

25

*River v. FERC*, 373 F.3d 1323, 1330 (D.C. Cir. 2004).  The standard of review is a narrow one,

but the court must review the record carefully to satisfy itself that the agency has made a

reasoned decision based on its evaluation of the significance – or lack of significance – of the

new information.  *Marsh*, 490 U.S. at 378.

Plaintiffs contend that it was arbitrary and capricious for the Corps not to supplement the

final EIS because of several significant new circumstances or changes to the Reservoir Project.

The Corps rejoins that none of the new circumstances pointed to by plaintiffs present a "seriously

different picture of the environmental landscape."  *See New River*, 373 F.3d at 1330.  The Corps

has the better argument.

First, plaintiffs contend that the significant change in water need is a significant new

circumstance demanding supplementation so that the Corps may rigorously evaluate all

reasonable alternatives.  The Corps responds that the change is not that big and that the Project is

still the only available practicable alternative.  As explained *supra* in Part IIB, the Corps has not

adequately explained why the Project is the only practicable alternative to meet the water need.

The Corps' failure to adequately explain itself does not prove, however, that it was arbitrary and

capricious for it not to prepare a supplemental EIS discussing practicable alternatives.  The court

simply does not have enough information to determine whether the change in water need

presented a seriously different picture because it does not know whether other alternatives, not

examined in detail in the final EIS, are now practicable.  Plaintiffs also have not pointed to any

*new* practicable alternatives not considered in the final EIS but which were practicable at the time

of the ROD.  Therefore, the Corps' failure to supplement the EIS is not arbitrary and capricious

in this regard.  In responding to this court's direction to adequately explain itself, however, if the

26

Corps determines that other alternatives, not examined in detail in the final EIS, have the potential to meet the water need with less damaging effects, it should examine those alternatives in detail in a supplemental EIS.

In addition, plaintiffs contend that the seasonal pumping hiatus imposed by the Virginia permit changes the design of the Project causing different salinity effects than those studied in the final EIS. The Corps responds that the pumping hiatus results in fewer effects than previously considered in the final EIS, and that NEPA supplementation is not required where changes to a proposed action reduce the effects of the action. When a change reduces the environmental effects of an action, a supplemental EIS is not required. *See Sierra Club v. U.S. Army Corps of Eng'rs*, 295 F.3d 1209, 1221-22 (11th Cir. 2002); *see also Bd. of County Comm'rs of Adams County, Colo. v. FAA*, 1994 WL 58969, at *2 (D.C. Cir. February 22, 1994) (holding that the FAA was not required to supplement an EIS after changing the location of air cargo facilities from the original proposal because the relocation resulted in decreased emissions and therefore caused no "serious environmental impact").

This issue presents a close question. The hiatus, of course, is mandated to protect species and will result in fewer withdrawals from the Mattaponi River. AR 023183. Plaintiffs, however, point out that even if the withdrawals are lower, their distribution over time may be significantly different than that modeled in the final EIS and therefore may have different effects than those studied. The Corps does little to respond other than to point to the ROD, which states that "the proposed raw water withdrawal regime would result in less impacts than those described in the Final Environmental Impact Statement" without further analysis. AR 023171, 023183. Nonetheless, given that the hiatus was implemented to provide additional protection to shad and

other fish species, the court concludes that the Corps was not arbitrary and capricious when it decided not to supplement the EIS in this regard.

Plaintiffs point to several other pieces of new information including the fact that one of the mitigation sites included in the Mitigation Plan is no longer available, a study that suggested that the Project may cause an increase in methyl mercury, and the fact that the VMRC permit allows a chemical feed system that may effect aquatic life, all of which were not considered in the final EIS. The Corps responds that the Mitigation Plan contains several contingency sites in the case that any of its preferred sites are unavailable. With respect to the risk of the formation of methyl mercury, the Corps states that it requested information in response to this concern and reasonably concluded that there is no site-specific evidence to indicate that it will be a problem for the Reservoir Project. And the chemical feed system, the Corps explains, need not be evaluated because there are no current plans to use such a system.

