# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

**ALLIANCE TO SAVE**
**THE MATTAPONI,** *et al.*,

**Plaintiffs,**

**v.**

**Civil Action No. 06-1268 (HHK/JMF)**

**UNITED STATES ARMY**
**CORPS OF ENGINEERS,** *et al.*,

**Defendants.**

## REPORT AND RECOMMENDATION

This case was referred to me by Judge Kennedy of the United States District Court

for the District of Columbia for a Report and Recommendation on all motions for

attorneys' fees and costs pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412[1]

("EAJA").  The specific motions are Petitioners' Corrected Application for Fee Award

and Expenses Under the Equal Access to Justice Act [#103] ("All. Mot."); Plaintiff-

Intervenor's Corrected Application for Attorneys' Fees and Costs [#101] ("Tribe Mot.");

Plaintiffs' Supplemental Application for Fee Award Under EAJA [#107]; Plaintiff-

Intervenor's Tribe's Supplemental Application for Attorneys' Fees [#108].  For the

reasons stated herein, I recommend that the Court find the plaintiffs and the plaintiff-

interveners are entitled to attorneys' fees and costs.

---

[1] All references to the United States Code or the Code of Federal Regulations are to the
electronic versions that appear on Westlaw or Lexis.

# I. BACKGROUND

Plaintiffs Alliance to Save the Mattaponi, Chesapeake Bay Foundation, Inc., and Sierra Club, Virginia Chapter, and plaintiff-interveners Carl T. Lone Eagle Custalow, chief of the Mattaponi Indian Tribe, and the Mattaponi Indian Tribe (collectively, "plaintiffs") brought this action against the United States Army Corps of Engineers ("Corps") and the United States Environmental Protection Agency ("EPA") (collectively, "defendants").  Defendant-intervener is the City of Newport News, Virginia ("Newport News").

This action challenged a permit issued by the Corps (under section 404 of the Clean Water Act ("CWA"), 33 U.S.C. § 1344) to Newport News for the construction of the King William Reservoir ("KWR"). Alliance to Save the Mattaponi v. United States Army Corps of Engineers, 606 F. Supp. 2d 121, 125 (D.D.C. 2009).  The plaintiffs sought to have the Court declare the permit unlawfully issued, issue an injunction requiring defendants to withdraw the KWR site from consideration, and issue an injunction requiring defendants to revoke the permit for KWR. Plaintiff's Amended Complaint [#45] at 61-62; Plaintiff-Intervenor's Amended Complaint [#49] at 26.

The stated purpose of KWR is "to provide a dependable, long-term water supply for the Lower Virginia Peninsula, in a manner that is not contrary to the public interest." Administrative Record ("AR") 023151.  Of concern in this case were three major components of the KWR project.  The first was the dam on the Cohoke Creek that would create a reservoir pool of 1,526 acres in surface area, and would destroy approximately

2

403 acres of regulated freshwater wetlands. AR 023150.  The second was a pump station and pipeline used to fill the reservoir with water diverted from the Mattaponi River. Id. The third was a mitigation plan implemented to offset the wetland losses caused by the dam. AR 023172.  At the core of this case was the destruction of the freshwater wetlands caused by the dam and the damage to the Mattaponi River caused by the diversion of its water to fill the reservoir. Alliance to Save the Mattaponi, 606 F. Supp. 2d at 126.

A. The Agencies' Actions

In 1997, the Norfolk District of the Army Corps of Engineers ("District") published the final environmental impact statement ("FEIS") on the KWR project, as required by the National Environmental Policy Act ("NEPA"). AR 002947.  This FEIS was based on a projected water demand shortfall of 40 million gallons per day ("mgd") by the year 2040, and included an "alternatives" analysis that eliminated all but six alternatives either because they did not meet the projected demand or because they were not practicable. AR 003060.  The Corps's Institute for Water Resources ("IWR") subsequently determined that the projected water shortage in the FEIS was inflated and offered a revised projected water shortage of around 24 mgd by 2040. AR 014153.

In 2001, the District published its Recommended Record of Decision ("RROD"), recommending denial of the KWR permit, finding that the project would cause significant degradation of the waters of the United States, that less damaging practicable alternatives existed, and that it was not in the public interest. AR 078277.  Because the Governor of Virginia objected to the District's recommended denial of the permit, the

3

application was referred to the Corps's North Atlantic Division ("NAD"). <u>Alliance to Save the Mattaponi</u>, 606 F. Supp. 2d at 125.