While the court is sympathetic to the idea that the unavailability of a preferred mitigation site opens the possibility that the Mitigation Plan will not produce the promised benefits, it cannot conclude that the Corps was arbitrary and capricious to not supplement the final EIS to discuss the loss of one preferred mitigation site. In any future plan, there is the possibility that circumstances will change and the Mitigation Plan correctly prepares for such a circumstance with contingency sites. AR 023193.[6] With respect to the methyl mercury issue, the Corps fully considered the FWS's concern, requiring Newport News to gather information about whether

_____

[6] Of course, as discussed in Part IIC, *supra*, the Corps must adequately investigate preferred and contingency sites to ensure that it has enough information to determine that the Mitigation Plan, regardless of whether mitigation ultimately occurs on preferred or contingency sites, will adequately compensate for the ecosystem loss due to the Project.

similar nearby dams had led to increased methyl mercury, and found that they did not.  AR 023205.  And while the Corps' argument that the use of the chemical feed system is not reasonably foreseeable seems at odds with the special conditions placed in the permit regarding the feed system, the court nonetheless concludes that the Corps' failure to supplement the EIS in this regard is not arbitrary and capricious.  If and when Newport News decides to install and use the chemical feed system, it will need the approval of both the Corps and the FWS.  AR 023318.

Plaintiffs also argue that a supplemental EIS is necessary to examine the cumulative impacts of the project.  NEPA requires federal agencies to consider cumulative impacts, which are defined as "impact[s] on the environment which result[] from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions . . . ."  40 C.F.R. §§ 1508.7 & 1508.25.  Pointing specifically to other wetland losses in the area and the possible expansion of the reservoir, plaintiffs argue that the Corps' statement in the ROD that "[t]here are no additional projects of this scope or magnitude anticipated in the project area.  Therefore, no cumulative impacts are expected to occur" simply sweeps aside concerns about cumulative impacts.  *See* AR 23189.  The Corps responds that it did evaluate cumulative impacts of other wetland losses and that it did not have to evaluate future expansion because such an expansion is not a proposed action requiring analysis at this point, nor is it a reasonably foreseeable future action.  The Corps has the better argument.

Plaintiffs do not argue that the final EIS did not consider cumulative impacts.  Instead, they appear to argue that the Corps did not take these impacts into account when it issued the permit.  In fact, the recommended ROD discusses cumulative impacts at length.  *See* AR 78181- 83.  The purpose of supplementing an EIS is to bring new information to light.  *See* 40 C.F.R. §

1502.9(c).  Here, plaintiffs seem to argue not that there is new information, but that the Corps did

not adequately consider the information before it.  This argument seems better suited to a

discussion of whether the Corps complied with the substantive statutes than whether the Corps

was required to supplement the EIS.  Therefore, plaintiffs fail to show that it was arbitrary and

capricious not to supplement the EIS in this regard.  On plaintiffs' claim that the Corps violated

NEPA by failing to supplement the EIS, summary judgment is therefore appropriate in favor of

the Corps.

F.      **The EPA Acted Arbitrarily and Capriciously by Considering Factors Outside of the
        Scope of Its Statutory Authority When It Decided Not to Veto the Permit.**

        The Clean Water Act authorizes the EPA Administrator to veto permits that will have an

unacceptable adverse effect on the environment.  33 U.S.C. §1344(c).  It states:

> The Administrator is authorized to prohibit the specification . . . of any defined
> area as a disposal site, and he is authorized to deny or restrict the use of any
> defined area for specification . . . as a disposal site, whenever he determines, after
> notice and opportunity for public hearings, that the discharge of such materials
> into such area will have an unacceptable adverse effect on municipal water
> supplies, shellfish beds and fishery areas (including spawning and breeding areas),
> wildlife, or recreational areas.  Before making such determination, the
> Administrator shall consult with the Secretary.  The Administrator shall set forth
> in writing and make public his findings and his reasons for making any
> determination under this subsection.

*Id.*  Plaintiffs argue that the EPA's failure to veto the permit under this provision was arbitrary

and capricious because (1) the record shows that the EPA believed the issuance of the permit

would result in unacceptable adverse effects and (2) the Regional Administrator's declaration

shows that his decision not to veto the permit was not based on any analysis of the environmental

effects of granting the permit.  Defendants rejoin that the only decision this court may review is

the EPA's decision not to initiate the notice and comment process that could result in a

determination of unacceptable adverse effects and a veto, and that this decision in entirely within the discretion of the Administrator and therefore unreviewable.  Moreover, defendants argue, the Regional Administrator's declaration demonstrates that he reasonably decided not to initiate the veto process.  Plaintiffs are correct for their second stated reason.