In 2002, the NAD issued an initial decision finding that there was a need for a dependable water source and that KWR was a practicable alternative to meet the need. <u>Id.</u> The Corps thus resumed processing the permit application. <u>Id.</u>

In 2004, Newport News submitted a wetlands mitigation plant ("Mitigation Plan"). <u>Id.</u> This plan proposed to exchange the 403 acres of wetlands destroyed by KWR for 806 acres of wetlands in another location. AR 008724.

In 2005, the NAD published its Record of Decision ("ROD") issuing the permit for KWR. AR 023150. The EPA did not veto the KWR permit. <u>Alliance to Save the Mattaponi</u>, 606 F. Supp. 2d at 126.

## B. District Court's Decision

The plaintiffs brought the instant action claiming that the Corps acted arbitrarily and capriciously when it approved the permit and that the EPA acted arbitrarily and capriciously when it failed to veto the permit. <u>See</u> <u>Alliance to Save the Mattaponi</u>, 606 F. Supp. 2d at 123. The plaintiffs challenged the Corps's findings that, in compliance with the CWA, the permit (1) was the least damaging practicable alternative, (2) would not contribute to significant degradation of the waters of the United States, and (3) was in the public interest. <u>Id.</u> at 126. Plaintiffs also challenged the EPA's decision not to veto the

4

permit.  Id.  Finally, plaintiffs challenged the Corps's failure to supplement the FEIS, as

required by NEPA.[2]  Id.

On cross-motions for summary judgment, the district court found in part for the

plaintiffs and in part for the defendants.  Id. at 141.  The district court found that the

administrative record did not support the Corps's finding that KWR was the least-

damaging practicable alternative and its finding that KWR would not significantly

degrade the aquatic ecosystem.  Id.  The district court also held that the Corps's finding

that KWR was in the public interest was also arbitrary and capricious, because it was

based in turn on the arbitrary and capricious finding that KWR had complied with the

404(b)(1)[3] guidelines.  Id. at 136.

Significantly, however, the district court found that the Corps's decision not to

supplement the FEIS was not arbitrary and capricious because the plaintiffs failed to

"present information that [was] both new and would provide a seriously different picture

of the environmental landscape."  Id. at 137 (internal quotation marks and citations

omitted).  Without knowing whether "other alternatives, not examined in detail in the

[FEIS]" had become practicable, because of the changed water needs, the district court

―――――――――――――――――

[2] NEPA requires federal agencies to prepare an environmental impact statement ("EIS")
for "major Federal actions significantly affecting the quality of the human environment."
42 U.S.C. § 4332(C).  The Council on Environmental Quality has promulgated a
regulation that requires an agency to supplement this EIS if "[t]he agency makes
substantial changes in the proposed action that are relevant to environmental concerns,"
or "[t]here are significant new circumstances or information relevant to environmental
concerns and bearing on the proposed action or its impacts." 40 C.F.R. § 1502.9(c).

[3] For an explanation of the 404 guidelines, see infra at 11.

did not have enough information to determine whether the change in water need

"presented a seriously different picture." Id.  Further, the plaintiffs did not provide the

district court with any new practicable alternatives to consider that were not considered

in the FEIS, but had become practicable at the time of the ROD. Id.  Thus, on this final

point, the district court found that the Corps's actions to not supplement the FEIS were

not arbitrary and capricious.

## II. The Applications for Attorneys' Fees under EAJA

The parties agreed to drop their cross-appeals and entered into settlement

discussions related to the issue of an award of attorneys' fees and costs to plaintiffs and

plaintiff-interveners.  These discussions failed, and the parties continued with their

briefing of the fee applications.

### A. Legal Standard

EAJA is a fee-shifting statute enacted by Congress that allows a qualified party

who prevails against the United States in a civil action to recover reasonable attorneys'

fees and costs incurred during the proceeding. Am. Wrecking Corp. v. Sec'y of Labor,

364 F.3d 321, 325 (D.C. Cir. 2004) (citing 28 U.S.C. § 2412(d)(1)(A)).  If a court finds,

however, that the position of the United States was substantially justified or that special

circumstances make the award unjust, the prevailing party is not entitled to such fees and

costs. Id.  The claimant must also be the "prevailing party" and meet the threshold

eligibility requirements of EAJA.  See INS v. Jean, 496 U.S. 154, 158 (1990) (citing 28

U.S.C. § 2412(d)(2)(B)).

"Once the private party has shown that it prevailed in the litigation, the government bears the burden of demonstrating that its position was substantially justified." Halverson v. Slater, 206 F.3d 1205, 1208 (D.C. Cir. 2000) (citing Wilkett v. ICC, 844 F.2d 867, 871 (D.C. Cir. 1988)).   The "position of the United States" refers both to "the position taken by the United States in the civil action," and to "the action or failure to act by the agency upon which the civil action is based." 28 U.S.C. § 2412(d)(2)(D).   "Whether or not the position of the United States was substantially justified shall be determined on the basis of the record (including the record with respect to the action or failure to act by the agency upon which the civil action is based) which is made in the civil action for which fees and other expenses are sought." 28 U.S.C. § 2412(d)(1)(B).