As an initial matter, the court has already determined that the decision under review is the EPA's decision not to veto the permit, and the standard against which to judge the agency's exercise of discretion is whether the discharge will have an unacceptable adverse effect.  *Alliance to Save the Mattaponi v. U.S. Army Corps of Eng'rs*, 515 F. Supp. 2d 1, 8-9 (D.D.C. 2007). Defendants moved for this court to reconsider its judgment and the court denied the motion. Defendants' current efforts to redefine the determination under review are equally unavailing. While the Clean Water Act requires the Administrator to provide for notice and comment in the course of determining whether or not to veto a permit, this does not constitute an entirely separate decision to "initiate the Section 404(c) process," *see* Corps' Mot. Summ. J. at 52, but is simply part of the process through which the Administrator may make the determination of unacceptable adverse effects that will allow him to veto the permit.

The statute authorizes the Administrator to veto a permit *"whenever he determines . . . that [it] will have an unacceptable adverse effect . . . ."* 33 U.S.C. § 1344(c) (emphasis added). To be sure, this grants the Administrator "a degree of discretion."  *Her Majesty the Queen in Right of Ontario v. U.S. EPA*, 912 F.2d 1525, 1533 (D.C. Cir. 1990).  But this discretion "is not a roving license to ignore the statutory text."  *Massachusetts v. EPA*, 549 U.S. 497, 533 (2007). Instead, the Administrator's exercise of discretion must relate to whether the permit will "have an unacceptable adverse effect on municipal water supplies, shellfish beds and fishery areas . . . , wildlife, or recreational areas."  *See* 33 U.S.C. § 1344(c).

31

Here, it is clear that the Administrator's decision not to veto the permit was not based on his determination that the permit would not likely have unacceptable adverse effects, but on a whole range of other reasons completely divorced from the statutory text.  The Regional Administrator (who, by regulation, must first recommend that the Administrator deny a permit, *see* 40 C.F.R. § 231.1) based his decision on his determination that engaging in the required notice and comment proceedings would divert resources; that given the extensive public process provided by the Corps, another such process would be unlikely to add any new information; that there was a water supply shortfall that needed to be addressed; and that the permit would likely be subject to litigation in any event, among other things.  EPA's Mem. in Opp. to Pls.' Motion to Compel [#60] Ex. at ¶ 10 (hereinafter, "Welsh Decl.").  None of these bases for his decision have anything to do with whether granting the permit would have an unacceptable adverse effect.[7]  Notably, the Regional Administrator "did not base [his] determination on any analysis of whether or not the [Project] complied with the Guidelines promulgated by EPA pursuant to section 404(b) of the Clean Water Act," *id.* at ¶ 10(d), something the EPA's regulations specifically direct him to do in determining whether issuance of a permit would result in unacceptable adverse effects, *see* 40 C.F.R § 231.2(e).  Because the Regional Administrator "relied on factors which Congress has not intended [him] to consider," his decision was arbitrary and capricious.  *See State Farm*, 463 U.S. at 43.

---

[7] Of the eight considerations listed by the Regional Administrator, only one comes close to addressing the statutory text.  The Regional Administrator states, "While I was aware that the proposed [Project] would result in the loss of an intact and functioning ecosystem, and that it would be difficult to fully mitigate for these impacts, I balanced that consideration against my understanding that the goal of the Mitigation Plan was full functional replacement . . . ."  Welsh Decl. ¶ 10(e).  Even this, however, does not suggest that the Regional Administrator had determined that the issuance of the permit would not likely have an unacceptable adverse effect.

In deciding that the EPA acted arbitrarily and capriciously in this case, the court does not find that the EPA must always undergo notice and comment to make a determination that issuance of a permit will or will not have an unacceptable adverse effect.[8]  Rather, the court decides that the Administrator must base his decision of whether or not to make a determination that issuance of a permit has unacceptable adverse effects, and therefore veto the permit, on whether he believes the issuance of the permit is likely to have unacceptable adverse effects. Summary judgment is granted to plaintiffs on this claim.

## III.  CONCLUSION

For the foregoing reasons, plaintiffs' motions for summary judgment [## 71, 72] are granted in part and denied in part and defendants' motions for summary judgment [## 76, 78] are granted in part and denied in part.  An appropriate order accompanies this memorandum opinion.

Henry H. Kennedy, Jr.
United States District Judge

---

[8]  And the court certainly does not endorse any view that simply by submitting negative comments on a permit application, the EPA has determined that the issuance of the permit will have unacceptable adverse effects.  *See* Corps' Mot. Summ. J. at 59.