The position of the United States is substantially justified if it is "justified in substance or in the main - that is, justified to a degree that could satisfy a reasonable person." Pierce v. Underwood, 487 U.S. 552, 565 (1988) (internal quotation marks omitted).   In other words, the government's position must have a "reasonable basis both in law and fact." Id.   The government has the burden, however, of demonstrating both the reasonableness of its litigation position *and* the agency's action. Role Models Am., Inc. v. Brownlee, 353 F.3d 962, 967 (D.C. Cir. 2004) (citing Halverson, 206 F.3d at 1208; 28 U.S.C. § 2412(d)(2)(D)); see also Marcus v. Shalala, 17 F.3d 1033, 1036 (7th Cir. 1994) (finding that attorneys' fees may be awarded "where the government's prelitigation conduct was not substantially justified even though its litigating position may have been

substantially justified and vice versa.").

EAJA sets forth substantial justification as a distinct legal standard, and the inquiry into reasonableness for EAJA purposes "may not be collapsed into [the] antecedent evaluation of the merits." Cooper v. U.S. R.R. Ret. Bd., 24 F.3d 1414, 1416 (D.C. Cir. 1994). Nevertheless, a court's reasoning regarding the merits may be relevant to the question of substantial justification. F.J. Vollmer Co., Inc. v. Magaw, 102 F.3d 591, 595 (D.C. Cir. 1996). Rather than simply "explain, repeat, characterize, and describe the merits," a court must analyze "why the government's position failed in court." Taucher v. Brown-Hruska, 396 F.3d 1168, 1174 (D.C. Cir. 2005) (quoting in part Halverson, 206 F.3d at 1209) (internal quotation marks omitted). Thus, a finding on the merits that the government's action was "arbitrary and capricious" does not necessarily compel the award of fees. Fed. Election Comm'n v. Rose, 806 F.2d 1081, 1087 (D.C. Cir. 1986).

B. Analysis

1. *Plaintiffs prevailed*

Plaintiffs argue that they are the prevailing parties because the Court found that the Corps and the EPA had violated the CWA and because they obtained most of the relief sought in the action. Plains. Mot. at 3-4; Tribe Mot. at 4-5. Defendants do not contest that the plaintiffs in this case are "prevailing parties" within the meaning of EAJA. United States' Opposition to Plaintiffs' and Plaintiff-Intervenors' Petition for Fees and Costs [#105] ("Defs. Opp.") at 5.

I must note, however, that while the government on one hand concedes that the

8

plaintiffs and plaintiff-interveners are prevailing parties, it takes comfort in the fact that the district court remanded the matter to the agency without specifically vacating the award of the permit.  This argument rings hollow.  The Administrative Procedure Act requires that agency action be set aside if found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706.  Judge Kennedy specifically so concluded and interdicted the agency action to prevent it from having any further effect.  Rather than vacating the agency action at that point, however, he remanded the issue to the agency to take necessary action so that, upon subsequent review, he could have concluded that the agency action could no longer be so condemned.  That he choose one remedy, remand, over another, vacating the permit, certainly does not rob his conclusion that the agency's action was arbitrary or capricious of its significance and finality.  That choice also has absolutely nothing to do with whether the position that the government took that led him to do what he did was substantially justified.  That his choice of remedy sheds light on the validity of the government's position is *non sequitur*.[4]

## 2. *The position of the United States*

Defendants argue, however, that plaintiffs are not entitled to attorneys' fees in this action because the position of the United States was substantially justified. Defs. Opp. 5.

---

[4] The government, while having conceded that plaintiffs are "prevailing parties" under EAJA, attempts to deliver a glancing blow at whether plaintiffs in fact prevailed because the Court did not vacate the permit. Def. Opp. 8.  It is fair to point out that the government abandoned its appeal and has since abandoned the project.  If that is not a victory for the plaintiffs, one wonders what is.

The position of the United States in this case includes the prelitigation action of the Corps in issuing the permit and of the EPA in not vetoing the permit, as well as the litigation position of the United States in defending these underlying agency actions. The question presented is whether those positions were substantially justified.

This case presents the situation encountered where a party has made several claims, prevailed on some and lost on others. At one point in the history of the interpretation of EAJA, the United States, taking a page from New Age medicine, sought a "holistic approach" that would deny a successful plaintiff attorneys' fees, even if the plaintiff prevailed on one of her claims, if a court concluded that the government's overall approach to the litigation was reasonable, as evidenced by its victories on plaintiff's remaining claims. See Air Transport Ass'n of Canada v. F.A.A., 156 F.3d 1329, 1332 (D.C. Cir. 1998). The court of appeals rejected this approach because it would deny the plaintiff attorneys' fees, even though she had secured the precise relief she sought by prevailing on one claim, because the government's position as to her other, losing claims was justified. Id. Instead, the government could escape the award of fees only if it showed that its position as to the claim upon which plaintiff prevailed was substantially justified. Id.

In a similar decision, the court of appeals criticized a district court judge who declined to award fees under EAJA to a prevailing party, despite his victory on one of his claims, because the government's resistance to his broader request for relief was substantially justified. Jacobs v. Schiffer, 204 F.3d 259, 263 (D.C. Cir. 2000). The court

of appeals reminded the lower court that a party prevails under EAJA even if its success

was partial. Id.  "In such circumstances, the district court's task with respect to the EAJA

inquiry was to determine whether the government's position with respect to the issue on

which the party prevailed was substantially justified." Id. (citing Air Transport, 156 F.3d

at 1332; Cincarelli v. Reagan, 729 F.2d 801, 804-05 (D.C. Cir. 1984)).

Thus, the Court's obligation is clear.  I begin by eliminating any claims for fees

premised on the claims upon which the government prevailed.  As to the plaintiffs'

prevailing claims, I must analyze, independent of the merits, whether the actions of the

concerned agencies, the Corps and the EPA, were substantially justified.

I begin with the action of the concerned agencies, the Corps and the EPA.

### 3. *The Corps's Position*

#### i. *The Corps's Alternatives Analysis Under 40 C.F.R. § 230.10(a)*

Section 404 of the CWA authorizes the Corps to issue permits for the discharge of

dredged or fill material into waters of the United States under certain conditions. 33

U.S.C. § 1344.  The issuance of such a permit must be evaluated according to binding

guidelines, called 404(b)(1) guidelines[5] codified at 40 C.F.R. § 230 *et seq*.  See 33 U.S.C.

§ 1344(b).  According to the 404(b)(1) guidelines, a permit may not be issued where

there "is a practicable alternative to the proposed discharge which would have a less

adverse impact on the aquatic ecosystem, so long as the alternative does not have other

significant adverse environmental consequences." 40 C.F.R. § 230.10(a).  "To the extent

_____

[5] So called because they are authorized by that section of the CWA.

that practicable alternatives have been identified and evaluated under a . . . planning process, such evaluation shall be considered by the permitting authority as part of the consideration of alternatives under the Guidelines.  Where such evaluation is less complete than that contemplated under this subsection, it must be supplemented accordingly." 40 C.F.R. § 230.10(a)(5).

In its 2005 ROD, the Corps concluded that "the analysis of alternatives in the [FEIS] provides sufficient information regarding alternatives to be evaluated under these Guidelines, consistent with the provisions of [40 C.F.R. § 230.10(a)(5)]." AR 023184. The water need projections had changed dramatically, however, since the publication of the FEIS in 1997, eight years earlier, and the district court found that the Corps had never explained "why in the face of the reduced need and the higher costs of [KWR] the final EIS remained sufficient." Alliance to Save the Mattaponi, 606 F. Supp. 2d at 129-30.

Additionally, the Corps concluded in its ROD that "the patchwork of small supply alternatives *may* not meet the long-term water supply needs . . . and *could* place risks of adverse impacts and environmental damages to [other water sources]." Alliance to Save the Mattaponi, 606 F. Supp. 2d at 130 (quoting AR 023203).  In response to this conclusion, however, Judge Kennedy indicated that before the Corps determines that "a Project that would flood 403 acres of functioning wetlands is the least-damaging practicable alternative, [it] must do more than give vague explanations about the potential adverse effects of or potential political opposition to other alternatives." Alliance to Save the Mattaponi, 606 F. Supp. 2d at 130.

The law of this Circuit is that "the adequacy of an agency's explanation is not only one on which reasonable minds can and frequently do differ, but is also logically unrelated to whether the underlying agency action is justified under the organic statute." Fed. Election Comm'n v. Rose, 806 F.2d 1081, 1088 (D.C. Cir. 1986).  The CWA "compels that the [least-damaging] alternative be considered and selected unless proven impracticable." Alliance to Save the Mattaponi, 606 F. Supp. 2d at 130 (citing Utahns for Better Transp. v. United States Dep't of Transp., 305 F.2d 1152, 1189 (10th Cir. 2002)). Despite the change in water projections, the Corps never considered alternatives to the KWR, even though the KWR would flood 403 acres of functioning wetlands.  The government's attempt to characterize the agency's position as a reasonable interpretation of an ambiguous statutory obligation is unconvincing.  There was no ambiguity in the statute.  As Judge Kennedy concluded, the Corps failed abjectly to fulfill an unequivocal statutory and regulatory responsibility to consider alternatives to the course of action proposed.  The Corps's position was therefore unreasonable and cannot be characterized as substantially justified.

ii. *The Corps Assessment of Degradation Under 40 C.F.R. § 230.10(c)*

The CWA also prohibits the Corps from issuing a permit if it will "cause or contribute to significant degradation of the waters of the United States." 40 C.F.R § 230.10(c).  "Effects contributing to significant degradation include 'significantly adverse effects' on 'the life stages of aquatic life and other wildlife dependent on aquatic ecosystems' and on 'aquatic ecosystem diversity, productivity and stability' including

13

'loss of fish and wildlife habitat.'" <u>Alliance to Save the Mattaponi</u>, 606 F. Supp. 2d at

131 (citing 40 C.F.R § 230.10(c)).

 In its 2005 ROD, the Corps concluded that the construction of KWR, including the

mitigation plan, would not cause or contribute to significant degradation of the waters of

the United States. AR 023190.

 Regarding the mitigation plan, the district court noted, "the record is replete with

letters from the FWS and the EPA" opposing the issuance of the permit because

mitigation areas would not compensate for the wetlands that would be destroyed. <u>Id.</u> at

132.  The Corps admitted that the mitigation plan would not be able to replicate the lost

wetlands, but had "determined [that] the [mitigation plan] will as a whole offset

anticipated losses in [ ] functional areas, thereby meeting all applicable wetland

mitigation policies and regulations." AR 023175.  The district court found that, although

the Corps's interpretation that the regulations do not require replication of the lost

wetlands was correct, the Corps had to address significant comments and criticisms and

explain how the mitigation plan adequately offset the anticipated losses in the teeth of the

conclusion of two other federal agencies (FWS and EPA) that argued to the precise

contrary. <u>Alliance to Save the Mattaponi</u>, 606 F. Supp. 2d at 132.  The letters from the

EPA and the FWS contained scientific opinion that the KWR would result in significant

degradation of the waters, particularly aquatic ecosystems.  While the Corps was not

obliged to agree with these scientific opinions, it was not substantially justified in failing

to address their comments and concerns, and was inviting further litigation by failing to

do so.  Its failure to grapple with the validity of the conclusions of two other federal

agencies with obvious expertise in environmental matters cannot be excused as

"reasonable."

Regarding the increased sustained salinity of the Mattaponi River, the Corps's

district office concluded that a very small, but sustained, increase in salinity could harm

vulnerable species. AR 078256.  In its 2005 ROD, the regional office of the Corps

addressed the potential change in salinity of the Mattaponi River only as being "within

the natural salinity fluctuation." AR 023185.  The district office had warned, however,

that even small increases of salinity could harm vulnerable species if sustained for a long

period of time.  The Corps, however, failed to consider the effects of chronic exposure,

and, thus, the district court found that the Corps's conclusion that changes in salinity will

not have a significant adverse effect was arbitrary and capricious. Alliance to Save the

Mattaponi, 606 F. Supp. 2d at 136.

As noted earlier, applying the standard of reasonableness to determine whether an

agency action is substantially justified requires a different analysis than a determination

on the merits that an agency action was arbitrary and capricious.  Thus, the finding by

Judge Kennedy that the agency was arbitrary and capricious when it neglected "a

relevant factor in reaching its decision does not invariably doom the decision itself to the

ranks of unreasonableness, as . . . an agency may lawfully reach the same conclusion

after taking the omitted factor into account." Rose, 806 F.2d at 1088.  Nevertheless, the

Corps failed to address a concern of its own local office that small sustained increases in

15

salinity could cause a "significant decrease in growth and reproduction of [vulnerable species]." See AR 078256. The Corps therefore concluded that the potential impacts of the change in salinity would be minor without consideration of the effect of sustained increases, when its own local office warned of their significant adverse effects on vulnerable species. This was as unreasonable as its disregarding without sufficient analysis the conclusions of the FWS and the EPA as to the deficiencies in the mitigation plan, and was, thus, not substantially justified.

   iii. *The Corps's Public Interest Review Under 33 C.F.R. § 320.4(a)*

   The Corps has promulgated a regulation that prohibits issuing a permit if "the district engineer determines that it would be contrary to the public interest." 33 C.F.R. § 320.4(a)(1). As part of the public interest review, a section 404 permit "will be denied if the discharge that would be authorized by such permit would not comply with the [EPA's] 404(b)(1) guidelines." Id. In conducting its public interest review for a section 404 permit, the Corps bases its finding in part on whether the permitted project "compl[ies] with the [EPA's] 404(b)(1) guidelines." 33 C.F.R. § 320.4(a). The district court determined that, because it found the Corps's findings under the 404(b)(1) guidelines arbitrary and capricious, the Corps's finding that issuance of the permit was in the public interest was also arbitrary and capricious. Alliance to Save the Mattaponi, 606 F. Supp. 2d at 136.

   The Corps, in its analysis, weighed heavily the public interest in a potable and reliable water supply for the Lower Virginia Peninsula. See AR 023190-211. Clearly, a

reliable supply of potable water is an important public interest.  Unfortunately for the

Corps, the pertinent regulation, that first speaks broadly to the Corps's power to deny a

permit not in the public interest, proceeds to indicate unequivocally that a permit must be

denied if the discharges permitted by the permit would violate the 404 Guidelines.  It is

therefore impossible for a permit to be in the public interest if the discharge it permits is

barred by the 404 guidelines.

 I have already concluded that the Corps violated the 404 Guidelines by failing to

consider the change in conditions and the alternatives available to flooding the wetlands.

Because a chain is never stronger than its weakest link, the issuance of the permit in the

public interest, although in violation of the 404 Guidelines, cannot be justified as

reasonable.  To the contrary, the issuance of the permit was in violation of the pertinent

regulations and in that sense indefensible since an agency must always follow its own

regulations.  See Mine Reclamation Corp. v. FERC, 30 F.3d 1519, 1524 (D.C. Cir. 1994).

4. <em>The EPA's Failure to Veto the Permit</em>

 The CWA provides the EPA with a final veto power over permits that implicate

section 404.  See 33 U.S.C. § 1344(c).  According to the statute:

> The Administrator is authorized to prohibit the
> specification (including the withdrawal of specification) of
> any defined area as a disposal site, and he is authorized to
> deny or restrict the use of any defined area for specification
> (including the withdrawal of specification) as a disposal
> site, whenever he determines, after notice and opportunity
> for public hearings, that the discharge of such materials
> into such area will have an unacceptable adverse effect on
> municipal water supplies, shellfish beds and fishery areas

17

> (including spawning and breeding areas), wildlife, or
> recreational areas.

33 U.S.C. § 1344(c).

The EPA decided not to veto the Corps's decision to grant the permit, based on its interpretation of this section.  The government argued that the EPA could interpret the phrase, "whenever he determines," to give the EPA Administrator complete discretion to initiate, or not to initiate, a determination of unacceptable adverse effects. United States' Environmental Protection Agency's Motion for Partial Reconsideration [#39] ("Mot. for Part. Reconsideration") at 4-5.  Based on this interpretation, the EPA argued that it could decline to review any potential adverse effects of the Corps issuing the permit and that its decision would be unreviewable. Id.

The district court rejected this interpretation, finding instead that section 404(c) simply authorizes the EPA Administrator to veto the permit or not, and that the decision must relate to the standards specified in the statute quoted above, *i.e.*, whether the permit will "have an unacceptable adverse effect on municipal water supplies, shellfish beds and fishery areas . . . wildlife, or recreational issues." 33 U.S.C. § 1344(c).  See Alliance to Save the Mattaponi, 606 F. Supp. 2d at 140.  Thus, as Judge Kennedy construed the statute, the only legitimate basis for the EPA to veto or not veto the permit is its consideration of the "unacceptable adverse effect" on water supplies, fish, other wildlife and recreational issues. Id.  Instead of using that standard, the EPA Regional Administrator based his decision on the facts that (1) engaging in notice and comment

18

proceedings would divert resources, (2) another such process would be unlikely to add any new information, (3) there was a water supply shortfall that had to be addressed, and (4) the permit would be subject to litigation in any event. Id.  But, none of these bases for the Administrator's decision had anything to do with whether granting the permit would have an unacceptable adverse effect on "municipal water supplies, shellfish beds and fishery areas (including spawning and breeding areas), wildlife, or recreational areas," the statutory standard set forth in the CWA section quoted above, 33 U.S.C. § 1344(c).

Defendants argue that, although the EPA's reading of 404(c) may not be the "most natural" reading of the statute, to find its position not substantially justified based on the district court's different interpretation would be to collapse the reasonableness inquiry into a recital of the judgment on the merits. Defs. Opp. 11.  Rather, argue defendants, agencies are afforded discretion to interpret reasonably those ambiguous statutes they administer. Id.  Defendants also note that the district court's ruling that the EPA's exercise of discretion must relate to "unacceptable adverse effects on municipal water supplies" was a previously undefined standard, further supporting the reasonableness of the EPA's interpretation. Id.

This Circuit has held that, in analyzing substantial justification, "the question is not whether the [agency] had the better argument[].  It is enough that the [agency's] interpretation and legal arguments had a reasonable basis in the text and purpose of the controlling statute . . . ."  Hill v. Gould, 555 F.3d 1003, 1007 (D.C. Cir. 2009).

Application of this standard requires separate consideration of the two arguments

19

made, the first, in 2007, that the decision not to revoke the permit was unreviewable because it was committed to agency discretion as a matter of law and, when that position was rejected, the second, 2009, that the agency's interpretation of an ambiguous, statutory standard was reasonable.

i. *Committed to Agency Discretion as a Matter of Law*

Given the natural tension between the branches of government, the Executive Branch understandably frequently attempts to insulate its agencies' actions from review under the Administrative Procedure Act by relyng on a provision of that Act, now codified as 5 U.S.C § 701 (a)(2), that exempts from judicial review matters committed to agency discretion by law.

This argument has rarely succeeded because of central principles that sharply constrain its applicability.  It is settled that there is a presumption in favor of judicial review,[6] so that the exception for actions committed to agency discretion by law is a narrow one. Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 410 (1971). The presumption is overcome only in those "rare instances where 'statutes are drawn in such broad terms that in a given case there is no law to apply.'" Id. (quoting S. Rep. No. 752, 79th Cong., 1st Sess., 26 (1945)).  See Heckler v. Chaney, 470 U.S. 821, 830 (1985) (§ 701(a)(2) applies in cases in which a statute is drawn so that a court would not have a meaningful standard against which to judge the agency's exercise of discretion).

---

[6] Abbott Labs v. Gardner, 387 U.S. 136, 140 (1967).

First, as Judge Kennedy concluded in his earlier decision, the statute quoted above

provides a standard by which the EPA's decision to veto or not veto a permit can be

judged.  Judge Kennedy stated:

> Second, EPA argues that plaintiffs' APA claims are barred
> because APA does not apply where agency action or
> inaction is "committed to agency discretion by law." 5
> U.S.C. § 701(a)(2).  But, as plaintiffs rightly note, the rare
> exception in which this provision bars suit, i.e., where the
> statute is "drawn in such broad terms that in a given case
> there is no law to apply," Citizens to Preserve Overton
> Park, Inc. v. Volpe, 401 U.S. 402, 410 (1971) (quoting S.
> Rep. No. 79-752, at 26 (1945)), occurs only when "the
> court would have no meaningful standard against which to
> judge the agency's exercise of discretion," Heckler v.
> Chaney, 470 U.S. 821, 830 (1985).  Here, there is such a
> standard: CWA provides that EPA may, pursuant to its
> discretion, veto a § 404 permit "whenever [it] determines . .
> . that the discharge . . . will have an unacceptable adverse
> effect. . . ."  Thus, the statute itself provides guidance,
> however minimal, to assist the court in determining
> whether the agency abused its (garden-variety (§ 706), not
> unreviewable ( § 701(a)(2))) discretion.

Alliance To Save Mattaponi v. U.S. Army Corps of Engineers, 515 F. Supp. 2d 1, 7-8
(D.D.C. 2007) (footnotes omitted).

As Judge Kennedy indicated, the CWA grants authority to do a certain thing and

then specifies the standard by which that authority is to be judged.  It would be hard to

imagine a better example to illustrate the grant of authority to an administrative agency

and the specification of the standard by which the exercise of that authority is to be

reviewed.  To read the CWA, on the other hand, as granting the agency the authority to

decline to exercise its authority (or to predicate its decision to decline on standards not in

the statute) is unreasonable.  It infers that Congress granted the agency the very authority

Congress explicitly denied it when it specified that the agency is to veto or not veto the

permit based on the standards that Congress provides in the statute.  Put another way, the

agency's interpretation is that Congress gave it *carte blanche* to do nothing, when the

Congressional demand is clear that the agency has to do something.  The mistaken

reliance on the principle that the EPA's decision not to veto the permit was a decision

committed to agency discretion is not substantially justified.  The CWA clearly does not

commit the decision to veto or not to veto the permit to unreviewable agency discretion.

To the contrary, it constrains the exercise of that discretion to a specific statutory

standard.

### ii. *The Interpretation of the Statute*

The government's justification of the EPA's interpretation of a supposedly

ambiguous statute fares no better than the EPA's other argument.  There is absolutely

nothing ambiguous about the statute's command as to how the decision to veto or not

veto a permit is to be done.  The decision must be based exclusively on the factors

identified in the statute, *i.e.*, the unacceptable adverse effect on water supplies, shellfish

beds, fisheries, wildlife, or recreational areas.  Premising it on other factors is not to

interpret a statute in a reasonable manner, but to violate it.  An agency's violation of a

clear Congressional command cannot be substantially justified.  The government's

litigation position was therefore unreasonable.

### 5. *Conclusion*

22

Thus, for the reasons herein, I find that the government was not substantially justified. This finding is not inconsistent with the decision in <u>Taucher</u>. <u>See</u> <u>Taucher</u>, 396 F.3d at 1175. The vice that the court of appeals saw in <u>Taucher</u> was its perception that there had not been an analysis of the reasonableness of the government's position, independent of the merits. <u>Id.</u> The court of appeals warns against awarding fees and justifying the award merely because the government had lost. In this case, an evaluation of the agency's action, separate from the merits analysis, shows that the agency disregarded its statutory obligations in the most obvious and unjustified manner. This was not a situation where a responsible argument can be made that a significant question of law, such as the interpretation of an ambiguous statute, divided the parties. Instead, the most objective observer would have to say that the Corps unreasonably disregarded the marked change in the demand for water, possible alternatives, and the concerns and conclusions of its own District office and of other agencies regarding the potential consequences of its actions. That observer would also find that it was unreasonable to say that the EPA's decision not to veto the permit was based on the statutory standards, let alone to argue that the agency's action was unreviewable. This case, in my view, simply does not present even a close call as to the reasonableness of the government's actions. Thus, for the reasons stated in my analysis, I find the actions not substantially justified.

### III. Award of Fees

EAJA authorizes courts to award "reasonable attorney fees." 28 U.S.C. §

2412(d)(2)(A).  To determine the reasonable attorneys' fees, the Court considers the

hourly rate and then the number of hours requested.  Role Models America, Inc. v.

Brownlee, 353 F.3d 962, 968 (D.C. Cir. 2004) (citing Murray v. Weinberger, 741 F.2d

1423, 1427 (D.C. Cir. 1984)).  In addition, the Court must compute the fees as a function

of the degree of success.  F.J. Vollmer Co., Inc., 102 F.3d at 599 (internal citations

omitted).  Accordingly, "courts should proportion fees to the significance of the overall

relief obtained by the plaintiff in relation to the hours reasonably expended on the

litigation." Id. (citing Hensley, 461 U.S. at 435) (internal quotation marks omitted).

Under EAJA, the plaintiffs cannot recover attorneys' for those claims on which they were

successful, but the government was substantially justified.  Thus, the Court is left to

calculate the proportion of reasonable fees to award based on all of the plaintiffs' claims

upon which it prevailed and which the government's position was not substantially

justified.

The calculation of the award of fees turns on which of the fees the Court finds to be

substantially justified.  Should Judge Kennedy choose not to accept my recommendation

as to my findings that the government was not substantially justified on all claims, or that

it was substantially justified on some of the claims, the calculation for fees may change

dramatically.  In an effort to conserve judicial resources, and to resolve the pending

issues with the greatest efficiency, I recommend that the motions, as they relate to the

amount of fees and costs awarded, be denied without prejudice, while the legal issues

regarding whether the government was substantially justified are resolved by the Court.

24

Immediately upon Judge Kennedy's ruling upon my report and recommendation, I would take up the issue of the calculation of fees, without the need for the parties to resubmit any briefings.  This tiered-resolution may not be appropriate in ruling on every fee petition; however, in this case, this is the most efficient methodology for resolving the issues, due to the complexity of the legal issues regarding whether the government's actions were substantially justified, and the potential impact that any different conclusion reached by Judge Kennedy would have on the calculation of fees.  For this reason, I recommend that the plaintiffs' and plaintiff-interveners' petition for fees, as it relates to the amount of the award, be denied *pendente lite*, and that the matter be resolved promptly by myself, on report and recommendation, upon Judge Kennedy's ruling on my instant report and recommendation.  I recommend this action for Plaintiffs' Supplemental Application for Fee Award Under EAJA [#107] and Tribe's Supplemental Application for Attorneys' Fees [#108], as the same efficiencies apply.

## VI. Conclusion

For the reasons stated herein, I recommend that the Court find that the government was not substantially justified, and that the plaintiffs and plaintiff-interveners should be awarded attorneys' fees and costs.  I, further, recommend that the amount of the award of attorneys' fees to the plaintiffs and to plaintiff-interveners be determined by me upon Judge Kennedy's action on this report and recommendation.

**Failure to file timely objections to the findings and recommendations set forth in this report may waive you right of appeal from an order of the district court**

25

adopting such findings and recommendations.  See Thomas v. Arn, 474 U.S. 140

(1985).


_____

JOHN M. FACCIOLA
UNITED STATES MAGISTRATE JUDGE